IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

GARY ROEMER,                                )
                                            )
                Plaintiff,                  )
                                            )        Case No. ____1:22-cv-524_____
        v.                                  )
                                            )
BOARD OF REGENTS OF NEW                     )
MEXICO STATE UNIVERSITY, DAN                )
ARVIZU,   LAURA   CASTILLE,                  )
DONALD   CONNER,   ANNAMARIE                 )
DELOVATO,  ROLANDO  FLORES,                  )        **COMPLAINT AND JURY
AND   MATTHEW   GOMPPER,                     )           DEMAND**
individually   and   in   their   official  )
capacities,                                 )
                                            )
                Defendants.                 )
                                            )
                                            )
                                            )
                                            )
                                            )
                                            )

Plaintiff Gary Roemer, by and through counsel, hereby states as follows:

### INTRODUCTION

1.      In November 2021, New Mexico State University fired Dr. Gary W.

Roemer – despite his status as a tenured full professor at the university – following

a biased and inadequate process that violated Roemer's constitutional free speech

and due process rights, under both the United States and New Mexico constitutions.

2.      NMSU allowed students who disliked Roemer for his expressions of

unpopular opinion to weaponize its disciplinary process against him. NMSU then

allowed administrators with strong, pre-existing biases against him to oversee that

process and reach a predetermined outcome.

3.     NMSU subjected Roemer to a nakedly biased investigation, in which an administrator who openly expressed her belief in Roemer's guilt to the complaining students oversaw the process. Unsurprisingly, given that he was judged guilty from the start, the process resulted in his termination.

4.     As the basis for firing Roemer, Defendants relied on vague and overbroad policies that violate the free speech and due process rights of the NMSU community.

5.      Then, after firing him, Defendants denied Roemer the post-termination hearing he was entitled to, not only under NMSU's official policy but also the due process clause of the Fourteenth Amendment and Article II, § 18 of the New Mexico Constitution.

## JURISDICTION AND VENUE

6.     This action arises under the First and Fourteenth Amendments to the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. §§ 1983 and 1988, and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*

7.     This Court has original jurisdiction over these federal claims pursuant to 28 U.S.C. §§ 1331 and 1343. This Court has authority to award the requested damages pursuant to 28 U.S.C. § 1343; the requested declaratory relief pursuant to 28 U.S.C. § 2201-02; and costs and attorneys' fees under 42 U.S.C. § 1988.

8.     This action also arises under the New Mexico Civil Rights Act, NMSA 1978, § 41-4A-1 *et seq.*

9.     This Court has supplemental jurisdiction over such claims according to 29 U.S.C. § 1367(a) because Plaintiff's claims under the New Mexico Civil Rights Act are so related to Plaintiff's other claims to be part of the same case or controversy.

10.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because the Defendants reside in this district and/or all of the acts described in this Complaint occurred in this district.

## PARTIES

11.     Plaintiff Gary Roemer was, until his termination, a tenured full professor in the Department of Fish, Wildlife and Conservation Ecology within the College of Agriculture, Consumer and Environmental Sciences at NMSU. Dr. Roemer served NMSU for 20 years and never received an unsatisfactory evaluation; in fact, he often received evaluations that "exceeded expectations".

12.     Defendant Board of Regents of New Mexico State University ("the Regents") is the 5-member governing body of New Mexico State University ("NMSU"), a governmental entity, and is responsible for the administration of NMSU, including but not limited to NMSU's compliance with laws, rules, regulations, and requirements. The Regents are also a public body as defined by NMSA 1978, § 41-4A-2 because they are the governing board of an institution of higher education and a branch of government that receives public funding. At all times relevant to this complaint, the Regents acted under color of state law and are sued in their official capacities.

13.     Defendant Dan Arvizu is the Chancellor of New Mexico State University. Defendant Arvizu summarily rejected Plaintiff's appeal on grounds of bias and procedural error, and upheld Plaintiff's termination, despite overwhelming evidence of bias and procedural error that violated NMSU policy, federal anti-discrimination law, and the Constitution. Defendant Arvizu further promulgates and enforces multiple NMSU Operating Policies that violate the First and Fourteenth Amendments. At all times relevant to this complaint, Defendant Arvizu acted under color of state law and is sued in both his official and individual capacities. And at all times relevant to this complaint, Defendant Arvizu was a person acting on behalf of, under color of, and within the course and scope of authority of a public body as defined by NMSA 1978, § 41-4A-3.

14.     Defendant Laura Castille is the Executive Director of the Office for Institutional Equity (OIE) at NMSU. Defendant Castille conducted herself in a flagrantly biased manner throughout OIE's investigation of Plaintiff, including by expressing her belief in Plaintiff's guilt to other parties and witnesses while performing the role of a supposedly neutral interviewer, and by withholding important evidence and information from Plaintiff and his advisor during the investigation. At all times relevant to this complaint, Defendant Castille acted under color of state law and is sued in both her official and individual capacities. And at all times relevant to this complaint, Defendant Castille was a person acting on behalf of, under color of, or within the course and scope of authority of a public body as defined in NMSA 1978, § 41-4A-3.

15.     Defendant Donald Conner is the Associate Dean & Director of
Academic Programs in the College of Agriculture, Consumer and Environmental
Sciences at NMSU. Defendant Conner took adverse action against Plaintiff on
multiple occasions in violation of his federal and state rights to free speech and
unlawfully interfered with Plaintiff's ability to gather exculpatory evidence during
OIE's investigation. At all times relevant to this complaint, Defendant Conner acted
under color of state law and is sued in both his official and individual capacities.
And at all times relevant to this complaint, Defendant Conner was a person acting
on behalf of, under color of, or within the course and scope of the authority of a
public body as defined by NMSA 1978, § 41-4A-3.

16.     Defendant Annamarie DeLovato is the Deputy Director of the Office
for Institutional Equity at NMSU. Defendant DeLovato served as an investigator in
Plaintiff's case and acted in a biased manner by denying Plaintiff and his advisor
with equal access to important information during the investigation. Defendant
DeLovato acted under color of state law and is sued in both her official and
individual capacities. At all times relevant to this complaint, Defendant DeLovato
was a person acting on behalf of, under color of, and within the course and scope of
the authority of a public body as defined in NMSA 1978, § 41-4A-3.

17.     Defendant Rolando Flores is the Dean of NMSU's College of
Agriculture, Consumer and Environmental Sciences. Defendant Flores brought
multiple complaints against Plaintiff based on his constitutionally protected speech,
allegations that ultimately contributed to Plaintiff's termination. At all times

relevant to this complaint, Defendant Flores acted under color of state law and is sued in both his official and individual capacities. And at all times relevant to this complaint, Defendant Flores was a person acting on behalf of, under color of, or within the course and scope of authority of a public body as defined by NMSA § 41-4A-3.

18.     Defendant Matthew Gompper is the head of the Department of Fish, Wildlife & Conservation Ecology at NMSU. Defendant Gompper took adverse action against Plaintiff on multiple occasions in violation of his right to free speech and unlawfully interfered with Plaintiff's ability to gather exculpatory evidence during OIE's investigation. At all times relevant to this complaint, Defendant Gompper acted under color of state law and is sued in both his official and individual capacities. And at all times relevant to this complaint, Defendant Gompper was a person acting on behalf of, under color of, or within the course and scope of the authority of a public body as defined by NMSA 1978, § 41-4A-3.

## FACTUAL ALLEGATIONS

### *Defendants Castille and Flores Have Pre-Existing Biases Against Plaintiff*

19.     On January 14, 2019, Plaintiff filed an internal discrimination complaint with NMSU's Office of Institutional Equity. Plaintiff's complaint alleged that NMSU's College of Agriculture, Consumer and Environmental Sciences (ACES) – and, in particular, ACES Dean Defendant Rolando Flores – was discriminating with respect to pay against older, white professors and in favor of younger, Hispanic professors.

20.     Just three weeks later, Plaintiff received a brief letter from Defendant Laura Castille stating that she was "not accepting [his] Complaint for investigation" and summarily dismissing it without even opening an investigation into his allegations.

21.     Plaintiff submitted his complaint to the State of New Mexico after Defendant Castille summarily rejected it. In sharp contrast to Castille's blithe dismissal of Plaintiff's concerns, the State of New Mexico found that there was, in fact, probable cause to conclude that discrimination had occurred.

22.     In a subsequent hearing on Plaintiff's complaint with the Human Rights Bureau of the State of New Mexico on January 20, 2021, Defendant Castille erroneously stated: "Basically, Dr. Roemer explained to me why I was not smart enough to understand his complaint, that I was not smart enough to understand what he was telling me, and that if I were smart enough, I would not have denied his complaint."

23.     Defendant Castille's dislike of and anger with Plaintiff is clear from this statement. She felt he treated her with condescension and later relished the opportunity to get back at him for this perceived slight.

24.     Immediately following Defendant Castille's dismissal of Plaintiff's discrimination complaint against Defendant Flores, both Castille and Flores began to display hostility towards Plaintiff.

25.     Their hostility included a campaign of pretextual complaints against him. On February 20, 2019, Defendant Castille informed Plaintiff that he was being

accused of sexual harassment for having referred to a male candidate for department head as "charming" in a meeting a week prior.

26.     It was Defendant Flores who brought the "charming" incident to Defendant Castille's attention and requested an investigation.

27.     Castille and Flores made up the rules of the investigation as they went along. For example, in a February 21, 2019 email to Plaintiff about this allegation, Defendant Castille grievously misstated the standard for sexual harassment, informing Plaintiff that "sexual harassment occurs when someone is offended by the remark or the action and it does not matter whether the remark or action was intended to be offensive."

28.     Plaintiff noted that Defendant Castille's definition violated the First Amendment and asked for a meeting with the general counsel's office. Castille refused, stating: "I do not think that it would be appropriate for me to meet with you and general counsel at this time regarding this matter. The general counsel's office has no control over the investigations happening in OIE. My office will proceed accordingly."

29.     Defendant Castille's investigation of Plaintiff for referring to a male job candidate as "charming" lasted for more than a year.

30.     Defendant Castille concluded her investigation by finding insufficient evidence to support a policy violation. Not to be outdone, however, she still compiled, in the guise of a report, a laundry list of petty grievances from Plaintiff's colleagues about his personality. Castille suggested that these things might

"warrant[ ] further attention" outside of OIE. This report was not sent to Plaintiff. Plaintiff received no opportunity to defend himself from these petty accusations.

31.     As a result of Defendant Castille's report, Defendant Conner – who reports directly to Defendant Flores – issued a formal reprimand to Plaintiff on May 22, 2020. According to Defendant Conner, Plaintiff had caused his colleagues "emotional distress" during the department head search process.

32.     On June 3, 2020, Plaintiff filed a grievance with the Faculty Grievance Review Board (FGRB) over Defendant Conner's reprimand.

33.     On July 14, 2020, following an FGRB hearing, wherein the members of the board were unanimous in their support of Plaintiff, Provost Carol Parker directed Defendant Conner to remove the reprimand from Plaintiff's file, finding that Plaintiff had not been given notice or an opportunity to respond – critical elements of due process – prior to being disciplined.

***Plaintiff Expresses His Opinion Regarding the Jacob Blake Shooting***

34.     On August 23, 2020, police in Kenosha, Wisconsin, shot and seriously injured Jacob Blake while responding to a 911 call regarding a domestic dispute. Blake's shooting was followed by widespread protests regarding police shootings of Black men. These protests turned into a violent riot in Kenosha, that included the burning and destruction of public and private property and further loss of life.

35.     Shortly after the shooting, Defendant Arvizu sent an email to the NMSU community expressing that he was "heartbroken" over the Blake shooting, citing it as "yet another instance of a Black man being shot by law enforcement" and

stating that "I am hopeful that our country will soon be able to come together to find common cause and move toward meaningful change in the name of social justice."

36.   Plaintiff, who was born and raised in Kenosha and has multiple first responders and law enforcement officers in his family, sent an email to a group of individuals – including his colleagues and the graduate students in his department – expressing a counterpoint to Defendant Arvizu's mass email. Plaintiff's email noted that while it did appear that "excessive lethal force was likely used" by Kenosha police on Blake, the situation was complicated by the fact that Blake had previously broken into the home of an ex-girlfriend and sexually assaulted her; had a warrant out for his arrest, which included a restraining order; was taking their children and his ex-girlfriend's car without her permission; and had fought with the officers while wielding a knife. Plaintiff expressed that "There have certainly been some recent incidents where innocent black people have been murdered at the hands of white people, and our country has a history of such violence and injustice. But that said, I think it is incumbent upon academic professionals to conduct research and seek the truth, and to draw objective inferences before rushing to a conclusion or passing judgement, because there is always at least two sides to every story."

37.   At NMSU, certain opinions, however measured, may not be expressed. To the contrary, they are considered "hostile" and "harmful." Plaintiff's thoughtful response to Defendant Arvizu's email angered several graduate students in his department. One student, AS, formally accused Plaintiff of "threatening and

harmful behavior" for sending the email and demanded that he be disciplined. Another student, BS, called his email "highly inappropriate and discriminatory."

38.    NMSU backed these complaints with the full weight of its authority. Plaintiff quickly received a letter of warning from Defendants Conner and Gompper on September 21, 2020, finding that Plaintiff's email regarding the Jacob Blake shooting was an act of "hostile misconduct" that violated NMSU policy.

39.    Just two weeks after the Jacob Blake email, another graduate student, JB, who had been copied on the email and who also worked under Plaintiff, met with Defendant Gompper to complain about Plaintiff. JB suddenly alleged that Plaintiff had been "bullying" her, expected too much work from her, and had made "inappropriate comments" regarding her appearance or the professionalism of her clothing. Defendant Gompper reported this student's concerns to the Office of Institutional Equity, run by Defendant Castille, reporting it "out of an abundance of caution."

40.    Without Plaintiff's knowledge, Defendant Castille interviewed JB on September 24, 2020.

41.    Egged on by Defendant Castille, JB filed a sexual harassment complaint against Plaintiff on September 28, 2020. Thus began an outrageously biased and improper process in which Defendant Castille openly criticized Plaintiff to parties and witnesses while she was supposed to maintain neutrality; pushed for more aggressive disciplinary action against Plaintiff; rejected evidence from Plaintiff as untimely while accepting untimely evidence from other parties; and

made clear to parties and witnesses that she had already judged Plaintiff guilty before her investigation was complete.

42.   It took NMSU more than two months to inform Plaintiff with a notice of JB's specific allegations.

43.   JB alleged that Plaintiff had occasionally expressed physical affection by hugging her, putting his arm around her, or kissing her on the cheek; had made inappropriate comments about her attire; and had made a remark to the effect that she should not get a boyfriend lest it cause her to become distracted from her work.

44.   In reality, JB was upset by the Jacob Blake email and by the fact that, in the months leading up to the allegations, Plaintiff had expressed dissatisfaction with JB's work and had spoken harshly to her about mistakes she had made while doing research in the field. Plaintiff had admonished JB for wearing attire unsafe for working in desert heat while trapping foxes as part of their research. In a related incident, JB's lack of supervision led to an undergraduate technician experiencing heat exhaustion; she was rescued by an EMT and rushed to a hospital by ambulance. Because of JB's neglect, a lethal injury occurred to a study animal, which Plaintiff had to euthanize. Upon information and belief, Plaintiff's criticism of JB's unsafe working attire was the basis for her allegation that he commented inappropriately on her clothing.

45.   As a matter of legal necessity, because he was no longer permitted to supervise her, Plaintiff was required to remove JB from his State Scientific Collecting Permit on November 7, 2020. Plaintiff did so at the advice of the State's

permit specialist, Miranda Baldwin, to prevent any legal liability with regards to JB violating Plaintiff's State permit if she conducted fieldwork while not under his supervision. Plaintiff later learned that JB had, in fact, already violated this and other permits without his knowledge.

46.     NMSU, however, counted following the law and regulations of the state as further evidence of wrongdoing. Defendants Castille and Conner treated Plaintiff's legally necessary action as impermissible retaliation and placed Plaintiff on administrative leave on November 13, 2020, which seriously compromised Plaintiff's research project.

47.     One of the conditions of Plaintiff's administrative leave was that he was forbidden to contact employees and students in his department. This impermissibly restricted his ability to gather exculpatory evidence in violation of the First Amendment and the federal Title IX regulations.

48.     Plaintiff continued to be judged guilty from the start. In an email to Defendant Gompper requesting to place Plaintiff on administrative leave, Defendant Castille wrote that "I understand that Gary going on leave would be an inconvenience for the department, **but frankly much damage is already done**." (Emphasis added). Thus, even prior to OIE's investigation, Castille had already concluded that Plaintiff engaged in conduct that caused "damage" to the university.

49.     On December 23, 2020, Plaintiff received notice of a second sexual harassment complaint – this one filed by the same graduate students who had complained to Defendant Gompper about the Jacob Blake email. Upon information

and belief, these complainants were good friends of complainant JB.

50.     This notice from Defendant Annamarie DeLovato included an allegation that the Jacob Blake email, "in its graphic description of a sexual assault incident," had "purposefully targeted and subjected female graduate students to discriminatory conduct based on sex/gender."

51.     The new complaint also recycled the complaint that Plaintiff's use of the word "charming" to describe a male department head candidate at a faculty meeting in February 2019 constituted discriminatory conduct. It was, in effect, double jeopardy. That incident had already been investigated by OIE and found not to be discrimination.

52.     Nonetheless, OIE apparently saw nothing wrong with subjecting Plaintiff to a second investigation for uttering the word "charming." In fact, while conducting what was supposed to be a "neutral" interview, Defendant Castille expressed dismay to one of the complainants, BS, that Plaintiff was "never held accountable" for the "charming" remark. Defendant Castille also shared confidential information about the previous OIE investigation with the complainant BS.

53.     The complaint further attempted, absurdly, to cast several wholly benign, stray remarks of Plaintiff's from over the years as discriminatory conduct. These remarks included saying "hello, ladies" to two female graduate students (BS and FM) and saying that a female student "scored" when she received an academic award and "high-fiving" her in a congratulatory gesture – something that student herself said she perceived as a wholly non-sexual reference to the award she had

just received, and after which she wrote a letter of support for Plaintiff.

***Defendant Castille Mocks, Condemns, and Reveals Confidential Information about Plaintiff While Acting as a "Neutral" Interviewer***

54.    Defendant Castille interviewed the complainants as part of the university's investigation.

55.    During the course of these interviews, Defendant Castille revealed confidential information about Plaintiff to the complainants; shared her negative view of Plaintiff with the complainants; and fished for additional information beyond what the complainants had already shared.

56.    In an interview with complainant BS regarding her allegations of sexual harassment, for example, Defendant Castille asked BS whether she'd ever heard of Plaintiff making any racially or ethnically inappropriate comments. Defendant Castille told BS that "I've heard [Plaintiff] described as a racist and a sexist and a homophobe," and asked whether BS had any information to support that.

57.    Defendant Castille openly mocked Plaintiff during her interview with BS. For example, when BS said she had tried to have a discussion with Plaintiff about the importance of proper pronoun use, Defendant Castille burst into laughter and said "I'm impressed that you tried to have a conversation with him about these things… you're a very optimistic person."

58.    When questioning BS about her reaction to Plaintiff's Jacob Blake email, Defendant Castille laughed that she found it "a little bit tragic" that he sent the fact-based email about Kenosha to graduate students, adding "like, why, why

would [Plaintiff] do that?"

59.     Defendant Castille further told BS that upon reading the Jacob Blake email, her first thought was "this doesn't surprise me," and that her second thought was "wow, [Plaintiff] thinks he's untouchable." The ostensibly neutral Defendant Castille enthused about this opportunity to hold Plaintiff accountable for expressing views she found distasteful.

60.     During other interviews, Defendant Castille actually helped the complainants anticipate Plaintiff's defense in order to bulletproof their cases. In the months preceding JB's complaint, for example, Plaintiff had been critical of her work. So, Defendant Castille cautioned JB that "he's going to say you're just mad because he is pointing out to you that you're not doing a good job," and urged JB that "I want you to think about" how to respond to that argument because Plaintiff "will spend hours and days and months combing through everything to make this about how you've just done a terrible job." Defendant Castille laughed as she said this, making clear that she had already dismissed the idea that JB may have, in fact, brought her complaint because she was angry that Plaintiff had been overly critical of her work.

61.     Defendant Castille also told JB, while acting as a supposedly neutral interviewer, that Plaintiff "has no boundaries" and that she could "only imagine how he came across at many times."

62.     Defendant Castille pressured JB to move forward with a formal investigation when JB expressed hesitation, stating that "I think it needs to

happen, we need to move forward with this."

63.     When JB asked Defendant Castille how likely she thought it was that "consequences will be seen from this," the ostensibly neutral Defendant Castille replied: **"I think it's likely."**

64.     In an interview with yet another complainant, AS, about the Jacob Blake email, AS mentioned that Plaintiff has a reputation for being opinionated. Defendant Castille replied "yes, I'm familiar with [Plaintiff], sadly. I'll just say that." Defendant Castille then laughed.

65.     When AS told Defendant Castille, without basis, that Plaintiff was "also very sexist on top of being racist," Defendant Castille sarcastically quipped "great combination."

66.     Defendant Castille went on, in her interview of AS, to lament the fact that Plaintiff would probably try to argue that the Jacob Blake email was protected by the First Amendment and academic freedom. Defendant Castille complained to AS about how faculty "try to use" NMSU's academic freedom policy to defend their right to express their opinions.

67.     At one point, AS asked Defendant Castille if she thought the university could stop "Gary from being Gary." Defendant Castille, laughing, replied: "I don't know that we can ever get Gary to stop being Gary, I think the question is, when can we stop letting Gary be Gary at New Mexico State University?"

68.     Defendant Castille was supposed to be acting in a neutral position, yet she thanked AS for bringing her complaint and told AS that her concern "is my

concern as well," and that AS was "right" about Plaintiff.

***NMSU's Investigative Report Reveals Defendants' Bias***

69.     On May 4, 2021, Defendant DeLovato issued a draft investigative report. In addition to the 4 graduate student complainants (AS, BS, FM, and JB) of whose complaints Plaintiff had been previously notified, the draft investigative report identified 2 new complainants for the first time: Defendant Flores and JL, a male former undergraduate student who had already graduated from NMSU.

70.     Neither Defendant Flores nor JL ever alleged that Plaintiff subjected them to discrimination or harassment. Thus, they were not proper complainants under NMSU Policy and Rule 3.25: Discrimination, Harassment and Sexual Misconduct on Campus, the policy under which Plaintiff was being investigated.

71.     Further, Plaintiff was never given notice that Defendant Flores or JL had made complaints against him. In the past, however, JL was the individual who complained that Plaintiff said a female student had "scored" by winning an award, willfully misinterpreting the comment as sexual even though the female student did not.

72.     The draft investigative report listed Defendant DeLovato as the NMSU investigator tasked with investigating the allegations against Plaintiff. However, Defendant Castille performed many of the interviews of the complainants that were used as evidence in the investigative report.

73.     The draft investigative report stated that Plaintiff was "presumed not responsible." However, Defendant Castille made clear to complainants when

interviewing them that she believed Plaintiff was responsible and needed to be held accountable, such as by telling one complainant she believed it was "likely" Plaintiff would face consequences.

74.     Following Plaintiff's objection, Defendant Flores and JL were removed as complainants in the final investigative report "as they served in the capacity as reporters and were not aggrieved parties." Defendant DeLovato already knew this when she prepared her draft investigative report. Had Plaintiff not objected, Defendants would have permitted these non-"aggrieved parties" to serve as complainants in Defendants' wide-ranging fishing expedition into Plaintiff.

***NMSU's Disparate Treatment of Plaintiff in the Disciplinary Process***

75.     While the complainants were given access to both the draft investigative report and the evidence associated with it on May 4, 2021, NMSU and Defendants withheld access to the evidence from Plaintiff on that date.

76.     When Plaintiff realized he could only access the report and not the evidence, he immediately emailed Defendant DeLovato to notify her of the problem.

77.     Defendant DeLovato ignored him. Instead, Plaintiff did not receive access to the evidence until almost 2 weeks later (on May 17, 2021). In the first few days after receiving the report and having been denied access to the evidence, Plaintiff reached out to several individuals in an effort to gather exculpatory evidence on his own. Yet Defendant Castille immediately forbid this, emailing the Plaintiff on May 7, 2021, "**You must stop contacting witnesses immediately.**" (Emphasis hers). In the draft investigative report, the names of the witnesses were

not provided, so the Plaintiff could not even know if the people he was contacting were witnesses.

78.     Further, on June 4, 2021, Defendant Conner sent Plaintiff a written warning that contacting witnesses to gather exculpatory evidence violated the terms of his administrative leave, which prohibited Plaintiff from contacting anyone in his department.

79.     In addition to violating the First Amendment, this violated the Department of Education's 2020 Title IX regulations, which prohibit universities from doing anything to "restrict the ability of either party to discuss the allegations under investigation or to gather and present relevant evidence."

80.     This was also the first of several instances in which Defendants prejudiced Plaintiff in the disciplinary process by treating him differently from the complainants, in violation of NMSU policy and the law.

81.     In December 2020, Plaintiff's advisor – Dr. William Boecklen – asked Defendant Castille to send him information about the role and duties of an advisor during the hearing process. Defendant Castille responded that "I don't have 'information' to send you per se."

82.     In March 2021, Dr. Azadeh Osanloo – the advisor to complainants AS, BS, and FM – sent Defendant Castille an email asking questions about an advisor training she had taken through the university. Plaintiff's advisor was never offered an advisor training through the university.

83.     Defendant Castille answered Dr. Osanloo's questions, sent her the

Powerpoint slides from the advisor training, and offered to send her the recording of the training as well.

84.    In May 2021, Defendant Castille sent a recording of the advisor training and a mock hearing to Michelle Bernstein, the advisor for complainant JB.

85.    In July 2021, as the hearings approached, Plaintiff explicitly asked Defendant Castille to send him and Dr. Boecklen the recording of the advisor training and mock hearing. Plaintiff even provided Defendant Castille with a copy of the email showing that she had provided this same aid to JB's advisor Michelle Bernstein.

86.    Defendant Castille refused, stating that she had "no obligation" to provide them — despite having provided them to the complainants' advisors.

87.    In addition to the fact that this was disparate treatment, under the Department of Education's 2020 Title IX regulations, NMSU has an "obligation" to make its training materials public.

88.    On July 27, 2021, Defendant Castille issued a notice of hearing calling for two separate hearings. The first, scheduled for August 4, 2021, concerned complainants AS, BS, and FM. The second, scheduled for August 17, 2021, concerned complainant JB.

89.    On July 30, 2021, Defendant Castille reached out to Dr. Osanloo (the advisor for AS, BS, and FM) to remind her that hearing exhibits were due that day, since she had not yet submitted any.

90.    Defendant Castille also asked Dr. Osanloo if she needed more time to

submit exhibits. An hour later and after the close of business, Dr. Osanloo submitted her exhibits.

91.     Defendant Castille did not reach out to Plaintiff or his advisor to remind them that exhibits were due or to ask whether they needed additional time to submit exhibits.

92.     When Plaintiff submitted exhibits on August 2, 2021, Defendant Castille told him that "these exhibits were not submitted timely," and that "the other parties submitted their exhibits timely," a statement Defendant Castille knew was false when made.

93.     Importantly, the exhibits Plaintiff sought to introduce concerned the bias on the part of Defendant Castille.

94.     The hearing officer, Jacquelyn Archuleta-Staehlin, was a former colleague of Defendant Castille prior to Defendant Castille joining NMSU. Emails between Defendant Castille and Archuleta-Staehlin reveal their personal friendship.

95.     Defendant Castille advocated that Archuleta-Staehlin's law firm, where Defendant Castille had worked before joining NMSU, provide hearing officers for NMSU even though the University's General Counsel suggested that a Request for Proposals be advertised to select a firm and hearing officer.

96.     Unsurprisingly, once selected, Archuleta-Staehlin refused to consider any evidence of her friend Defendant Castille's bias at the hearing.

***Plaintiff is Terminated in Violation of the First Amendment and Without Due Process***

97.     Following one extension, NMSU ultimately held hearings on both complaints against Plaintiff on August 17, 2021. Each hearing lasted approximately half a day.

98.     On August 31, 2021, Archuleta-Staehlin issued a determination in each of the two cases, finding Plaintiff responsible for violating NMSU ARP 3.25, which prohibits discrimination, and ARP 3.80, which prohibits hostile misconduct. She recommended that Plaintiff be terminated.

99.     Archuleta-Staehlin's determination did not identify what specific statements of Plaintiff's had actually constituted sexual harassment, discrimination, or hostile misconduct. Upon information and belief, however, Archuleta-Staehlin concluded that Plaintiff's statement that a candidate for department head was "charming" constituted sexual harassment. OIE had concluded years prior that this statement did *not* constitute sexual harassment.

100.     Upon information and belief, Archuleta-Staehlin also concluded that Plaintiff's email concerning the Jacob Blake shooting constituted sexual harassment and hostile misconduct because it included a description of a sexual assault allegedly perpetrated by Blake, a description contained in ***a public news article*** and in ***a criminal complaint*** pertaining to the Blake shooting from which Plaintiff was quoting.

101.     Upon information and belief, Archuleta-Staehlin also concluded that using the word "ladies" to refer to women constituted sexual harassment.

102.    On September 8, 2021, Defendant Castille sent Plaintiff a letter notifying him of his termination and informing him that, pursuant to NMSU's anti-discrimination policy, Plaintiff could appeal this decision only on narrow procedural grounds.

103.    Specifically, the only permissible grounds for appeal under NMSU Policy 3.25 are (1) new facts and evidence not previously available; (2) bias; or (3) procedural error. Plaintiff was never given an opportunity to challenge the merits of the decision that led to his termination.

104.    Plaintiff appealed on the grounds of procedural error and investigator bias.

105.    Plaintiff's appeal pointed out numerous procedural irregularities in his case, including the fact that the allegations set forth in the hearing officer's determination differed from the allegations set forth in the complaints against Plaintiff; that the hearing officer conflated allegations brought by the various complainants; that the hearing officer did not set forth a rationale for her determination on each allegation; and that the procedures violated the requirements of the Department of Education's 2020 Title IX regulations in multiple ways.

106.    Plaintiff's appeal also pointed out the numerous, flagrant displays of bias throughout the process by Defendant Castille.

107.    Defendant Castille informed Plaintiff on October 20, 2021, that the Defendant Arvizu had denied his appeal nearly a full month earlier on

September 27, 2021. No explanation was offered for this delayed notification.

108.    Further, Defendant Arvizu never provided any substantive explanation for his denial of Plaintiff's appeal. Defendant Arvizu's decision consisted of an email from his Chief of Staff informing NMSU's provost that "the Chancellor is in support of the recommended approved sanctions and to move forward."

***Plaintiff Receives no Post-Termination Process***

109.    According to NMSU Policy 10.50 ("Faculty Alleged Misconduct Investigation, Discipline, and Appeals Processes"), NMSU faculty are entitled to a post-termination hearing before a Faculty Appeals Board. Such a hearing is necessary to satisfy the constitutional due process requirement of post-termination process.

110.    On October 27, 2021, Plaintiff wrote to Defendant Castille to request a post-termination hearing.

111.    Plaintiff received no response and sent Defendant Castille a follow-up email, again requesting a post-termination hearing, on November 15, 2021.

112.    On November 15, 2021, Defendant Castille replied that "I did not respond because ARP 10:50 does not fall within the purview of my office; however, the decision of the Chancellor is final."

## FIRST CAUSE OF ACTION
### Deprivation of Due Process Under the Fifth and Fourteenth Amendments (42 U.S.C § 1983) Against Defendants Board of Regents, Arvizu, Castille, and DeLovato

113.    Plaintiff repeats and realleges each of the foregoing allegations in this Complaint as if fully set forth herein.

114.    Plaintiff has a protected property interest in his continued employment with New Mexico State University, of which the state cannot deprive him without due process of law.

115.    Plaintiff has a protected liberty interest in his good name, reputation, honor, and integrity, of which the state cannot deprive him without due process of law.

116.    Plaintiff was entitled to have his case investigated and decided in an unbiased and impartial manner. Plaintiff was also entitled to a post-termination hearing before being deprived of his continued employment.

117.    Defendants Castille and DeLovato evinced clear and explicit bias against Plaintiff throughout their investigation, which deprived him of the presumption of innocence and demonstrably affected the testimony of the other parties and witnesses. Defendants Castille and DeLovato also denied Plaintiff and his advisor equal access to important information during the process.

118.    Defendant Arvizu ratified the biased actions of Defendants Castille and DeLovato by upholding the sanction of termination despite clear evidence of bias.

119.    Defendant Castille then denied Plaintiff the required post-termination process despite his repeated requests.

120.    Defendants agreed to, approved, and ratified this unconstitutional conduct.

121.    It would have been plainly obvious to a reasonable official that the actions and inactions complained of in this Complaint would deprive or lead to the deprivation of Plaintiff's state and federal constitutional rights.

122.    Because of Defendants' actions, Plaintiff has suffered, and continues to suffer, economic injury and irreparable harm. He, therefore, is entitled to an award of monetary damages, including punitive damages, and equitable relief.

123.    Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiff is entitled to an award of monetary damages in an amount to be determined by the evidence and this Court and the reasonable costs of this lawsuit, including their reasonable attorneys' fees.

## SECOND CAUSE OF ACTION
**Violation of the First Amendment (42 U.S.C. § 1983): Facial Overbreadth of ARP 3.25 Against Defendants Board of Regents and Arvizu**

124.    Plaintiff repeats and realleges each of the foregoing allegations in this Complaint as if fully set forth herein.

125.    Defendant Board of Regents is the governing body of New Mexico State University. Under NMSU policy, Defendant Board of Regents has delegated the responsibility for promulgating, amending, and repealing so-called "Operational Policies" to the chancellor.

126.    Defendant Arvizu, the Chancellor of NMSU, promulgates, amends, and

repeals Operational Policies as part of his official job responsibilities.

127.    Plaintiff was terminated for speech and expression that constituted "sexual harassment" in violation of ARP 3.25, the NMSU Operational Policy entitled "Prohibition on All Forms of Unlawful Discrimination."

128.    ARP 3.25 defines "sexual harassment" as conduct that "has the purpose or effect of substantially interfering with an individual's academic or work performance, or creating an intimidating, hostile and offensive environment in which to work or learn."

129.    A regulation violates the First Amendment for overbreadth if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010).

130.    ARP 3.25 is unconstitutionally overbroad. While a public university may prohibit harassment "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school," *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 650 (1999), ARP 3.25 goes far beyond that.

131.    ARP 3.25 prohibits any conduct, including "verbal conduct," i.e., speech, that creates a subjectively "offensive" environment for another person.  This does not require that the environment be objectively offensive; the mere subjective feelings of a complainant suffice.  Yet courts around the country have held that speech cannot be prohibited based exclusively on subjective listener reaction.

132.    Defendant Castille relied on this policy when she informed Plaintiff that "sexual harassment occurs when someone is offended by the remark or the action and it does not matter whether the remark or action was intended to be offensive." NMSU's hearing officer also relied on this policy in recommending Plaintiff's termination.

133.    As a direct and proximate result of ARP 3.25, Plaintiff and all NMSU faculty and students have suffered irreparable injury, including being deprived of their constitutional rights to free expression. *Broadrick v. Oklahoma*, 413 U.S. 601, 611-12 (1973).

134.    Without declaratory and injunctive relief from this court, Defendants' unconstitutional actions will continue, and Plaintiff and all NMSU faculty and students will continue to suffer irreparable harm indefinitely.

### THIRD CAUSE OF ACTION
**Violation of the First Amendment (42 U.S.C. § 1983): Facial Overbreadth and Vagueness of ARP 3.80 Against Defendants Board of Regents and Arvizu**

135.    Plaintiff repeats and realleges each of the foregoing allegations in this Complaint as if fully set forth herein.

136.    Defendant Board of Regents is the governing body of New Mexico State University. Under NMSU policy, Defendant Board of Regents has delegated the responsibility for promulgating, amending, and repealing so-called "Operational Policies" to the chancellor.

137.    Defendant Arvizu, the Chancellor of NMSU, promulgates, amends, and repeals Operational Policies as part of his official job responsibilities.

138.   ARP 3.80 prohibits "hostile misconduct." "Hostile misconduct" includes "bullying," which ARP 3.80 defines as any non-discriminatory act or omission "committed with the intention of intimidation or causing emotional distress or other harm."

139.   A regulation violates the First Amendment for overbreadth if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010).

140.   ARP 3.80 is unconstitutionally overbroad. A great deal of speech and expression that others might find subjectively distressing is nonetheless wholly protected by the First Amendment. *See, e.g.*, *Snyder v. Phelps*, 562 U.S. 443, 460-61 (2011) ("Speech is powerful. It can stir people to action, move them to tears of both joy and sorrow, and — as it did here — inflict great pain. On the facts before us, we cannot react to that pain by punishing the speaker. As a Nation we have chosen a different course — to protect even hurtful speech on public issues to ensure that we do not stifle public debate.")

141.   A regulation is void for vagueness if a person of ordinary intelligence cannot distinguish between permissible and prohibited conduct, and when there are no explicit standards to prevent arbitrary and capricious application. *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

142.   ARP 3.80 prohibits conduct, verbal or non-verbal, that is committed with the intention of causing emotional distress "or other harm." ARP 3.80 does not

define what kinds of "other harm" render conduct impermissible. This prevents a person of ordinary intelligence from distinguishing between permissible and prohibited conduct.

143.    Defendants Conner and Gompper relied on this policy when they issued Plaintiff a letter of warning concluding that Plaintiff's expression of his opinions about the Jacob Blake shooting was an act of "hostile misconduct" that violated NMSU policy. NMSU's hearing officer also relied on this policy in recommending Plaintiff's termination.

144.    As a direct and proximate result of ARP 3.80, Plaintiff and all NMSU faculty and students have suffered irreparable injury, including being deprived of their constitutional rights to free expression.

145.    Without declaratory and injunctive relief from this court, Defendants' unconstitutional actions will continue, and Plaintiff and all NMSU faculty and students will continue to suffer irreparable harm indefinitely.

## FOURTH CAUSE OF ACTION
### As-Applied Violation of Plaintiff's First Amendment Rights (42 U.S.C. § 1983) Against All Defendants

146.    Plaintiff repeats and realleges each of the foregoing allegations in this Complaint as if fully set forth herein.

147.    Plaintiff engaged in constitutionally protected speech and has been subjected to numerous adverse employment actions – including, ultimately, termination of his employment – as a result.

148.    Plaintiff was found responsible for violations of NMSU policy for engaging in constitutionally protected speech, including, but not limited to, an

email expressing his opinions on — and sharing publicly available, ***factual*** information about — the police shooting of Jacob Blake in response to an email sent by Defendant Arvizu to the entire NMSU community.

149.    Because of Defendants' actions, Plaintiff has suffered, and continues to suffer, economic injury and irreparable harm. He, therefore, is entitled to an award of monetary damages, including punitive damages, and equitable relief.

150.    Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiff is entitled to an award of monetary damages in an amount to be determined by the evidence and this Court and the reasonable costs of this lawsuit, including their reasonable attorneys' fees.

## FIFTH CAUSE OF ACTION
### Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* Against Defendant Board of Regents

151.    Plaintiff repeats and realleges each of the foregoing allegations in this Complaint as if fully set forth herein.

152.    Title IX of the Education Amendments of 1972 provides, in relevant part:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

153.    NMSU is an institution of higher education that receives federal funding.

154.    Title IX "bars the imposition of university discipline where sex is a

motivating factor in the decision to discipline." *Doe v. Univ. of Denver*, 1 F.4th 822, 829 (10th Cir. 2021) (quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994)).

155.   Evidence of an erroneous outcome can show that sex was a motivating factor in a university's decision to impose discipline.

156.   The process to which Defendants subjected Plaintiff was rife with serious procedural irregularities that cast doubt on the outcome of the proceeding. These irregularities include, but are not limited to, using a biased investigator who openly mocked and derided Plaintiff to the complainants while ostensibly serving as a neutral interviewer; limiting Plaintiff's ability to gather exculpatory evidence; and denying Plaintiff any post-termination hearing as required by university policy and the U.S. and New Mexico Constitutions.

157.   Evidence of disparate treatment can also show that sex was a motivating factor in a university's decision to impose discipline.

158.   Throughout his disciplinary process, Plaintiff was treated differently from the female complainants. For example, while the complainants were given access to both the draft investigative report and the evidence associated with it on May 4, 2021, Defendants withheld access to the evidence from Plaintiff on that date. And while complainants' advisor was able to take advisor training through the university, Plaintiff's advisor was never offered an advisor training through the university. Defendant Castille also reached out to complainants' advisor to remind her of the deadline for submitting exhibits and to ask if she needed additional time. Defendant Castille did not reach out to Plaintiff's advisor either to issue a reminder

—

or to offer additional time, and in fact, some of Plaintiff's exhibits were later rejected for being untimely.

159.   Violations of the federal regulations effectuating Title IX can also constitute evidence that sex was a motivating factor in a university's decision to impose discipline. *Doe v. Tex. Christian Univ.*, 2022 U.S. Dist. LEXIS 91384, *16 (N.D. Tex. Apr. 29, 2022).

160.   Defendants violated the federal Title IX regulations in multiple ways over the course of Plaintiff's disciplinary proceeding, including by employing an investigator who explicitly told complainants that she believed Plaintiff was guilty; by failing to make Title IX training materials available on their website; and by restricting Plaintiff's ability to gather exculpatory evidence.

161.   Because of Defendants' actions, Plaintiff has suffered, and continues to suffer, economic injury and irreparable harm.  He, therefore, is entitled to an award of monetary damages and equitable relief.

**SIXTH CAUSE OF ACTION**
**Violation of the New Mexico Civil Rights Act (NMSA 1978, § 41-4A-1 *et seq.*)**
**for Violations of Article II, § 18 of the New Mexico Constitution**
**Against Defendant Board of Regents**

162.   Plaintiff repeats and realleges each of the foregoing allegations in this Complaint as if fully set forth herein.

163.   Article II, § 18 of the New Mexico Constitution provides that "[n]o person shall be deprived of life, liberty or property without due process of law . . . ."

164.   Plaintiff has a protected property interest in his continued employment with New Mexico State University, of which the state cannot deprive him without

due process of law.

165.   Plaintiff has a protected liberty interest in his good name, reputation, honor, and integrity, of which the state cannot deprive him without due process of law.

166.   The New Mexico Constitution affords Plaintiff the right to have his case investigated and decided in an unbiased and impartial manner.  Plaintiff was also entitled to a post-termination hearing before being deprived of his continued employment.

167.   Defendants Castille and DeLovato evinced clear and explicit bias against Plaintiff throughout their investigation, which deprived him of the presumption of innocence guaranteed by the New Mexico Constitution and demonstrably affected the testimony of the other parties and witnesses.  Defendants Castille and DeLovato also denied Plaintiff and his advisor equal access to important information during the process.

168.   Defendant Arvizu ratified the biased acts of Defendants Castille and DeLovato by upholding the sanction of termination despite clear evidence of bias.

169.   Defendant Castille then denied Plaintiff the required post-termination process despite his repeated requests.

170.   Defendants Castille, DeLovato, and Arvizu were persons acting on behalf of, under color of, or within the course and scope of the authority of Defendant Board of Regents of New Mexico Statute University, which is a public body according to the New Mexico Civil Rights Act.

171.    Defendant Board of Regents agreed to, approved, and ratified this unconstitutional conduct.

172.    The New Mexico Constitution is interpreted under the interstitial approach.  *See State v. Gomez*, 1997-NMSC-006, ¶ 19, 122 N.M. 777, 932 P.2d 1. Under this approach, a court "may diverge from federal precedent" and find the New Mexico Constitution to be more protective "for three reasons: a flawed federal analysis, structural differences between state and federal government, or distinctive state characteristics."  *Id.*  All three interstitial criteria establish the New Mexico Constitution's due process clause to be more protective than federal due process protections.

173.    Therefore, it would have been plainly obvious to a reasonable official that the actions and inactions complained of in this Complaint would deprive or lead to the deprivation of Plaintiff's state constitutional rights.

174.    Because of Defendants' actions, Plaintiff has suffered, and continues to suffer, economic injury and irreparable harm.  He, therefore, is entitled to an award of monetary damages and equitable relief.

175.    Plaintiff is entitled to an award of monetary damages in an amount to be determined by the evidence and this Court and is entitled, according to NMSA 1978, § 41-4A-5, to the reasonable costs of this lawsuit, including his reasonable attorneys' fees.

## SEVENTH CAUSE OF ACTION
**Violation of the New Mexico Civil Rights Act (NMSA 1978, § 41-4A-1 et seq.)
for Violations of Article II, § 17 of the New Mexico Constitution
Against Defendant Board of Regents**

176.   Plaintiff repeats and realleges each of the foregoing allegations in this Complaint as if fully set forth herein.

177.   Article II, § 17 of the New Mexico Constitution states that "[e]very person may freely speak, write and publish his sentiments on all subjects," and that "no law shall be passed to restrain or abridge the liberty of speech . . . ."

178.   The New Mexico Constitution is interpreted under the interstitial approach. *See State v. Gomez*, 1997-NMSC-006, ¶ 19, 122 N.M. 777, 932 P.2d 1. Under this approach, a court "may diverge from federal precedent" and find the New Mexico Constitution to be more protective "for three reasons: a flawed federal analysis, structural differences between state and federal government, or distinctive state characteristics." *Id.* All three interstitial criteria establish Article II, § 17 of the New Mexico Constitution contains broader protections than those contained in the First Amendment.

179.   The New Mexico Supreme Court has held "that neither students nor teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Futrell v. Ahrens*, 1975-NMSC-044, ¶ 7, 88 N.M. 284, 540 P.2d 214. This includes the prohibition on regulations that are overbroad.

180.   Defendant Board of Regents is the governing body of New Mexico State University. Under NMSU policy, Defendant Board of Regents has delegated responsibility for promulgating, amending, and repealing so-called "Operational Policies" to the chancellor.

181.   Defendant Arvizu, the Chancellor of NMSU, promulgates, amends, and

repeals Operational Policies as part of his official job responsibilities.

182.    Plaintiff was terminated for speech and expression that constituted "sexual harassment" in violation of ARP 3.25, the NMSU Operational Policy entitled "Prohibition on All Forms of Unlawful Discrimination."

183.    ARP 3.25 defines "sexual harassment" as conduct that "has the purpose or effect of substantially interfering with an individual's academic or work performance, or creating an intimidating, hostile and offensive environment in which to work or learn."

184.    ARP 3.25 is unconstitutionally overbroad. ARP 3.25 prohibits any conduct, including "verbal conduct," i.e. speech, that creates a subjectively "offensive environment" for another person.  This does not require that the environment be objectively offensive; the mere subjective feelings of a complainant suffice.  Such a restriction, based upon a subjective listener reaction, violates the New Mexico Constitution.

185.    Defendant Castille relied on this policy when she informed Plaintiff that "sexual harassment occurs when someone is offended by the remark or the action and it does not matter whether the remark or action was intended to be offensive."  NMSU's hearing officer also relied on this policy in recommending Plaintiff's termination.

186.    ARP 3.80 is similarly overbroad.  That police prohibits "hostile misconduct."  "Hostile misconduct" includes "bullying," which ARP 3.80 defines as any non-discriminatory act or omission "committed with the intention of

intimation or causing emotional distress or other harm."

187.   This policy is overbroad, under the New Mexico Constitution, because a great deal of speech and expression that others might find subjectively distressing is nonetheless wholly protected by the First Amendment.

188.   ARP 3.80 is also void for vagueness, according to the New Mexico Constitution, because it prohibits conduct, verbal or non-verbal, that is committed with the intention of causing emotional distress "or other harm." ARP 3.80 does not define what kinds of "other harm" render conduct impermissible. This prevents a person of ordinary intelligence from distinguishing between permissible and prohibited conduct.

189.   Defendants Conner and Gompper relied on this policy when they issued Plaintiff a letter of warning concluding that Plaintiff's expression of his opinions about the Jacob Blake shooting was an act of "hostile misconduct" that violated NMSU policy. NMSU's hearing officer also relied on this policy in recommending Plaintiff's termination.

190.   Moreover, Plaintiff engaged in speech protected by the New Mexico Constitution and has been subjected to numerous adverse employment actions – including, ultimately, termination of his employment – as a result.

191.   Plaintiff was found responsible for violations of NMSU policy for engaging in speech protected by the New Mexico Constitution, including, but not limited to, an email expressing his opinions on, and sharing publicly available, factual information about, the police shooting of Jacob Blake in response to an email

sent by Defendant Arvizu to the entire NMSU community.

192.   As a direct and proximate result of ARP 3.25, Plaintiff and all NMSU faculty and students have suffered irreparable injury, including being deprived of their state constitutional rights to free expression.

193.   As a direct and proximate result of ARP 3.80, Plaintiff and all NMSU faculty and students have suffered irreparable injury, including being deprived of their constitutional rights to free expression.

194.   Without declaratory and injunctive relief from this court, Defendants' unconstitutional actions will continue, and Plaintiff and all NMSU faculty and students will continue to suffer irreparable harm indefinitely.

195.   Moreover, because of Defendants' actions, Plaintiff has suffered, and continues to suffer, economic injury and irreparable harm.  He, therefore, is entitled to an award of monetary damages and equitable relief.

196.   Plaintiff is entitled to an award of monetary damages in an amount to be determined by the evidence and this Court and is entitled, according to NMSA 1978, § 41-4A-5, to the reasonable costs of this lawsuit, including his reasonable attorneys' fees.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Gary Roemer respectfully requests that the Court enter judgment against Defendants and provide Plaintiff with the following relief:

i.   Declare that Defendants' improper investigation and termination of Plaintiff violated his First Amendment and due process rights;

ii.  Declare that ARP 3.25 is unconstitutionally overbroad in violation of the First Amendment.

iii.  Declare that ARP 3.80 is unconstitutionally overbroad and vague in violation of the First and Fourteenth Amendments.

iv.  Declare Defendant Board of Regents in violation of Title IX of the Education Amendments of 1972, 20 USC § 1681, *et seq.*

v.  Issue a permanent injunction mandating that Defendants Board of Regents and Arvizu cease enforcement of ARP 3.25 and ARP 3.80;

vi.  Issue a permanent injunction against Defendants vacating their finding of responsibility and mandating that they reinstate Plaintiff to his former position;

vii.  Award monetary damages in an amount to be determined by the Court to compensate Plaintiff for Defendants' interference with his rights under the U.S. Constitution, their interference with his ability to earn an income; and other damages, including irreparable harm to Plaintiff's professional reputation, research program and research career, caused by their unconstitutional actions.

viii.  Award monetary damages in an amount to be determined by the Court to compensate Plaintiff for Defendants' interference with his rights under the New Mexico Constitution, their interference with his ability to earn an income, and other damages, including irreparable harm to Plaintiff's professional reputation, research program and research

career, caused by their unconstitutional actions.

ix.    Award Plaintiff reasonable attorneys' fees, costs, and other costs and

disbursements in this action pursuant to 42 U.S.C. §§ 1988 and 2000e-

5(k) as well as under NMSA 1978, § 41-4A-5; and

x.    Award such further and additional relief as the Court shall deem just,

proper and authorized by law, and that the costs of this action be taxed

against Defendants.

**JURY DEMAND: PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL
COUNTS SO TRIABLE**

Respectfully submitted,

ALLEN HARRIS PLLC

 */s/ Samantha K. Harris*

Samantha K. Harris
PA Bar No. 90268
*Pro hac vice admission pending*
PO Box 673
Narberth, PA 19072
(860) 345-5310
sharris@allenharrislaw.com

HARRISON, HART & DAVIS, LLC

*/s/ Nicholas T. Hart*

Nicholas T. Hart
924 Park Ave. SW, Suite E
Albuquerque, NM 87102
(505) 295-3261
nick@harrisonhartlaw.com

ATTORNEYS FOR PLAINTIFF