UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| GARY ROEMER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 22-524-JB/GJF |
| | ) |
| BOARD OF REGENTS OF NEW MEXICO | ) |
| STATE UNIVERSITY, et al., | ) |
| | ) |
| Defendant(s) | ) |

**MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS[1]**

Plaintiff Gary Roemer, by and through counsel, hereby files this Motion for Partial Judgment on the Pleadings pursuant to Fed. R. Civ. P. 12(c) with respect to Plaintiff's Second Cause of Action, Violation of the First Amendment, (42 U.S.C. § 1983): Facial Overbreadth of ARP 3.25 Against Defendants Board of Regents and Arvizu; and Third Cause of Action, Violation of the First Amendment (42 U.S.C. § 1983): Facial Overbreadth and Vagueness of ARP 3.80 Against Defendants Board of Regents and Arvizu. Plaintiff seeks declaratory and injunctive relief on both Counts. As there are no material facts in dispute regarding these Counts, the Court need only decide questions of law as are appropriate to resolve on a Rule 12(c) Motion for Judgment on the Pleadings.

---

[1] Plaintiff has conferred with Defendants concerning this motion as required by Local Rule 7.1, and Defendants oppose this motion.

1

## INTRODUCTION

It has been nearly 50 years since the Supreme Court of the United States affirmed that "the mere dissemination of ideas — no matter how offensive to good taste — on a state university campus may not be shut off in the name alone of 'conventions of decency.'" *Papish v. Bd. of Curators of Univ. of Mo.*, 410 U.S. 667, 670 (1973). Even before that — more than half a century ago — the Court recognized that "[t]he classroom is peculiarly the 'marketplace of ideas,'" and that "[t]he Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, [rather] than through any kind of authoritative selection.'" *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967) (internal citation omitted).

Yet despite occupying this special role in society, universities have a long history of using discriminatory harassment policies to punish a wide variety of speech about political and social issues involving sex, gender, and race. Shawnee State University found that Professor Nicholas Meriwether had created a "hostile environment" when — because of his religious beliefs — he opted to use a transgender student's last name rather than refer to the individual by their chosen pronouns. The Sixth Circuit held that Shawnee State had violated Meriwether's free speech rights. *Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021). Rutgers University found Professor James Livingston responsible for discriminatory harassment over Facebook posts complaining about gentrification in his New York neighborhood which stated, among other things, "I now hate white people. I am a white people, for God's sake, but can we keep them — us — us out of my neighborhood?"[2] In 2015, Northwestern University investigated feminist film

---

[2] "Rutgers caves to outrage mob: Professor faces punishment for Facebook posts about white people, Harlem gentrification," *TheFire.Org* (Aug. 21, 2018), https://www.thefire.org/news/rutgers-caves-outrage-mob-professor-faces-punishment-facebook-posts-about-white-people-harlem.

2

professor Laura Kipnis not once but twice for supposed sex discrimination for criticizing the university's Title IX policies and practices in newspaper articles and a book.[3]

It is therefore no surprise that college and university speech restrictions — often referred to as "speech codes" — have repeatedly been struck down by courts for unconstitutional overbreadth or vagueness. *See, e.g.*, *Speech First, Inc. v. Fenves*, 979 F.3d 319, 339 n.17 (5th Cir. 2020). Yet in the face of so much law and history to the contrary, Defendants have chosen to maintain such codes within New Mexico State University's (NMSU's) Administrative Rules and Procedures (ARP), in its "Prohibition of All Forms of Unlawful Discrimination," (ARP 3.25) and its "Prohibition of Bullying, Hazing and Hostile Misconduct (Non-Discriminatory)" (ARP 3.80).

While Plaintiff's termination for his constitutionally protected expression illustrates one way in which these codes can be used to engage in unlawful viewpoint discrimination, they are also unconstitutionally overbroad on their face alone, restricting speech for the sole reason that someone else finds it subjectively hostile or offensive. Such codes clearly "regulate substantially more expression than the First Amendment allows to be regulated." *Griffin v. Bryant*, 30 F. Supp. 3d 1139, 1156 (D.N.M. 2014) (Browning, J.).

Worse still, NMSU's bullying policy, ARP 3.80, adds the problem of unconstitutional vagueness to that of overbreadth, forbidding students and employees from committing (or even omitting) acts with the intention of causing "emotional distress or other harm." This prohibition on causing "other harm"— harm that goes totally undefined in the policy — utterly fails to give "the person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

---

[3] Jeannie Suk Gersen, *Laura Kipnis's Endless Trial by Title IX*, The New Yorker (Sept. 20, 2017), https://www.newyorker.com/news/news-desk/laura-kipniss-endless-trial-by-title-ix.

Defendants must not be permitted to maintain these unconstitutionally overbroad and vague policies at NMSU. They chill expression, make arbitrary and viewpoint-discriminatory abuses possible, and are totally unnecessary for the smooth functioning of an educational institution. Defendants' admissions leave no material facts in dispute that would prevent this Court from providing the declaratory and injunctive relief Plaintiff requests, for the ultimate benefit not just of Plaintiff but of all students and employees of New Mexico State University.

## **STANDARD OF REVIEW**

Pursuant to Fed. R. Civ. P. 12(c), this Court may grant judgment on the pleadings if, accepting all facts pleaded by the non-moving party as true, "the moving party has clearly established that no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law." *Park Univ. Enters. v. Am. Cas. Co.*, 442 F.3d 1239, 1244 (10th Cir. 2006), *quoting United States v. Any & All Radio Station Transmission Equip.*, 207 F.3d 458, 462 (8th Cir. 2000). If, under these circumstances, "the dispute can be resolved on both the pleadings and any facts of which the Court can take judicial notice… [a] motion for a judgment on the pleadings will be granted." *Ramirez v. Wal-Mart Stores, Inc.,* 192 F.R.D. 303, 304 (D.N.M. 2000). Courts may grant judgment on the pleadings in whole or in part. *See, e.g., Corona v. City of Clovis*, No. 2:17-cv-805, 2019 U.S. Dist. LEXIS 136070 (D.N.M. Aug. 12, 2019). A motion for judgment on the pleadings may be filed at any time after pleadings are closed so long as it is "early enough not to delay trial." *Cheney v. Farmington Mun. Schs.*, No. 16-cv-61, 2016 U.S. Dist. LEXIS 58893, *6 (D.N.M. May 3, 2016).

Further, because Plaintiff's requested relief is injunctive in nature, this Court must evaluate four factors in determining whether to grant the requested relief: "(1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury

outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest." *Kitchen v. Herbert*, 755 F.3d 1193, 1208 (10th Cir. 2014).

## MATERIAL FACTS

The following material facts are alleged in the Complaint and are admitted in Defendants' Answer:

Plaintiff Gary Roemer was, until his termination, a tenured full professor in the Department of Fish, Wildlife and Conservation Ecology within the College of Agriculture, Consumer and Environmental Sciences at NMSU. (Compl. ¶ 11, Ans. ¶ 11.)

Defendant Board of Regents of New Mexico State University ("the Board") is the 5-member governing body of New Mexico State University ("NMSU"), a governmental entity, and is responsible for the administration of NMSU, including but not limited to NMSU's compliance with laws, rules, regulations, and requirements. The Board is also a public body as defined by NMSA 1978, § 41-4A-2. (Compl. ¶ 12, Ans. ¶ 12.)

Defendant Dan Arvizu is NMSU's Chancellor. At all times relevant to this complaint, Defendant Arvizu acted under color of state law and was acting on behalf of, under color of, and within the course and scope of authority of a public body as defined by NMSA 1978, § 41-4A-3. (Compl. ¶ 13, Ans. ¶ 13.) Under NMSU policy, the Board has delegated the responsibility for promulgating, amending, and repealing so-called "Operational Policies" to the chancellor. (Compl. ¶ 125, Ans. ¶ 125.) Defendant Arvizu, the Chancellor of NMSU, promulgates, amends, and repeals Operational Policies as part of his official job responsibilities. (Compl. ¶ 126, Ans ¶ 126.)

NMSU's Administrative Rules and Procedures (ARP) Section 3.25 defines "sexual harassment" as conduct that "has the purpose or effect of substantially interfering with an individual's academic or work performance, or creating an intimidating, hostile and offensive environment in which to work or learn." (Compl. ¶ 128, Ans ¶ 128.)

ARP 3.80 prohibits "hostile misconduct." "Hostile misconduct" includes "bullying," which ARP 3.80 defines as any non-discriminatory act or omission "committed with the intention of intimidation or causing emotional distress or other harm." (Compl. ¶ 138, Ans. ¶ 138.)

In addition to considering these undisputed material facts, the Court "can take judicial notice of agency rules and regulations" such as NMSU's Administrative Rules and Procedures. *Ray v. Aztec Well Serv. Co.*, 748 F.2d 888, 889 (10th Cir. 1984). Plaintiff requests that the Court take judicial notice of ARP 3.25 and 3.80, attached for the Court's convenience as Exhibits A and B, in this case.

## ARGUMENT

I. **Success on the Merits**

   A. <u>NMSU ARP 3.25 is unconstitutionally overbroad and violates the First Amendment.</u>

      1. *Policy language*

NMSU ARP 3.25 is titled "Prohibition of All Forms of Unlawful Discrimination," and it applies to "[a]ll students and employees" of NMSU. Part 3 of ARP 3.25 contains the university's operative definitions of sexual harassment. There are two separate definitions: one for sexual harassment that is covered by Title IX (Part 3.B), and the other for "conduct of a sexual nature"

that "constitutes a violation of NMSU policy" (Part 3.D). [4] As required by the federal Title IX regulations, 34 CFR §106.30(a), Part 3.B defines hostile environment harassment under Title IX in general accordance with the standard set forth in *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999): behavior that is "so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victims' educational experience, that the victim-students are effectively denied equal access to an institution's resources and opportunities." *Id.* at 651. Plaintiff does not challenge Defendants' authority to regulate harassment that meets the *Davis* standard.

But under Parts 3.C and 3.D, NMSU grants itself broad authority to punish conduct it deems impermissible even when that conduct does not rise to the level of harassment under Title IX. Part 3.C states NMSU's intent to prohibit any "unwelcome, non-consensual, non-verbal, verbal or physical conduct that is of a sexual nature," emphasizing that "even one incident" of such activity — whether it be non-verbal, verbal, or physical — may be a violation. Part 3.D. gives further shape to the rule, stating three conditions under which "conduct of a sexual nature" unambiguously constitutes a violation of NMSU policy. The first two such conditions it provides are prohibitions on *quid pro quo* sexual harassment. The third, Part 3.D.3., states that NMSU policy is violated when conduct of a sexual nature **"has the purpose or effect of substantially interfering with an individual's academic or work performance, or creating an intimidating, hostile and offensive environment in which to work or learn."** (Emphasis added).

---

[4] Since the federal government in 2020 issued the Title IX regulations found in 34 CFR §106, many schools have adopted rules treating accusations of sex discrimination outside of Title IX's jurisdiction differently from those within it, "simply adding another [system] for sexual misconduct governed under Title IX to comply with the new regulations." Foundation for Individual Rights in Education, *Spotlight on Due Process 2020-2021*, https://www.thefire.org/research-learn/spotlight-due-process-2020-2021.

7

### 2. Facial overbreadth

"A facial challenge considers the restriction as a whole, while an as-applied challenge tests the application of that restriction to the facts of a plaintiff's concrete case. Facial challenges seek to vindicate not only individual plaintiffs' rights but also those of all others who wish to engage in the speech being prohibited." *Faustin v. City & Cty. of Denver*, 423 F.3d 1192, 1196 (10th Cir. 2005). The language of ARP 3.25 is unconstitutionally overbroad on its face. As the Tenth Circuit noted just this year, in the First Amendment context, "the party asserting the facial challenge need only show that 'a substantial number of [the statute's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *United States v. Hernandez-Calvillo*, 39 F.4th 1297, 1301-02 (10th Cir. 2022) (internal citations omitted).

ARP 3.25 easily crosses this bar. Most critically, it contains no objective, "reasonable person" standard, nor any requirement of severity or pervasiveness, instead prohibiting any "verbal" conduct — that is, speech — that a listener subjectively believes creates a "hostile" or "offensive" environment. As the Supreme Court and courts around the country have held, however, subjective listener reaction is not a valid basis for prohibiting speech. "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989). See also *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 206 (3d Cir. 2001) (holding that there is "no question that the free speech clause protects a wide variety of speech that listeners may consider deeply offensive...."); *Doe v. Univ. of Mich.*, 721 F. Supp. 852 (E.D. Mich. 1989) ("Nor could the University proscribe speech simply because it was found to be offensive, even gravely so, by large numbers of people").

Under ARP 3.25, NMSU faculty and students enjoy their free speech rights only at the mercy of the most sensitive members of the university community — a problem the U.S.

8

Supreme Court explicitly addressed in *Davis v. Monroe County Board of Education* when it required that harassment be not only severe and pervasive, but also "objectively offensive." *Davis*, 526 U.S. at 651. Indeed, courts have repeatedly struck down speech codes that condition speech on subjective listener reaction. In *Saxe v. State College Area School District*, the Third Circuit struck down a public high school's anti-harassment policy because it conditioned the permissibility of speech on subjective listener reaction. The court found the policy unconstitutional because it did not "require any threshold showing of severity or pervasiveness," and thus "it could conceivably be applied to cover any speech about some enumerated personal characteristics the content of which offends someone." *Saxe*, 240 F.3d at 217. The court emphasized that "it is certainly not enough that the speech is merely offensive to some listener." *Id*. *See also Bair v. Shippensburg Univ.*, 280 F. Supp. 2d 357 (M.D. Pa. 2003) ("regulations that prohibit speech on the basis of listener reaction alone are unconstitutional both in the public high school and university settings"); *Booher v. Bd. of Regents*, No. 2:96-CV-135, 1998 U.S. Dist. LEXIS 11404, *26 (E.D. Ky. Jul. 21, 1998) (finding that a harassment policy without an objective component depends upon a "single individual's subjective feelings" and violates the First Amendment).

Further, rather than requiring any actual impact, ARP 3.25 requires that speech have only "the purpose or effect" of "substantially interfering with an individual's academic or work performance," or of "creating an intimidating, hostile and offensive environment in which to work or learn." The "purpose or effect" provision also renders the policy unconstitutionally overbroad. Other courts to consider this policy language in the context of public university speech codes have struck it down. In *DeJohn v. Temple University*, 537 F.3d 301 (3d Cir. 2008), the Third Circuit struck down as overbroad a Temple University speech code whose operative

9

language was nearly identical to that found in NMSU's discriminatory harassment policy: it prohibited "expressive, visual or physical conduct of a sexual or gender-motivated nature when . . . (c) such conduct has the purpose or effect of unreasonably interfering with an individual's work, educational performance, or status; or (d) such conduct has the purpose or effect of creating an intimidating, hostile, or offensive environment." *Id*. at 316.

As the *DeJohn* court pointed out about the "purpose or effect" language:

> Under the Supreme Court's rule in *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969), a school must show that speech will cause actual, material disruption before prohibiting it. Under the language of Temple's Policy, a student who sets out to interfere with another student's work, educational performance, or status, or to create a hostile environment would be subject to sanctions regardless of whether these motives and actions had their intended effect. **As such, the focus on motive is contrary to Tinker's requirement that speech cannot be prohibited in the absence of a tenable threat of disruption.**

*DeJohn,* at 317 (emphasis added) (internal citations omitted).

While attempts to interfere with someone's performance, or to create an intimidating, hostile, or offensive environment may be unpleasant and worthy of moral sanction, this does not mean that NMSU may prohibit them based on motive alone. In opting to craft a sexual harassment policy that includes speech and behavior not prohibited by Title IX — one purposely designed to evade the requirement under *Davis* that discriminatory harassment in the educational context be "severe, pervasive, and objectively offensive" — NMSU has intentionally put in place an overbroad policy that cannot survive First Amendment scrutiny.

  B. <u>NMSU ARP 3.80 is unconstitutionally overbroad and vague and violates the First Amendment</u>

   1. *Policy language*

NMSU ARP 3.80 is titled "Prohibition of Bullying, Hazing and Hostile Misconduct (Non-Discriminatory)."

Part 2.A. defines "Bullying" as "[a]n act or omission (not based on discriminatory motives prohibited by RPM and ARP 3.25) committed with the intention of intimidation or causing emotional distress or other harm, typically directed toward a person perceived to be vulnerable or less powerful."

Part 2.C. defines "Hostile Misconduct" as "[a]n unjustified act or omission or series of acts or omissions (not based on discriminatory motives prohibited by RPM and ARP 3.25), which is sufficiently severe, pervasive or persistent so as to unreasonably interfere with or limit a person's ability to participate in academic opportunities or activities, or to work productively in the workplace."

Part 4 provides a "non-exhaustive list" that "describes conduct that may contribute to a finding of a violation of this rule, if substantiated by the facts," and makes clear through inclusions on the list that speech and expression are to be considered forms of "conduct." Among other things, the list includes any "Abusive or demeaning verbal acts or name calling; graphic and written statements in any media (e.g. texting, email, social media)."

   2. *Facial overbreadth*

Like ARP 3.25, ARP 3.80 is unconstitutionally overbroad because "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. at 473 (2010), supra. This is particularly true because the definitions of both Bullying and Hostile Misconduct include not just "acts" but also "omissions." This vastly broadens the scope of what is covered by including not just speech considered "bullying" or "hostile" under the policy, but *even silence or refusal to speak*, raising the absurd specter of official investigations into whether someone's silent hostility towards another is punishable by the state government.

The definition of Bullying includes a single instance of speech (or lack of speech) intended to cause "emotional distress" or "other harm." It lacks even a subjective requirement that anyone actually be harmed by the expression (or non-expression), let alone an objective requirement that the harm caused be one that a reasonable person would feel or experience. If NMSU can prohibit speech simply because it causes someone to subjectively experience "emotional distress" or "other harm," then nothing is off limits. Hamline University, for example, recently suspended an art history professor for causing "harm" by showing a medieval painting depicting the Prophet Muhammad in a global art history survey course.[5] In January, a Stanford University student was reported to the university for "Protected Identity Harm" after being seen in a photograph reading Hitler's *Mein Kampf*.[6] In September 2022, Furman University placed a professor under investigation and banned him from campus after photos surfaced of him attending the 2017 "Unite the Right" rally in Charlottesville, Virginia. Furman's president said the investigation was necessary because the views expressed at the Unite the Right rally were "harmful to members of our community."[7]

The "non-exhaustive list" of examples of prohibited misconduct in Part 4 of ARP 3.80 further demonstrates the policy's application to protected speech. Example 1 lists "[a]busive or demeaning verbal acts or name calling; graphic and written statements in any media (e.g. texting, email, social media) as prohibited conduct "if substantiated by the facts." This would include

---

[5] Eugene Volokh, *Hamline University Lecturer 'Is Fired Over a Medieval Painting of the Prophet Muhammad'*, Reason.com (Dec. 26, 2022), https://reason.com/volokh/2022/12/26/hamline-university-apparently-fires-art-history-lecturer-for-showing-depictions-of-muhammed.
[6] Graham Piro & Alex Morey, *Report: Stanford student may need to 'take accountability,' 'acknowledge harm' for reading Hitler's 'Mein Kampf'*, TheFire.org (Jan. 25, 2023), https://www.thefire.org/news/report-stanford-student-may-need-take-accountability-acknowledge-harm-reading-hitlers-mein.
[7] Amanda Shaw, *Furman investigating after photos surface of professor at Unite the Right rally*, Foxcarolina.com (Oct. 3, 2022), https://www.foxcarolina.com/2022/10/03/furman-investigating-after-photos-surface-professor-unite-right-rally.

anything from routine insults delivered over Twitter or group texting apps to the sharing of internet "memes" that a recipient subjectively finds demeaning.

Much of the expression prohibited by ARP 3.80 will undoubtedly be unpleasant and emotionally painful. Yet it is precisely on issues of great importance to the people involved where the temptation to use the machinery of state authority to silence or punish one's opponent must be most vigorously resisted. As the Supreme Court wrote in *Snyder v. Phelps*, a case in which it affirmed the right of Westboro Baptist Church members to protest outside a military funeral with highly offensive signs including "Thank God for Dead Soldiers" and "You're Going to Hell": "Speech is powerful. It can stir people to action, move them to tears of both joy and sorrow, and — as it did here — inflict great pain. On the facts before us, we cannot react to that pain by punishing the speaker. As a Nation we have chosen a different course — to protect even hurtful speech on public issues to ensure that we do not stifle public debate." 562 U.S. 443, 460-61 (2011).

3. *Unconstitutional vagueness*

ARP 3.80 is also unconstitutionally vague. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). The Tenth Circuit has explained that "[a] plaintiff may challenge a statute as overly vague where the statute's deterrent effect on legitimate expression is 'both real and substantial' and the statute is not 'readily subject to a narrowing construction by the state courts …'" *Faustin v. City & Cty. of Denver*, 423 F.3d 1192, 1201-02 (10th Cir. 2005) (internal citations omitted).

Unfortunately for Defendants, "not clearly defined" is an understatement when describing NMSU's Bullying policy as found in ARP 3.80, Part 2.A.: "An act or omission…

committed with the intention of intimidation or causing emotional distress or **other harm**, typically directed toward a person perceived to be vulnerable or less powerful." (Emphasis added). NMSU gives no further clue as to what might constitute "other harm." While the Supreme Court has held that laws must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly," *Grayned* at 108, ARP 3.80 fails to do so, leaving students and employees to guess at what might be considered "other harm," and giving NMSU administrators unbridled discretion to punish whatever expression (or, again, *lack of expression*) they dislike. "[I]f arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Grayned*, at 108-109. If this is true of the state or federal legal system, despite their array of other procedural safeguards, it is doubly true for the internal disciplinary system of a state university like NMSU.

Further, because the bullying policy "'abut[s] upon sensitive areas of basic First Amendment freedoms,' it 'operates to inhibit the exercise of [those] freedoms.' Uncertain meanings inevitably lead citizens to "'steer far wider of the unlawful zone' . . . than if the boundaries of the forbidden areas were clearly marked."'" *Id*., at 109 (footnotes omitted). A policy so vague that it has so many possible meanings, and correspondingly so many possible applications is no policy at all, except insofar as its in terrorem effect of causing people to "steer wide of the zone" are useful to those administering the policy.

II. **Other Factors**

In First Amendment cases, a showing of success on the merits is generally "the determinative factor" in deciding whether injunctive relief is warranted, because "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," "when a law is likely unconstitutional, the interests of those the government represents[], do not outweigh a plaintiff's interest in having its constitutional rights protected," and "it is always in the public interest to prevent the violation of a party's constitutional rights." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013).

A. <u>Irreparable harm</u>

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). *See also Planned Parenthood Ass'n of Utah v. Herbert*, 828 F.3d 1245, 1263 (10th Cir. 2016) ("When an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary") (internal citations omitted). Plaintiff was terminated for speech that allegedly violated ARP 3.25 and 3.80 and cannot be vindicated so long as NMSU is permitted, in violation of the First Amendment, to punish speech simply because another individual finds it subjectively offensive or harmful. Moreover, these policies continue to chill and violate the free speech rights of all students and faculty in the NMSU community.

B. <u>Balance of harms</u>

A plaintiff seeking injunctive relief must also demonstrate that "the threatened injury outweighs the harm that the injunction may cause the opposing party." *Kitchen v. Herbert*, 755 F.3d 1193, 1208 (10th Cir. 2014). While Plaintiff and other NMSU students and faculty are severely harmed by policies restricting their First Amendment rights in the university

environment, NMSU will not be harmed by having to conform its policies to the First Amendment, by which it is legally bound. Plaintiff does not challenge NMSU's right to prohibit actual harassment, threats, or other forms of unprotected speech — he merely challenges NMSU's right, as a state entity, to define those terms in a manner that includes a significant amount of constitutionally protected speech. NMSU administrators may certainly feel *inconvenienced* by having to tolerate speech that causes students to complain about feeling subjectively offended or emotionally harmed, but this inconvenience does not outweigh the harm done to those whose protected speech is censored by ARP 3.25 and ARP 3.80. As the Supreme Court stated in *Terminiello v. Chicago*, 337 U.S. 1 (1949):

> Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea. That is why freedom of speech, though not absolute, is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest. There is no room under our Constitution for a more restrictive view.

*Terminiello*, 337 U.S. at 4.

    C.  <u>Public interest</u>

"Vindicating First Amendment freedoms is clearly in the public interest." *Pac. Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1237 (10th Cir. 2005). This is particularly so "in the University setting, where the State acts against a background and tradition of thought and experiment that is at the center of our intellectual and philosophic tradition." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 835 (1995). Plaintiff's challenge to policies that violate the free speech rights of all of NMSU's students and faculty more than meets the fourth prong of the standard for injunctive relief.

## CONCLUSION

For the reasons set forth above, Plaintiff requests that this Court grant his Motion and enter Judgment in his favor on Counts II and IV.

Dated: February 14, 2023

Respectfully submitted,

                                                ALLEN HARRIS PLLC

                                                */s/ Samantha K. Harris*

                                                Samantha K. Harris
                                                PA Bar No. 90268
                                                PO Box 673
                                                Narberth, PA 19072
                                                (860) 345-5310
                                                sharris@allenharrislaw.com

                                                HARRISON, HART & DAVIS, LLC

                                                */s/ Nicholas T. Hart*

                                                Nicholas T. Hart
                                                924 Park Ave. SW, Suite E
                                                Albuquerque, NM 87102
                                                (505) 295-3261
                                                nick@harrisonhartlaw.com

                                                ATTORNEYS FOR PLAINTIFF