IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

GARY ROEMER,

       Plaintiff,

vs.                                                                          No. CIV 22-0524 JB/JHR

BOARD OF REGENTS OF NEW MEXICO
STATE UNIVERSITY; DAN ARVIZU;
LAURA CASTILLE; DONALD CONNER;
ANNAMARIE DELOVATO; ROLANDO
FLORES and MATTHEW GOMPPER, all
individually and in their official capacities,

       Defendants.

## ORDER[1]

**THIS MATTER** comes before the Court on: (i) the Defendants' Motion for Judgment on

the Pleadings or for Summary Judgment Based on Qualified Immunity on Count I of Plaintiff's

Complaint and Memorandum in Support, filed April 21, 2023 (Doc. 55)("Count I QI Motion"); and

(ii) the Defendants' Motion for Summary Judgment Based on Qualified Immunity on Courts II-IV

of Plaintiff's Complaint and Memorandum in Support, filed April 21, 2023 (Doc. 56)("Counts II-

IV QI Motion"). The Court held a hearing on June 16, 2023. See Clerk's Minutes at 1, filed June

16, 2023 (Doc. 83). The primary issues are: (i) whether Defendants Laura Castille and Annamarie

Delovato are entitled to qualified immunity on Count I's allegation that Castille and Delovato

---

[1]This Order disposes of: (i) the Defendants' Motion for Judgment on the Pleadings or for
Summary Judgement Based on Qualified Immunity on Count 1 of Plaintiff's Complaint and
Memorandum in Support, filed April 21, 2023 (Doc. 55); and (ii) the Defendants' Motion for
Summary Judgment Based on Qualified Immunity on Courts II-IV of Plaintiff's Complaint and
Memorandum in Support, filed April 21, 2023 (Doc. 56). The Court will issue at a later date,
however, a Memorandum Opinion more fully detailing its rationale for this decision.

deprived the Plaintiff Gary Roemer of his Constitutional right to Due Process as guaranteed by the Fifth and Fourteenth Amendments to the Constitution of the United States by: (a) exhibiting bias against Roemer throughout their internal investigation of complaints that students at New Mexico State University lodged against Roemer, an instructor at New Mexico State University, a public university at which Castille and Delovato were administrators, (b) interfering with Roemer's access to other parties and witnesses, and (c) denying Roemer and his advisor access to information important to the investigation process; (ii) whether Defendant Dan Arvizu is entitled to qualified immunity on Count I's allegation that Arvizu deprived Roemer of his Constitutional right to Due Process as guaranteed by the Fifth and Fourteenth Amendments to the Constitution by upholding the sanction of termination following the investigation; (iii) whether Castille is entitled to qualified immunity on Count I's allegation that Castille deprived Roemer of his Constitutional right to Due Process as guaranteed by the Fifth and Fourteenth Amendments to the Constitution by denying Roemer's requests for post-termination process; (iv) whether Arvizu is entitled to qualified immunity on Count II's allegation that Arvizu administers a New Mexico State University Operational Policy -- ARP 3.25 -- that is facially overbroad in violation of the First Amendment to the Constitution; (v) whether Arvizu is entitled to qualified immunity on Count III's allegation that Arvizu administers another New Mexico State University Operational Policy -- ARP 3.80 -- that is facially overbroad in violation of the First Amendment to the Constitution; (vi) whether Arvizu is entitled to qualified immunity on Count III's allegation that Arvizu administers a New Mexico State University Operational Policy -- ARP 3.80 -- that is facially void for vagueness in violation of the First Amendment to the Constitution; and (vii) whether Castille, Delovato, Arvizu, Donald Conner, Rolando Flores, and Matthew Gompper are entitled to qualified immunity on Count IV's allegation that Roemer's First Amendment rights were violated as-applied by the manner in which New

Mexico State University Operational Policy led to Roemer's employment termination, because Roemer's alleged violation of this Policy involved speech that Roemer contends is Constitutionally protected.  The Court concludes: (i) that Castille and Delovato are entitled to qualified immunity on Count I's allegation that Castille and Delovato deprived Roemer of his Constitutional right to Due Process, because Castille and Delovato's actions did not violate Roemer's constitutional right to Due Process during the investigatory process, and, even if the actions did violate his right, that right was not clearly established at the time of the alleged misconduct; (ii) that Arvizu is entitled to qualified immunity on Count I's allegation that Arvizu deprived Roemer of his Constitutional right to Due Process, because Arvizu's actions did not violate Roemer's Constitutional right to Due Process by upholding his termination, and, even if the actions did violate his right, that right was not clearly established at the time of the alleged misconduct; (iii) that Castille is entitled to qualified immunity on Count I's allegation that Castille deprived Roemer of his Constitutional right to Due Process, because Castille's actions did not violate Roemer's Constitutional right to Due Process by denying Roemer's requests for post-termination process, and, even if the actions did violate his right, that right was not clearly established at the time of the alleged misconduct; (iv) that Arvizu is entitled to qualified immunity on Count II's allegation that Arvizu administers a New Mexico State University Operational Policy -- ARP 3.25 -- that is facially overbroad in violation of the First Amendment, because the policy is constitutional under the First Amendment, and, even if Roemer's Constitutional right was violated, the contours of that right were not clearly established at the time of the alleged misconduct; (v) that Arvizu is entitled to qualified immunity on Count III's allegation that Arvizu administers another New Mexico State University Operational Policy -- ARP 3.80 -- that is facially overbroad in violation of the First Amendment, because the policy is Constitutional under the First Amendment, and, even if Roemer's Constitutional right

was violated, the contours of that right were not clearly established at the time of the alleged misconduct; (vi) that Arvizu is entitled to qualified immunity on Count III's allegation that Arvizu administers a New Mexico State University Operational Policy -- ARP 3.80 -- that is facially void for vagueness in violation of the First Amendment, because the policy in question is Constitutional under the First Amendment, and, even if Roemer's Constitutional right was violated, the contours of that right were not clearly established at the time of the alleged misconduct; and (vii) that Castille, Delovato, Arvizu, Conner, Flores, and Gompper are entitled to qualified immunity on Count IV's allegation that Roemer's First Amendment rights were violated as-applied by the manner in which New Mexico State University Operational Policy led to Roemer's employment termination, because Castille, Delovato, Arvizu, Conner, Flores, and Gompper's actions did not violate Roemer's First Amendment rights in this context, and, even if they did violate his rights, those rights were not clearly established at the time of the alleged misconduct.  Accordingly, the Court grants the Count I QI Motion and the Counts II-IV QI Motion.

## <u>LAW REGARDING QUALIFIED IMMUNITY</u>

Government officials performing "discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982).  Qualified immunity "protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'" <u>Roybal v. City of Albuquerque</u>, No. CIV 08-0181 JB/LFG, 2009 WL 1329834, at *10 (D.N.M. Apr. 28, 2009)(Browning, J.)(quoting <u>Siegert v. Gilley</u>, 500 U.S. 226, 232 (1991)).

Section 1983 creates a cause of action for a plaintiff to seek money damages from state officials who have violated his or her constitutional or statutory rights.  See 42 U.S.C. § 1983. Under Bivens, 403 U.S. 388, 397 (1971), a plaintiff may seek money damages from federal officials who have violated his or her constitutional rights.[2]  The Supreme Court, however, deems it "untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials."  Butz v. Economou, 438 U.S. 478, 504 (1978).  Officials may assert qualified immunity to ensure that fear of liability will not "unduly inhibit officials in the discharge of their duties." Anderson v. Creighton, 483 U.S. 635, 638, (1987).  See Green v. Padilla, 484 F. Supp. at 1129 (explaining that qualified immunity protects government officials who perform discretionary functions if there is not prior, well established case law which would have put them on fair notice of their potential liability).

If a government official has not violated a "clearly established" right, the official is shielded from personal liability.  Harlow v. Fitzgerald, 575 U.S. 800, 818 (1982).  Qualified immunity therefore "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986).  Qualified immunity protects officers

---

[2]Bivens has been extended, however, to only a handful of constitutional rights.  See Davis v. Passman, 442 U.S. 228, 248 (1979)(finding an implied cause of action for violations of the equal protection principles enmeshed within the due process clause of the Fifth Amendment to the United States Constitution, U.S. Const. amend V); Carlson v. Green, 446 U.S. 14 (1980)(extending Bivens to allow for damages for violations of the cruel-and-unusual punishment clause of the Eighth Amendment to the United States Constitution).  The Supreme Court has expressed hesitation about federal courts extending Bivens into new contexts.  See Hernandez v. Mesa, 140 S. Ct. 735, 750 (2020)("When evaluating whether to extend Bivens, the most important question 'is "who should decide" whether to provide for a damages remedy, Congress or the courts?' The correct 'answer most often will be Congress'" (quoting Ziglar v. Abbasi, 582 U.S. 120, 134 (2017), quoting Bush v. Lucas, 462 U.S. 367, 380 (1983))).

who have "reasonable, but mistaken beliefs" and operate at the sometimes "hazy border" of the

laws.  Saucier v. Katz, 533 U.S. 194, 205 (2001).  A court

> can often avoid ruling on the plaintiff's claim that a particular right exists. If prior
> case law has not clearly settled the right, and so given officials fair notice of it, the
> court can simply dismiss the claim for money damages. The court need never
> decide whether the plaintiff's claim, even though novel or otherwise unsettled, in
> fact has merit.

Camreta v. Greene, 563 U.S. 692, 705 (2011).  A series of policy considerations guide the United

States Court of Appeals for the Tenth Circuit's qualified-immunity analysis: "(1) protecting against

'unwarranted timidity on the part of public officials;' (2) ensuring 'that talented candidates are not

deterred by the threat of damages suits from entering public service;' and (3) guarding against

employees being distracted from their duties."  Estate of Jensen by Jensen v. Clyde, 989 F.3d 848,

856 (10th Cir. 2021)(citing Richardson v. McKnight, 521 U.S. 399, 408 (1997)).

Qualified immunity therefore shields government officials from liability when "their

conduct does not violate clearly established statutory or constitutional rights of which a reasonable

person would have known."  Pearson v. Callahan, 555 U.S. 223, 231 (2009)(quoting Harlow v.

Fitzgerald, 457 U.S. at 818).   When a defendant asserts qualified immunity, it "creates a

presumption that they are immune from suit," and not a presumption that they are immune from

liability. Perea v. Baca, 817 F.3d 1198, 1202 (10th Cir. 2016).  When a defendant asserts qualified

immunity, therefore, the plaintiff must demonstrate: (i) that the defendant's actions violated his or

her constitutional or statutory rights; and (ii) that the right was clearly established at the time of

the alleged misconduct, such that "every reasonable officer would have understood" as much.

Estate of Smart by Smart v. City of Wichita, 951 F.3d 1161, 1178 (10th Cir. 2020).  See Riggins

v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009).  See also Pueblo of Pojoaque v. New Mexico,

214 F. Supp. 3d 1028, 1079 (D.N.M. 2016)(Browning, J.)(requiring that the plaintiff must

demonstrate both prongs of the qualified immunity analysis in order to overcome a defendant's qualified immunity defense).

1.      **The Procedural Approach to Qualified Immunity.**

The Supreme Court has clarified the proper procedure for lower courts to evaluate a qualified immunity defense.  Before the Supreme Court's decision in Pearson v. Callahan, 555 U.S. 223 (2009), the Supreme Court directed lower courts to decide, first, whether the facts alleged or shown by the plaintiff make out a constitutional violation, and, if so, then decide whether the right at issue was clearly established at the time of the alleged violation.  See Saucier v. Katz, 533 U.S. 194, 200 (2001).  The Supreme Court's decision in Pearson v. Callahan, however, made the so-called "Saucier two-step" advisory rather than mandatory, noting that Saucier v. Katz's "rigid order of battle" had faced criticism from lower courts on "practical, procedural, and substantive grounds."  Pearson v. Callahan, 555 U.S. at 234 (quoting Pierre N. Leval, Judging Under the Constitution: Dicta About Dicta, 81 N.Y.U. L. Rev. 1249, 1275, 1277 (2006)).  Although the Supreme Court recognizes that the Saucier rule was "beneficial" and "often appropriate," lower courts are now permitted to exercise their "sound discretion" when deciding "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  Pearson v. Callahan, 555 U.S. at 236-37.

In rejecting the prior mandatory approach, the Supreme Court recognizes that "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," and that such an approach burdens district courts and Courts of Appeals with "what may seem to be an essentially academic exercise."  Pearson v. Callahan, 555 U.S. at 237.  The Supreme Court explains that the prior mandatory approach "departs from the general rule of constitutional avoidance and runs counter to the 'older, wiser judicial counsel

'not to pass on questions of constitutionality unless such adjudication is unavoidable.'" <u>Pearson</u> <u>v. Callahan</u>, 555 U.S. at 241 (quoting <u>Scott v. Harris</u>, 550 U.S. at 388; then quoting <u>Spector Motor</u> <u>Service, Inc. v. McLaughlin</u>, 323 U.S. 101, 105 (1944)).  <u>See</u> <u>Reichle v. Howards</u>, 566 U.S. 658, 664 (2012)(affirming <u>Pearson v. Callahan</u>'s procedure and noting that deciding qualified immunity issues on the basis of a right being not "clearly established" by prior caselaw "comports with our usual reluctance to decide constitutional questions unnecessarily").

The Supreme Court recognizes seven circumstances where district courts "should address only"[3] qualified immunity's clearly established prong: when (i) the first, constitutional violation question "is so fact bound that the decision provides little guidance for future cases"; (ii) "it appears that the question will soon be decided by a higher court"; (iii) deciding the constitutional question requires "an uncertain interpretation of state law"; (iv) "qualified immunity is asserted at the pleading stage," and "the precise factual basis for the . . . claim . . . may be hard to identify"; (v) tackling the first element "may create a risk of bad decision making," because of inadequate briefing; (vi) discussing both elements risks "bad decision making," because the court is firmly convinced that the law is not clearly established and is thus inclined to give little thought to the existence of the constitutional right; or (vii) the doctrine of "constitutional avoidance" suggests the

---

[3]In <u>Camreta v. Greene</u>, the Supreme Court states that there are seven circumstances in which the district courts "should address only" the clearly established prong, but, in the same sentence, notes that deciding the violation prong is left "to the discretion of the lower courts." <u>Camreta v. Greene</u>, 563 U.S. at 707.  In <u>Kerns v. Bader</u>, 663 F.3d 1173 (10th Cir. 2011), then-Judge Gorsuch, writing for the Tenth Circuit, interpreted <u>Camreta v. Greene</u> to mean that district courts are restricted from considering the violation prong in seven particular circumstances.  <u>See</u> <u>Kerns v. Bader</u>, 663 F.3d at 1180-81.  The Supreme Court, however, has not stressed the seven circumstances as mandatory.  Instead, it has recently reaffirmed only that lower courts "should think hard, and then think hard again before addressing both qualified immunity and the merits of an underlying constitutional claim."  <u>District of Columbia v. Wesby</u>, 138 S. Ct. 577, 589 n.7 (2018).  This language suggests that the inquiry is still discretionary, although the court should exercise its discretion carefully.

wisdom of passing on the first constitutional question when "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right."  Kerns v. Bader, 663 F.3d 1173, 1180-81 (10th Cir. 2011)(Gorsuch, J.)(quoting Pearson v. Callahan, 555 U.S. at 236-42).  Regarding the last of these seven circumstances, the Supreme Court has clarified that courts may "avoid avoidance" and address the first prong before the second prong in cases involving a recurring fact pattern, where guidance on the constitutionality of the challenged conduct is necessary, and the conduct is likely to face challenges only in the qualified immunity context.  Camreta v. Greene, 563 U.S. at 706-707.  See Kerns v. Bader, 663 F.3d at 1181.[4]

---

[4]In Kerns v. Bader, the Tenth Circuit reversed the Court's decision that an officer was not entitled to qualified immunity, noting that the Court "analyzed both aspects of the qualified immunity test before agreeing" with the plaintiff that the qualified immunity defense did not protect the officer.  663 F.3d at 1183.  In reversing, the Tenth Circuit stated:

> Because we agree with Sheriff White on the latter (clearly established law) question, we reverse without addressing the former (constitutional violation) question.  And we pursue this course because doing so allows us to avoid rendering a decision on important and contentious questions of constitutional law with the attendant needless (entirely avoidable) risk of reaching an improvident decision on these vital questions.

663 F.3d at 1183-84.  The Tenth Circuit did not analyze whether the officer violated the plaintiff's constitutional rights and stated that guidance on the particular constitutional issue would be more appropriate in a case not involving qualified immunity:  "Neither do we doubt that the scope of the Constitution's protection for a patient's hospital records can be adequately decided in future cases where the qualified immunity overlay isn't in play (e.g., through motions to suppress wrongly seized records or claims for injunctive or declaratory relief)."  663 F.3d at 1187 n.5.  On remand, the Court stated:

> While the Court must faithfully follow the Tenth Circuit's decisions and opinions, the Court is troubled by this statement and the recent trend of the Supreme Court's hesitancy in § 1983 actions to address constitutional violations.  A Reconstruction Congress, after the Civil War, passed § 1983 to provide a civil remedy for constitutional violations.  See Mitchum v. Foster, 407 U.S. 225, 238-39 (1972).  In Mitchum v. Foster, the Supreme Court explained:
>
> > Section 1983 was originally § 1 of the Civil Rights Act of 1871 . . . and was enacted for the express purpose of "enforc(ing)

the Provisions of the Fourteenth Amendment." The predecessor of § 1983 was thus an important part of the basic alteration in our federal system wrought in the Reconstruction era through federal legislation and constitutional amendment.

407 U.S. at 238-39.  Congress did not say it would remedy only violations of "clearly established" law, but that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983.  The Supreme Court established the qualified immunity defense in Pierson v. Ray, 386 U.S. 547 (1967), and held that officials were not liable for constitutional violations where they reasonably believed that their conduct was constitutional.  See E. Clarke, Safford Unified Sch. Dist. No. 1 v. Redding: Why Qualified Immunity is a Poor Fit in Fourth Amendment School Search Cases, 24 B.Y.U. J. Pub. L. 313, 329 (2010).  The Supreme Court first introduced the "clearly established" prong in reference to an officer's good faith and held that a compensatory award would only be appropriate if an officer "acted with such an impermissible motivation or with such disregard of the [individual's] clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith."  Wood v. Strickland, 420 U.S. 308, 322 (1975).  In Harlow v. Fitzgerald, when the Supreme Court moved to an objective test, the clearly established prong became a part of the qualified immunity test.  See 457 U.S. at 818 ("We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights.").  It seems ironic that the federal courts would restrict a congressionally mandated remedy for constitutional violations -- presumably the rights of innocent people -- and discourage case law development on the civil side -- and restrict case law development to motions to suppress, which reward only the guilty and is a judicially created, rather than legislatively created, remedy.  Commentators have noted that, "[o]ver the past three decades, the Supreme Court has drastically limited the availability of remedies for constitutional violations in" exclusionary rule litigation in a criminal case, habeas corpus challenges, and civil litigation under § 1983. J. Marceau, The Fourth Amendment at a Three-Way Stop, 62 Ala. L. Rev. 687, 687

"Courts should think carefully before expending 'scarce judicial resources' to resolve difficult and novel questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'"  Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011)(quoting Pearson v. Callahan, 555 U.S. at 236-37).[5]  See Camreta v. Greene, 563 U.S. at 707 ("In general, courts should

---

(2011).   Some commentators have also encouraged the courts to drop the suppression remedy and the legislature to provide more -- not less -- civil remedies for constitutional violations.  See Christopher Slobogin, Why Liberals Should Chuck the Exclusionary Rule, 1999 U. Ill. L. Rev. 363, 390-91 (1999)("Behavioral theory suggests that the exclusionary rule is not very effective in scaring police into behaving. . . .  These theories also suggest that a judicially administered damages regime . . . would fare significantly better at changing behavior at an officer level."); Hon. Malcolm R. Wilkey, Constitutional Alternatives to the Exclusionary Rule, 23 S. Tex. L.J. 531, 539 (1982)(criticizing the exclusionary rule and recommending alternatives).  In Hudson v. Michigan, 547 U.S. 586 (2006), the Supreme Court noted that civil remedies were a viable alternative to a motion to suppress when it held that the exclusionary rule was inapplicable to cases in which police officers violate the Fourth Amendment when they fail to knock and announce their presence before entering.  See 547 U.S. at 596-97.  Rather than being a poor or discouraged means of developing constitutional law, § 1983 seems the better and preferable alternative to a motion to suppress.  It is interesting that the current Supreme Court and Tenth Circuit appear more willing to suppress evidence and let criminal defendants go free, than have police pay damages for violations of innocent citizens' civil rights.  It is odd that the Supreme Court has not adopted a clearly established prong for suppression claims; it seems strange to punish society for police violating unclear law in criminal cases, but protect municipalities from damages in § 1983 cases.

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d 1176, 1224 n.36 (D.N.M. 2012)(Browning, J.), abrogated on other grounds as recognized by Ysasi v. Brown, No. 13-0183, 2014 WL 936835, at *9 n.24 (D.N.M. Feb. 28, 2014)(Browning, J.).  See Richard E. Myers, Fourth Amendment Small Claims Court, 10 Ohio St. J. Crim. L. 571, 590-97 (2013)(arguing that municipalities should establish small-claims courts to adjudicate police officers' Fourth Amendment violations and award monetary judgments).  It remains odd to suggest that the deficit of constitutional law should occur in the sphere of a factually shaky judge-made exclusionary rule and discourages constitutional law at the cost of Congressionally-passed rule, and Judge Gorsuch's rational for qualified immunity.

[5]The appellate courts have little appreciation for how hard it is to do a clearly established prong review first without looking -- closely and thoroughly -- at whether there is a constitutional right and whether there is a violation.  It is difficult to review the facts, rights, and alleged violations in the comparative cases without looking at the facts, rights, and alleged violations on

think hard, and then think hard again, before turning small cases into large ones."). The Tenth

Circuit will remand a case to the district court for further consideration when the district court has

given only cursory treatment to qualified immunity's clearly established prong. See Kerns v.

Bader, 663 F.3d at 1182. See also Pueblo of Pojoaque v. New Mexico, 214 F. Supp. 3d 1028,

1082-83 (D.N.M. 2016)(Browning, J.).

---

the merits in the case before the Court. Pearson v. Callahan sounds like a good idea in theory, but
it does not work well in practice. The clearly established prong is a comparison between the case
before the Court and previous cases, and Pearson v. Callahan suggests that the Court can compare
before the Court fully understands what it is comparing. In practice, Saucier v. Katz works better.
The "Saucier two-step" encourages courts to articulate the constitutional rights at issue. Before
Pearson v. Callahan, 555 U.S. 223 (2009), made the "Saucier two-step" discretionary, it faced
criticism from numerous Supreme Court members. Associate Justice Stephen Breyer wrote,
before Pearson v. Callahan, that he "would end the failed Saucier experiment now." Morse v.
Frederick, 551 U.S. 393, 432 (2007)(Breyer, J., concurring in the judgment and dissenting in part).
Joined by Associate Justices Ruth Bader Ginsburg and Stephen Breyer, Associate Justice John
Paul Stevens criticized Saucier v. Katz, because it was an "unwise judge-made rule under which
courts must decide whether the plaintiff has alleged a constitutional violation before addressing
the question whether the defendant state actor is entitled to qualified immunity." Bunting v.
Mellon, 541 U.S. 1019, 1019 (2004). Joined by Chief Justice of the United States William
Rehnquist, Associate Justice of the United States Supreme Court Antonin Scalia wrote: "We
should either make clear that constitutional determinations are *not* insulated from our review . . .
or else drop any pretense at requiring the ordering in every case." Bunting v. Mellon, 541 U.S. at
1025 (Scalia, J., dissenting from the denial of certiorari).

Judicial resources are valuable and scarce, but they should not be conserved at the expense
of protecting Constitutional rights. In addition to being easier in practice, Saucier v. Katz also
increases the frequency and depth with which courts articulate Constitutional law. See Nancy
Leong, The Saucier Qualified Immunity Experiment, An Empirical Analysis, 36 Pepp. L. Rev.
667 (2009). Chief Justice Rehnquist opined that "[d]eciding the constitutional question before
addressing the qualified immunity question also promotes clarity in the legal standards for official
conduct, to the benefit of both the officers and the general public." Wilson v. Layne, 526 U.S.
603, 609 (1999). The evidence to support Chief Justice Rehnquist's assertion, however, is mixed.
See Paul W. Hughes, Not a Failed Experiment: Wilson-Saucier Sequencing and the Articulation
of Constitutional Rights, 80 U. Colo. L. Rev. 401, 404 (2009)("[T]he proof of the pudding is in
the eating; levels of constitutional articulation increased dramatically following the Court's
development of the Wilson-Saucier sequencing doctrine."). See also Leong, 36 Pepp. L. Rev. at
670 (finding that mandatory sequencing "leads to the articulation of more constitutional law, but
not the expansion of constitutional rights"); Greg Sobolski & Matt Steinberg, Note, An Empirical
Analysis of Section 1983 Qualified Immunity Actions and Implications of Pearson v. Callahan, 62
Stan. L. Rev. 523 (2010). The bottom line is that a trial court often -- if not frequently -- needs to
decide whether the constitutional right was violated before deciding if it is clearly established.

2.    __Clearly Established Rights.__

A right is "clearly established" when it was "sufficiently clear that every reasonable official employee would have understood that what he is doing violates that right." Mullenix v. Luna, 577 U.S. 7, 11 (2015)(quoting Reichle v. Howards, 566 U.S. at 664).  A clearly established right is "generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'" Lobozzo v. Colorado Dep't of Corr., No. 10-1396, 429 F. App'x 707, 710 (10th Cir. 2011)(quoting Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983)).  "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186 (alteration in original)(quoting Saucier v. Katz, 533 U.S. at 202).  A court should inquire "whether the law put officials on fair notice that the described conduct was unconstitutional" rather than engage in "a scavenger hunt for cases with precisely the same facts." Pierce v. Gilchrist, 359 F.3d 1279, 1298 (10th Cir. 2004).  In other words, existing precedent must have placed the constitutional or statutory question "beyond debate." Ashcroft v. al-Kidd, 563 U.S. at 741.

The Supreme Court requires that courts not define the constitutional right at issue "'at a high level of generality.'" White v. Pauly, 580 U.S. 73, 79 (2017)(quoting Ashcroft v. al-Kidd, 563 U.S. at 742).  The Supreme Court refers to this principle as a "longstanding principle." White v. Pauly, 580 U.S. at 79.  Nevertheless, the clearly established law must be "particularized" to the case's facts. Anderson v. Creighton, 483 U.S. at 640.  If the clearly established law at issue is not sufficiently particularized, the "[p]laintiffs would be able to convert the rule of qualified immunity

. . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." Anderson v. Creighton, 483 U.S. at 639.  "[G]eneral statements of the law" are not "inherently incapable" of clearly establishing a right, because they can sometimes give "fair and clear warning" to officers. United States v. Lanier, 520 U.S. 259, 271 (2017). See White v. Pauly, 580 U.S. at 79 (reiterating this principle).  Importantly, the "unlawfulness must be apparent." Anderson v. Creighton, 483 U.S. at 640.  See Brosseau v. Haugen, 543 U.S. 194, 199 (2004)("Of course, in an obvious case, these standards can 'clearly establish' the answer, even without a body of relevant case law.")(citing Hope v. Pelzer, 536 U.S. 730, 738 (2002)(noting that, in a case where the Eighth Amendment violation was "obvious," that there need not be a materially similar case for the right to be clearly established)).  A court therefore must "inquire whether clearly established law makes improper the actions that the officer took in the case's circumstances." City of Escondido v. Emmons, 139 S. Ct. 500, 503 (2019).

In the Tenth Circuit, until recently, this rule meant that a right is clearly established only when there is a factually similar "Supreme Court or Tenth Circuit decision on point, or if the clearly established weight of authority from other courts shows that the right must be as the plaintiff maintains." Truman v. Orem City, 1 F. 4th 1227, 1235 (10th Cir. 2021)(quoting Thomas v. Kaven, 765 F.3d 1183, 1194 (10th Cir. 2014)).  Although a plaintiff asserting a violation of a clearly established right must in most circumstances point to a case that is sufficiently factually similar, the Supreme Court recently has stated that this closeness is not always required.  See Taylor v. Riojas, 141 S. Ct. 52, 54 (2020)("Taylor").  The Supreme Court, in a short per curiam opinion, suggests an objective, "no reasonable correctional officer" standard when it held that "no reasonable correctional officer could have concluded that, under the extreme circumstances of this case, it was constitutionally permissible to house [the plaintiff] in such deplorably unsanitary

conditions for such an extended period of time."  Taylor, 141 S. Ct. at 53.  In Taylor, corrections

officers housed an inmate in "shockingly unsanitary cells."  141 S. Ct. at 53.  One cell was covered

"nearly floor to ceiling, in 'massive mounts' of feces: all over the floor, the ceiling, the window,

the walls, and even 'packed inside the water faucet.'"  141 S. Ct. at 53 (quoting Taylor v. Stevens,

946 F.3d 211, 218 (5th Cir. 2019)).  Correctional officers confined the plaintiff in this cell for four

days, but the plaintiff did not eat or drink, because he feared that his food and water would be

contaminated.  See 141 S. Ct. at 53.  Correctional officers then moved the plaintiff to a second cell

that was "frigidly cold" and was equipped with "only a clogged drain in the floor to dispose of

bodily wastes."  141 S. Ct. at 53.  The plaintiff held his bladder for more than twenty-four hours

before finally involuntarily relieving himself, which caused the clogged drain to overflow and "raw

sewage to spill across the floor."  141 S. Ct. at 53.  Because the plaintiff was not provided a bed

and was confined without clothes, the plaintiff was "left to sleep naked in sewage."  141 S. Ct. at

53.

     The United States Court of Appeals for the Fifth Circuit held that these confinement

conditions violated the Eighth Amendment's ban on cruel-and-unusual punishment, but it granted

the corrections officers qualified immunity because the law was not clearly established.  See

Taylor, 141 S. Ct. at 53 (citing Taylor v. Stevens, 946 F.3d 211, 222 (5th Cir. 2019)).  The Fifth

Circuit concluded that the corrections officials did not have "fair warning" that confining the

plaintiff in these conditions would be unconstitutional.  Taylor v. Stevens, 946 F.3d at 222 (quoting

Hope v. Pelzer, 536 U.S. at 741).  The Supreme Court reversed, holding that the Fifth Circuit erred

when it granted qualified immunity on this basis.  See Taylor, 141 S. Ct. at 53.  Although the

plaintiff could not identify a case on point, the Supreme Court noted that -- even in the absence of

a case clearly establishing the law -- "no reasonable correctional officer could have concluded that,

under the extreme circumstances of this case, it was constitutionally permissible to house [the plaintiff] in such deplorably unsanitary conditions for such an extended period of time." Taylor, 141 S. Ct. at 53.  See Truman v. Orem City, 1 F. 4th at 1240 (summarizing the Supreme Court's conclusion and stating that the Supreme Court "made clear that [the plaintiff] did not have to" identify a case on point).

For decades, lower courts have tried diligently and faithfully to follow the unwritten signals of superior courts.[6]  One such unwritten signal is that "a nigh identical case must exist for the law to be clearly established." Caldwell v. University of N.M. Bd. of Regents, 510 F.Supp.3d 982, 1031 n.14 (D.N.M. Dec. 31, 2020)(Browning, J.).[7]  As numerous Courts of Appeals have

---

[6]As former Tenth Circuit judge, and now Stanford law school professor, Michael McConnell, has noted, much of what lower courts do is read the implicit, unwritten signs that the superior courts send them through their opinions.  See Michael W. McConnell, Address at the Oliver Seth American Inn of Court: How Does the Supreme Court Communicate Its Intentions to the Lower Courts: Holdings, Hints and Missed Signals (Dec. 17, 2014).

[7]The Court notes, as it has elsewhere, see, e.g., Caldwell v. University of N.M. Bd. of Regents, 510 F.Supp.3d at 1031 n.14, that qualified immunity is a problematic doctrine.  This problem is particularly true of the Supreme Court's approach before Taylor.  "Factually identical or highly similar factual cases are not . . . the way the real world works."  Caldwell v. University of N.M. Bd. of Regents, 510 F.Supp.3d at 1031 n.14.

Many cases have so many facts that are unlikely to ever occur again in a significantly similar way.  See York v. City of Las Cruces, 523 F.3d 1205, 1212 (10th Cir. 2008)("However, [the clearly established prong] does not mean that there must be a published case involving identical facts; otherwise we would be required to find qualified immunity wherever we have a new fact pattern.").  The Supreme Court's obsession with the clearly established prong assumes that officers are routinely reading Supreme Court and Tenth Circuit opinions in their spare time, carefully comparing the facts in these qualified immunity cases with the circumstances they confront in their day-to-day police work.  It is hard enough for the federal judiciary to embark on such an exercise, let alone likely that police officers are endeavoring to parse opinions.  It is far more likely that, in their training and continuing education, police officers are taught general principles, and, in the intense atmosphere of an arrest, police officers rely on these general principles, rather than engaging in a detailed comparison of their situation with a previous Supreme Court or published Tenth Circuit case.  It strains credulity to believe that a reasonable officer, as he is approaching a suspect to arrest, is thinking to himself: "Are the facts here anything like the facts in York v. City of Las Cruces?"  Thus, when the Supreme Court grounds its clearly-established jurisprudence in the language of what a reasonable officer or a "reasonable official" would know, Kisela v. Hughes, 584 U.S. 100, 105 (2018), yet still requires a highly factually

analogous case, it either has lost sight of reasonable officer's experience or is using that language to mask an intent to create "an absolute shield for law enforcement officers," Kisela v. Hughes, 584 U.S. at 121 (Sotomayor, J. dissenting).  The Court concludes that the Supreme Court is doing the latter, crafting its recent qualified immunity jurisprudence to effectively eliminate § 1983 claims against State actors in their individual capacities by requiring an indistinguishable case and by encouraging courts to go straight to the clearly established prong.  See Saenz v. Lovington Mun. Sch. Dist., 105 F. Supp. 3d 1271, 1297 n.4 (D.N.M. 2015)(Browning, J.).

In most circumstances, a prior plaintiff must have been subjected to almost identical treatment, and a court must have found that law to have been clearly established for a subsequent plaintiff to get around the obstacle that qualified immunity creates.  See Stephen R. Reinhardt, The Demise of Habeas Corpus and the Rise of Qualified Immunity and the Rise of Qualified Immunity: The Court's Ever Increasing Limitations on the Development and Enforcement of Constitutional Rights and Some Particularly Unfortunate Consequences, 113 Mich. L. Rev. 1219, 1245 (2015)("[T]he Court has through qualified immunity created such powerful shields for law enforcement that people whose rights are violated, even in egregious ways, often lack any means of enforcing rights.").  See also White v. Pauly, 580 U.S. at 79 (2017)(criticizing the Tenth Circuit below, because it "failed to identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment).  In most of those situations, officials can escape liability for violating someone's statutory or constitutional rights, because a prior court has not addressed the issue.  As United States Circuit Judge for the Court of Appeals for the Fifth Circuit Don Willett notes, this situation creates a Catch-22.  See Zadeh v. Robinson, 902 F.3d 483, 499 (5th Cir. 2018)(Willett, J. concurring in part and dissenting in part)(opinion withdrawn on rehearing).  The plaintiffs "must produce precedent even as fewer courts are producing precedent.  Important constitutional questions go unanswered precisely because those questions are yet unanswered.  Courts then rely on that judicial silence to conclude there's no equivalent case on the books."  Zadeh v. Robinson, 902 F.3d at 499.  In short, "[n]o precedent = no clearly established law = no liability.  An Escherian Stairwell.  Heads defendants win, tails plaintiffs lose."  Zadeh v. Robinson, 902 F.3d at 499.

The Court disagrees with the Supreme Court's approach.  The most conservative, principled decision is to minimize the expansion of the judicially created clearly established prong, so that it does not eclipse the congressionally enacted § 1983 remedy.  As the Cato Institute notes in an amicus brief, "qualified immunity has increasingly diverged from the statutory and historical framework on which it is supposed to be based."  Pauly v. White, No. 17-1078 Brief of the Cato Institute as Amicus Curiae Supporting Petitioners at 2 (U.S. Supreme Court, filed March 2, 2018)("Cato Brief").  "The text of 42 U.S.C. § 1983 . . . makes no mention of immunity, and the common law of 1871 did not include any across-the-board defense for all public officials." Cato Brief at 2.  "With limited exceptions, the baseline assumption at the founding and throughout the nineteenth century was that public officials were strictly liable for unconstitutional misconduct. Judges and scholars alike have thus increasingly arrived at the conclusion that the contemporary doctrine of qualified immunity is unmoored from any lawful justification."  Cato Brief at 2.  See generally William Baude, Is Qualified Immunity Unlawful?, 106 Cal. L. Rev. 45 (2018)(arguing that the Supreme Court's justifications for qualified immunity are incorrect).  Further, as Justice Clarence Thomas has argued, the Supreme Court's qualified immunity analysis "is no longer grounded in the common-law backdrop against which Congress enacted [§ 1983], we are no longer engaged in interpret[ing] the intent of Congress in enacting the Act."  Ziglar v. Abbasi, 582 U.S.

recently noted, however, <u>Taylor</u> clarifies that it is no longer the case that an almost-identical case

must exist.  <u>See</u> <u>Truman v. Orem City</u>, 1 F. 4th at 1241 ("Just like any reasonable corrections

officer should have understood the inmate in <u>Taylor</u>'s conditions . . . offended the Constitution, so

too should any reasonable prosecutor understand that providing a medical examiner fabricated

evidence and then putting him on the stand to testify based on that false information offends the

Constitution."); <u>Moderwell v. Cuyahoga County</u>, 997 F.3d 653, 660 (6th Cir. 2021)(explaining

that the Supreme Court held in <u>Taylor</u> that "there does not need to be a case directly on point"

---

120, 158 (2017)(Thomas, J., concurring)(internal quotation marks omitted).  "Our qualified
immunity precedents instead represent precisely the sort of 'freewheeling policy choice[s]' that we
have previously disclaimed the power to make." <u>Ziglar v. Abbasi</u>, 582 U.S. at 159-60 (Thomas,
J., concurring)(quoting <u>Rehberg v. Paulk</u>, 566 U.S. 536, 363 (2012)).  The judiciary should be true
to § 1983 as Congress wrote it.

Moreover, in a day when police shootings and excessive force cases are in the news, there
should be a remedy when there is a constitutional violation, and jury trials are the most democratic
expression of what police action is reasonable and what action is excessive.  If the citizens of New
Mexico decide that state actors used excessive force or deliberately were indifferent, the verdict
should stand, and not be set aside because the parties could not find an indistinguishable Tenth
Circuit or Supreme Court decision.  Finally, always to decide the clearly established prong first
and then always to say that the law is not clearly established could be stunting the development of
constitutional law.  <u>See</u> Aaron L. Nielson & Christopher J. Walker, <u>The New Qualified Immunity</u>,
89 S. Cal. L. Rev. 1, 6 (2015).  And while the Tenth Circuit -- with the exception of now-Justice
Gorsuch, <u>see</u> Shannon M. Grammel, <u>Justice Gorsuch on Qualified Immunity</u>, Stan. L. Rev. Online
(2017) -- seems to be in agreement with the Court, <u>see</u>, <u>e.g.</u>, <u>Casey</u>, 509 F.3d at 1286, the Supreme
Court's per curiam reversals appear to have the Tenth Circuit stepping lightly around qualified
immunity's clearly established prong, <u>see</u>, <u>e.g</u>, <u>Perry v. Durborow</u>, 892 F.3d 1116, 1123-27 (10th
Cir. 2018); <u>Aldaba v. Pickens</u>, 844 F.3d 870, 874 (10th Cir. 2016); <u>Rife v. Jefferson</u>, No. 17-7037
, 742 F. App'x 377 (10th Cir. 2018); <u>Malone v. Bd. of Cty. Comm'rs for Cty. of Dona Ana</u>, No.
16-2222, 707 Fed.App'x. 552 (10th Cir. 2017); <u>Brown v. City of Colo. Springs</u>, No. 16-1206, 709
Fed.App'x. 906, 909 (10th Cir. 2017), and willing to reverse district court decisions should the
district court conclude that the law is clearly established, <u>but see</u> <u>Matthews v. Bergdorf</u>, 889 F.3d
1136, 1149-50 (10th Cir. 2018)(Baldock, J.)(holding that a child caseworker was not entitled to
qualified immunity, because a caseworker would know that "child abuse and neglect allegations
might give rise to constitutional liability under the special relationship exception"); <u>McCoy v.
Meyers</u>, 887 F.3d 1034, 1052-53 (10th Cir. 2018)(Matheson, J.)(concluding that there was clearly
established law even though the three decisions invoked to satisfy that prong were not "factually
identical to this case," because those cases "nevertheless made it clear that the use of force on
effectively subdued individuals violates the Fourth Amendment").

when no reasonable officer could have concluded that the challenged action was constitutional); Taylor v. Ways, 999 F.3d 478, 492 (7th Cir. June 2, 2021)( noting that Taylor reaffirmed that "the Supreme Court does not demand a case directly on point"); Roque v. Harvel, 993 F.3d 325, 335 (5th Cir. 2021)(citing Taylor for the proposition that, "'in an obvious case,' general standards 'can clearly establish the answer, even without a body of relevant case law" (quoting Brosseau v. Haugen, 543 U.S. 194, 199 (2004))).  See also Joanna C. Schwartz, Qualified Immunity and Federalism All the Way Down, 109 Geo. L.J. 305, 351 (2020)("The Court's decision in *Taylor* sends the signal to the lower courts that they can deny qualify immunity without a prior case on point."); Lawrence Rosenthal, Defending Qualified Immunity, 72 S.C.L. Rev. 547, 593 & n.193 (2020)("More recently, however, the Court has stressed that on egregious facts, qualified immunity should be denied regardless whether there are factually similar precedents.").

There are, therefore, two possible interpretations of Taylor.  First, Taylor could simply clarify that the holding in Hope v. Pelzer, 536 U.S. at 741 -- that identifying an earlier case with "'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established," but that it is "not necessary to such a finding" -- is still good law even though it has fallen out of favor among lower courts.  This reading of Taylor would mean there is a narrow exception to the standard requirement that a plaintiff identify an earlier case on point that applies only in cases with "extreme circumstances" or "particularly egregious" facts.  Second, Taylor could mean that a court now must ask whether the conduct is particularly egregious such that no reasonable officer could have concluded that their actions are constitutional, and, if the conduct is egregious, then there does not need to be a case clearly establishing the law.

Most Courts of Appeals have adopted the second interpretation.  Nonetheless, there is confusion both between and within the Courts of Appeals about <u>Taylor</u>'s scope.[8]  Since <u>Taylor</u>, courts have asked not just whether the law was clearly established through a factually similar case

_____

[8]Cases from the United States Court of Appeals for the Ninth Circuit illustrate the confusion within the Courts of Appeals about <u>Taylor</u>'s scope.  Compare, for example, <u>O'Doan v. Sanford</u>, 991 F.3d 1027 (9th Cir. March 19, 2021) with <u>Rico v. Ducart</u>, 980 F.3d 1293 (9th Cir. 2020)(Silver, J., concurring in part and dissenting in part).  <u>O'Doan v. Sanford</u> noted that for law to be clearly established, "the right must be sufficiently clear that every reasonable official would [have understood] that what he is doing violates the right.  In other words, existing precedent must have placed the statutory or constitutional question beyond debate."  991 F.3d at 1036-37 (quoting <u>Reichle v. Howards</u>, 566 U.S. 658, 664 (2012)).  The Ninth Circuit pointed to the importance of factually analogous precedential cases, stating that that: "the Supreme Court has reminded lower courts that "[u]se of excessive force is an area of the law 'in which the result depends very much on the facts of each case' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue."  <u>O'Doan v. Sanford</u>, 991 F.3d at (first citing <u>Kisela v. Hughes</u>, 584 U.S. at 104; then quoting <u>Mullenix v. Luna</u>, 577, U.S. 7, 13 (2015)(per curiam)).  The Ninth Circuit concluded that the plaintiff had not identified any precedent case law that had clearly established a right and emphasized the importance of specificity over general or categorical statements of Constitutional violations in qualified immunity cases.  <u>See</u> <u>O'Doan v. Sanford</u>, 991 F.3d at 1044 (describing limits applying to the obviousness principle and distinguishing <u>O'Doan</u> from <u>Taylor</u> because of situational ambiguity.)  Finally, the Ninth Circuit reiterated that "the obviousness principle [is] an exception to the specific-case requirement [and] is especially problematic in the Fourth Amendment context."  <u>O'Doan v. Sanford</u>, 991 F.3d at 1044 (quoting <u>Sharp v. County of Orange</u>, 871 F.3d 901, 912 (9th Cir. 2017)).

On the other hand, the Honorable Judge Leslie E. Silver's concurrence in <u>Rico v. Ducart</u>, 980 F.3d at 1305, restates that the second prong of qualified immunity asks whether a reasonable official would have known that their actions were unconstitutional.  <u>See Rico v. Ducart</u>, 980 F.3d at 1305. Judge Silver then points out that requiring plaintiffs to show exceedingly specific and existing case law that addresses the alleged misconduct's lawfulness, narrows the second prong in a way that the Supreme Court rejected in <u>Ashcroft v. al-Kidd</u>, 563 U.S. 731, 741 (2011).  <u>See Rico v. Ducart</u>, 980 F.3d at 1306 (explaining that determining whether there is precedent addressing "the lawfulness of creating noise while conducting court-ordered suicide-prevention welfare checks in a maximum-security facility built of concrete, metal, and steel" is functionally equivalent to necessitating a case on point).  The concurrence's crux is that, while specificity is necessary when considering a case's context and the alleged violative conduct, courts should not require unreasonable specificity when obvious issues such as "basic and clearly necessary requirements" arise in the context of qualified immunity.  <u>See Rico v. Ducart</u>, 980 F.3d at 1306. (stating that "[b]asic and clearly necessary requirements, such as sleep" are established beyond debate both because a reasonable official would know that depriving an inmate of sleep obviously violates an inmate's rights and because "[t]he right to adequate sleep, a well-recognized human need, is also established by persuasive authority").

from that Court of Appeals or from the Supreme Court, but also whether the conduct at issue was "particularly egregious" such that "no reasonable officer could have concluded that" their actions were constitutionally permissible.  Taylor, 141 S. Ct. at 53.  See Truman v. Orem City, 1 F. 4th at 1240.  In other words, in addition to asking whether the officer was theoretically on notice that they were acting unlawfully,[9] the court also must ask whether the conduct at issue was "particularly egregious" -- an apparently objective question.  McCoy v. Alamu, 141 S. Ct. 1364, 1364 (2021)(vacating and remanding in light of Taylor even though the conduct at issue was likely not "particularly egregious").[10]

_____

[9]The Court notes that one of the most basic premises of the law of qualified immunity -- that an officer is aware either actually or potentially that their conduct is unlawful because they know the holdings of both watershed constitutional decisions and the lower court decisions that apply them -- does not hold up to empirical scrutiny.  See Joanna C. Schwartz, Qualified Immunity's Boldest Lie, 88 U. Chi. L. Rev. 605, 610 (2021)(finding that, although police departments do regularly inform officers about "watershed" decisions, officers are "not regularly informed about court decisions interpreting those decisions in different factual scenarios -- the very types of decisions that are necessary to clearly establish the law about the constitutionality of uses of force").  The Court previously has noted:

> It is far more likely that, in their training and continuing education, police officers are taught general principles, and, in the intense atmosphere of an arrest, police officers rely on these general principles, rather than engaging in a detailed comparison of their situation with a previous Supreme Court or published Tenth Circuit case. It strains credulity to believe that a reasonable officer, as he is approaching a suspect to arrest, is thinking to himself: "Are the facts here anything like the facts in York v. City of Las Cruces?" Thus, when the Supreme Court grounds its clearly-established jurisprudence in the language of what a reasonable officer or a "reasonable official" would know, Kisela v. Hughes, 138 S. Ct. 1148, 1153 (2018), yet still requires a highly factually analogous case, it has either lost sight of reasonable officer's experience or it is using that language to mask an intent to create "an absolute shield for law enforcement officers," Kisela v. Hughes, 138 S. Ct. at 1162 (Sotomayor, J. dissenting).

Manzanares v. Roosevelt Cnty. Adult Detention Center, 331 F. Supp.3d 1260, 1294 n.10 (D.N.M. 2018)(Browning, J.).

[10]Professor Colin Miller of the University of South Carolina School of Law notes that there are only two likely interpretations of the Supreme Court's summary disposition of McCoy v.

The United States Court of Appeals for the Third Circuit, for example, notes that Taylor did not affect whether three State legislators who took a public stand against the sale of State-owned property and then tried to pass a law divesting the State's ability to sell it were entitled to qualified immunity, because the legislators' actions were "not so outrageous that 'no reasonable . . . officer could have concluded' they were permissible under the Constitution."  HIRA Educ. Servs. N. Am. v. Augustine, 991 F.3d 180, 191 n.7 (3d Cir. 2021)(quoting Taylor, 141 S. Ct. at 53).  The United States Court of Appeals for the Seventh Circuit, too, concludes that Taylor means an officer is not entitled to qualified immunity if his or her conduct was "particularly egregious." Lopez v. Sherriff of Cook Cnty., 993 F.3d 981, 991 (7th Cir. 2021).  In Lopez v. Sherriff of Cook County, the Seventh Circuit found that an off-duty correctional officer who shot and then used as a human shield a man who fired his gun into the air near a crowd after a scuffle did not act "so egregious[ly] that any reasonable officer would know they [were] violating the Constitution notwithstanding the lack of an analogous decision."[11]  993 F.3d at 991.  The United States Court

_____

Alamu: (i) that the Court remanded so that the Fifth Circuit could consider whether the case involved "extreme circumstances" or "particularly egregious facts" like those in Taylor; and (ii) that the Supreme Court remanded so that the Fifth Circuit can reconsider without looking for analogous prior precedent and instead "determine whether any reasonable officer should have realized" that the conduct violated the plaintiff's constitutional rights.  Colin Miller, The End of Comparative Qualified Immunity, 99 Tex. L. Rev. Online 217, 224 (2021)("Miller, The End of Comparative Qualified Immunity").  Miller argues that this second interpretation is more likely to be correct, because it "would be difficult to characterize" the officer's conduct as "'particularly egregious' without making a similar finding about most other unconstitutional behavior by government officers who seek qualified immunity."  Miller, The End of Comparative Qualified Immunity, at 224 (no citation for quotation).

[11]The Court does not agree with the Seventh Circuit's conclusion.  An off-duty officer using someone he had just shot multiple times as a human shield to "ward off" someone else with a gun -- the individual used as a human shield had moments earlier fired a gun into the air near a crowd -- is particularly egregious such that any reasonable officer should have realized that it violates someone's constitutional rights.  Lopez v. Sherriff of Cook Cnty., 993 F.3d 992.  Even if the officer was trying to protect himself and the public, firing a gun near a crowd does not justify being used as a flesh shield to protect an off-duty officer who had shot that very shield moments

of Appeals for the Ninth Circuit also distinguishes <u>Taylor</u> on the basis of the conduct's severity. <u>See</u> <u>Rico v. Ducart</u>, 980 F.3d 1292, 1300 n.9 (9th Cir. 2020).  In <u>Rico v. Ducart</u>, the Ninth Circuit held that correctional officers who performed inmate-welfare checks that, because of the design of the prison, created loud noises every forty-five minutes were entitled to qualified immunity, because the facts were not "as extreme as those present in" <u>Taylor</u>.  980 F.3d at 1300 n.9. Similarly, the Ninth Circuit also has decided that <u>Taylor</u> "only highlights the level of blatantly unconstitutional conduct necessary to satisfy the obviousness principles." <u>O'Doan v. Sanford</u>, 991 F.3d at 1044 (9th Cir. 2021).

The other Courts of Appeals, however, have characterized <u>Taylor</u> as only reaffirming an "extreme-circumstances" or "obvious-clarity" exception.  The Fifth Circuit, for example, has distinguished <u>Taylor</u>, noting that it "involved a factually distinct claim involving unsanitary prison conditions," so it did not apply to a case about mental healthcare in prison.  <u>Landry v. Laborde-Lahoz</u>, 852 Fed. App'x 123, at *129 (5th Cir. April 19, 2021).[12]  The Fifth Circuit, however, like

---

earlier.  Numerous provisions of international law and the laws of war, <u>see</u>, <u>e.g.</u>, Rome Statute of the International Criminal Court, art. 8(2)(b)(xxiii)(including in the definition of "war crimes" "[u]tilizing the presence of a civilian or other protected person to render certain points, areas or military forces immune from military operations")(July 17, 1998), prohibit such conduct.  A police officer need not be familiar with international law to know that such conduct is improper, nor should someone else have been used as a human shield previously and a Court of Appeals concluded that conduct to have violated clearly established law for a subsequent human shield to overcome the burden of qualified immunity.  The Seventh Circuit found that the situation was "too fast-moving, too unpredictable, and too volatile" for an officer to know that using as a human shield the person he had just shot multiple times was a violation that was "so egregious that any reasonable officer would know they are violating the Constitution notwithstanding the lack of an analogous decision."  993 F.3d at 992.  Instead, the Seventh Circuit appears to require the officer theoretically to be on notice that this conduct was a law violation because a prior officer must have done the same thing and an earlier court -- most likely the Seventh Circuit itself -- must have found that the use of human shields violates some other clearly established law.  If human shields are banned in war, they should not be allowed on the Chicago's streets.  Any reasonable officer should know this conduct is not acceptable conduct under the Constitution.

[12]The Court does not agree with the Fifth Circuit's reasoning on this point, although it does

other Courts of Appeals, has not adopted a consistent approach to <u>Taylor</u>.  The Fifth Circuit also

has noted that "it would have been 'obvious' to a reasonable officer that" several officers using

their body weight to apply pressure to an unarmed man who did not resist arrest while the man

was in the "maximal-restraint" position for five-and-a-half minutes so that the man stopped

breathing and his lips turned blue -- while officers nearby "milled around"-- would constitute "such

a severe tactic against this particular person would be constitutionally proscribed," and that the

officer would "have no recourse to qualified immunity." <u>Aguirre v. City of San Antonio</u>, 995 F.3d

395, 403-04, 424 (5th Cir. 2020)(Jolly, J., concurring).  The Fifth Circuit further has cited <u>Taylor</u>

to support its assertion that, "'in an obvious case,' general standards 'can clearly establish the

answer, even without a body of relevant law.'" <u>Roque v. Harvel</u>, 993 F.3d 325, 335 (5th Cir.

2021)(quoting <u>Brousseau v. Haugen</u>, 542 U.S. 194, 199 (2004)).  In <u>Roque v. Harvel</u>, however,

the Fifth Circuit did not say what those "general standards" might be, from where they might come,

or where a court might look for them, and then proceeded to characterize qualified immunity law

as requiring a case on point in almost all circumstances.  993 F.3d at 335.[13]  More recently,

---

not disagree with the case's result.  The Fifth Circuit reasons that <u>Taylor</u> did not support the
plaintiff's argument that County officials acted with deliberate indifference in violation of the
Eighth Amendment, because it was "factually distinct." <u>Landry v. Laborde-Lahoz</u>, No. 20-20365,
852 Fed.App'x. at 129.  That <u>Taylor</u> is factually distinct has no bearing on the merits of a
deliberate-indifference claim, but impacts its applicability to the qualified immunity question.

[13]The Fifth Circuit's treatment of <u>Taylor</u> and the clearly established analysis is not
consistent.  In <u>Tucker v. City of Shreveport</u>, 998 F.3d 165 (2021), the Fifth Circuit did not cite
<u>Taylor</u>, but writes that

> "[q]ualified immunity is justified unless *no* reasonable officer could have acted as
> [the defendant officers] did here, or *every* reasonable officer faced with the same
> facts would *not* have [acted as the defendant officers did]." <u>Mason v. Faul</u>, 929
> F.3d 752, 764 (5th Cir. 2019, <u>cert. denied</u>, 141 S. Ct. 116, 207 (2020)(citing <u>District
> of Columbia v. Wesby</u>, 138 S. Ct. 577, 590 (2018)("The precedent must be clear
> enough that every reasonable official would interpret it to establish the particular
> rule the plaintiff seeks to apply.  Otherwise, the rule is not one that 'every
> reasonable official' would know.")).

however, the Fifth Circuit acknowledged that Taylor excuses a plaintiff from "their obligation to identify an analogous case in 'extreme circumstances' where the constitutional violation is 'obvious.'"  Cope v. Cogdill, 3 F.4th 198, 206 (5th Cir. July 2, 2021)(quoting Taylor, 141 S. Ct. at 53-54).  The Fifth Circuit stressed, however, that this hurdle is a "high standard," because the facts must be "'particularly egregious.'"  Cope v. Cogdill, 3 F.4th at 206 (quoting Taylor, 141 S. Ct. at 53-54).

Most relevant here, the Tenth Circuit also has not given Taylor consistent treatment.  For example, the Tenth Circuit treated Taylor as an example of the rule of United States v. Lanier, 520 U.S. 259 (1997), that a "general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful," if it gives "fair and clear warning" that the conduct violates the plaintiff's constitutional rights.  United States v. Lanier, 520 U.S. at 271.  See Routt v. Howry, No. 19-6187, 835 F. App'x. 379, 382 (10th Cir. 2020).  This treatment of Taylor asks about the relationship between a "general constitutional rule *already identified* in the decisional law" and the "conduct in question," and asks whether that rule applies with "obvious clarity."  United States v. Lanier, 520 U.S. at 271 (emphasis added).  Elsewhere, the Tenth Circuit states: "It suffices that 'the alleged unlawfulness [is] apparent in light of preexisting law.' That is,

---

Tucker v. City of Shreveport, 998 F.3d at 176-77.  The Fifth Circuit's analysis in Tucker v. City of Shreveport confuses the reasonableness of the officers' behavior with the clarity of the precedent that clearly establishes the law.  See 998 F.3d 165.  As Taylor suggests, an officer can act particularly egregiously and not be entitled to qualified immunity even if no precedent clearly establishes the law.  See 141 S. Ct. at 54.  See Ramirez v. Guadarrama, 2 F.4th 506, 523 (5th Cir. 2021)(mem.)(Willett, J., dissenting from the denial of rehearing en banc)("The Supreme Court's reliance on Taylor [in McCoy v. Alamu, 141 S. Ct. 1364 (2021)(mem.)] confirms that the Court does not consider that case an anomaly, but instead a course correction signaling lower courts to deny immunity for clear misconduct, even in cases with unique facts.").

'a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question.'" Huff v. Reeves, 996 F.3d 1082, 1088 (10th Cir. 2021)(first quoting Riggins v. Goodman, 572 F.3d 1101, 1101 (10th Cir. 2009), and then quoting Taylor, 141 S. Ct. at 53-54).

In Frasier v. Evans, however, the Tenth Circuit wrote that "under certain 'extreme circumstances' general constitutional principles established in the caselaw may give reasonable government officials fair warning that their conduct is constitutionally or statutorily unlawful." Frasier v. Evans, 992 F.3d 1003, 1015 (10th Cir. 2021)(quoting Taylor, 141 S. Ct. at 53).  The Tenth Circuit continued by noting that the situation before them -- several police officers surrounding a man who asked one of the officers for a statement about the force the officer had just used on a "uncooperative suspect," and then one of the officers grabbing the tablet and searching it for a video of the encounter -- was "not such a rare case" as Taylor or Hope v. Pelzer, 536 U.S. 730 (2002).  Frasier v. Evans, 992 F.3d at 1021-22.  In other words, rather than having to point to an existing case with sufficiently analogous facts, a plaintiff instead can defeat an assertion of qualified immunity by meeting Taylor's "extreme circumstances" or "particularly egregious" standard.  Frasier v. Evans, 992 F.3d at 1015.

More recently, the Tenth Circuit held that, even without a prior precedent clearly establishing the law, it was "obvious" that a prosecutor providing materially false information to a medical examiner that influences his expert opinion whether a homicide occurred -- and then putting that medical examiner on the stand to testify about that false information -- is "obviously egregious." Truman v. Orem City, 1 F. 4th at 1240 (quoting District of Columbia v. Wesby, 138 S. Ct. 577, 590 (2018), and then Pierce v. Gilchrist, 359 F.3d 1279, 1298 (10th Cir. 2004)).  The Tenth Circuit, in Truman v. Orem City, comparing the facts directly to those in Taylor, continued:

"Just like any reasonable correctional officer should understand the inmate in Taylor's conditions of confinement offended the Constitution, so too should any reasonable prosecutor understand that providing a medical examiner fabricated evidence and then putting him on the stand to testify based on that false information offends the Constitution."   1 F. 4th at 1240.   In reaching its conclusion in Truman v. Orem City, the Tenth Circuit reiterated that its qualified immunity analysis is "'not a scavenger hunt for prior cases with precisely the same facts, and a prior case need not be exactly parallel to the conduct here for the officials to have been on notice of clearly established law.'" Truman v. Orem City, 1 F. 4th at 1235 (quoting Reavis v. Frost, 967 F.3d 978, 992 (10th Cir. 2020)).  Because the Tenth Circuit concluded that "the right not to be deprived of liberty as a result of the fabrication of evidence by a government officer was clearly established at the time of the prosecutor's conduct," 1 F. 4th at 1236, it found that the plaintiff had plausibly alleged a fabrication-of-evidence claim against the prosecutor, 1 F. 4th at 1237.  This treatment of Taylor does not just ask about the relationship between a "general constitutional rule already identified in the decisional law" and whether it applies with "obvious clarity" to the conduct, Routt v. Howry, No. 19-6187, 835 F. App'x at 382 (quoting United States v. Lanier, 520 U.S. at 271), but instead focuses on the objective "particularly egregious" standard, which applies even without any general constitutional principles that courts have already promulgated, because "no reasonable officer" could have concluded the conduct to be lawful,  Taylor, 141 S. Ct. at 53.

The Court does its best to follow diligently and faithfully the unwritten signals of superior courts, but, here, the signals are not clear.[14]  The Court therefore will proceed with both lines of

---

[14]The Court agrees with the Tenth Circuit's treatment of Taylor in Truman v. Orem City, 1 F.4th 1227, that Taylor marginally expands the standard in United States v. Lanier, and in Hope v. Pelzer, and stands for  the proposition that an officer is not entitled to qualified immunity when his or her conduct is "particularly egregious" such that "any reasonable officer should have realized" that his or her conduct offends the Constitution.  Taylor, 141 S. Ct. at 54.  See Moderwell

analysis.  An officer therefore is entitled to qualified immunity unless a plaintiff can demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established either (a) by a factually similar Supreme Court or Tenth Circuit case on point, see Thomas v. Kaven, 765 F.3d 1183, at 1194, or, in rare cases, by "general constitutional principles," Routt v. Howry, 835 F. App'x. at 382 -- at the time of the alleged misconduct, or (b) because the conduct was "particularly egregious" such that "any reasonable officer should have realized" it was unlawful, Taylor, 141 S. Ct. at 54.  See Estate of Smart by Smart v. City of Wichita, 951 F.3d 1161, 1178 (10th Cir. 2020)(quoting Perea v. Baca, 817 F.3d 1198, 1202 (10th Cir. 2016))("'To overcome this presumption,' the plaintiffs bear the burden of 'show[ing] that (1) the officers' alleged conduct violated a constitutional right, and (2) [that right] was clearly established at the time of the violation, such that every reasonable official would have understood, that such conduct constituted a violation of that right.'").  See also Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009)("When a defendant asserts qualified immunity at summary judgment . . .  the plaintiff [must] . . . demonstrate on the facts alleged both that the defendant violated his constitutional or statutory rights, and that the right was clearly established at the time of the alleged unlawful activity."); Pueblo of Pojoaque v. New Mexico, 214 F. Supp. 3d at 1079.

---

v. Cuyahoga County, 997 F.3d 653, 660 (6th Cir. 2021)("[W]hen 'no reasonable correctional officer could have concluded' that the challenged action was constitutional, the Supreme Court has held that there does not need to be a case directly on point." (quoting Taylor, 141 S. Ct. at 53)). The Court concludes this treatment to be correct, especially in light of the Supreme Court's summary disposition in McCoy v. Alamu, 141 S. Ct. 1364, 1364 (mem)(2021).  See Ramirez v. Guadarrama, 2 F.4th at 523-24 (Willett, J., dissenting from the denial of rehearing en banc)("The Supreme Court's reliance on Taylor [on McCoy v. Alamu, 141 S. Ct. 1364 (2021)(mem.)] confirms that the Court does not consider that case an anomaly, but instead a course correction signaling lower courts to deny immunity for clear misconduct, even in cases with unique facts."); Miller, The End of Comparative Qualified Immunity, at 222-23.  On the other hand, given the Court's view on qualified immunity, the Court hopes that the lower courts patch the hole in the defense's line of reasoning, since it is so wide that the nation can run a truck through it.

The Court previously has applied the "particularly egregious" standard to cases concerning sexual assault in prison.  See Ortiz v. New Mexico, 550 F.Supp.3d 1020, 1175 (D.N.M. 2021)(Browning, J.).  In Ortiz v. New Mexico, the Court concluded that any reasonable correctional officer should understand that sexually assaulting an inmate or "knowingly allowing [the sexual assault] to happen despite being aware that it was prohibited by State law and prison policy . . . 'offends the Constitution.'"  550 F. Supp. at 1175 (quoting Truman v. Orem City, 1 F.4th at 1240).  The behavior the correctional officer exhibited was particularly egregious, because any reasonable officer would conclude that they were violating the Constitution.  See Ortiz v. New Mexico, 550 F. Supp. 3d at 1175 (citing Taylor, 141 S. Ct. at 54).  Under the "particularly egregious" standard, the Court concluded that the correctional officers were not entitled to qualified immunity.  See Ortiz v. New Mexico, 550 F. Supp. 3d at 1175.  The Court previously has applied the "particularly egregious" standard to other cases as well.  See Howes v. New Mexico Dept. of Health, No. CIV 21-0256, 2023 WL. 1419832, at *78 (D.N.M. Jan. 31, 2023)(Browning, J.)(concluding that a doctor's allegations of violations of his liberty interest in his reputation were not "particularly egregious" such that a reasonable officer would have realized the conduct was unlawful); Copar Pumice Co., Inc. v. Morris, No. CIV 07-79, 2008 WL 2323488, at *28 (D.N.M. 2008)(Browning, J.)(concluding that an official's conduct is not objectively reasonable if he or she enforces an ordinance in a "particularly egregious manner or in a manner which a reasonable officer would recognize exceed the bounds of the ordinance" (quoting Mimics, Inc. v. Village of Angel Fire, 394 F.3d 836, 846-47 (2005)).

## ANALYSIS

The Court grants the Count I QI Motion and the Counts II-IV QI Motion.  Castille, Delovato, Arvizu, Conner, Flores, and Gompper are entitled to qualified immunity from the liability alleged in Counts I, II, III, and IV of the Complaint and Jury Demand, filed July 15, 2022

(Doc. 1)("Complaint").  The Court briefly explains these conclusions in turn, with a more fulsome

analysis forthcoming.  See supra note 1.

I.      **CASTILLE AND DELOVATO ARE ENTITLED TO QUALIFIED IMMUNITY ON COUNT I'S ALLEGATION THAT CASTILLE AND DELOVATO DEPRIVED ROEMER OF HIS CONSTITUTIONAL RIGHT TO DUE PROCESS, BECAUSE CASTILLE AND DELOVATO'S ACTIONS DID NOT VIOLATE ROEMER'S CONSTITUTIONAL RIGHT TO DUE PROCESS IN THIS CONTEXT, AND, EVEN IF THEY VIOLATED HIS RIGHT, THAT RIGHT WAS NOT CLEARLY ESTABLISHED AT THE TIME OF THE ALLEGED MISCONDUCT.****

In the Complaint and Jury Demand, filed July 15, 2022 (Doc. 1)("Complaint"), Roemer

alleges in Count I that Castille and Delovato "evinced clear and explicit bias against Plaintiff

throughout their investigation, which deprived him of the presumption of innocence and

demonstrably affected the testimony of the other parties and witnesses," and also "denied Plaintiff

and his advisor equal access to important information during the process."  Complaint ¶ 117, at 26.

In the Count I QI Motion, Castille and Delovato argue that, even if "all the[] allegations" of bias

against Roemer are true, "they do not establish the violation of a clearly established constitutional

right," and thus Castille and Delovato are entitled to qualified immunity against Roemer's claim.

Count I QI Motion at 14.  As for the allegations of interference with witness interviews, Castille

and Delovato again argue that there is no clearly established constitutional right to conduct pre-

hearing witness interviews in this context.  See Count 1 QI Motion at 14 (citing Tonkovich v. Kan.

Bd. of Regents, 159 F.3d 504, 520 (10th Cir. 1998)).  On the question of access to information,

Castille and Delovato assert that Roemer "does not have a clearly established right to have the

evidence at the exact same time as the complainants."  Count I QI Motion at 15.  Castille and

Delovato conclude by attacking Roemer's claims on the basis of both qualified immunity prongs,

see Law Regarding Qualified Immunity supra, at 6, stating: "[T]here is no constitutional violation

at issue, and certainly none of clearly established law," Count I QI Motion at 15.  In response,

Roemer cites cases involving the importance of the "[i]mpartiality of the tribunal" to the concept of Due Process, Plaintiff's Response to Defendant's Motion to Judgment on the Pleadings or for Summary Judgment Based on Qualified Immunity on Count I at 8, filed May 12, 2023 (Doc. 65)("Count I QI Motion Response")(citing Riggins v. Goodman, 572 F.3d 1101, 1112 (10th Cir. 2009)), and other cases involving ex parte communications between judges and biased jurors and conflicts of interest, see Count I QI Motion Response at 9-10 (citing Bjorklund v. Miller, 467 F. App'x 758, 766 (10th Cir. 2012); United States v. Washita Const. Co., 789 F.2d 809, 820-21 (10th Cir. 1986)).  As for Roemer's allegations that Delovato denied him his Constitutional right to Due Process by "den[ying the] Plaintiff and his advisor access to evidence for two full weeks during which time the complainants and their advisors had access to such evidence," Roemer cites no cases in support of the unconstitutionality of this action in this context.  Count I QI Motion Response at 13.

The Court concludes that Castille and Delovato are entitled to qualified immunity on the Due Process allegations in Count I of the Complaint.  As for qualified immunity's first prong, the Court concludes that Castille and Delovato did not deprive Roemer his Constitutionally protected procedural Due Process rights in the context of his Title IX Hearing and eventual termination.  See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 546 (1985)("The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story."); Riggins v. Goodman, 572 F.3d 1101, 1108 (10th Cir. 2009).  Moreover, Roemer's allegations of bias are too speculative, and, in any event, neither Castille nor Delovato acted as the decisionmaker in Roemer's tribunal.  See Riggins v. Goodman, 572 F.3d at 1113-14.  Moreover, Roemer was able to cross-examine all witnesses against him at his hearing.  See Confidential Notice of Determination at 3 (dated September 8,

2021), filed May 12, 2023 (Doc. 65-9).  Castille and Delovato's alleged conduct, in short, is not

Constitutionally repugnant for procedural Due Process purposes.  See Mackey v. Montrym, 443

U.S. 1, 13 (1979)("The Due Process Clause simply does not mandate that all governmental decision

making comply with standards that assure perfect, error-free determinations." (citing Greenholtz v.

Inmates of Neb. Penal & Corr. Complex, 442 U.S. 1, 7 (1979)).  Alternatively, the "precise

contours" of Roemer's procedural due process rights in this context were not clearly established,

and thus Castille and Delovato are entitled to qualified immunity on the allegations against them in

Count I of the Complaint.  Caldwell v. Univ. of N.M. Bd. of Regents, No. CIV 20-0003, 2023 WL

4236016, at *57 (D.N.M. June 28, 2023)(Browning, J.).

## II.   ARVIZU IS ENTITLED TO QUALIFIED IMMUNITY ON COUNT I'S ALLEGATION THAT ARVIZU DEPRIVED ROEMER OF HIS CONSTITUTIONAL RIGHT TO DUE PROCESS, BECAUSE ARVIZU'S ACTIONS DID NOT VIOLATE ROEMER'S CONSTITUTIONAL RIGHT TO DUE PROCESS IN THIS CONTEXT, AND, EVEN IF THE ACTIONS VIOLATE HIS RIGHT, THAT RIGHT WAS NOT CLEARLY ESTABLISHED AT THE TIME OF THE ALLEGED MISCONDUCT.

In the Complaint, Roemer alleges that Arvizu, in his role as Chancellor of New Mexico

State University, see Complaint ¶ 13, at 4, "ratified the biased actions of Defendants Castille and

Delovato by upholding the sanction of termination despite clear evidence of bias," Complaint

¶ 118, at 26.  In the Count I QI Motion, Arvizu asserts generally that all post-termination process

received by Roemer was Constitutionally adequate, in essence because his pre-termination process

was "extensive"; thus, according to Tenth Circuit case law, "the right of appeal to Chancellor

Arvizu was sufficient to satisfy any post-termination due process requirements."  Count I QI

Motion at 13 (citing Benavidez v. City of Albuquerque, 101 F.3d 620, 626 (10th Cir. 1996)).

Roemer disagrees with this argument, and, relying on Calhoun v. Gaines, 982 F.2d 1470, 1475

(10th Cir. 1992), asserts that Arvizu violated Roemer's "clearly established" right to "adequate pre-

termination *and* post-termination process." Count I QI Motion Response at 13 (citing Calhoun v. Gaines, 982 F.2d at 1475).

The Court concludes that Arvizu did not violate Roemer's Constitutional right to Due Process based on how Arvizu handled Roemer's appeal, and even if he did violate Roemer's right, that right's contours were not clearly established at the time of the alleged misconduct. As to the first conclusion, the Court again observes that the procedural Due Process which Roemer received in the course of his termination is Constitutionally adequate. See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 546 ("The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story."); Riggins v. Goodman, 572 F.3d at 1108. Moreover, Roemer's emphasis on the Constitutional indispensability of post-termination process does not account for binding case law from the Tenth Circuit, which instructs that post-termination process is to be considered in concert with the degree of pre-termination process offered in the matter: courts "must evaluate the constitutionality of post-termination process in light of the pre-termination procedures it follows." Benavidez v. City of Albuquerque, 101 F.3d at 626. Here, similar to the plaintiffs in Benavidez v. City of Albuquerque, Roemer's pre-termination process was robust: he had a full adversarial fact-finding hearing at which an advisor represented him, cross-examined witnesses against him, made opening and closing statements, and introduced evidence -- all in the presence of a hearing officer. See Final Decision at 1 (dated August 31, 2021), filed April 21, 2023 (Doc. 55-6). Moreover, as in Benavidez v. City of Albuquerque, "[g]iven these pre-termination procedures, the risk of an erroneous deprivation was minimized, tipping the balance in favor of a post-termination process in which Plaintiffs were only entitled to 'some opportunity' to present their side of the case." Benavidez v. City of Albuquerque, 101 F.3d at 627 (no source given for quoted material).

The Court concludes that Roemer's opportunity to appeal to Arvizu his termination, in which Roemer was permitted to raise various issues and even proffer new evidence, see Office of Institutional Equity, Standard Operating Procedures, Process for Resolving Complaints of Discriminations at 5 (revised August 14, 2020), filed March 28, 2023 (Doc. 49-4), is Constitutionally sufficient given the pre-termination proceedings in this case.  Roemer's reliance on Calhoun v. Gaines, 982 F.2d at 1475, is unpersuasive, as the plaintiff in that case received no formal pre-termination hearing, see Calhoun v. Gaines, 982 F.2d at 1473, and the Tenth Circuit in that case acknowledged that, to comport with procedural Due Process requirements, "some form of pretermination hearing, plus a full-blown adversarial post-termination hearing (unless such was included as part of the pretermination proceedings) are required." Calhoun v. Gaines, 982 F.2d at 1476 (citing Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 545).  This understanding comports with the Court's conclusions above.  Last, in the alternative, if Arvizu's post-deprivation process deprived Roemer of his right to procedural Due Process, the Court concludes that the "precise contours" of Roemer's procedural due process rights in the post-deprivation context were not clearly established, and thus Arvizu is entitled to qualified immunity on the allegations against him in Count I of the Complaint.  Caldwell v. Univ. of N.M. Bd. of Regents, 2023 WL 4236016, at *57.

III.   **CASTILLE IS ENTITLED TO QUALIFIED IMMUNITY ON COUNT I'S ALLEGATION THAT SHE DEPRIVED ROEMER OF HIS CONSTITUTIONAL RIGHT TO DUE PROCESS, BECAUSE CASTILLE'S ACTIONS DID NOT VIOLATE ROEMER'S CONSTITUTIONAL RIGHT TO DUE PROCESS IN THIS CONTEXT, AND, EVEN IF THE ACTIONS VIOLATE ROEMER'S RIGHT, THAT RIGHT WAS NOT CLEARLY ESTABLISHED AT THE TIME OF THE ALLEGED MISCONDUCT.**

In the Complaint, Roemer alleges that Castille unconstitutionally "denied Plaintiff the required post-termination process despite his repeated requests."  Complaint ¶ 119, at 27.  As explained in the previous section of this opinion, as a matter of Constitutional procedural Due

Process, Roemer received the post-deprivation process to which he was due.  See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 546; Benavidez v. City of Albuquerque, 101 F.3d at 626. Accordingly, Castille's conduct did not deprive him of any Constitutional right in this context.  In the alternative, if Castille's conduct related to Romer's post-deprivation process did deprive Roemer of his right to procedural Due Process, the Court concludes that the "precise contours" of Roemer's procedural due process rights in the post-deprivation context were not clearly established, and thus Castille is entitled to qualified immunity on the allegations against him in Count I of the Complaint.  Caldwell v. Univ. of New Mexico Bd. of Regents, 2023 WL 4236016, at *57.

IV.  **ARVIZU IS ENTITLED TO QUALIFIED IMMUNITY ON COUNT II'S ALLEGATION THAT ARVIZU DEPRIVED ROEMER OF HIS CONSTITUTIONAL RIGHTS UNDER THE FIRST AMENDMENT BY ADMINSTERING AN UNCONSTITUTIONAL POLICY, BECAUSE THE POLICY IN QUESTION IS CONSTITUTIONAL UNDER THE FIRST AMENDMENT, AND, EVEN IF ROEMER'S CONSTITUTIONAL RIGHT WAS VIOLATED, THE CONTOURS OF THAT RIGHT WERE NOT CLEARLY ESTABLISHED AT THE TIME OF THE ALLEGED MISCONDUCT.**

Count II of the Complaint alleges that Arvizu, who "promulgates, amends, and repeals Operational Policies as part of his official job responsibilities," is responsible, in part, for the facial constitutional overbreadth of ARP 3.25 -- part of New Mexico State University's anti-discrimination policy.  Complaint ¶ 126, at 27-28.  See id. ¶¶ 124-134, at 27-29.  In this way, Roemer alleges, Arvizu violated his rights under the First Amendment and should be liable to Roemer under 42 U.S.C. § 1983.  See Complaint ¶¶ 124-134, at 27-29.  The Court has concluded, however, that ARP 3.25 is facially constitutional under the First Amendment.  See Order at 1, filed September 18, 2023 (Doc. 88)("The Court concludes that both ARP 3.25 and ARP 3.80 are facially constitutional."); Hooper v. California, 155 U.S. 648, 657 (1895)("The elementary rule is that every reasonable construction must be resorted to in order to save a statute from unconstitutionality.").  Given this conclusion, when considering Arvizu's entitlement to a defense

of qualified immunity on Count II of Roemer's complaint, the Court concludes that Arvizu's alleged actions did not violate Roemer's Constitutional rights.  In the alternative, even if Arvizu's conduct related to his administration of ARP 3.25 deprived Roemer of his First Amendment right based on the policy's Constitutional overbreadth, the Court concludes that the "precise contours" of this right were not clearly established, and thus Castille is entitled to qualified immunity on the allegations against him in Count II of the Complaint.  Caldwell v. Univ. of N.M. Bd. of Regents, 2023 WL 4236016, at *57.

**V.    ARVIZU IS ENTITLED TO QUALIFIED IMMUNITY ON COUNT III'S ALLEGATION THAT ARVIZU DEPRIVED ROEMER OF HIS CONSTITUTIONAL RIGHTS UNDER THE FIRST AMENDMENT BY ADMINSTERING AN UNCONSTITUTIONAL POLICY, BECAUSE THE POLICY IN QUESTION IS CONSTITUTIONAL UNDER THE FIRST AMENDMENT, AND, EVEN IF ROEMER'S CONSTITUTIONAL RIGHT WAS VIOLATED, THE CONTOURS OF THAT RIGHT WERE NOT CLEARLY ESTABLISHED AT THE TIME OF THE ALLEGED MISCONDUCT.**

Similarly, the Court concludes that Arvizu is entitled to qualified immunity on Count III's allegation that he deprived Roemer of his First Amendment rights by his administration of another allegedly unconstitutional New Mexico State University Operational Policy -- ARP 3.80.  See Complaint ¶¶ 135-145, at 29-31.  Roemer again alleges that Arvizu is liable for Constitutional harm arising from this policy, because he "promulgates, amends, and repeals Operational Policies as part of his official job responsibilities."  Complaint ¶ 137, at 29.  This argument, however, runs into the same issue as Roemer's contentions regarding ARP 3.25.  Namely, because the Court concludes that ARP 3.80 is facially Constitutional under the First Amendment, see Order at 1, filed September 18, 2023 (Doc. 88), Arvizu's actions in administering the policy do not deprive Roemer of his First Amendment rights.  Even if they violate Roemer's right, the Court concludes that this right's "precise contours" were clearly established in this context, and thus Castille is entitled to qualified immunity on the allegations against him in Count I of the Complaint.  Caldwell v. Univ.

of New Mexico Bd. of Regents, 2023 WL 4236016, at *57.

**VI.    ARVIZU IS ENTITLED TO QUALIFIED IMMUNITY ON COUNT III'S ALLEGATION THAT ARVIZU DEPRIVED ROEMER OF HIS CONSTITUTIONAL RIGHTS UNDER THE FIRST AMENDMENT BY ADMINSTERING AN UNCONSTITUTIONAL POLICY, BECAUSE THE POLICY IN QUESTION IS NOT VOID FOR VAGUENESS UNDER THE FIRST AMENDMENT AND THEREFORE ROEMER'S CONSTITUTIONAL RIGHT WAS NOT VIOLATED IN THE MANNER ALLEGED, AND, EVEN IF THERE WAS A VIOLATION, THAT RIGHT'S CONTOURS WERE NOT CLEARLY ESTABLISHED AT THE TIME OF THE ALLEGED MISCONDUCT.**

As it pertains to Arvizu's entitlement to qualified immunity, Roemer's allegation that ARP 3.80 is facially void for vagueness in violation of the First Amendment fares no better. Again, the Court concludes that ARP 3.80 is facially Constitutional under the First Amendment, see Order at 1, filed September 18, 2023 (Doc. 88), and, accordingly, Arvizu's actions in administering the policy do not deprive Roemer of his First Amendment rights. Even if they violate his right, the Court concludes that this right's "precise contours" were not clearly established, and thus Castille is entitled to qualified immunity on the allegations against him in Count I of the Complaint. Caldwell v. Univ. of New Mexico Bd. of Regents, 2023 WL 4236016, at *57.

**VII.   CASTILLE, DELOVATO, ARVIZU, AND DEFENDANTS DONALD CONNER, ROLANDO FLORES, AND MATTHEW GOMPPER ARE ENTITLED TO QUALIFIED IMMUNITY ON COUNT IV'S ALLEGATION THAT ROEMER'S FIRST AMENDMENT RIGHTS WERE VIOLATED AS-APPLIED, BECAUSE CASTILLE, DELOVATO, ARVIZU, CONNER, FLORES, AND GOMPPER'S ACTIONS DID NOT VIOLATE ROEMER'S FIRST AMENDMENT RIGHTS IN THIS CONTEXT, AND, EVEN IF THEY VIOLATE HIS RIGHT, THAT RIGHT WAS NOT CLEARLY ESTABLISHED AT THE TIME OF THE ALLEGED MISCONDUCT.**

Last, the Court concludes that Castille, Delovato, Arvizu, Conner, Flores, and Gompper are entitled to qualified immunity on Count IV's allegation that Roemer's First Amendment rights were violated as applied by the manner New Mexico State University Operational Policy led to Roemer's employment termination. Relevant here, in Count IV of the Complaint, Roemer alleges that

Castille, Delovato, Arvizu, Conner, Flores, and Gompper undertook actions that led to Roemer

suffering "numerous adverse employment actions" which arose from these Defendants' as-applied

violation of Roemer's First Amendment rights to engage in "constitutionally protected speech."

Complaint ¶¶ 147-49, at 31-32. As an initial matter, when considering qualified immunity, the

summary judgment standard is distinct.  See Thomson v. Salt Lake Cnty., 584 F.3d 1304, 1312

(10th Cir. 2009).  Whereas a nonmovant opposing a conventional motion for summary judgment

need establish only a genuine dispute of material fact that would enable a reasonable jury to find

in its favor at trial, a nonmovant opposing a motion for summary judgment based on qualified

immunity faces a substantially higher burden: "When a defendant asserts qualified immunity at

summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a

constitutional right and (2) the constitutional right was clearly established."  Martinez v. Beggs,

563 F.3d 1082, 1088 (10th Cir. 2009)(citing Pearson v. Callahan, 555 U.S. 223, 232 (2009).  See

Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009)("The plaintiff must demonstrate on

the facts alleged both that the defendant violated his constitutional or statutory rights, and that the

right was clearly established at the time of the alleged unlawful activity.").

Moreover, because a motion for summary judgment based on qualified immunity presents

a question of law, "a federal court's factual analysis relative to the qualified-immunity question is

distinct."  Cox v. Glanz, 800 F.3d 1231, 1243 (10th Cir. 2015).  See Thomson v. Salt Lake Cnty.,

584 at 1326 (Holmes, J., concurring)("[T]he principal purpose of assessing whether plaintiff's

evidence gives rise to genuine issues of material fact is different [in a qualified immunity context]

than it is in the traditional summary judgment analytic paradigm.").

> "[T]he objective is not to determine whether a plaintiff survives
> summary judgment because plaintiff's evidence raises material issues that
> warrant resolution by a jury.  Instead, the principal purpose is to determine
> whether plaintiff's factual allegations are sufficiently grounded in the record

> such that they may permissibly comprise the universe of facts that will serve as
> the foundation for answering the legal question before the court."

Cox v. Glanz, 800 F.3d at 1243 (quoting Thomson v. Salt Lake Cnty., 584 F.3d at 1326 (Holmes,

J., concurring)).  If the plaintiff successfully establishes the violation of a clearly established right

-- "the legal question before the court" -- based upon his or allegations grounded sufficiently in

the record, then the burden returns to the defendant to prove that he is entitled nonetheless to

judgment as a matter of law.  Medina v. Cram, 252 F.3d 1124, 1128 (10th Cir. 2001).  Only at this

point, once the nonmovant "crosses the legal hurdle comprised of his or her two-part burden," and

shifts the burden to the defendants, should "the courts be concerned with the true factual landscape

-- as opposed to the factual landscape as plaintiff would have it."  Thomson v. Salt Lake Cnty.,

584 at 1326 (Holmes, J., concurring).  "Based upon that true factual landscape, courts should

determine whether defendant can carry the traditional summary judgment burden of establishing

that there are no genuine issues of material fact for jury resolution and that defendant is entitled to

judgment as a matter of law."  Thomson v. Salt Lake Cnty., 584 at 1326 (Holmes, J., concurring).

See Green v. Padilla, No. CIV 19-0751, 2023 WL 6540904, at *48-49 (D.N.M. October 6,

2023)(Browning, J.).

     Under this standard, adopting Roemer's "version of the facts," Scott v. Harris, 550 U.S.

372, 378 (2007), the Court concludes that Roemer has not carried his "heavy" burden to defeat

summary judgment on Castille, Delovato, Arvizu, Conner, Flores, and Gompper's qualified

immunity defense.  As to the first prong, the Court concludes that Roemer has not shown that

Castille, Delovato, Arvizu, Conner, Flores, or Gompper violated his rights under the First

Amendment in the context at issue.  Moreover, even if they had violated Roemer's rights, as to the

second prong, Roemer has "made no more than an anemic attempt to carry this burden as to the

clearly-established-law question," and "did virtually nothing to define the contours of the clearly-

established-law question, as to which []he ultimately carried the burden of proof in the qualified-immunity context." <u>Cox v. Glanz</u>, 800 F.3d at 1245-46.

   **IT IS ORDERED** that: (i) the Defendants' Motion for Judgment on the Pleadings or For Summary Judgment Based on Qualified Immunity on Count I of Plaintiff's Complaint and Memorandum in Support, filed April 21, 2023 (Doc. 55), is granted; and (ii) the Defendants' Motion for Summary Judgment Based on Qualified Immunity on Courts II-IV of Plaintiff's Complaint and Memorandum in Support, filed April 21, 2023 (Doc. 56), is granted.


_____
UNITED STATES DISTRICT JUDGE


*Counsel:*

Samantha Harris
Allen Harris PLLC
Narbeth, Pennsylvania

-- and --

Michael Thad Allen
Allen Harris PLLC
Quaker Hill, Connecticut

-- and --

Nicholas Thomas Hart
Harrison & Hart, LLC
Albuquerque, New Mexico

   *Attorneys for the Plaintiff*

Cody R. Rogers
Serpe Andrews, PLLC

Las Cruces, New Mexico

*Attorneys for Defendant Board of Regents of New Mexico State University, Dan Arvizu, Donald Conner, Annamarie DeLovato, Rolando Flores, and Matthew Gompper*

Michelle Lalley Blake
Allen Law Firm, LLC
Albuquerque, New Mexico

*Attorneys for Defendant Laura Castille*