## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

GARY ROEMER,

      Plaintiff,

vs.                                                                                   No. CIV 22-0524 JB/JHR

BOARD OF REGENTS OF NEW MEXICO
STATE UNIVERSITY; DAN ARVIZU;
LAURA CASTILLE; DONALD CONNER;
ANNAMARIE DELOVATO; ROLANDO
FLORES and MATTHEW GOMPPER,
individually and in their official capacities,

      Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on: (i) the Plaintiff's Motion for Partial Judgment on the Pleadings, filed February 14, 2023 (Doc. 42)("Motion"); (ii) the Defendants' Motion for Judgment on the Pleadings or for Summary Judgment Based on Qualified Immunity on Count I of Plaintiff's Complaint and Memorandum in Support, filed April 21, 2023 (Doc. 55)("Count I QI Motion"); and (iii) the Defendants' Motion for Summary Judgment Based on Qualified Immunity on Counts II-IV of Plaintiff's Complaint and Memorandum in Support, filed April 21, 2023 (Doc. 56)("Counts II-IV QI Motion"). The Court held a hearing on June 16, 2023. See Clerk's Minutes at 1, filed June 16, 2023 (Doc. 83). The primary issues are: (i) whether § 3.25 of New Mexico State University's Administrative Rules and Procedures (ARP) -- the university's anti-discrimination policy -- is facially overbroad with respect to the First Amendment of the Constitution of the United States; (ii) whether ARP 3.80 -- another NMSU policy prohibiting bullying, hazing, and "hostile misconduct" -- likewise is facially overbroad; (iii) whether ARP 3.80 is void for vagueness in violation of the First Amendment; (iv) whether Defendants Laura

Castille, New Mexico State University's[1] Office of Institutional Equity's Executive Director, Annamarie DeLovato, New Mexico State University's Office of Institutional Equity's Deputy Director, and Dan Arvizu, New Mexico State University's then-Chancellor,[2] are entitled to qualified immunity on Count I's allegation that Ms. Castille, Delovato, and Arvizu deprive Plaintiff Gary Roemer, a professor at New Mexico State University ("NMSU"), of his Constitutional right to Due Process that the Fifth and Fourteenth Amendments to the Constitution of the United States guarantees; (v) whether Arvizu and the NMSU Board of Regents ("Regents Board") administered an NMSU policy -- ARP 3.25 -- that is facially overbroad in violation of the First Amendment, as Count II alleges; (vi) whether Arvizu and the Regents Board administered another NMSU policy -- ARP 3.80 -- that is facially overbroad and facially vague in violation of the First Amendment, as Count III alleges; and (vii) whether Ms. Castille, Delovato, Arvizu, the Regents Board, Defendants Donald Conner, NMSU's Associate Dean & Director of Academic Programs in the College of Agriculture, Consumer, and Environmental Sciences, Rolando Flores, NMSU's Dean of the College of Agriculture, Consumer, and Environmental Sciences, and Matthew Gompper, NMSU's Department of Fish, Wildlife, and Conservation Ecology's head, are entitled to summary judgment on Count IV's allegation that the Defendants violate Roemer's First Amendment rights by disciplining and terminating him pursuant to ARP 3.25 and ARP 3.80, because Roemer's alleged violation of these policies involves speech that Roemer contends is Constitutionally protected.  The

---

[1]New Mexico State University is a public university in Las Cruces, New Mexico.

[2]Dan Arvizu is no longer New Mexico State University's Chancellor.  See NMSU Regents, Chancellor Announce Mutual Separation; Gogue Named Interim Chancellor, https://newsroom.nmsu.edu/news/nmsu-regents--chancellor-announce-mutual-separation--gogue-named-interim-chancellor/s/80be0114-343d-4d3c-8b4a-1804519285ea (last visited Feb. 26, 2025).

Court concludes that: (i) ARP 3.25 is facially Constitutional; (ii) ARP 3.80 is facially Constitutional; (iii) ARP 3.80 is not unconstitutionally vague; (iv) the Regents Board, Arvizu, Ms. Castille, and DeLovato are entitled to summary judgment -- and, as to Arvizu, Ms. Castille, and DeLovato, qualified immunity -- as to Count I's allegations that Regents Board, Arvizu, Ms. Castille, and DeLovato deprive Roemer of his Constitutional right to Due Process; (v) Arvizu and the Regents Board are entitled to summary judgment -- and Arvizu is entitled to qualified immunity -- as to Count II's allegation that they administered an NMSU policy -- ARP 3.25 -- that is facially overbroad in violation of the First Amendment; (vi) the Regents Board and Arvizu are entitled to summary judgment – and Arvizu is entitled to qualified immunity -- as to Count III's allegations that they administered another NMSU policy -- ARP 3.80 -- that is facially overbroad and facially vague in violation of the First Amendment; and (vii) the Regents Board, Arvizu, Ms. Castille, Conner, DeLovato, Flores, and Gompper are entitled to summary judgment -- and, as to the each Defendant besides the Regents Board, qualified immunity -- as to Count IV's allegation that the Defendants violate Roemer's First Amendment rights by disciplining and terminating him pursuant to ARP 3.25 and 3.80.  Accordingly, the Court: (i) denies the Motion; (ii) grants the Count I QI Motion; and (iii) grants the Counts II-IV QI Motion.

## **FACTUAL BACKGROUND**

The Court provides two factual background sections below, because the legal standard for each motion requires a different factual analysis.  First, the Court provides a factual background for purposes of deciding Roemer's rule 12(c) Motion; as discussed below, the Court takes these facts from the pleadings and considers them in the light most favorable to the Defendants as the non-movants.  Second, the Court provides the undisputed facts for purposes of deciding the Count I QI Motion and the Counts II-IV QI Motion; pursuant to rule 56(a) of the Federal Rules of Civil

Procedure, the Court takes these facts from the parties' statements of undisputed material fact and considers them in the light most favorable to Roemer as the non-movant.

1.    **The Factual Background for Roemer's rule 12(c) Motion.**

The standard for evaluating a rule 12(c) motion for judgment on the pleadings is the same as the standard for evaluating a rule 12(b)(6) motion to dismiss.  See Caldwell v. Univ. of N.M. Bd. of Regents, 679 F. Supp. 3d 1087, 1104 (D.N.M. 2023)(Browning, J.)("Caldwell")(citing Atl. Richfield Co. v. Farm Credit Bank of Wichita, 226 F.3d 1138, 1160 (10th Cir. 2000)).  Under this standard, the Court accepts "'all facts pleaded by the non-moving party as true and grants all reasonable inferences from the pleadings' in that party's favor."  Sanders v. Mountain Am. Fed. Credit Union, 689 F.3d 1138, 1141 (10th Cir. 2012)(quoting Park Univ. Enters. Inc. v. Am. Cas. Co., 442 F.3d 1239, 1244 (10th Cir. 2006)).  Because Roemer, the plaintiff, is the movant, the Court will consider as true (i) facts pleaded in the Answer, filed August 17, 2022 (Doc. 23), and (ii) only those facts pleaded in the Complaint and Jury Demand, filed July 15, 2022 (Doc. 1)("Complaint"), that the Defendants do not deny in the Answer.

Roemer was a tenured professor at NMSU in the College of Agriculture, Consumer, and Environmental Sciences ("College").  See Complaint ¶ 11, at 3 (asserting this fact); Answer ¶ 11, at 2 (admitting this fact).  On September 28, 2020, J.B., a graduate student who worked under Roemer, filed a sexual-harassment complaint against him ("the First Complaint").  See Complaint ¶¶ 39, 41, at 11 (asserting this fact); Answer ¶¶ 39, 41, at 7 (admitting this fact).  In the First Complaint, J.B. alleges that Roemer occasionally hugged her, put his arm around her, and kissed her on the cheek; moreover, she alleges that he made inappropriate comments about her attire and suggested that she should not get a boyfriend lest a romantic relationship distract her from her work.  See Complaint ¶ 43, at 12 (asserting this fact); Answer ¶ 43, at 7 (admitting this fact).  Soon

after J.B. filed the First Complaint, on November 7, 2020, Roemer removed her from his State Scientific Collecting Permit.[3]  See Complaint ¶ 45, at 12 (asserting this fact); Answer ¶ 45, at 7 (admitting this fact).  In response, NMSU directed Roemer "to stop retaliating against JB, strongly warned [him] that further retaliation could constitute a further actionable violation of NMSU administrative rules and procedures, and placed him on administrative leave to prevent further instances of retaliation."  See Complaint ¶ 46, at 13 (asserting this fact).  Answer ¶ 46, at 7-8 (admitting this fact).

A few weeks after NMSU placed Roemer on administrative leave, a second graduate student filed a sexual-harassment complaint against him in December 2020 ("the Second Complaint").  See Answer ¶ 49, at 8 (admitting this fact); Complaint ¶ 49, at 13 (asserting this fact).  The Second Complaint alleges that Roemer purposefully targeted female graduate students for harassment and discrimination based on their gender, and references in particular an email that he sent that contains a graphic description of sexual assault.  See Answer ¶ 50, at 8 (admitting this fact); Complaint ¶¶ 50-53, at 14 (asserting that the Second Complaint references an email Roemer sent and further alleging that it "cast several wholly benign, stray remarks of Plaintiff's from over the years as discriminatory conduct").  The Second Complaint also documents a number of Roemer's "discriminatory and inappropriate remarks" from years past.  See Complaint ¶¶ 50-53, at 14 (asserting that the Second Complaint discusses several of Roemer's remarks from over the years); Answer ¶ 53, at 8 (admitting this fact).

NMSU held hearings on the two complaints on August 17, 2021.  Complaint ¶ 97, at 23

---

[3]The New Mexico Department of Game and Fish issues permits for individuals seeking authorization for the taking of protected wildlife for education, scientific, or research purposes. N.M. Code R. § 16.35.6.6.

(asserting this fact); Answer ¶ 97, at 11 (admitting this fact).  The hearing officer, attorney Jacquelyn Archuleta-Staehlin, issued opinions in each of the two cases, finding that Roemer violated ARP 3.25, the anti-discrimination policy, violated ARP 3.80, the anti-bullying policy, and recommending that NMSU terminate his employment.  Complaint ¶ 98, at 23 (asserting this fact); Answer ¶ 98, at 11 (admitting this fact).  Roemer appealed the decision, but then-Chancellor Arvizu denied his appeal.  Complaint ¶¶ 104, 107-08, at 24-25 (asserting this fact).  Answer ¶ 108, at 11 (admitting this fact).

2.  **Undisputed Material Facts for the Summary Judgment Motions**.

The Court states the undisputed material facts in the text, and the Court discusses specifically facts that are purportedly disputed or actually disputed in the footnotes. The Court derives the undisputed facts from: the Count I QI Motion; the Counts II-IV QI Motion; the Plaintiff's Response to Defendants' Motion for Judgment on the Pleadings or for Summary Judgment Based on Qualified Immunity on Count I, filed May 12, 2023 (Doc. 65)("Count I Response");[4] the Plaintiff's Response to Defendants' Motion for Judgment [sic] Based on

---

[4]Concerning the procedural rules that govern the movant's submission of a reply to summary judgment motion, D.N.M.LR-Civ. 56.1(b) provides:

> The response must contain a concise statement of the material facts cited by the movant as to which the non-movant contends a genuine issue does exist.  Each fact in dispute must be numbered, must refer with particularity to those portions of the record upon which the non-movant relies, and must state the number of the movant's fact that is disputed.  All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted. The response may set forth additional facts other than those which respond to the Memorandum which the non-movant contends are material to the resolution of the motion.  Each additional fact must be lettered and must refer with particularity to those portions of the record upon which the non-movant relies.

D.N.M.LR-Civ. 56.1(b).

Qualified Immunity on Counts II-IV of Plaintiff's Complaint, filed May 12, 2023 (Doc. 66)("Count II-IV Response"); the Defendants' Reply to Plaintiff's Response to Motion for Summary Judgment Based on Qualified Immunity on Count I of Plaintiff's Complaint and Memorandum in Support, filed June 2, 2023 (Doc. 76)("Count I Reply"); and the Defendants' Reply to Plaintiff's Response to Motion for Summary Judgment Based on Qualified Immunity on Counts II-IV of Plaintiff's Complaint and Memorandum in Support, filed June 2, 2023 (Doc. 77)("Counts II-IV Reply").

 The Defendants' two summary judgment motions share many undisputed material facts. Rather than repeating these facts in the factual background section, the Court will indicate when a fact appears only in one summary judgment motion, as opposed to both summary judgment motions.  Similarly, Roemer's two response briefs also share many of the same additional facts. Rather than repeating these facts in the factual background section, the Court will indicate when a fact appears only in one of Roemer's responses, rather than both responses.[5]

**3.     Roemer's Wage Discrimination Complaint.**

 In 2019, Roemer filed a discrimination complaint with NMSU's Office of Institutional Equity ("OIE"), alleging that more junior, Hispanic faculty members in his department received

---

 In submitting his Count I Response and his Counts II-IV Responses, Roemer does not always properly classify each fact in a lettered order, nor does he always properly reference the respective letter of each of the Count I QI Motion's and Counts II-IV QI Motion's facts that he disputes, as D.N.M.LR-Civ. 56.1(b) requires.  The Court will not, however, disregard Roemer's otherwise sound disputations in his responses on procedural grounds.  See Tapia v. City of Albuquerque, 10 F. Supp. 3d 1207, 1252 (D.N.M. 2014)(Browning, J.)(citations omitted)("[T]he Court . . . generally does not grant dispositive motions on procedural defaults alone.").

 [5]For clarification and consistency, when citing briefs, exhibits, or other documents filed in the CM/ECF system, the Court cites to the page numbers that the CM/ECF system places on the upper, right-hand corner of the documents.

higher wages than him.  See Count I Response at 2 (asserting this fact); Counts II-IV Response at 2-3 (asserting this fact); Letter from Gary Roemer to OIE at 1 (not dated), filed May 12, 2023 (Doc. 66-5)("Roemer's OIE Complaint").[6]  Ms. Castille summarily dismissed Roemer's OIE Complaint without investigation.  See Count I Response at 2 (asserting this fact); Counts II-IV Response at 3 (asserting this fact); Letter from Laura Castille to Gary Roemer at 1 (dated Feb. 5, 2019), filed May 12, 2023 (Doc. 66-6).[7]  On February 21, 2019, Ms. Castille sent Roemer an email in which she states: "'sexual harassment occurs when someone is offended by the remark or the action and it does not matter whether the remark or action was intended to be offensive.'"  Counts II-IV Response at 22 (quoting Email from Laura Castille to Gary Roemer at 5 (dated Feb. 21, 2019), filed May 12, 2023 (Doc. 66-14))(asserting this fact); Email from Laura Castille to Gary Roemer at 5 (dated Feb. 21, 2019).[8]  Later that year, New Mexico's Human Rights Bureau determined that Roemer's wage-discrimination complaint had probable cause.[9]  See Count I Response at 2 (asserting this fact); Counts II-IV Response at 3 (asserting this fact); Letter from

---

[6]Roemer has not included this fact in a separate section of "lettered" "additional facts"; accordingly, the Court is not required to consider this additional information.  D.N.M.LR-Civ. 56.1(b).  Nevertheless, the Defendants' replies do not mention, contradict, address, or otherwise respond to this fact; accordingly, the Court deems this fact undisputed.

[7]Roemer has not included this fact in a separate section of "lettered" "additional facts"; accordingly, the Court is not required to consider this additional information.  D.N.M.LR-Civ. 56.1(b).  Nevertheless, the Defendants' replies do not mention, contradict, address, or otherwise respond to this fact; accordingly, the Court deems this fact undisputed.

[8]Roemer has not included this fact in a separate section of "lettered" "additional facts"; accordingly, the Court is not required to consider this additional information.  D.N.M.LR-Civ. 56.1(b).  Nevertheless, the Defendants' replies do not mention, contradict, address, or otherwise respond to this fact; accordingly, the Court deems this fact undisputed.

[9]The Count I Response does not explain or describe the process through which the New Mexico Human Rights Bureau learned about and evaluated Roemer's OIE complaint.

Bill McCamley, New Mexico Department of Workforce Solutions Cabinet Secretary, to Gary

Roemer at 1 (dated Oct. 17, 2019), filed May 12, 2023 (Doc. 66-7).[10]

4.    <u>**Chancellor Arvizu's Email About the Shooting of Jacob Blake, Roemer's Response
      to Arvizu's Email, and Roemer's Email to Jessica Buskirk.**</u>

On August 28, 2020, Chancellor Arvizu sent "the entire NMSU community" an email in

which he describes the police shooting of Jacob Blake in Kenosha, Wisconsin, "as 'another

instance of a Black man being shot by law enforcement, this time in the back, as his children

looked on.'"  Counts II-IV Response at 23 (quoting Dan's Dispatch at 1 (dated August 28, 2020),

filed May 12, 2023 (Doc. 66-15))(asserting this fact); Dan's Dispatch at 1.[11]  On August 29, 2020,

Roemer responds to Arvizu's email by sending an email to an NMSU faculty email list and several

NMSU graduate students regarding the police shooting of Jacob Blake.[12]  <u>See</u> Count I Response

----

[10]Roemer has not included this fact in a separate section of "lettered" "additional facts";
accordingly, the Court is not required to consider this additional information.  <u>See</u> D.N.M.LR-Civ.
56.1(b).  Nevertheless, the Defendants' replies do not mention, contradict, address, or otherwise
respond to this fact; accordingly, the Court deems this fact undisputed.

[11]Roemer has not included this fact in a separate section of "lettered" "additional facts";
accordingly, the Court is not required to consider this additional information.  <u>See</u> D.N.M.LR-Civ.
56.1(b).  Nevertheless, the Defendants' replies do not mention, contradict, address, or otherwise
respond to this fact; accordingly, the Court deems this fact undisputed.

[12]For clarity's sake, the full text of Roemer's email, with the subject line "Dan's Dispatch,
Jacob Blake and my hometown," is below:

I was born in Kenosha, Wi on October 11, 1960.  My Mom was born in
Kenosha to two immigrant parents, and my Dad immigrated there from Germany
in 1926 with his family. Both of my parents lived through the Great Depression and
my Dad and my Uncle Gay fought in WWII against their homeland. My Dad was
in Normandy on D-Day . My Dad became a factory worker at American Motors,
Corp., my Mom was a bookkeeper/office assistant, and together, they built a home,
raised 4 kids and gave my siblings and myself a great upbringing on a modest
income.  My oldest brother is a retired police officer from nearby Racine, WI and
my nephew is a police officer. There was always a lot of racial tension in my
hometown, but my Dad was most definitely not a racist, and he taught me many

things before he died of a heart attack in my second semester of college. One was that there are at least two sides to every story.

After what happened in Kenosha, I called family and friends and they told me some things you may not be aware of, so I found some additional information.

The Kenosha police officers were responding to a 911 call from a woman, and that Mr. Blake is accused "of breaking into the home of a woman he knew and sexually assaulting her." https://nypost.com/2020/08/28/this-iswhy-jacob-blake-had-a-warrant-out-for-his-arrest/

"The victim, ..., told police she was asleep in bed with one of her children when Blake came into the room around 6 a.m. and allegedly said "I want my sh-t," She told cops Blake then used his finger to sexually assault her, sniffed it and said, "Smells like you've been with other men," the criminal complaint alleges."

Before this incident, "Police filed charges against him for felony sexual assault, trespassing and domestic abuse in July when a warrant was issued for his arrest."

"Officers who encounter people with active warrants are required to take them into custody." https://www.kenoshanews.com/news/local/police-union-releases-statement-on-blake-shooting/article_140a3c34-d0b4-5a78-b838-e2ace80cf8dc.html

During the incident, "officers went "hands-on" with Blake and two officers used tasers. "Mr. Blake forcefully fought with the officers," including putting one of the officers in a headlock." It has been further alleged that "Mr. Blake was not unarmed. He was armed with a knife.  The officers did not see the knife initially," ... "The officers issued repeated commands for Mr. Blake to drop the knife. He did not comply."

This is corroborated by a bystander, "The witness who recorded the shooting, 22-year-old Raysean White, has said he hadn't seen a knife in Blake's hand, but that he heard the officers yell to him, "Drop the knife! Drop the knife!" before they shot Blake in front of his young children." https://nypost.com/2020/08/29/kenosha-cops-say-jacobblake-was-holding-knife-contradicting-ag/

I'm obviously not trained as a police officer, but from what I saw, excessive lethal force was most likely used, but if you had responded to a 911 call, scuffled with a man that you knew had a warrant out for his arrest for domestic violence, who continued to resist arrest, and who appears to have been wielding a knife, would you have acted perfectly or could you have made a grave mistake?

at 1 (asserting this fact); Counts II-IV Response at 1 (asserting this fact); Email from Gary Roemer

to Faculty-Talk at 1 (dated Aug. 29, 2020), filed May 12, 2023 (Doc. 66-2)("Blake Email").[13] On

September 8, 2020, Roemer exchanged emails with his graduate-student advisee, Jessica Buskirk,

about upcoming field work for her master's thesis on desert kit foxes; in one email, Roemer writes

---

Yet our Chancellor wrote this: "A number of major events made national news this week.  We were all heartbroken when we received word of the police shooting of Jacob Blake in Kenosha, Wisconsin.  Sadly, this is yet another instance of a Black man being shot by law enforcement, this time in the back, as his children looked on.  Our frustration with this seemingly endless string of similar, repeated events was further compounded when a teenager shot three protestors, killing two of them, in the days that followed.  Our deepest sympathies are with the families of everyone who has been impacted by these tragic events.  I am hopeful that our country will soon be able to come together to find common cause and move toward meaningful change in the name of social justice."

There have certainly been some recent incidents where innocent black people have been murdered at the hands of white people, and our country has a history of such violence and injustice.  But that said, I think it is incumbent upon academic professionals to conduct research and seek the truth, and to draw objective inferences before rushing to a conclusion or passing judgement, because there is always at least two sides to every story.

Respectfully,

Dr. Gary Roemer, Professor
Dept. of Fish, Wildlife & Conservation Ecology
New Mexico State University
Las Cruces, NM 88003
Off: 575-646-3394
groemer@nmsu.edu

Blake Email at 1-2.

[13]Roemer has not included this fact in a separate section of "lettered" "additional facts"; accordingly, the Court is not required to consider this additional information.  See D.N.M.LR-Civ. 56.1(b).  The Defendants' Counts II-IV QI Motion references this email.  See Counts II-IV QI Motion at 13-14.  Moreover, unambiguous record evidence establishes Roemer sent this email. See Faculty-Talk Email at 1.  Because both parties agree on the substance of the above-the-line proposition, and the record unambiguously establishes this fact, the Court deems it undisputed.

to Buskirk: "Jesus Jess, who taught you how to trap foxes?"  Counts II-IV Response at 1 (asserting

this fact); Count I Response at 1; Email from Gary Roemer to Jessica Buskirk at 1 (dated Sept. 8,

2020), filed May 12, 2023 (Doc. 66-1).[14]

5.    **The Graduate Students' Complaints, and the OIE Investigation.**

On September 9, 2020, Ms. Castille recommends over email that NMSU accept Cuddy &

McCarthy, LLP's bid to serve as Hearing officers for NMSU without considering other proposals.

See Count I Response at 6 (asserting this fact); Email from Laura Ms. Castille to Roy Collins at 2

(dated Sept. 9, 2020), filed May 12, 2023 (Doc. 65-13).[15]  On September 10, 2020, Allison Salas

filed a complaint with OIE alleging that Roemer sexually and racially harassed her by forwarding

her Roemer's Blake Email.  See Count I Response at 2 (asserting this fact); NMSU Campus

Community Incident Report Form at 1 (dated Sept. 10, 2020), filed May 12, 2023 (Doc. 65-

4)("Salas Complaint").[16]  On September 13, 2020, Brittany Schweiger filed a complaint with OIE

---

[14]Roemer has not included this fact in a separate section of "lettered" "additional facts"; accordingly, the Court is not required to consider this additional information.  See D.N.M.LR-Civ. 56.1(b).  Nevertheless, the Defendants' replies do not mention, contradict, address, or otherwise respond to this fact; accordingly, the Court deems this fact undisputed.

[15]The Defendants' Count I Reply does not dispute this fact, but it instead asserts that this fact is "immaterial."  Count I Reply at 3.  Arguing a proposed fact at summary judgment is immaterial to the Court's disposition of the summary judgment motion and is not effective to contest a fact.  See Lowery v. City of Albuquerque, No. CIV 09-0457 JB/WDS, 2011 WL 1336670 at *4 n.8 (D.N.M. Mar. 31, 2011)(Browning, J.).  If necessary, the Court will address materiality in the Analysis, but will deem the fact undisputed for the Factual Background section.  See Walton v. N.M. State Land Off., 49 F. Supp. 3d 920, 924 n.2 (D.N.M. 2014)(Browning, J.)("[O]bjecting to an asserted fact as immaterial in response to an asserted fact effectively deems the fact undisputed.").  Accordingly, the Court deems this fact undisputed.

[16]The Defendants' Replies do not respond directly to Roemer's assertion about the Salas Complaint, likely because Roemer does not include this fact in a separate section of "lettered" "additional facts," as D.N.M.LR-Civ. 56.1(b) requires.  D.N.M.LR-Civ. 56.1(b).  Both the Count I QI Motion and the Counts II-IV QI Motion cite to the Salas Complaint, however.  See Count I QI Motion at 3 (citing Salas Complaint); Counts II-IV QI Motion at 4 (citing Salas Complaint).

alleging that Roemer sexually and racially harassed her by forwarding her the Blake Email.  See Count I Response at 2 (asserting this fact); Email from Brittany Schweiger to Institutional Equity at 1 (dated Sept. 13, 2020), filed May 12, 2023 (Doc. 66-5)("Schweiger Complaint").[17]  On September 14, 2020, Buskirk reported Roemer to OIE, alleging that Roemer bullied her and made several inappropriate comments to her regarding her appearance and her professional attire.  See Office of Institutional Equity Complaint at 1 (dated December 1, 2020), filed May 12, 2023 (Doc. 66-12)("December 1 OIE Complaint").[18]  In an interview with Salas on September 14, 2020, Ms.

---

Accordingly, because the parties do not dispute the Salas Complaint's timing or existence, the Court deems the text's fact -- that on September 10, Allison Salas files a complaint with OIE alleging that Roemer sexually and racially harassed her by forwarding her the Blake Email -- undisputed.

[17]The Defendants' Replies do not respond directly to Roemer's assertion about the Schweiger Complaint, likely because Roemer does not include this fact in a separate section of "lettered" "additional facts," as D.N.M.LR-Civ. 56.1(b) requires.  D.N.M.LR-Civ. 56.1(b).  Both the Count I QI Motion and the Counts II-IV QI Motion cite, however, to the Schweiger Complaint.  See Count I QI Motion at 3 (citing Schweiger Complaint); Counts II-IV QI Motion at 4 (citing Schweiger Complaint).   Accordingly, because the parties do not dispute the Schweiger Complaint's timing or existence, the Court deems the text's fact -- that on September 13, Brittany Schweiger files a complaint with OIE alleging that Roemer sexually and racially harassed her by forwarding her the Blake email -- undisputed.

[18]Roemer's Responses both assert that Buskirk reported Roemer to OIE, but neither response asserts precisely when Buskirk filed the report.  See Count I QI Response at 1 (stating that NMSU terminated Roemer after Buskirk "brought a Title IX complaint in which she falsely alleged" that Roemer sexually harassed her); Counts II-IV QI Response at 2 (stating that "Buskirk filed a complaint alleging that" Roemer sexually harassed her)(citing Email from Laura Castille to Gary Roemer at 1, dated September 28, 2020 7:35 p.m., filed May 12, 2023 (Doc. 66-4)("Sept. 28 Ms. Castille Email")).  The Sept. 28 Ms. Castille Email informs Roemer that Buskirk filed a report against him with OIE, but the email does not state when Buskirk filed the report.  See Sept. 28 Ms. Castille Email at 1.  Elsewhere in the Counts II-IV Response, however, Roemer cites to Office of Institutional Equity Complaint (dated December 1, 2020), filed May 12, 2023 (Doc. 66-12)("Dec. 1 OIE Complaint").  The Dec. 1 OIE Complaint states: "On September 14, 2020, OIE has received a report alleging that Gary Roemer ('Respondent') 'bullied' a female graduate student."  Dec. 1 OIE Complaint at 1.  The document goes on to state: "The graduate student was later identified as Jessica Buskirk."  Dec. 1 OIE Complaint at 1.

The Court's goal in the Factual Background section is to present the undisputed facts in

Castille tells Salas that Salas is "right" about Roemer, and states: "I don't know that we can ever get Gary to stop being Gary. I think the question is, when can we stop letting Gary be Gary at New Mexico State University?" Count I Response at 9 (asserting this fact); Audio Recording: Interview Between Laura Castille and Allison Salas at 38:27 (taken Sept. 14, 2020).[19]

On September 21, 2020, Gommper and Conner sent Roemer a memorandum containing a warning regarding the Blake Email. See Counts II-IV Response at 16 (asserting this fact); Letter from Matthew Gompper and Donald Conner to Gary Roemer at 1 (dated Sept. 21, 2020), filed May 12, 2023 (Doc. 66-8)("Gompper and Conner Letter").[20] The written warning states that the Blake Email "'constitutes hostile misconduct and violates NMSU ARP 3.80.'" Counts II-IV Response at 16 (asserting this fact)(quoting Gommper and Conner Letter at 1); Gompper and

_____

chronological order. Neither party includes Buskirk's report to OIE as an exhibit, so the Court has to rely on other record evidence referring to Buskirk's report to assign the report a date and include it in the proper position in the Factual Background section. As the preceding paragraph discusses, Roemer's responses are vague as to when Buskirk filed the report. Accordingly, the Court is left to choose between two pieces of Roemer's record evidence in its effort to assign the Buskirk report a date: the Sept. 28 Ms. Castille Email and the Dec. 1 OIE Complaint. Because the Dec. 1 OIE Complaint asserts explicitly that OIE received Buskirk's complaint on September 14, 2020, the Court adopts that date in the text as the date upon which Buskirk filed the OIE report about Roemer.

[19]Roemer has not included this fact in a separate section of "lettered" "additional facts"; accordingly, the Court is not required to consider this additional information. D.N.M.LR-Civ. 56.1(b). Nevertheless, the Defendants' replies do not mention, contradict, address, or otherwise respond to this fact; accordingly, the Court deems this fact undisputed.

Additionally, the parties do not identify this recording's date in their briefs. Accordingly, the Court uses the date included in the audio file's metadata.

[20]Roemer has not included this fact in a separate section of "lettered" "additional facts"; accordingly, the Court is not required to consider this additional information. D.N.M.LR-Civ. 56.1(b). Nevertheless, the Defendants' replies do not mention, contradict, address, or otherwise respond to this fact; accordingly, the Court deems this fact undisputed.

Conner Letter at 1.[21]    On September 22, 2020, in an interview with Schweiger, Ms. Castille states

that Roemer "thinks he's untouchable."    See Count I Response at 9 (asserting this fact); Audio

Recording: Interview Between Laura Castille and Brittany Schweiger at 51:35 (taken September

22, 2020)("Schweiger Interview").[22]    On September 24, 2020, in an interview with Buskirk,

Buskirk asks Ms. Castille about the likelihood that Roemer would face consequences from the OIE

investigation; Ms. Castille responds, "I think it's likely."    Count I Response at 9 (asserting this

fact); Audio recording: Interview Between Laura Castille and Jessica Buskirk at 1:17:20 (taken

Sept. 24, 2020)("Buskirk Interview").[23]    In the same interview, Ms. Castille states that the

investigation "needs to happen, we need to move forward with this."    Count I Response at 9

(asserting this fact); Buskirk Interview at 1:19:38.[24]

---

[21]Roemer has not included this fact in a separate section of "lettered" "additional facts"; accordingly, the Court is not required to consider this additional information.  D.N.M.LR-Civ. 56.1(b).  Nevertheless, the Defendants' replies do not mention, contradict, address, or otherwise respond to this fact; accordingly, the Court deems this fact undisputed.

[22]Roemer has not included this fact in a separate section of "lettered" "additional facts"; accordingly, the Court is not required to consider this additional information.  D.N.M.LR-Civ. 56.1(b).  Nevertheless, the Defendants' replies do not mention, contradict, address, or otherwise respond to this fact; accordingly, the Court deems this fact undisputed.
    Additionally, the parties do not identify this recording's date in their briefs.  Accordingly, the Court uses the date included in the audio file's metadata.

[23]Roemer has not included this fact in a separate section of "lettered" "additional facts"; accordingly, the Court is not required to consider this additional information.  D.N.M.LR-Civ. 56.1(b).  Nevertheless, the Defendants' replies do not mention, contradict, address, or otherwise respond to this fact; accordingly, the Court deems this fact undisputed.
    Additionally, the parties do not identify this recording's date in their briefs.  Accordingly, the Court uses the date included in the audio file's metadata.

[24]Roemer has not included this fact in a separate section of "lettered" "additional facts"; accordingly, the Court is not required to consider this additional information.  D.N.M.LR-Civ. 56.1(b).  Nevertheless, the Defendants' replies do not mention, contradict, address, or otherwise respond to this fact; accordingly, the Court deems this fact undisputed.

Buskirk attempted to switch graduate-thesis advisors, but Roemer emailed her on September 26, 2020, and conveyed his unwillingness to allow her to publish her thesis using data that belonged to him without his continued involvement.  See Counts II-IV Response at 2 (asserting this fact); Email from Gary Roemer to Jessica Buskirk (Sept. 26, 2020 5:50 p.m.) at 1-2, filed May 12, 2023 (Doc. 66-3)("Roemer's Data Email").[25]  As a result of Buskirk's OIE Complaint, Ms. Castille emailed Roemer, informing him that he would no longer serve on Buskirk's thesis committee.  See Counts II-IV Response at 2 (asserting this fact); Sept. 28 Ms. Castille Email at 1.[26]  On October 17, 2020, Fiona McKibben filed a complaint with OIE alleging that Roemer sexually and racially harassed her by forwarding her the Blake Email.  See Count I Response at 2 (asserting this fact); Email from Fiona McKibben to Institutional Equity at 1 (Oct. 17, 2020 9:24am), filed May 12, 2023 (Doc. 65-3)("McKibben Complaint").[27]

_____

[25]Roemer has not included this fact in a separate section of "lettered" "additional facts"; accordingly, the Court is not required to consider this additional information.  D.N.M.LR-Civ. 56.1(b).  Nevertheless, the Defendants' replies do not mention, contradict, address, or otherwise respond to this fact; accordingly, the Court deems this fact undisputed.

[26]Roemer has not included this fact in a separate section of "lettered" "additional facts"; accordingly, the Court is not required to consider this additional information.  See D.N.M.LR-Civ. 56.1(b).  Nevertheless, the Defendants' replies do not mention, contradict, address, or otherwise respond to this fact; accordingly, the Court deems this fact undisputed.

[27]The Defendants' Replies do not respond directly to Roemer's assertion about the McKibben Complaint, likely because Roemer does not include this fact in a separate section of "lettered" "additional facts," as D.N.M.LR-Civ. 56.1(b) requires.  D.N.M.LR-Civ. 56.1(b).  Both the Count I QI Motion and the Counts II-IV QI Motion cite to the McKibben Complaint, however.  See Count I QI Motion at 3 (citing McKibben Complaint); Counts II-IV QI Motion at 4 (citing McKibben Complaint).  Accordingly, because the parties do not dispute the McKibben Complaint's timing or existence, the Court deems the text's fact -- that on October 17, 2020, Fiona McKibben files a complaint with OIE alleging that Roemer sexually and racially harassed her by forwarding the Blake email -- undisputed.

6.    **OIE Issues Two Complaints Against Roemer in December 2020.**

On December 1, 2020, OIE issued a complaint against Roemer stemming from Buskirk's allegations.  See Counts II-IV Response at 18 (asserting this fact); Office of Institutional Equity Complaint at 1 (dated December 1, 2020), filed May 12, 2023 (Doc. 66-12)("Dec. 1 OIE Complaint").[28] On December 21, 2020, OIE issued a second complaint against Roemer, alleging multiple violations of NMSU's policy prohibiting discriminatory conduct based on sex or race. See Count I QI Motion at 3 (asserting this fact); Counts II-IV QI Motion at 3 (asserting this fact); Office of Institutional Equity Complaint at 1 (dated December 21, 2020), filed April 21, 2023 (Doc. 56-1)("December 21 OIE Complaint").[29]  The December 21 OIE Complaint alleges that Roemer made several comments to his graduate students about their dating life and physical appearance.  See Count I QI Motion at 3 (asserting this fact); Counts II-IV QI Motion at 3 (asserting this fact); December 21 OIE Complaint at 1.[30]  Additionally, the December 21 OIE Complaint alleges that Roemer made several demeaning and sexist comments to female colleagues.  See Count I QI Motion at 3 (asserting this fact); Counts II-IV QI Motion at 3 (asserting

---

[28]Roemer has not included this fact in a separate section of "lettered" "additional facts"; accordingly, the Court is not required to consider this additional information.  D.N.M.LR-Civ. 56.1(b).  Nevertheless, the Defendants' replies do not mention, contradict, address, or otherwise respond to this fact; accordingly, the Court deems this fact undisputed.

[29]Neither of Roemer's responses mention, contradict, address, or otherwise respond to this fact in the sections entitled "Plaintiff's Response to Defendants' Statement of Undisputed Material Fact"; accordingly, the Court deems this fact undisputed.  See D.N.M.LR-Civ. 56.1 ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[30]Neither of Roemer's responses mention, contradict, address, or otherwise respond to this fact in the sections entitled "Plaintiff's Response to Defendants' Statement of Undisputed Material Fact"; accordingly, the Court deems this fact undisputed.  See D.N.M.LR-Civ. 56.1 ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

this fact); December 21 OIE Complaint at 1.[31]  The December 21 OIE Complaint also alleges that

Roemer stated that a female student "'scored'" at a NMSU awards banquet; the December 21 OIE

Complaint does not state that Roemer was intoxicated when he made this statement.  Count I QI

Motion at 3 (asserting this fact); Counts II-IV QI Motion at 3 (asserting this fact); Count I Response

at 4 (not disputing this fact); Counts II-IV Response at 4 (not disputing this fact); December 21

OIE Complaint at 2.[32]  Furthermore, the December 21 OIE Complaint alleges that, in a meeting

with Roemer about the awards banquet, he stated he would be more careful with his word choice

in the future.  Count I QI Motion at 3 (asserting this fact); Counts II-IV QI Motion at 3 (asserting

this fact); December 21 OIE Complaint at 2.[33]  Finally, the December 21 OIE Complaint also

---

[31]Neither of Roemer's responses mention, contradict, address, or otherwise respond to this fact in the sections entitled "Plaintiff's Response to Defendants' Statement of Undisputed Material Fact"; accordingly, the Court deems this fact undisputed.  See D.N.M.LR-Civ. 56.1 ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[32]Both of the Defendants' motions also state that the December 21 OIE Complaint "identified a prior instance in which Roemer had gotten intoxicated at an awards banquet."  Count I QI Motion at 3 (citing December 21 OIE Complaint); Counts II-IV QI Motion (citing December 21 OIE Complaint).  Roemer successfully disputes this fact, stating that the December 21 OIE Complaint does not allege Roemer was intoxicated at the banquet.  See Count I Response at 4 (citing December 21 OIE Complaint); Counts II-IV Response at 4 (citing December 21 OIE Complaint).  The Defendants' replies both state, in response to Roemer's position, that "Plaintiff is correct."  Count I Reply at 1; Counts II-IV Reply at 2.  Accordingly, the Court deems the fact in the text -- that the December 21 OIE Complaint does not state that Roemer was intoxicated when Roemer stated at an awards banquet that his students "scored" -- undisputed.
    In the Count I Reply and the Counts II-IV Reply, the Defendants assert that the allegation that Roemer was intoxicated at the banquet appears in a separate document that Roemer received at the same time as he received the December 21 OIE Complaint.  See Count I Reply at 1-2; Counts II-IV Reply at 2; Memo From Lauri Millot to Case File at 1 (dated June 27, 2018), filed June 2, 2023 (Doc. 77-1)("Millot Memo").  The local rules regarding a reply, however, "do not provide for additional facts."  Herrera v. Santa Fe Pub. Schs., 41 F. Supp. 3d 1188, 1239 (D.N.M. 2014)(Browning, J.).  Accordingly, the Court does not include the Defendants' assertion about the Millot Memo in the text as a statement of undisputed material fact.

[33]Neither of Roemer's responses mention, contradict, address, or otherwise respond to this fact in the sections entitled "Plaintiff's Response to Defendants' Statement of Undisputed Material

alleges that Roemer bcc'ed graduate students in his department on an email he sent to the Faculty

Talk listserv[34] about the police shooting of Jacob Blake in Kenosha, Wisconsin.  See Count I QI

Motion at 3 (asserting this fact); Counts II-IV QI Motion at 3 (asserting this fact); December 21

OIE Complaint at 2.[35]

**7.    OIE's Investigation.**

OIE initiated an investigation pursuant to ARP 3.25.  See Count I QI Motion at 4 (asserting

this fact); Letter from Annamarie DeLovato to Brittany Schweiger at 1 (dated December 23, 2020),

filed April 21, 2023 (Doc. 55-3).[36]  On May 4, 2021, Roemer emailed DeLovato and stated he

could not access the evidence she electronically shared with him earlier that day, but DeLovato

ignored his email.  See Count I Response at 13 (asserting this fact); Email from Gary Roemer to

Annamarie DeLovato at 1 (dated May 4, 2021), filed May 12, 2023 (Doc. 65-19).[37]  On May 21,

---

Fact"; accordingly, the Court deems this fact undisputed.  See D.N.M.LR-Civ. 56.1 ("All material
facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[34]A  listserv  is  "an  online  mailing  list."    Listserv,  Dictionary.com,
https://www.dictionary.com/browse/listserv (last visited February 25, 2025).

[35]Neither of Roemer's responses mention, contradict, address, or otherwise respond to this
fact in the sections entitled "Plaintiff's Response to Defendants' Statement of Undisputed Material
Fact"; accordingly, the Court deems this fact undisputed.  See D.N.M.LR-Civ. 56.1 ("All material
facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[36]Neither of Roemer's responses mention, contradict, address, or otherwise respond to this
fact in the sections entitled "Plaintiff's Response to Defendants' Statement of Undisputed Material
Fact"; accordingly, the Court deems this fact undisputed.  See D.N.M.L.R.-Civ. 56.1 ("All material
facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[37]Roemer has not included this fact in a separate section of "lettered" "additional facts";
accordingly, the Court is not required to consider this additional information.  D.N.M.LR-Civ.
56.1(b).  Nevertheless, the Defendants' replies do not mention, contradict, address, or otherwise
respond to this fact; accordingly, the Court deems this fact undisputed.

2021, an NMSU employee admonished Roemer for contacting witnesses identified in a draft investigative report.  See Count I Response at 8 (asserting this fact); Final Investigation Report at 8 (dated July 21, 2021), filed April 21, 2023 (Doc. 56-3)("Final Report").[38]  On July 12, 2021, OIE issued its Final Report regarding the December 21 OIE Complaint.  See Count I QI Motion at 4 (asserting this fact); Counts II-IV QI Motion at 4 (asserting this fact); Final Report at 2.[39]  The Final Report contains investigative findings regarding Roemer's sexually inappropriate conduct towards female colleagues and graduate students.  See Count I QI Motion at 4 (asserting this fact); Counts II-IV Motion at 4 (asserting this fact); Final Report at 16; id. at 16 n.34.[40]  In the Final Report, OIE's investigator, DeLovato, concludes that, pursuant to ARP 3.25, the investigation will

---

[38]Roemer has not included this fact in a separate section of "lettered" "additional facts"; accordingly, the Court is not required to consider this additional information.  D.N.M.LR-Civ. 56.1(b).  Nevertheless, the Defendants' replies do not mention, contradict, address, or otherwise respond to this fact; accordingly, the Court deems this fact undisputed.

[39]Neither of Roemer's responses mention, contradict, address, or otherwise respond to this fact in the sections entitled "Plaintiff's Response to Defendants' Statement of Undisputed Material Fact"; accordingly, the Court deems this fact undisputed.  See D.N.M.L.R.-Civ. 56.1 ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[40]In his responses, Roemer purports to dispute that any of the conduct the Final Report describes was sexually inappropriate.  See Count I Response at 4; Counts II-IV Response at 4.  Roemer does not cite to any record evidence in support of his position.  The Final Report contains allegations that Roemer comments on female students' appearances and attractiveness.  See Final Report at 16 (alleging that Roemer, among other remarks, (i) describes Buskirk and another witness as "cute girls"; (ii) "suggested students date as they were attractive people"; and (iii) states that a student had "athletic legs").  Additionally, the Final Report contains an allegation that Roemer "stated something to the effect that even though he was married, that did not mean he could not 'look at the menu' in reference to a student whom he stated was attractive."  Final Report at 16 n.34.  The Court concludes, therefore, that Roemer's position that none of the conduct in the Final Report is sexually inappropriate, see Count I Response at 4, Counts II-IV Response at 4, lacks support in the record.  Accordingly, the Court deems the text's fact -- that the Final Report contains findings regarding Roemer's alleged sexually inappropriate conduct towards female colleagues and graduate students -- undisputed.

advance to a formal hearing and that, during the hearing, Roemer would be entitled to an advisor

who would have the chance to cross-examine witnesses, including the complainants.  See Count I

QI Motion at 4 (asserting this fact); Final Report at 25.[41]

8.      **The August 17, 2021, Hearing.**

NMSU held the formal hearing on August 17, 2021.  See Count I QI Motion at 4 (asserting

this fact); Counts II-IV QI Motion at 4 (asserting this fact); Transcript of Hearing at 1 (dated

August 17, 2021), filed April 21, 2023 (Doc. 55-5)("Pre-Termination Tr. (Doc. 55-5)").[42]  The

hearing officer, attorney Archuleta-Staehlin, is Ms. Castille's former colleague -- Ms. Castille

worked at Ms. Archuleta-Staehlin's law firm, Cuddy & McCarthy, LLP, prior to her employment

at NMSU.  See Count I Response at 6 (asserting this fact); Castille LinkedIn Profile at 1 (not

dated), filed May 12, 2023 (Doc. 65-11).[43]  Additionally, Ms. Castille returned to work at Cuddy

---

[41]Neither of Roemer's responses mention, contradict, address, or otherwise respond to this fact in the sections entitled "Plaintiff's Response to Defendants' Statement of Undisputed Material Fact"; accordingly, the Court deems this fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[42]Neither of Roemer's responses mention, contradict, address, or otherwise respond to this fact in the sections entitled "Plaintiff's Response to Defendants' Statement of Undisputed Material Fact"; accordingly, the Court deems this fact undisputed.  See D.N.M.L.R.-Civ. 56.1 ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[43]The Defendants' Count I QI Motion asserts that Ms. Archuleta-Staehlin "had no affiliation with NMSU," see Count I QI Motion at 4, and Roemer successfully disputes this fact, see Count I Response at 5.  The Defendants do not cite to any record evidence in support of their assertion that Ms. Archuleta-Staehlin had no affiliation with NMSU.  Accordingly, the Court does not include this assertion in the text as an undisputed fact.  See D.N.M.LR-Civ. 56.1(b) (stating that the facts "must refer with particularity to those portions of the record upon which the movant relies").

Regarding the fact that Ms. Archuleta-Staehlin is Ms. Castille's former colleague, Defendants' Count I Reply does not dispute this fact, but it instead asserts that this fact is "immaterial."  Count I Reply at 3.  Arguing a proposed fact at summary judgment is immaterial to the Court's disposition of the summary judgment motion and is not effective to contest a fact.  See

& McCarthy, LLP, after Ms. Castille left NMSU.  See Count I Response at 6 (asserting this fact);

Castille LinkedIn Profile at 1.[44]  Ms. Castille and Ms. Archuleta-Staehlin, moreover, "were on

personally friendly terms."  Count I Response at 6 (asserting this fact); Email from Jacquelyn

Archuleta-Staehlin to Laura Castille at 1 (dated Aug. 24, 2021), filed May 12, 2023 (Doc. 65-

12).[45]

At the beginning of the August 17, 2021, hearing, Roemer's advisor at the hearing, William

Boecklen, "expressed concern about the biased statements made by [] Ms. Castille during the

investigation (such as asking a complainant, 'when can we stop letting Gary be Gary at New

Mexico State University')"; Ms. Archuleta-Staehlin states, however, "'I am not interested in Ms.

Ms. Castille's behavior at this point in time.'"  Count I Response at 6 (asserting this fact)(quoting

---

Lowery v. City of Albuquerque, 2011 WL 1336670 at *4 n.8.  If necessary, the Court will address
materiality in the Analysis, but will deem the fact undisputed for the Factual Background section.
See Walton v. N.M. State Land Off., 49 F. Supp. 3d at 924 n.2 ("[O]bjecting to an asserted fact as
immaterial in response to an asserted fact effectively deems the fact undisputed.").   Accordingly,
the Court deems this fact undisputed.

[44]The Defendants' Count I Reply does not dispute this fact, but it instead asserts that this
fact is "immaterial."  Count I Reply at 3.  Arguing a proposed fact at summary judgment is
immaterial to the Court's disposition of the summary judgment motion and is not effective to
contest a fact.  See Lowery v. City of Albuquerque, 2011 WL 1336670 at *4 n.8.  If necessary, the
Court will address materiality in the Analysis, but will deem the fact undisputed for the Factual
Background section.  See Walton v. N.M. State Land Off., 49 F. Supp. 3d at 924 n.2 ("[O]bjecting
to an asserted fact as immaterial in response to an asserted fact effectively deems the fact
undisputed.").  Accordingly, the Court construes this fact as undisputed.

[45]The Defendants' Count I Reply does not dispute this fact, but it instead asserts that this
fact is "immaterial."  Count I Reply at 3.  Arguing a proposed fact at summary judgment is
immaterial to the Court's disposition of the summary judgment motion and is not effective to
contest a fact.  See Lowery v. City of Albuquerque, 2011 WL 1336670 at *4 n.8.  If necessary, the
Court will address materiality in the Analysis, but will deem the fact undisputed for the Factual
Background section.  See Walton v. N.M. State Land Off., 49 F. Supp. 3d at 924 n.2 ("[O]bjecting
to an asserted fact as immaterial in response to an asserted fact effectively deems the fact
undisputed.").  Accordingly, the Court construes this fact as undisputed.

Transcript of Hearing at 26:1-21 (dated August 17, 2021), filed May 12, 2023 (Doc. 65-14)("Pre-termination Tr. (Doc. 65-14)")); Pre-Termination Tr. (Doc. 65-14) at 26:1-21.[46]  Later in the hearing, Roemer testifies that he bcc'ed the Department of Fish, Wildlife, and Conservation Ecology graduate students because he "'didn't want everybody on Faculty Talk[, the faculty email list to which Roemer sends the Blake email,] to know everybody's e-mail in our department.'" Count I QI Motion at 4 (asserting this fact)(quoting Pre-Termination Tr. (Doc. 55-5) at 158:14-22)(Court adds brackets); Counts II-IV QI Motion at 4 (asserting this fact)(quoting Pre-Termination Tr. (Doc. 55-5) at 158:14-22); Pre-Termination Tr. (Doc. 55-5) at 158:14-22.[47] Roemer also testifies: "he 'didn't think about how that email was going to be received.'"  Count I QI Motion at 4 (asserting this fact)(quoting Pre-Termination Tr. (Doc. 55-5) at 158:14-22); Counts II-IV QI Motion at 4 (asserting this fact)(quoting Pre-Termination Tr. (Doc. 55-5) at 158:14-22); Pre-Termination Tr. (Doc. 55-5) at 158:14-22.[48]  Roemer apologizes about the "graphic 'excerpt

---

[46]The Defendants' Count I Reply does not dispute this fact, but it instead asserts that this fact is "immaterial."  Count I Reply at 3.  Arguing a proposed fact at summary judgment is immaterial to the Court's disposition of the summary judgment motion and is not effective to contest a fact.  See Lowery v. City of Albuquerque, 2011 WL 1336670 at *4 n.8.  If necessary, the Court will address materiality in the Analysis, but will deem the fact undisputed for the Factual Background section.  See Walton v. N.M. State Land Off., 49 F. Supp. 3d at 924 n.2 ("[O]bjecting to an asserted fact as immaterial in response to an asserted fact effectively deems the fact undisputed.").  Accordingly, the Court construes this fact as undisputed.

[47]Neither of Roemer's responses mention, contradict, address, or otherwise respond to this fact in the sections entitled "Plaintiff's Response to Defendants' Statement of Undisputed Material Fact"; accordingly, the Court deems this fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[48]Neither of Roemer's responses mention, contradict, address, or otherwise respond to this fact in the sections entitled "Plaintiff's Response to Defendants' Statement of Undisputed Material Fact"; accordingly, the Court deems this fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

from the criminal complaint,'" and admits that "'it was in poor taste for me to include it.'"  Count

I QI Motion at 4 (asserting this fact)(citing Pre-Termination Tr. (Doc. 55-5) at 159:10-13); Counts

II-IV QI Motion at 4 (asserting this fact)(citing Pre-Termination Tr. (Doc. 55-5) at 159:10-13);

Pre-Termination Tr. (Doc. 55-5) at 159:10-13.[49]  Furthermore, Roemer testifies that he "made

comments about a female graduate student's legs."  Count I QI Motion at 4 (asserting this

fact)(citing Pre-Termination Tr. (Doc. 55-5) at 190:5-18[50]).  See Pre-Termination Tr. (Doc. 55-5)

at 190:5-18.

        Additionally, Roemer testifies:

> Q:    Do you think that you have boundary issues, Dr. Roemer?
>
> A:    Boundary issues?  Yeah, I mean, I guess.  I never really thought about it, you know, because, as I mentioned, I try and get to know people.  And I would hope that they would understand who I am as well.  And if there's an issue that -- or a line that I crossed, then I hope that they would tell me.

Count I QI Motion at 4 (asserting this fact)(quoting Pre-Termination Tr. (Doc. 55-5) at 191:16);

Count I Response at 5 (quoting Pre-Termination Tr. (Doc. 55-5) at 191:14-22)(asserting this fact);

Counts II-IV Response at 5 (quoting Pre-Termination Tr. (Doc. 55-5) at 191:14-22)(asserting this

fact); Pre-Termination Tr. (Doc. 55-5) at 191:14-22.[51]  Roemer also testifies that he has a "'knack'"

---

[49]Neither of Roemer's responses mention, contradict, address, or otherwise respond to this fact in the sections entitled "Plaintiff's Response to Defendants' Statement of Undisputed Material Fact"; accordingly, the Court deems this fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[50]The Count I QI Motion cites to "195-18" in support of this assertion.  Count I QI Motion at 4.  This is not a cognizable citation to a deposition transcript.  Accordingly, the Court concludes that the Defendants omitted a "0" and a colon from their transcript cite, and includes the correct citation above the line.

[51] The Count I QI Motion states that Roemer admits that he had "'boundary issues'" with

for offending people.  Count I QI Motion at 4 (quoting Pre-Termination Tr. (Doc. 55-5) at 212:11-12)(asserting this fact); Pre-Termination Tr. (Doc. 55-5) at 212:11-12.[52]

Roemer makes the following additional statements at the hearing.  First, he testifies that initially, the practice of personal pronouns appearing on email signatures confused him.  See Counts II-IV Response at 19 (asserting this fact); Transcript of Hearing at 166:1-24 (dated August 17, 2021), filed May 12, 2023 (Doc. 66-13)("Pre-Termination Tr. (Doc. 66-13)").[53]  Second, he testifies that in response to his student winning an award at an awards banquet, he said that "'my student scored,'" and contends he did not intend the remark to have "any sexual meaning whatsoever."  Counts II-IV Response at 19 (quoting Pre-Termination Tr. (Doc. 66-13) at 167:1-25; id. at 168:1-25)(asserting this fact); Pre-Termination Tr. (Doc. 66-13) at 167:1-25; id. at 168:1-25.[54]  Third, Roemer testifies that "he said he could tell when complainant Allison Salas was in her office because he could smell her strongly scented lotion from down the hall."  Counts II-IV

_____

his students.  Count I QI Motion at 4 (quoting Doc. 55-5 Tr. at 191:16).  Roemer successfully disputes that his testimony constitutes an admission that he had boundary issues.  See Count I Response at 5; Counts II-IV Response at 5.  Pursuant to Hunt v. Cromartie, 526 U.S. 541, 551 (1999), the Court views the facts in the light most favorable to the non-movant, and does not adopt as an undisputed fact the Defendants' assertion that Roemer admitted that he has boundary issues with his students.

[52] Neither of Roemer's responses mention, contradict, address, or otherwise respond to this fact; accordingly, the Court deems this fact undisputed.

[53] Roemer has not included this fact in a separate section of "lettered" "additional facts"; accordingly, the Court is not required to consider this additional information.  See D.N.M.LR-Civ. 56.1(b).  Nevertheless, the Defendants' replies do not mention, contradict, address, or otherwise respond to this fact; accordingly, the Court deems this fact undisputed.

[54] Roemer has not included this fact in a separate section of "lettered" "additional facts"; accordingly, the Court is not required to consider this additional information.  See D.N.M.LR-Civ. 56.1(b).  Nevertheless, the Defendants' replies do not mention, contradict, address, or otherwise respond to this fact; accordingly, the Court deems this fact undisputed.

Response at 19 (asserting this fact); Pre-Termination Tr. (Doc. 66-13) at 170:1-25; id. at 171:1-

25. [55]  Fourth, he testifies that he "referenced an inside joke between himself and his wife, who is

Japanese, about how she married him for a green card."  Counts II-IV Response at 19 (asserting

this fact); Pre-Termination Tr. (Doc. 66-13) at 174:1-25; id. at 175:1-25.[56]  Fifth, he testifies that

"he once told a male student who came into class wearing a cowboy hat, vest, and boots, 'Dude,

you look dapper today.  That's a nice vest you got on.'"  Counts II-IV Response at 19 (quoting

Pre-Termination Tr. (Doc. 66-13) at 189:1-26; id. 190:1-25)(asserting this fact); Pre-Termination

Tr. (Doc. 66-13) at 189:1-26; id. 190:1-25.[57]  Sixth, he testifies that "he once used the word

'charming' to refer to a male candidate for department head."  Counts II-IV Response at 19

(quoting Pre-Termination Tr. (Doc. 66-13) at 205:1-25; id. at 206:1-25)(asserting this fact); Pre-

Termination Tr. (Doc. 66-13) at 205:1-25; id. at 206:1-25.[58]  Seventh, Roemer testifies "he once

said 'ask her out already' to a male graduate student who [Roemer] felt was taking up too much

---

[55] Roemer has not included this fact in a separate section of "lettered" "additional facts"; accordingly, the Court is not required to consider this additional information.  See D.N.M.LR-Civ. 56.1(b).  Nevertheless, the Defendants' replies do not mention, contradict, address, or otherwise respond to this fact; accordingly, the Court deems this fact undisputed.

[56] Roemer has not included this fact in a separate section of "lettered" "additional facts"; accordingly, the Court is not required to consider this additional information.  See D.N.M.LR-Civ. 56.1(b).  Nevertheless, the Defendants' replies do not mention, contradict, address, or otherwise respond to this fact; accordingly, the Court deems this fact undisputed.

[57] Roemer has not included this fact in a separate section of "lettered" "additional facts"; accordingly, the Court is not required to consider this additional information.  See D.N.M.LR-Civ. 56.1(b).  Nevertheless, the Defendants' replies do not mention, contradict, address, or otherwise respond to this fact; accordingly, the Court deems this fact undisputed.

[58] Roemer has not included this fact in a separate section of "lettered" "additional facts"; accordingly, the Court is not required to consider this additional information.  See D.N.M.LR-Civ. 56.1(b).  Nevertheless, the Defendants' replies do not mention, contradict, address, or otherwise respond to this fact; accordingly, the Court deems this fact undisputed.

time complimenting Brittany Schweiger's presentation during a brown-bag lunch"; Roemer, however, also testifies that "he was intending to say either 'ask it already' or 'spit it out already,' but that he misspoke."  Counts II-IV Response at 19 (quoting Pre-Termination Tr. (Doc. 66-13) at 160:1-25)(asserting this fact); Pre-Termination Tr. (Doc. 66-13) at 160:1-25.[59]  Eighth, Roemer testifies that "he once told Fiona McKibben she had 'strong athletic legs' in the context of a conversation about her past as an elite ultimate frisbee player and coach."  Counts II-IV Response at 19 (quoting Pre-Termination Tr. (Doc. 66-13) at 162:1-25; id. at 163:1-25)(asserting this fact); Pre-Termination Tr. (Doc. 66-13) at 162:1-25; id. at 163:1-25.[60]  Finally, during closing statements, Roemer's advisor, Boecklen, states that Roemer's "'intention was never really to harm anybody.'"  Count I QI Motion at 4 (quoting Pre-Termination Tr. (Doc. 55-5) at 222:24-223:1)(asserting this fact); Pre-Termination Tr. (Doc. 55-5) at 222:24-223:1.[61]

9.   **The Hearing Officer's August 31, 2021, Final Decisions.**

The hearing officer issued two final decisions on August 31, 2021.  See Count I QI Motion at 4 (asserting this fact); Counts II-IV QI Motion at 4 (asserting this fact); Final Decision in Schweiger, Salas and McKibben v. Roemer at 1, dated August 31, 2021, filed April 21, 2023 (Doc.

---

[59] Roemer has not included this fact in a separate section of "lettered" "additional facts"; accordingly, the Court is not required to consider this additional information.  See D.N.M.LR-Civ. 56.1(b).  Nevertheless, the Defendants' replies do not mention, contradict, address, or otherwise respond to this fact; accordingly, the Court deems this fact undisputed.

[60] Roemer has not included this fact in a separate section of "lettered" "additional facts"; accordingly, the Court is not required to consider this additional information.  See D.N.M.LR-Civ. 56.1(b).  Nevertheless, the Defendants' replies do not mention, contradict, address, or otherwise respond to this fact; accordingly, the Court deems this fact undisputed.

[61] Neither of Roemer's responses mention, contradict, address, or otherwise respond to this fact; accordingly, the Court deems this fact undisputed.

55-6 at 1)("Schweiger et al. Final Decision"); Final Decision in <u>Buskirk v. Roemer</u> at 10, dated

August 31, 2021, filed April 21, 2023 (Doc. 55-6 at 10)("Buskirk Final Decision").[62]  Each of the

two final decisions concludes that Roemer violated ARP 3.25 and ARP 3.80, and recommends

discipline "'up to and including termination of employment with the University.'"   Count I QI

Motion at 4 (quoting the Schweiger et al. Final Decision at 8)(asserting this fact); Counts II-IV QI

Motion at 4 (quoting the Schweiger et al. Final Decision at 8)(asserting this fact).  <u>See</u> Count I

Response at 5 (quoting the Schweiger et al. Final Decision at 2)(asserting this fact);  Counts II-IV

Response at 5 (quoting the Schweiger et al. Final Decision at 2)(asserting this fact); Schweiger et

al. Final Decision at 2, 8.[63]  In the Schweiger et al. Final Decision, the hearing officer concludes:

"'Dr. Roemer admits he did comment on the appearance, smell and body parts, dating and

---

[62] For clarity's sake, the Court notes that the document that the Defendants' motions refer to as the "Final Decision" consists of two final decisions, each of which has a different caption and corresponds to a different set of complainants; the above-the-line citation reflects the distinction between the two documents.  Moreover, neither of Roemer's responses mention, contradict, address, or otherwise respond to this fact; accordingly, the Court deems this fact undisputed.

[63]The Court notes that neither of the Defendants' motions provide a pin-cite for their statement of material fact, so it is unclear whether the Defendants purport to rely on and quote the Schweiger et al. Final Decision or the Buskirk Final Decision.  <u>See</u> Count I QI Motion at 4; Counts II-IV QI Motion at 4.  The Court provides a pin-cite to the Schweiger et al. Final Decision for clarity's sake.  Moreover, the Defendants' motions assert that the hearing officer concludes that "Roemer's actions violated Title IX and NMSU ARP 3.25."  Count I QI Motion at 4; Counts II-IV QI Motion at 4.  Roemer disputes this assertion; he states that: "The Final Decision actually concluded that Dr. Roemer 'violated NMSU Administrative Policy and Rule 3.25 (ARP) and 3.80 (ARP).'"  Count I Response at 5 (quoting the Schweiger et al. Final Decision at 2); Counts II-IV Response at 5 (quoting the Schweiger et al. Final Decision at 2).  In their replies, the Defendants state: "Plaintiff's purported dispute with UMF No. 8 is again semantic," but they do not cite to any record evidence contradicting Roemer's position.  Count I Reply at 2-3; Counts II-IV Reply at 2-3.  The Defendants' assertion that the hearing officer concludes Roemer violated Title IX conflicts with the record evidence.  Accordingly, the Court deems the text's fact -- that the two final decisions conclude that Roemer violated ARP 3.25 and ARP 3.80 -- undisputed.

relationship status of female students on more than one occasion.'"  Counts II-IV Response at 18 (quoting the Schweiger et al. Final Decision at 4)(asserting this fact); Schweiger et al. Final Decision at 4.[64]  In the Buskirk Final Decision, the hearing officer concludes: "'Dr. Roemer admits he did comment on the appearance, and relationship status of female students on more than one occasion.'"  Counts II-IV Response at 18 (quoting the Buskirk Final Decision at 13)(asserting this fact); Buskirk Final Decision at 13.[65]

10.    **Roemer's Communications With Ms. Castille About His Appeal**.

On September 8, 2021, Ms. Castille sent Roemer a Confidential Notice of Determination informing Roemer of the hearing officer's decision that NMSU should fire Roemer; in the email, Ms. Castille informs Roemer that his only recourse "was a written appeal to the Chancellor on narrow procedural grounds."  Count I Response at 3 (asserting this fact); Letter from Laura Castille to Gary Roemer at 4 (dated Sept. 8, 2021), filed May 12, 2023 (Doc. 65-9)("Determination Letter").[66]  Roemer appealed to Arvizu, the Chancellor, but on October 20, 2021, Ms. Castille sent Roemer a letter informing him that Arvizu denied his appeal.  See Count I Response at 4 (asserting

---

[64]Roemer has not included this fact in a separate section of "lettered" "additional facts"; accordingly, the Court is not required to consider this additional information.  See D.N.M.LR-Civ. 56.1(b).  Nevertheless, the Defendants' replies do not mention, contradict, address, or otherwise respond to this fact; accordingly, the Court deems this fact undisputed.

[65] Roemer has not included this fact in a separate section of "lettered" "additional facts"; accordingly, the Court is not required to consider this additional information.  See D.N.M.LR-Civ. 56.1(b).  Nevertheless, the Defendants' replies do not mention, contradict, address, or otherwise respond to this fact; accordingly, the Court deems this fact undisputed.

[66] Roemer has not included this fact in a separate section of "lettered" "additional facts"; accordingly, the Court is not required to consider this additional information.  D.N.M.LR-Civ. 56.1(b).  Nevertheless, the Defendants' replies do not mention, contradict, address, or otherwise respond to this fact; accordingly, the Court deems this fact undisputed.

this fact); Letter from Laura Castille to Gary Roemer at 1 (dated October 20, 2021), filed May 12, 2023 (Doc. 65-10)("Appeal-Denial Letter").[67]    Arvizu did not provide an explanation for his decision, and did not hold a post-termination hearing or other meeting at which Roemer "was given an opportunity to be heard."  See Count I Response at 4 (asserting this fact); Appeal Denial Letter at 1.[68]    On October 27, 2021, Roemer emailed Ms. Castille and requests a "post-termination hearing pursuant to ARP 10.50."  Count I Response at 11 (asserting this fact); Email from Gary Roemer to Laura Castille at 1 (dated Oct. 27, 2021), filed May 12, 2023 (Doc. 65-16).[69]    ARP 10.50, "Faculty Alleged Misconduct Investigation, Discipline, and Appeals Processes," provides that:

> following the imposition of sanctions, a faculty member is entitled to a post-determination hearing before a Faculty Appeals Board, which makes a recommendation to the provost and senior vice president for academic affairs, who renders a decision.  The faculty member also has the right to appeal the provost and senior vice president for academic affairs' decision to the Chancellor.

Count I Response at 11 (citing ARP 10.50, filed May 12, 2023 (Doc. 65-15))(asserting this fact).[70]

---

[67]Roemer has not included this fact in a separate section of "lettered" "additional facts"; accordingly, the Court is not required to consider this additional information.  D.N.M.LR-Civ. 56.1(b).  Nevertheless, the Defendants' replies do not mention, contradict, address, or otherwise respond to this fact; accordingly, the Court deems this fact undisputed.

[68]Roemer has not included this fact in a separate section of "lettered" "additional facts"; accordingly, the Court is not required to consider this additional information.  D.N.M.LR-Civ. 56.1(b).  Nevertheless, the Defendants' replies do not mention, contradict, address, or otherwise respond to this fact; accordingly, the Court deems this fact undisputed.

[69]Roemer has not included this fact in a separate section of "lettered" "additional facts"; accordingly, the Court is not required to consider this additional information.  D.N.M.LR-Civ. 56.1(b).  Nevertheless, the Defendants' replies do not mention, contradict, address, or otherwise respond to this fact; accordingly, the Court deems this fact undisputed.

[70]Roemer has not included this fact in a separate section of "lettered" "additional facts"; accordingly, the Court is not required to consider this additional information.  See D.N.M.LR-Civ.

On November 11, 2021, NMSU's Office of the Provost terminated Roemer.  See Count I QI Motion at 5 (asserting this fact); Counts II-IV QI Motion at 4 (asserting this fact); Memorandum from the Office of the Provost to Dr. Gary Roemer at 1 (dated Nov. 11, 2021), filed April 21, 2023 (Doc. 55-7).[71]

Ms. Castille did not respond, so Roemer sent a follow-up email to Ms. Castille on November 15, 2021, contending that the post-termination hearing is part of his due process rights. See Count I Response at 11 (asserting this fact); Email from Gary Roemer to Laura Castille at 1 (dated Nov. 15, 2021), filed May 12, 2023 (Doc. 65-17).[72]  Ms. Castille responded that same day, stating in an email: "'I did not respond because ARP 10:50 [sic] does not fall within the purview of my office; however, the decision of the Chancellor is final.'"  Count I Response at 11-12 (quoting Email from Laura Castille to Gary Roemer at 1 (dated Nov. 15, 2021), filed May 12, 2023 (Doc. 65-18))(asserting this fact); Email from Laura Castille to Gary Roemer at 1 (dated Nov. 15, 2021).[73]

---

56.1(b).  Nevertheless, the Defendants' replies do not mention, contradict, address, or otherwise respond to this fact; accordingly, the Court deems this fact undisputed.

[71] Neither of Roemer's responses mention, contradict, address, or otherwise respond to this fact; accordingly, the Court deems this fact undisputed.

[72] Roemer has not included this fact in a separate section of "lettered" "additional facts"; accordingly, the Court is not required to consider this additional information.  See D.N.M.LR-Civ. 56.1(b).  Nevertheless, the Defendants' replies do not mention, contradict, address, or otherwise respond to this fact; accordingly, the Court deems this fact undisputed.

[73] Roemer has not included this fact in a separate section of "lettered" "additional facts"; accordingly, the Court is not required to consider this additional information.  See D.N.M.LR-Civ. 56.1(b).  Nevertheless, the Defendants' replies do not mention, contradict, address, or otherwise respond to this fact; accordingly, the Court deems this fact undisputed.

## PROCEDURAL BACKGROUND

The Court begins the Procedural Background section by summarizing the Complaint, which, along with the answer, forms the basis for Roemer's rule 12(c) Motion. Next, the Court summarizes the Defendants' motions for summary judgment. Finally, the Court summarizes Roemer's responses to the motions for summary judgment and summarizes the Defendants' replies.

### 1.    The Complaint.

Roemer filed his Complaint on July 15, 2022. The Complaint contains seven causes of action against the Defendants in their official and personal capacities. See Complaint ¶¶ 12-18, at 3-6; id. ¶¶ 113-96, at 26-40. The first cause of action is a claim pursuant to 42 U.S.C. § 1983 alleging that the Defendants NMSU Board of Regents, Arvizu, Ms. Castille, and DeLovato deprive him of a protected property interest without due process of law in violation of the Fifth and Fourteenth Amendments of the Constitution. See Complaint ¶¶ 113-23, at 26-27. The Regents Board is NMSU's five-member governing body; Roemer sues the Regents Board in its official capacity only. See Complaint ¶ 12, at 3. This cause of action seeks damages and equitable relief. See Complaint ¶ 123, at 27.

The second cause of action is a § 1983 claim against the Regents Board and Arvizu alleging that ARP 3.25 -- the anti-discrimination policy -- is overbroad facially in violation of the First Amendment. See Complaint ¶¶ 124-134, at 28-29. This cause of action seeks injunctive relief. See Complaint ¶ 134, at 29. The third cause of action is a claim pursuant to § 1983 against the Regents Board and Arvizu alleging that ARP 3.80, the anti-bullying policy, is overbroad facially and unconstitutionally vague in violation of the First Amendment. See Complaint ¶¶ 135-45, at 29-31. This cause of action seeks injunctive relief. See Complaint ¶ 145, at 31.

The fourth cause of action is a claim pursuant to § 1983 alleging that the Regents Board, Arvizu, Ms. Castille, DeLovato, Conner, Flores, and Gompper violate Roemer's First Amendment rights.  See Complaint ¶¶ 146-50, at 31-32.  This cause of action seeks damages and equitable relief.  See Complaint ¶ 149, at 32.  The fifth cause of action is a claim pursuant to Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 ("Title IX"), alleging that the Regents Board, motivated by Roemer's sex, violate federal law by imposing University discipline.  See Complaint ¶¶ 151-61, at 32-34.  This cause of action seeks damages and equitable relief.  See Complaint ¶ 161, at 34.  The sixth cause of action is a claim pursuant to the New Mexico Civil Rights Act, N.M.S.A. §§ 41-4A-1, alleging that the Regents Board violates Article II, § 18 of the New Mexico Constitution, by depriving Roemer of a protected liberty interest without due process of law. See Complaint ¶¶ 162-75, at 34-36.  This cause of action seeks damages and equitable relief.  See Complaint ¶ 174, at 36. The seventh and final cause of action is a claim pursuant to the New Mexico Civil Rights Act against the Regents Board alleging that APA 3.25 and APA 3.80 are overbroad facially, in violation of Article II, § 17 of the Constitution of the State of New Mexico, and that APA 3.80 is unconstitutionally vague in violation of the same provision.  See Complaint ¶¶ 176-96, at 36-40.  This cause of action seeks damages and equitable relief.  See Complaint ¶ 195, at 40.

### 2.    Roemer's Motion for Judgment on the Pleadings.

In his Motion, Roemer requests that the Court grant partial judgment on the pleadings with respect to his second cause of action, a claim pursuant to § 1983 against the Regents Board and Arvizu alleging that ARP 3.25, the anti-discrimination policy, is facially overbroad in violation of the First Amendment, see Complaint ¶¶ 124-134, at 28-29, and with respect to his third cause of action, a claim pursuant to § 1983 against the Regents Board and Arvizu alleging that ARP 3.80,

the anti-bullying policy, is facially overbroad and unconstitutionally vague in violation of the First Amendment.  See Complaint ¶¶ 135-45, at 29-31.  Roemer argues that both ARP 3.25 and ARP 3.80 are unconstitutionally overbroad on their face because they restrict speech "for the sole reason that someone else finds it subjectively hostile or offensive."  Motion, at 3.  Additionally, Roemer argues that ARP 3.80 is unconstitutionally vague.  See Motion, at 1.  Accordingly, Roemer asks the Court to issue a permanent injunction mandating that the Regents and Arvizu cease enforcement of both policies.  See Complaint ¶¶ 124-134, at 28-29; id. ¶¶ 135-45, at 29-31. Roemer argues that an injunction is warranted, because he prevails on each of the familiar four factors: (i) actual success on the merits; (ii) irreparable harm unless the injunction is issued; (iii) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (iv) the injunction, if issued, will not adversely affect the public interest.  Motion, at 4-5 (quoting Kitchen v. Herbert, 755 F.3d 1193, 1208 (10th Cir. 2014)).

First, Roemer addresses the merits of his overbreadth claim pertaining to ARP 3.25.  See Motion, at 7.  Roemer's argument focuses exclusively on the unconstitutionality of Parts 3(C) and 3(D) of ARP 3.25.  See Motion, at 7.  Part 3(C) reads: "No student or employee, either in the workplace or in the academic environment, should be subjected to unwelcome, non-consensual, non-verbal, verbal or physical conduct that is of a sexual nature.  Even one incident may constitute a violation of NMSU policy, rule or procedure."  ARP 3.25 Part 3(C).

Part 3(D) reads:

Conduct of a sexual nature, [sic] constitutes a violation of NMSU policy and/or law and policy when:

1. Submission to such conduct is made either explicitly  or implicitly a term or condition of an individual's employment or academic status;

2. Submission to or rejection of the conduct is used as a basis for academic

or employment decisions or evaluations, or permission to participate in an activity; or

3. The conduct has the purpose or effect of substantially interfering with an individual's academic or work performance, or creating an intimidating, hostile and offensive environment in which to work or learn.

ARP 3.25 Part 3(D).

Roemer argues that his facial challenge succeeds, because "a substantial number of [Part 3(C) and 3(D)'s] applications are unconstitutional, judged in relation to the [Policy's] plainly legitimate sweep." Motion, at 8 (quoting United States v. Hernandez-Calvillo, 39 F.4th 1297, 1301-02 (10th Cir. 2022)(quoting United States v. Stevens, 559 U.S. 460, 473 (2010)), cert. granted, judgment vacated by 143 S. Ct. 2687 (2023)). First, he asserts that the First Amendment bars the government from prohibiting "the expression of an idea simply because society finds the idea itself offensive or disagreeable." See Motion, at 8 (quoting Texas v. Johnson, 491 U.S. 397, 414 (1989)). Roemer contends that because "subjective listener reaction is not a valid basis for prohibiting speech," ARP 3.25 Parts 3(C) and 3(D) are facially unconstitutional, as they "contain[] no objective, 'reasonable person' standard, nor any requirement of severity or pervasiveness, instead prohibiting any 'verbal conduct' -- that is, speech -- that a listener subjectively believes creates a 'hostile' or 'offensive' environment." Motion, at 8 (internal quotations have no citation). In Roemer's view, the absence of an objective standard puts Part 3(D) at loggerheads with the standard for harassment under Title IX from Davis v. Monroe County Board of Education, 526 U.S. 629, 651 (1999)("Davis"), [74] a case in which the Supreme Court of the United States requires

---

[74] As the Court will discuss later in its analysis, Roemer's citation to Davis fails to advance his argument because Davis gives the standard for Title IX liability for damages when a federal funding recipient is deliberately indifferent to gender-based, peer-to-peer harassment. See Davis, 526 U.S. at 651. Contrary to what Roemer implies in his Motion, Davis does not announce an

that actionable harassment be "not only severe and pervasive, but also 'objectively offensive.'"
Motion, at 9 (quoting <u>Davis</u>, 526 U.S. at 651).  Roemer cites a number of lower-court decisions
that strike down school rules which condition the permissibility of speech on subjective listener
reaction.  Motion, at 9 (discussing <u>Saxe v. State Coll. Area Sch. Dist.</u>, 240 F.3d 200, 206 (3rd Cir.
2001)(Alito, J.)("<u>Saxe</u>"); <u>Bair v. Shippensburg Univ.</u>, 280 F. Supp. 2d 357 (M.D. Pa. 2003)(Jones,
J.)("<u>Bair</u>"); and <u>Booher v. Bd. Of Regents</u>, No. 2:96-CV-135, 1998 WL 35867183, at *26 (E.D.
Ky. Jul. 21, 1998)(Coffman, J.))

       To conclude his merits argument regarding ARP 3.25, Roemer zeroes in on the policy's
"purpose and effect" provision, Part D(3), arguing that this provision "also renders the policy
unconstitutionally overbroad."  <u>See</u> Motion, at 9.  In support of his argument, he cites to <u>DeJohn
v. Temple University</u>, 537 F.3d 301 (3rd Cir. 2008)("<u>DeJohn</u>"), in which, he argues, the United
States Court of Appeals for the Third Circuit "struck down as overbroad" a university speech code
with similar "purpose and effect" language.  Motion, at 10.  Roemer finds particularly important
the Third Circuit's statement that "'the [speech code's] focus on motive is contrary to <u>Tinker's</u>
requirement that speech cannot be prohibited in the absence of a tenable threat of disruption.'"
<u>See</u> Motion at 10 (quoting <u>DeJohn</u>, 537 F.3d at 317).

       Next, Roemer turns to the merits of his facial challenge to ARP 3.80 as unconstitutionally
overbroad.  Motion, at 11.  ARP 3.80's title is "Prohibition of Bullying, Hazing and Hostile
Misconduct (Non-Discriminatory)."  ARP 3.80.  ARP 3.80 Part 2(A), "Definitions," states that
"bullying" refers to "[a]n act or omission (not based on discriminatory motives prohibited by RPM
and ARP 3.25) committed with the intention of intimidation or causing emotional distress or other

---

outer boundary circumscribing the harassing speech that a public university permissibly may
prohibit without violating the First Amendment.

harm, typically directed toward a person perceived to be vulnerable or less powerful." ARP 3.80 Part 2(A). Part 2(C) of the Policy defines "Hostile Misconduct" as "[a]n unjustified act or omission or series of acts or omissions (not based on discriminatory motives prohibited by RPM and ARP 3.25), which is sufficiently severe, pervasive or persistent so as to unreasonably interfere with or limit a person's ability to participate in academic opportunities or activities, or to work productively in the workplace." ARP 3.80 Part 2(C). Part 4(A) provides a "non-breadth list" that "describes conduct that may contribute to a finding of a violation of this rule, if substantiated by the facts." ARP 3.80 Part 4(A).

Roemer begins his overbreadth argument by pointing out "the definitions of both Bullying and Hostile Misconduct include not just 'acts' but also 'omissions.'" Motion, at 11. He argues that the definitions' inclusion of "omissions" means that NMSU could punish someone for their silence or refusal to speak. Motion, at 11. Moreover, Roemer characterizes the definition of Bullying as lacking both a subjective requirement -- that the speech at issue actually harms someone – and an objective requirement -- that "the harm caused be one that a reasonable person would feel or experience." Motion, at 12. Thus, for Roemer, "nothing is off limits" when it comes to enforcement of the policy. Motion, at 12.

Finally, Roemer makes his vagueness argument as to ARP 3.80. Motion, at 13. He contends that the policy is so indefinite as to violate basic principles of due process, because 3.80 Part 2(A) defines bullying as "an act or omission committed with the intention of intimidation or causing emotional distress or other harm." Motion, at 14. Roemer asserts that, because NMSU "gives no further clue as to what might constitute 'other harm," ARP 3.80 fails to "'give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly.'" See Motion, at 14 (quoting Grayned v. City of Rockford, 408 U.S. 104, 108 (1972)).

This failure, argues Roemer, will lead to "arbitrary and discriminatory application" of the policy that will chill First Amendment freedoms.  Motion, at 14.

To conclude his Motion, Roemer addresses the other factors for injunctive relief, acknowledging that "[i]n First Amendment cases, a showing of success on the merits is generally 'the determinative factor' in deciding whether injunctive relief is warranted."  Motion, at 15 (quoting Hobby Lobby Stores, Inc. v. Sebelius, 723 F.3d 1114, 1145 (10th Cir. 2013)).  Addressing the irreparable-harm factor, Roemer points to the rule that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  Motion, at 15 (quoting Elrod v. Burns, 427 U.S. 347, 373 (1976)).  This rule applies to Roemer, because he contends that he was "terminated for speech that allegedly violated ARP 3.25 and 3.80."  Motion, at 15.  Addressing the balance-of-harms factor, Roemer argues that the University's policies severely harm him, other NMSU faculty, and students because the policies impermissibly restrict First Amendment rights; in contrast, NMSU will not be harmed, he argues, by "having to confirm its policies to the First Amendment."  Motion, at 15-16.  Finally, Roemer addresses the public-interest factor and asserts that "'vindicating First Amendment freedoms is clearly in the public interest,'" especially "'in the University setting.'"  Motion, at 16 (quoting Pac. Frontier v. Pleasant Grove City, 414 F.3d 1221, 1237 (10th Cir. 2005); and Rosenberger v. Rector & Visitors of the Univ. of Va., 515 U.S. 819, 835 (1995)).

### 3.    The Defendants' Response in Opposition to the Motion for Judgment on the Pleadings.

The Defendants' Response in Opposition to Plaintiff's "Motion for Partial Judgment on the Pleadings," filed March 14, 2023 (Doc. 48)("Response"), begins by asserting that, because Romer's employment was terminated based on his ARP 3.25 violations, and not based on any ARP

3.80 violations, he lacks standing to bring his overbreadth and vagueness challenges pertaining to ARP 3.80.  Response, at 4.  To support their assertion, the Defendants note that the "Notice of Allegations and Advisement of Rights" (dated December 23, 2020), filed March 14, 2023 (Doc. 48-1), states that Roemer was being investigated for alleged violations of ARP 3.25, and not of ARP 3.80.  Response, at 4.  The Defendants admit, however, that each of the two written Final Decisions issued after the hearings state that the hearing officer concluded that Roemer violated both ARP 3.25 and ARP 3.80.  Response, at 4 n.2.  Nonetheless, the Defendants argue that, because the nature of the allegations in the complaints are "all related to discrimination on the basis of race or sex," ARP 3.80 could not have played a "substantive role" in Roemer's termination, as ARP 3.80 "specifically does not apply to conduct that is based on discrimination."  Response, at 4.

In the alternative, the Defendants argue that even if Roemer has standing to bring his challenges to ARP 3.80, those challenges would fail on the merits.  Response, at 5.  According to the Defendants, "[u]niversities may undoubtedly hold their faculty to more exacting standards of professionalism than the First Amendment would allow for students," because students cannot walk away easily from a professor's speech that offends them.  Response, at 6 (citing Dambrot v. Cent. Mich. Univ., 55 F.3d 1177, 1190 (6th Cir. 1995); and Bonnell v. Lorenzo, 241 F.3d 800, 820 (6th Cir. 2001))(Court adds brackets).  Additionally, the Defendants argue that the "[p]laintiff does not identify any constitutionally protected speech that is at risk due to ARP 3.80" and assert that "there is no evidence in the record to suggest that NMSU has interpreted ARP 3.80 in a way that infringes on protected speech."  Response, at 6 (Court adds brackets).

Next, the Defendants respond to Roemer's vagueness challenge to ARP 3.80.  Response, at 7.  They cite out-of-Circuit authority for the proposition that there is "'substantially more room for imprecision in regulations bearing only civil, or employment, consequences than would be

tolerated in a criminal code.'"  Response, at 7 (quoting <u>Dade v. Baldwin</u>, 802 F. App'x 878, 885 (6th Cir. 2020))(citing <u>Arnett v. Kennedy</u>, 416 U.S. 134, 159-60 (1974)).  Moreover, they note that ARP 3.80 Part 2(C) defines "Hostile Misconduct" as encapsulating "Bullying" and "Hazing" that is "'sufficiently severe, pervasive or persistent so as to unreasonably interfere with or limit a person's ability to participate in academic opportunities or activities, or to work productively in the workplace."  Response, at 8 (quoting ARP 3.80 Part 2(C)).  They argue that the severe-and-pervasive standard, and the unreasonable-interference requirement, along with the non-exhaustive list of potentially prohibited misconduct ARP 3.80 Part 4(A) lists, make it implausible that "an individual of reasonable intelligence would be unable to determine what conduct" the policy prohibits.  Response, at 8.

Finally, the Defendants address Roemer's argument that ARP 3.25 is unconstitutionally overbroad.  Response, at 8.  They argue that Part 3(D) should be read in conjunction with "the rest of Part 3," specifically, Part (3)(B), which defines "sexual harassment under Title IX" as including "'unwelcome conduct' of a sexual nature that a reasonable person would find 'so severe, pervasive, and objectively offensive' that it effectively denies someone equal access to an education program."  Response, at 10.  According to the Defendants, because "ARP 3.25 Part 3 contains both a 'reasonable person" standard" and a "severe, pervasive and objectively offensive" standard, Roemer fails to identify a "'substantial amount of constitutionally protected speech'" that the policy might impact.  Response at 10 (quoting <u>Leondardson v. City of E. Lansing</u>, 896 F.2d 190, 195 (6th Cir. 1990)).  The Defendants urge that in light of this failure, the Court deny Roemer's motion.  <u>See</u> Response, at 10.

### 4.    **Roemer's Reply Brief.**

Roemer's Reply to Defendants' Response in Opposition to Plaintiff's Motion for Partial

Judgment on the Pleadings, filed March 28, 2023 (Doc. 49)("Reply"), first addresses the Defendants' standing arguments regarding his challenges to ARP 3.80.  Reply, at 1.  The Reply highlights that (i) the Defendants admit in their Answer that Roemer was found responsible for violating ARP 3.80; and (ii) the hearing officer's Final Determination explicitly states that Roemer violated ARP 3.80.    Reply, at 1. Second, Roemer renews his attack on ARP 3.80's Constitutionality, asserting that his Response "provided multiple examples of the types of protected speech that could be punished under the plain language of ARP 3.80."  Reply, at 3. Roemer reviews some of these examples in his Reply and adds additional hypotheticals based on current events.  See Reply, at 4-5.  He declares that "[s]peech, as well as graphic and written expression, does not lose constitutional protection because another person subjectively finds it 'demeaning.'"  Reply, at 4 (citing Synder v. Phelps, 562 U.S. 442 (2011), for the assertion that even extremely demeaning speech retains constitutional protections)(Court adds brackets). Additionally, of further concern to Roemer is "the fact that ARP 3.80 explicitly applies to 'verbal acts' necessarily means that the failure to speak can be a prohibited 'omission.'" See Reply at 6. Consequently, according to Roemer, "[a]t NMSU, a professor's failure to affirm a particular political viewpoint could easily constitute 'bullying' in violation of ARP 3.80, if someone complained that the professor's 'omission' caused them to experience 'emotional distress or other harm.'"  Reply, at 8 (quoting ARP 3.80 Part 2(A))(Court adds brackets).

To conclude his ARP 3.80 arguments, Roemer returns to his vagueness challenge and rebuts the Defendants' claim that a person of reasonable intelligence would be able to determine what conduct the policy prohibits; this argument is belied, he asserts, by the fact that "silence can violate the policy."  Reply, at 7.  Moreover, he rejects the Defendants' contention that the definition of bullying in ARP 3.80 Part 2(A) "somehow incorporates the [Hostile Misconduct definition's]

standards of seriousness and reasonability." Reply, at 7. According to Roemer, had the policy sought to "subordinate" the definitions of bullying and hazing to that of hostile misconduct, "it would have been a simple matter to replace 'may' with 'must also'" in ARP 3.80 Part 4(A). Reply, at 8 (quoting ARP 3.80 Part 4(A)). To the contrary, as is evident from its title, ARP 3.80 covers three different concepts, Roemer argues: bullying, hazing, and hostile misconduct. See Reply, at 8.

In the brief's final section, Roemer turns to ARP 3.25. Reply, at 8. He disputes the Defendants' reading of the Policy, stating that NMSU "explicitly maintains two separate definitions of sexual harassment in ARP 3.25." Reply, at 8. Moreover, he reiterates that he is not challenging the definition that tracks the Title IX requirements; rather, he challenges the broader definition under Part 3.D(3). See Reply, at 8. This section is too broad to pass First Amendment muster, he argues; it allows, for example, NMSU to ban "campus drag shows or protests in favor of trans rights," because this kind of "expression and activism" "might well 'have the purpose or effect of substantially interfering with' a conservative Christian or Muslim student's 'academic or work performance' by presenting images or views that deeply upset them." Reply, at 10 (quoting ARP 3.25 Part 3(D)(3)).

### 5. The Defendants' Motions for Summary Judgment.

The Defendants filed two motions for summary judgment, the Count I QI Motion -- which they also style as a motion for judgment on the pleadings -- and the Counts II-IV QI Motion. The Count I QI Motion addresses Count I of Roemer's Complaint, which is a claim pursuant to § 1983 alleging that the Regents Board, Arvizu, Ms. Castille, and DeLovato deprived him of a protected property interest without due process of law in violation of the Fifth and Fourteenth Amendments of the Constitution. See Complaint ¶¶ 113-23, at 26-27. The Counts II-IV QI Motion addresses

Counts II, III, and IV of Roemer's Complaint.  Count II is a claim pursuant to § 1983 against the Regents Board and Arvizu alleging that ARP 3.25, the anti-discrimination policy, is overbroad facially in violation of the First Amendment.  See Complaint ¶¶ 124-134, at 28-29.  Count III is a claim pursuant to § 1983 against the Regents and Arvizu alleging that ARP 3.80, the anti-bullying policy, is overbroad facially and unconstitutionally vague in violation of the First Amendment. See Complaint ¶¶ 135-45, at 29-31.  Count IV is a claim pursuant to § 1983 alleging that the Regents Board, Arvizu, Ms. Castille, DeLovato, Conner, Flores, and Gompper violated Roemer's First Amendment rights.  See Complaint ¶¶ 146-50, at 31-32.

### 6.    The Defendants Count I QI Motion.

In the Count I QI Motion, the Defendants argue that Arvizu, Ms. Castille, and DeLovato are entitled to qualified immunity on Count I of Roemer's Complaint, because "none of Plaintiff's alleged due process violations implicate a violation of a clearly established constitutional right." Count I QI Motion at 11.  They also argue that Arvizu is entitled to qualified immunity, because "NMSU provided Plaintiff sufficient due process during the appeal."  Count I QI Motion at 11. According to the Defendants, "[a] hearing that may result in the termination of a public employee requires an oral or written notice to the employee of the charges against him; an explanation of the employer's evidence; and an opportunity for the employee to respond to the disciplinary charges." Count I QI Motion at 11-12 (citing Merrifield v. Bd. of Cnty. Commr's for Cnty. of Santa Fe, 654 F.3d 1073, 1077-78 (10th Cir. 2011))(Court adds brackets).  The Defendants assert that Roemer "received robust pre-termination process," noting that he received an "extensive evidentiary hearing, where he was allowed to present evidence and witnesses, and to cross-examine witnesses, including the complainants."  Count I QI Motion at 12.

Next, the Defendants dispute that Roemer is entitled to a post-termination hearing.  See

Count I QI Motion at 12.  They argue that the Court must evaluate the Constitutionality of post-termination process in light of the pre-termination process which Roemer received.  See Count I QI Motion at 12 (quoting Copelin-Brown v. N.M. State Pers. Office, 399 F.3d 1248, 1255 (10th Cir. 2005)).  They quote Benavidez v. City of Albuquerque, 101 F.3d 620, 626 (10th Cir. 1996)("Benavidez"), for the proposition that employees who have a "meaningful opportunity" to explain their position and challenge their dismissal in pre-termination proceedings need receive only "'some opportunity' to present [their] side of the case" to provide "'a meaningful hedge against erroneous action.'"  101 F.3d at 626 (quoting Cleveland Bd. of Euc. v. Loudermill, 470 U.S. at 545 n.8).  According to the Defendants, "the right of appeal to Chancellor Arvizu was sufficient to satisfy any post-termination due process requirements," in light of "the extensive pre-termination process."  Count I QI Motion at 13.  The Defendants assert, moreover, that, because Roemer's strategy at the hearing "largely consisted of admitting the factual allegations against him but claiming that the complainants were 'too sensitive,' plaintiff [sic] received sufficient 'appellate' due process from Defendant Dan Arvizu because there was no meaningful factual dispute that a second hearing would have brought to light."  Count I QI Motion at 13 (no citation for quoted material).  The Defendants also assert that "there is no clearly established law holding that where a robust pre-termination process is provided, Defendants Arvizu or Ms. Castille were required to provide additional post-termination process."  Count I QI Motion at 13.

The Defendants also respond to the other due process violations that Count I alleges, namely, that "Defendant Ms. Castille made biased statements about plaintiff [sic] with witnesses during her investigation," and that "Defendant Ms. Castille treated the complainants against [sic] Plaintiff more favorably than him."  Count I QI Motion at 14.  The Defendants contend that there is no "clearly established constitutional right to a completely 'neutral' investigator during a Title

IX investigation."  Count I QI Motion at 14 (no citations for quoted material).  They state that the "significance of bias in the due process context turns on the bias of the hearing officer or tribunal, not that of an investigator,"  Count I QI Motion at 14, and "[t]here is no evidence that the hearing officer was unconstitutionally biased,"  Count I QI Motion at 14.   Next, they state that Roemer cannot identify a clearly established right allowing him to interview witnesses before his hearing, because due process "'does not guarantee that parties to an adversarial proceeding may discover every piece of evidence they desire.'"  Count I QI Motion at 14 (quoting Tonkovich v. Kan. Bd. of Regents, 159 F.3d 504, 520 (10th Cir. 1998)("Tonkovich")).  They assert that NMSU provided him with the OIE Investigator's evidence, gave him an opportunity to rebut it, and permitted him to cross-examine witnesses at the hearing.  See Count I QI Motion at 15.  Finally, in response to Roemer's allegation that DeLovato "provided him with the evidence against him two weeks after providing it to his accusers," Count I QI Motion at 15, the Defendants assert that Roemer "does not have a clearly established right to have the evidence at the exact same time as the complainants," Count I QI Motion at 15.

### 7.   **The Defendants' Counts II-IV QI Motion.**

In the Counts II-IV QI Motion, the Defendants first address Count IV of Roemer's Complaint, which is styled as an as-applied challenge, and alleges that Defendants Arvizu, Ms. Castille, Conner, DeLovato, Flores, and Gompper violated his First Amendment rights, because he engaged in Constitutionally protected speech and suffered adverse employment actions as a result.  See Complaint ¶ 147, at 31.  First, the Defendants contend that ARP 3.25 is content neutral and passes intermediate scrutiny, because it serves a substantial government interest and is narrowly tailored to serve that interest.  See Counts II-IV QI Motion at 11-14.  Second, they invoke the public-employee-speech doctrine, and contend that, while Roemer

> may have had a First Amendment right to speak to his fellow professors about Jacob
> Blake, [] he does not have the same constitutional right to drag graduate students
> who have expressed no desire to engage with him or discuss the matter into the fray
> by sending them email [sic] containing graphic descriptions of sexual content.

Counts II-IV QI Motion at 15. Third, they contend that Ms. Castille, Conner, DeLovato, Flores, and Gompper are entitled to qualified immunity, because they were not the final decision-makers who enforced ARP 3.25's provisions against Roemer. See Counts II-IV QI Motion at 16. Finally, they maintain that Roemer did not suffer an employment-related injury resulting from ARP 3.80's application, so he cannot bring an as-applied challenge against ARP 3.80. See Counts II-IV QI Motion at 17.

Next, the Defendants address Roemer's Count II, his overbreadth challenge to ARP 3.25. See Counts II-IV QI Motion at 18. They argue that Arvizu is entitled to qualified immunity, because ARP 3.25 "does not prohibit a substantial amount [of] speech" that the First Amendment protects." Counts II-IV QI Motion at 18. They contend, moreover, that "'public universities may restrict their employees' speech in a manner that would be impermissible absent the employment relationship.'" Counts II-IV QI Motion at 18-19 (quoting Smock v. Bd. of Regents of Univ. of Mich., 353 F.Supp. 3d 651, 659 (E.D. Mich. 2018)(Tarnow, J.)). ARP 3.25 Parts 3(B) and (C), they assert, prohibits only unprotected conduct, and, moreover, Roemer does not identify "any potential instances of free speech" that ARP 3.25 might stifle. Counts II-IV QI Motion at 19-20. They therefore conclude that Arvizu is entitled to qualified immunity because ARP 3.25 is not facially overbroad. See Counts II-IV QI Motion at 20.

The Defendants make a similar argument regarding the overbreadth challenge to ARP 3.80; they seem to assert it prohibits only conduct, and not speech: Romer "does not identify any constitutionally protected speech that is at risk due to ARP 3.80." Counts II-IV QI Motion at 21.

They note that ARP 3.80's non-exhaustive list of examples includes acts like threats, physical

abuse, forced physical activity, and theft that the First Amendment does not protect.  See Counts

II-IV QI Motion at 21.  Moreover, they contend that Roemer lacks standing to bring his

overbreadth claim regarding ARP 3.80, because Roemer "was not disciplined under ARP 3.80."

Counts II-IV QI Motion at 22.  Finally, they contend that ARP 3.80 is not unconstitutionally vague,

because its language is "sufficiently clear to a reasonable person."  Counts II-IV QI Motion at 24.

8.    **Roemer's Count I Response**.

      Roemer begins his Count I Response by asserting that Ms. Castille "took multiple actions

that deprived him of a fair and impartial hearing."  Count I Response at 8.

> First, while acting as a supposedly neutral investigator for OIE, Defendant Castille
> explicitly urged the student complainants to pursue action against Dr. Roemer.
> [Complaint ¶ 41, at 11].  She coached the complainants on what Dr. Roemer's
> counterarguments were likely to be and how to respond to them most effectively.
> [Complaint ¶ 60, at 16]. She rejected evidence of her own bias submitted by Dr.
> Roemer for consideration at the hearing as untimely, while allowing the
> complainants to submit untimely evidence.  [Complaint ¶¶ 89-93, at 21-22].  She
> placed conditions on Dr. Roemer's administrative leave that prevented him from
> gathering exculpatory evidence.  [Complaint ¶¶ 75-77, at 19].  She denied Dr.
> Roemer's advisor access to hearing training materials that she provided to the
> complainants' advisors.  [Complaint ¶¶ 81-85, at 20-21]. She helped ensure that a
> personal friend and former colleague of hers served as the hearing officer.
> [Complaint ¶¶ 94-96, at 22].  Finally, after Dr. Roemer was found responsible, she
> refused to afford him the post-termination process to which he was entitled under
> NMSU ARP 10.50, which OIE itself acknowledged was applicable.  [Complaint ¶¶
> 109- 112; at 25].  see also [Notice of Allegations & Advisement of Rights at 2-3
> (dated December 23, 2020), filed April 21, 2023 (Doc. 55-3)] (acknowledging
> applicability of 10.50).

Count I Response at 8.  Next, Roemer asserts that Ms. Castille "intentionally and significantly

interfered" with the tribunal's impartiality, an "'essential element of due process.'"  Count I

Response at 8 (quoting Riggins v. Goodman, 572 F.3d 1101, 1112 (10th Cir. 2009)("Riggins").

He contends that Ms. Castille's "vendetta" against Roemer "gave her friend Ms. Archuleta-

Staehlin a powerful incentive to ensure the case turned out the way Ms. Castille told the complainants it 'likely' would, not least to ensure that she was hired for future hearings." Count I Response at 9 (no citation for quoted material). Roemer contends that it "cannot be ruled out at this stage that there were significant ex parte communications between Defendant Castille and her friend Archuleta-Staehlin, something the Tenth Circuit has identified as a source of bias." Count I Response at 10. Overall, Romer asserts that Ms. Castille's actions create an "'intolerable risk of unfairness'" in the hearing process. Count I Response at 10 (citing Messina v. City of Fed. Heights, No. 99-1380, 2000 U.S. App. LEXIS 20157, *10 (10th Cir. 2000))(unpublished)).

Next, Roemer contends that ARP 10.50 provides that, "following the imposition of sanctions, a faculty member is entitled to a post-determination hearing before a Faculty Appeals Board, which makes a recommendation to the provost and senior vice president for academic affairs, who renders a decision." Count I Response at 11 (citing ARP 10.50). "The faculty member also has the right to appeal the provost and senior vice president for academic affairs' decision to the Chancellor." Count I Response at 11 (citing ARP 10.50). Roemer contends, however, that, despite his requests for a post-termination hearing pursuant to ARP 10.50, Ms. Castille told him that her office was not responsible for ARP 10.50 and that the Chancellor's decision is final. See Count I Response at 11-12. Roemer disputes that Flor v. University of New Mexico, 469 F.Supp. 3d. 1143, 1156 (D.N.M. 2020)(Parker, J.)("Flor"), and Benavidez, 101 F.3d at 627, support the Defendants' post-termination-process arguments. See Count I Response at 12. Roemer argues that in Flor, the post-termination process the plaintiff receives is a hearing in which he is "permitted to have counsel present," cross-examine witnesses, and present evidence. Count I Response at 12. He also argues that, in Benavidez, the plaintiffs receive a similar post-termination hearing. See Count I Response at 12. In contrast, Roemer contends, he received only a written appeal. See

Count I Response at 12. Finally, Roemer argues that DeLovato and Arvizu violated his clearly established rights, because, respectively: (i) DeLovato denied him access to the evidence for two weeks, during which the complainants had access to the evidence; and (ii) Arvizu decided Roemer's written appeal without explanation and without personally hearing from the parties or witnesses. See Count I Response at 13. In the last section of his Count I Response, Roemer argues that he is entitled to additional discovery, because, "as the Supreme Court has recognized, a qualified immunity defense does not protect an official from all discovery, but only from discovery which is 'broad reaching.'" Count I Response at 16 (quoting Crawford-El v. Britton, 523 U.S. 574, 593 n.14 (1998))(emphasis in Count I Response).

### 9. Roemer's Counts II-IV Response.

In Roemer's Counts II-IV Response, he repeats arguments from his Motion for Judgment on the Pleadings regarding ARP 3.25 and ARP 3.80's unconstitutionality. See Counts II-IV Response at 6-15. Next, he turns to his as-applied challenge, and again states that the hearing officer's decision notes that Roemer violated ARP 3.25 and ARP 3.80. See Counts II-IV Response at 16. His primary argument is that the "Defendants' 'list of allegations' against Dr. Roemer consisted of a handful of isolated, stray utterances." Counts II-IV Response at 17. Roemer asserts that, regarding the hearing officer's findings of fact in the two final decisions, her conclusion that Roemer sexually harassed various students "was based on the comments to which Dr. Roemer admitted at the hearing." Counts II-IV Response at 18. Roemer then reviews his admissions at the hearing and contends that:

> it is clear that this handful of benign comments, made to different people over the course of a lengthy career, does not remotely rise to the level of conduct that is "so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." Davis v. Monroe Cnty Bd. of Educ, 529 U.S. 629, 632 (1999).

Counts II-IV Response at 19.  He goes on to assert that the hearing officer did not find that Roemer's comments denied the "complainants' access to educational opportunities or benefits," although he states in a footnote that the hearing officer concludes that Buskirk's "educational access was impeded due to the ongoing dispute over data ownership and her thesis that resulted from her complaint against Dr. Roemer," but maintains that "this is unrelated to the question of whether the comments that Ms. Archuleta-Staehlin concluded were 'sexual harassment' in any way denied the complainants' [sic] access to educational opportunities or benefits." Counts II-IV Response at 20 n.7.

Next, Roemer contends that the Defendants are not entitled to qualified immunity, "because no competent administrator could have believed that the handling of Dr. Roemer's case was consistent with the First Amendment," as it is "clearly established that speech cannot be prohibited on the grounds that it may cause another person to feel emotionally harmed."  Counts II-IV Response at 20 (citing Synder v. Phelps, 562 U.S. at 460-61).  Moreover, Roemer contends, citing to Davis, it is clearly established that "a handful of isolated comments made over a period of years is insufficient to rise to the level of constitutionally proscribable [sic] sexual harassment." Counts II-IV Response at 21.  After repeating his criticisms of ARP 3.25's and ARP 3.80's Constitutionality, he recaps the Blake Email, and states that "Defendants Gompper and Conner punished Dr. Roemer" by issuing him a written warning "when he dared to share his response, which was equally an expression of opinion on national [sic] news story, and about which NMSU's Chancellor had initiated a community-wide conversation."  Counts II-IV Response at 23.  Roemer also contends that Gommper and Conner punished Roemer based on student-complainants stating that they "found his email to be 'fowl' [sic] and 'inappropriate' -- something the law clearly establishes that they cannot do."  Counts II-IV Response at 24 (citing Papish v. Bd. of Curators of

the Univ. of Mo., 410 U.S. 667, 670 (1973)).

      **10.**     **The Defendants' Count I Reply**.

      In the Defendants' Count I Reply, they state that Roemer fails "to meet his burden of pointing to 'particularized' clearly established law.  Count I Reply at 4 (no citation for quoted material).  The Defendants discuss Roemer's citation to Riggins, 572 F.3d at 1112, and contend that, in this case, the Tenth Circuit rejects the plaintiff's position that, because "'the City's investigatory and adjudicative functions were combined in the same personnel,' . . . this constituted bias."  Count I Reply at 5 (quoting Riggins, 572 F.3d at 1113).  The Defendants characterize Roemer's contention that the hearing officer was biased as "wild speculation," noting that, in a State "with a small bar such as New Mexico, it is more likely than not that attorneys engaged in various capacities will know each other and may have even worked together."  Count I Reply at 5.

      The Defendants continue to discuss the Responses' cases.  They argue that: (i) Messina v. City of Federal Heights is distinguishable, and, in any event, cannot constitute clearly established law because it is unpublished; (ii) Calhoun v. Gaines is distinguishable because the professor in that case does not receive any pretermination hearing; and (iii) neither Flor nor Benavidez hold that due process "requires a post-termination hearing, particularly where a full-blown adversarial proceeding was provided before termination."  Count I Reply at 6-7 (emphasis in Count I Reply).  Moreover, the Defendants contend that Roemer has not identified a clearly established right to have access to evidence at the same time as the complainants.  See Count I Reply at 7.

      Lastly, the Count I Reply addresses Roemer's request for additional discovery, pursuant to rule 56(d) of the Federal Rules of Civil Procedure.  See Count I Reply at 8.  The Defendants contend that, in the Tenth Circuit "where a defense of qualified immunity has been raised the

nonmoving party must additionally demonstrate 'how discovery will enable [him] to rebut [Defendants'] showing of objective reasonableness,' or demonstrate a 'connection between the information he would seek in discovery and the validity of the defendant's qualified immunity assertion.'" Count I Reply at 11 (quoting Lewis v. City of Fort Collins, 903 F.2d 752, 758 (10th Cir. 1990))(brackets in Count I Reply, but not in Lewis v. City of Fort Collins).  According to the Defendants, Roemer "sets forth a series of legal conclusions and conspiracy theories for which plaintiff conclusorily [sic] claims he needs discovery," which is "not enough under Rule 56(d)." Count I Reply at 12.  Moreover, the Defendants contend that Roemer has not "indicated how his 'discovery' would assist him in overcoming Individual Defendants' entitlement to qualified immunity, which is entirely based on questions of law."  Count I Reply at 12 (no citation for quoted material).

**11.    The Defendants' Counts II-IV Reply.**

In their Counts II-IV Reply, the Defendants assert that Gommper and Conner's written warning to Roemer pursuant to ARP 3.80 does not form "any part of [Roemer's] basis for termination."  Counts II-IV Reply at 4 n.1 (Court adds brackets).  They next assert that Roemer does not contend that the First Amendment protects "the alleged conduct identified as the basis for his termination."  Counts II-IV Reply at 4.  They also note that the hearing officer found that Roemer's conduct was "'sufficiently severe, pervasive and objectively offensive that a reasonable person standing in the shoes of Complainant[s] would find his actions to be not only harassing but discriminatory and not appropriate in any educational setting.'"  Counts II-IV Reply at 4 (not identifying which final decision it quotes).  The Defendants, moreover, contend that Roemer's contention that "the sole basis for his termination was forwarding his Jacob Blake/Kenosha emails to graduate students" is "blatantly contradicted by the record evidence."  Counts II-IV Reply at 5.

Next, the Defendants advance their argument that Roemer misreads ARP 3.25 by denying that Part 3(B)'s language applies to Part 3(D).  See Counts II-IV Reply at 5.  They also note that the hearing officer applied "the severity, pervasiveness and objectively reasonable standards to plaintiff's conduct."  Counts II-IV Reply at 5.  Furthermore, they assert that Roemer has not identified "any acts by anyone other than Defendants Castille and Arvizu that would even arguably subject them to liability for his termination."  Counts II-IV Reply at 5.  They contend that "ARP 3.25 is much more like the policies at issue in Buchanan v. Alexander, 284 F.Supp. 3d 792, 801 (M.D. La. 2018)(Dick, J.), aff'd in part, rev'd in part, dismissed in part, 919 F.3d 847 (5th Cir. 2019)."  Counts II-IV Reply at 7.  Additionally, they deny that strict scrutiny applies to all anti-harassment policies.  See Counts II-IV Reply at 8.  Finally, they contend that the Defendants are entitled to qualified immunity on Counts II-IV, because "the appropriate analysis is factually specific and depends almost entirely" on the challenged policy's exact language.  Counts II-IV Reply at 9.

### 12.    The June 16, 2023, Hearing.

The Court held a hearing on the Motion on June 16, 2023.  See Clerk's Minutes at 1, filed June 16, 2023 (Doc. 83).  Roemer first addresses his Motion for Judgment on the Pleadings, and discusses one of the factors from United States v. Hernandez-Cavillo, namely, whether there are other regulations that independently and more narrowly proscribe the same actions.  See Draft Transcript of Hearing at 5:1-8, taken June 16, 2023 (Harris)("Tr.").[75]  According to Roemer, there does not exist any unprotected speech that could be addressed only under 3(D) rather than under 3(B).  See Tr. at 5:9-12 (Harris).  Furthermore, Roemer contends, there are "many potential

---

[75] The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

applications [of 3(D)] that involve protected speech.  Because all it requires is that, you know, an individual subjectively finds the verbal conduct or the expression offensive."  Tr. at 5:13-17 (Harris).

Regarding ARP 3.80, Roemer first argues that he has standing to bring his overbreadth and vagueness challenges, because (i) Gompper and Conner sent him a written disciplinary letter regarding an email he wrote warning him that the email "constitutes hostile misconduct under 3.80;" and (ii) the hearing officer's final determination found that he violated ARP 3.80.  See Tr. at 6:12-23 (Harris).   In response, the Court expresses its concern that the factual dispute regarding with which policy Roemer was charged or cited would prevent the Court from ruling on the legal issue.  See Tr. at 7:8-14 (Court); id. at 8:13-18(Court).  Roemer states that "those documents speak for themselves, and that the Defendant's argument can be easily dismissed because of the plain language of the documents that are attached to the briefing and that are cited in the pleading."  See Tr. at 8:19-24 (Harris).

Next, the Defendants address the Court and criticize Roemer's reading of the Policies.  See Tr. at 10:13-22 (Rogers).  First, the Defendants argue that "if there is a way [] to read the policy that renders it constitutional, that's how you should read the policy."  Tr. at 10:25; id. at 11:1-2 (Rogers).   Specifically, the Defendants argue that ARP 3.25 Part 3 is related to NMSU's Title IX policies "and how it enforces those [policies.]"  Tr. at 11:21-22 (Rogers).  They dispute that "[a] special different procedure was followed because one subsection applied and the other didn't."  See Tr. at 12:5-7 (Rogers).  Moreover, the Defendants highlight two constitutional "touchstones" for policies to comply with the First Amendment: (i) a standard of objective reasonableness; and (ii) "that the harassment or misconduct has to be so severe and pervasive that it alters someone's educational experience."  Tr. at 12:12-22 (Rogers).  According to the Defendants, this second

touchstone is "plainly on the face of [ARP 3.25]." Tr. at 12:23-25 (Rogers).

From here, the Defendants turn to whether Roemer was indeed charged with violating ARP 3.80. Tr. at 13:18-21(Rogers). They reiterate their position that Roemer was "charged with, litigated, and ultimately terminated based on a violation of NMSU's policy prohibiting sexual discrimination in the form of sexual harassment," Tr. at 14:11-23 (Rogers), and they suggest that the Court ask whether it was "clearly established that even by issuing him a written warning under the language of that policy that these officials violated the law." Tr. at 13:1-17 (Rogers). To that end, the Defendants agree that the policy violation dispute is immaterial to the facial challenge and "more appropriately directed maybe at the due process end of this." Tr. at 15:23-25 (Court)(Rogers); id. at 16:1-2 (Rogers).

Next, the parties turn to the Defendants' summary judgment motions; the Defendants address the due process claim fist. See Tr. at 30:24-25 (Rogers); id. at 31:1-9 (Rogers). They contend that Ms. Castille's statements to the complainants "are largely irrelevant because she wasn't the decision maker in this case." Tr. at 31:10-19 (Rogers). Next, they contend that Tenth Circuit precedent holds that due process "doesn't require that Mr. Roemer be allowed to interview any witnesses, particularly those that he wanted to"; instead, all due process entitles is a copy of any statements or allegations the witnesses have made, which he received here. Tr. at 32: 16-24 (Rogers); id. at 33:1-10 (Rogers). Moreover, they contend that receiving the evidence two weeks later than the complainant did not prejudice Roemer. See Tr. at 33:11-19 (Rogers). They also contend that, because Roemer received a full-blown evidentiary hearing before his termination, all due process entitles him in the post-termination context is "something that constitutes a meaningful hedge against error. And he got that when he submitted an appeal to the chancellor." Tr. at 34:3-10 (Rogers). They go on to distinguish other due process cases from the events leading up to

Roemer's termination.  See Tr. at 34:16-38:4 (Rogers).  Finally, they address Roemer's 56(d) request for discovery and contend that Riggins rejects a similar allegation of due process violation on the basis of bias.  See Tr. at 389:5-19 (Rogers).

In response, Roemer contends that his allegations regarding the hearing officer's bias are not pure speculation, and points to the emails between Ms. Castille and Ms. Archuleta-Staehlin regarding the appointment of Cuddy & McCarty to serve as Title IX investigators.  See Tr. at 39:15-25 (Harris).  Roemer also discusses how "what comments Castille might have made to Archuleta-Staehlin are highly material to the due process claim," because Ms. Castille's bias is "extreme."  Tr. at 40:8-12 (Harris).  Roemer contends that one can infer from Ms. Castille's statement to one of the complainants that Roemer is "likely" to face consequences from the investigation that Ms. Castille "knew she was going to be able to exercise significant influence over the process." Tr. at 40:13-22 (Harris).  Roemer also contends that Roemer "had no idea" why the Chancellor denied his appeal and argues that NMSU violated its own policies guaranteeing faculty a post-termination hearing.  Tr. at 42:1-19 (Harris).  In rebuttal, the Defendants assert that the NMSU policy regarding post-termination hearings "does not apply to proceedings that go under 3.25 and Title IX." Tr. at 44:12-16 (Rogers).  The Court states that it is taking the issue under advisement, but notes that the bias issue does not seem to warrant further investigation, such that it is inclined to deny the 56(d) motion.  See Tr. at 45:13-20 (Court).  Moreover, the Court states that UNM's procedures here are "comparable," and not "below the standard I've already blessed [at] hearings, and so I'm inclined to grant this motion." Tr. at 45:22-24 (Court); see Tr. at 46:1-6 (Court).

Next, the Defendants present argument on their Counts II-IV QI Motion; they contend that "[a]ll of the substance of that analysis that's in the hearing officer's decision has to do with sex-

based discrimination in the form [of] sexual harassment.  Not bullying, hazing, or other hostile misconduct."  Tr. at 47:1-4 (Rogers).  So, the Defendants therefore deny that "somehow 3.80 was applied here."  Tr. at 47:5-6 (Rogers).  Moreover, the Defendants argue that the analysis for student-speech codes focuses on whether they are narrowly tailored, because courts agree that universities "have a compelling interest in preventing harassment."  Tr. at 47:16-23 (Rogers). They contend that ARP 3.25 is tailored narrowly, and assert that it "contains the requirement that harassment be so severe and pervasive that it objectively interferes with someone's academic or work environment."  Tr. at 48:5-10 (Rogers).  They also contend that, regarding the Blake email, the email is "one instance in a litany of acts of misconduct that form the basis for" Roemer's termination, Tr. at 49:2-7 (Rogers); additionally, they contend that NMSU's concern regarding the email was that Roemer was "dragging these grad students into this debate that they wanted to have no part of, particularly because it contained highly sexualized discussions, and discussions about sex crimes that happened."  Tr. at 50:9-19 (Rogers).  Finally, the Defendants argue that Ms. Castille, Conner, DeLovato, Flores, and Gompper are not final decision-makers with regard to Roemer's termination, and, thus, "because there has been no factual development of any alleged wrongdoing on their part, they should be dismissed."  Tr. at 51:10-21 (Rogers).

In response, Roemer contends that it is incorrect to read ARP 3.25 Part 3(B) and Part 3(D) in conjunction.  See Tr. at 57:1-8 (Harris).  He also contends that Davis gives the definition of sexual harassment in a university setting, so it clearly is established that Part 3(D) is facially unconstitutional.  See Tr. at 57:17-25 (Harris).  Next, Roemer contends that Conner and Gompper are the final decision-makers regarding the warning they issued to Roemer about the Blake Email. See Tr. at 58:8-17 (Harris).  Moreover, Roemer contends that "[a]ll of the plaintiff's prior conduct, including things years old, that had been judged not to be harassment, were considered when

deciding to terminate him, so that is why they are defendants. And Defendant Ms. Castille is the person who issued plaintiff his letter of termination." Draft Tr. at 58:18-23 (Harris). Additionally, he contends that, pursuant to Lowe v. Angelo's Italian Foods, 87 F.3d 1170 (10th Cir. 1996), "isolated comments may not support a cause of action for sexual harassment." Tr. at 60:7-10 (Harris).[76] Finally, Roemer contends that ARP 3.80 is unconstitutional, because "it's clearly established that speech cannot be prohibited simply because it causes emotional harm." Tr. at 61:1-12 (Harris).

Following Roemer's argument, the Court asks Defendants to comment on Roemer's argument that NMSU's two sexual harassment policies should be read separately. See Tr. at 61:22-25 (Court). In response, the Defendants answer that the Court should find a way to read the policy that renders it Constitutional. See Tr. at 63:9-14 (Rogers). The Court then states that it takes the motions under advisement. See Tr. at 66:14-21 (Court).

## LAW REGARDING STANDING

A federal court may hear cases only where the plaintiff has standing to sue. See TransUnion LLC v. Ramirez, 594 U.S. 413, 423-42 (2021)("TransUnion"). Standing has two components. See Bd. of Cnty Comm'rs of Sweetwater Cnty v. Geringer, 297 F.3d 1108, 1112 (10th Cir. 2002)(quoting Sac & Foxc Nation of Mo. v. Pierce, 213 F.3d 566, 573 (10th Cir. 2000)). First, standing has a constitutional component arising from Article III's requirement that federal courts hear only genuine cases or controversies. See TransUnion, 594 U.S. at 423. Second, standing has a prudential component. See Habecker v. Town of Estes Park, 518 F.3d 1217, 1224

---

[76]As the Court discusses in the Analysis section, Roemer conflates here a cause of action for employment discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, with a university's Constitutional ability to discipline students and faculty for certain kinds of sexual speech, so his assertion regarding what Tenth Circuit law clearly establishes is incorrect.

n.7 (10th Cir. 2008)(noting that prudential standing concerns may prevent judicial resolution of a case even where constitutional standing exists).  The burden of establishing standing rests on the plaintiff.  See, e.g., Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 104 (1998).  The plaintiff must "allege . . . facts essential to show jurisdiction.  If they fail to make the necessary allegations, they have no standing."  FW/PBS v. City of Dallas, 493 U.S. 215, 231 (1990)(quoting McNutt v. Gen. Motors Acceptance Corp., 298 U.S. 178, 189 (1936)).  Moreover, where the defendant challenges standing, a court must presume lack of jurisdiction "'unless 'the contrary appears affirmatively from the record.'"  Renne v. Geary, 501 U.S. 312, 316 (1991)(quoting Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 546 (1986).  "'It is a long-settled principle that standing cannot be "inferred argumentatively from averments in the pleadings," but rather must affirmatively appear in the record.'"  Phelps v. Hamilton, 122 F.3d 1309, 1326 (10th Cir. 1997)(quoting FW/PBS v. City of Dallas, 493 U.S. at 231).

### 1.      Article III Standing.

"Article III of the Constitution limits the jurisdiction of federal courts to Cases and Controversies."  San Juan Cnty. v. United States, 503 F.3d 1163, 1171 (10th Cir. 2007)(en banc). See U.S. Const. art. III, § 2.  "In general, this inquiry seeks to determine 'whether [the plaintiff has] such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination.'"  Wyoming ex rel. Crank v. United States, 539 F.3d 1236, 1241 (10th Cir. 2008)(quoting Massachusetts v. EPA, 549 U.S. 497, 539 (2007)). "[A] suit does not present a Case or Controversy unless the plaintiff satisfies the requirements of Article III standing."  San Juan Cnty. v. United States, 503 F.3d at 1171.  To establish standing, a plaintiff must show three things: "(1) 'an injury in fact that is both concrete and particularized as well as actual or imminent;' (2) a

causal relationship between the injury and the challenged conduct; and (3) a likelihood that the injury would be redressed by a favorable decision." Protocols, LLC v. Leavitt, 549 F.3d 1294, 1298 (10th Cir. 2008)(quoting Wyoming ex rel. Crank v. United States, 539 F.3d at 1241). While courts "must afford due respect to Congress's decision to impose a statutory prohibition or obligation on a defendant, and to grant a plaintiff a cause of action to sue over the defendant's violation of that statutory prohibition or obligation," importantly, "Congress's creation of a statutory prohibition or obligation and a cause of action does not relieve courts of their responsibility to independently decide whether a plaintiff has suffered a concrete harm under Article III." TransUnion, 594 U.S. at 426.

"Standing is determined as of the time the action is brought." Smith v. U.S. Court of Appeals, for the Tenth Circuit, 484 F.3d 1281, 1285 (10th Cir. 2007)(quoting Nova Health Sys. v. Gandy, 416 F.3d 1149, 1154 (10th Cir. 2005)). In Smith v. U.S. Court of Appeals, for the Tenth Circuit, the Tenth Circuit rejects a plaintiff's standing to challenge the Colorado appellate courts' practice of deciding cases in non-precedential, unpublished opinions, which, the plaintiff as asserts, allows courts to affirm incorrect decisions without interfering with official, "published" law. 484 F.3d at 1285. The Tenth Circuit notes that the plaintiff recently had taken his State appeal and, therefore,

> was in no position to challenge the adequacy of state appellate review in cases culminating in unpublished opinions unless he could show that he would in fact receive such review from the state court of appeals (and from the state supreme court as well, if it took the case on certiorari).

484 F.3d at 1285.

By contrast, in Nova Health Systems v. Gandy, the Tenth Circuit holds that abortion providers have standing to challenge an Oklahoma parental-notification law on the grounds that

they were in imminent danger of losing patients because of the new law.  See 416 F.3d at 1154.

The Tenth Circuit was careful to frame the issue, however, as whether, "as of June 2001 [the time

the lawsuit was filed]," Nova Health faced any imminent likelihood that it would lose some minor

patients seeking abortions.  416 F.3d at 1155.  Moreover, while focusing on the time of filing, the

Tenth Circuit allows the use of evidence from later events -- prospective patients lost because of

the notification law after the lawsuit began -- to demonstrate that the plaintiff faced an imminent

threat as of the time of filing.  See 416 F.3d at 1155.

     The mere presence on the books of an unconstitutional statute, in the absence of

enforcement or credible threat of enforcement, does not entitle anyone to sue, even if he or she

alleges an inhibiting effect on Constitutionally protected conduct that the statute prohibits.  See

Winsness v. Yocom, 433 F.3d 727, 732 (10th Cir. 2006).  "This does not necessarily mean that a

statute must be enforced against the plaintiff before he can sue."  Winsness v. Yocom, 433 F.3d at

732 (quoting Ward v. Utah, 321 F.3d 1263, 1267 (10th Cir. 2003)).  Where a plaintiff can show a

"credible threat of prosecution," they can sue for prospective relief against enforcement.  Winsness

v. Yocom, 433 F.3d at 732 (quoting Ward v. Utah, 321 F.3d at 1267).  Thus, to satisfy Article III,

the "plaintiff's expressive activities must be inhibited by 'an objectively justified fear of real

consequences, which can be satisfied by showing a credible threat of prosecution or other

consequences following from the statute's enforcement.'"  Winsness v. Yocom, 433 F.3d at 732.

See Wilson v. Stocker, 819 F.2d 943, 946 (10th Cir. 1987)(holding that the plaintiff has standing

where he suffers "an ongoing injury resulting from the statute's chilling effect on his desire to

exercise his First Amendment rights").

## LAW REGARDING RULE 12(B)(6)

     Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon

which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994)(Brorby, J.). The sufficiency of a complaint is a question of law, and, when considering a rule 12(b)(6) motion, a court must accept as true all well-pled factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss."); Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)(Briscoe, J.)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pleaded factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff." (citing Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006)(McKay, J.)).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 554, 555 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. at 678. "Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp. v. Twombly, 550 U.S. at 555 (citing 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216 at 235-36 (3d ed. 2004)).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if

assumed to be true, state a claim to relief that is plausible on its face.  See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010).  "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556).  "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims."  Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(Kelly, J.)(emphasis in original).  The Tenth Circuit has stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible."  [Bell Atl. Corp. v. Twombly, 550 U.S.] at [570].  The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(McConnell, J.)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570).

Although defendants generally must plead affirmative defenses in their answers, and not argue them on a motion to dismiss, see Fed. R. Civ. P. 8(c), there are exceptions.  First, a defendant can argue an affirmative defense on a motion to dismiss where the defendant asserts an immunity defense -- the courts handle these cases differently than other motions to dismiss.  See Robbins v. Oklahoma, 519 F.3d at 1247; Glover v. Gartman, 899 F. Supp. 2d 1115, 1137-39, 1141 (D.N.M. 2012)(Browning, J.)(citing Pearson v. Callahan, 555 U.S. 223 (2009)).  Second, the defendant can raise the defense on a motion to dismiss where the facts establishing the affirmative defense are apparent on the complaint's face.  See Miller v. Shell Oil Co., 345 F.2d 891, 893 (10th Cir.

1965)(Hill, J.)("Under Rule 12(b), a defendant may raise an affirmative defense by a motion to dismiss for the failure to state a claim. If the defense appears plainly on the face of the complaint itself, the motion may be disposed of under this rule."). The defense of limitations is the affirmative defense that the complaint's uncontroverted facts is most likely to establish. See 5 C. Wright & A. Miller, Federal Practice & Procedure § 1277, at 643 (3d ed. 2004). If a complaint sets forth dates that appear to fall outside of the statutory limitations period, then a defendant may move for dismissal under rule 12(b)(6). See Rohner v. Union P. R. Co., 225 F.2d 272, 273-75 (10th Cir. 1955)(Wallace, J.); Gossard v. Gossard, 149 F.2d 111, 113 (10th Cir. 1945)(Phillips, J.); Andrew v. Schlumberger Tech. Co., 808 F. Supp. 2d 1288, 1292 (D.N.M. 2011)(Browning, J.).

A plaintiff may counter this motion with an assertion that a different statute of limitations or an equitable tolling doctrine applies to bring the suit within the statute. JThe Tenth Circuit has not clarified whether this assertion must be pled with supporting facts in a complaint or may be merely argued in response to the motion.[77] Cf. Kincheloe v. Farmer, 214 F.2d 604 (7th Cir.

---

[77]The Tenth Circuit views a claim based on a statute of limitations as an "affirmative defense," which "[a] plaintiff need not anticipate in the complaint" as "it is the defendant's burden to plead an affirmative defense." Fernandez v. Clean House, LLC, 883 F.3d 1296, 1298-99 (10th Cir. 2018)(citing Gomex v. Toledo, 446 U.S. 635, 640 (1980)). See United States v. Titterington, 374 F.3d 453, 456 (6th Cir. 2004)(citing United States v. Cook, 84 U.S. 168 (1872))("[T]he Supreme Court has held that a statute-of-limitations claim falls on the affirmative-defense side of the line."). The Plaintiffs are not required to "plead against affirmative defenses" and, accordingly, a motion to dismiss cannot be sustained on factors of an affirmative defense the plaintiff was not required to anticipate. Asebedo v. Kan. State Univ., 559 F. App'x. 668, 671-72 (10th Cir. 2014)(holding that a dismissal based on a plaintiff omitting a claim of reasonableness in his or her complaint is invalid when reasonableness is an element of an affirmative defense and thus not required in the complaint). Accordingly, "[t]he statute of limitations . . . is not at issue until it is raised," and "[o]nly then does it become incumbent upon the plaintiff to meet the allegations or face dismissal of [their] complaint." Cutsinger v. Cullinan, 72 Ill. App. 3d 527, 531-32 (Ill. App. 1979). The Court thus concludes that a plaintiff is not required to include facts to support an assertion that a different statute of limitations or an equitable tolling doctrine applies in their initial complaint as this would effectively be requiring the plaintiff to plead against an affirmative defense.

1954)(Major, J.)(holding that, once a plaintiff has pled facts in a complaint indicating that the statute of limitations is a complete or partial bar to an action, the plaintiff must plead facts establishing an exception to the affirmative defense).  It appears that, from case law in several Courts of Appeals, a plaintiff may avoid this problem altogether -- at least at the motion-to-dismiss stage -- by refraining from pleading specific or identifiable dates.  See, e.g., Goodman v. Praxair, Inc., 494 F.3d 458, 465-66 (4th Cir. 2007)(Niemeyer, J.); Hollander v. Brown, 457 F.3d 688, 691 n.1 (7th Cir. 2006)(Ripple, J.).  Although the Tenth Circuit has not addressed this practice squarely, the Court has permitted this practice.  See Anderson Living Tr. v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1207 (D.N.M. 2014)(Browning, J.).

## LAW REGARDING JUDGMENT ON THE PLEADINGS

"After the pleadings are closed -- but early enough not to delay trial -- a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c).  A "[j]udgment on the pleadings should not be granted 'unless the moving party has clearly established that no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law.'" Park Univ. Enters., Inc. v. Am. Cas. Co. of Reading, 442 F.3d 1239, 1244 (10th Cir. 2006)(quoting United States v. Any & All Radio Station Transmission Equip., 207 F.3d 458, 462 (8th Cir. 2000)).  The same standards for evaluating a 12(b)(6) motion apply to a motion for a judgment on the pleadings.  See Atlantic Richfield Co. v. Farm Credit Bank of Wichita, 226 F.3d at 1160 ("A motion for judgment on the pleadings under Rule 12(c) is treated as a motion to dismiss under rule 12(b)(6).").  Thus, a court accepts "all facts pleaded by the non-moving party as true and grants all reasonable inferences from the pleadings in that party's favor." Sanders v. Mountain Am. Fed. Credit Union, 689 F.3d at 1141.  All of the nonmoving parties' allegations are deemed true, and all of the movants' contrary assertions are deemed false.  See Nat'l Metro. Bank v. United States, 323 U.S. 454, 456-

57 (1945); Ramirez v. Dep't of Corr., 222 F.3d 1238, 1240 (10th Cir. 2000); Freeman v. Dep't of Corr., 949 F.2d 360, 361 (10th Cir. 1991).

Under rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." Mobley v. McCormick, 40 F.3d at 340. A complaint that faces a rule 12(b)(6) motion to dismiss does not require detailed factual allegations, but a plaintiff's obligation to set forth the grounds of his or her entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. at 555. "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp. v. Twombly, 550 U.S. at 555. A plaintiff must "nudge his claims across the line from conceivable to plausible" to survive a motion to dismiss. Bell Atl. Corp. v. Twombly, 550 U.S. at 570. "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." Ridge at Red Hawk, LLC v. Schneider, 493 F.3d at 1177. The Tenth Circuit states:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible." The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.
>
> This requirement of plausibility serves not only to weed out claims that do not (in the absence of additional allegations) have a reasonable prospect of success, but also to inform the defendants of the actual grounds of the claim against them. "Without some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement of providing not only 'fair notice' of the nature of the

- 66 -

claim, but also 'grounds' on which the claim rests."  See Airborne Beepers & Video, Inc. v. AT&T Mobility LLC, 499 F.3d 663, 667 (7th Cir. 2007)("[A]t some point the factual detail in a complaint may be so sketchy that the complaint does not provide the type of notice of the claim to which the defendant is entitled under Rule 8.").   The Twombly Court was particularly critical of complaints that "mentioned no specific time, place, or person involved in the alleged conspiracies." n.10.   Given such a complaint, "a defendant seeking to respond to plaintiffs' conclusory allegations . . . would have little idea where to begin."  Id.

Robbins v. Oklahoma, 519 F.3d at 1247-48.

## LAW REGARDING DOCUMENTS OUTSIDE THE PLEADINGS ON A MOTION TO DISMISS

Generally, a complaint's sufficiency must rest on its contents alone.  See Casanova v. Ulibarri, 595 F.3d 1120, 1125 (10th Cir. 2010); Gossett v. Barnhart, 139 F. App'x. 24, 24 (10th Cir. 2005)(unpublished)("In ruling on a motion to dismiss, the district court is limited to the facts pled in the complaint.").[78]  Emphasizing this point, the Tenth Circuit, in Carter v. Daniels, 91 F. App'x. 83 (10th Cir. 2004)(unpublished), states: "When ruling on a Rule 12(b)(6) motion, the

---

[78]The Court relies on Gossett v. Barnhart, 139 F. App'x. 24, 24 (10th Cir. 2005) to the extent its reasoned analysis is persuasive in this case.  See 10th Cir. R. 32.1(A), 28 ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit states:

In this circuit, unpublished orders are not binding precedent, . . . And we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that Gossett v. Barnhart, Carter v. Daniels, 91 F. App'x. 83 (10th Cir. 2004), Hook v. Regents of University of California., 394 F. App'x 522 (10th Cir. 2010), Joritz v. Gray-Little, 822 F. App'x 731 (10th Cir. 2020), Hunt v. Board of Regents of University of New Mexico, 792 Fed. App'x 595 (10th Cir. 2019), Routt v. Howry, No. 19-6187, 835 F. App'x. 379, 382 (10th Cir. 2020), and Peterson v. Williams, No. 20-4059, 2022 WL 1421959  (10th Cir. May 5, 2022), have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

district court must examine only the plaintiff's complaint. The district court must determine if the complaint alone is sufficient to state a claim; the district court cannot review matters outside of the complaint."  91 F. App'x. at 85.  Instead, a court must convert a motion to dismiss into a motion for summary judgment if "matters outside the pleading are presented to and not excluded by the court," and "all parties . . . [are] given reasonable opportunity to present all material made pertinent to such a motion by Rule 56."  Fed. R. Civ. P. 12(d).

There are, however, certain limited categories of documents that a district court can consider on a motion to dismiss without converting it into a motion for summary judgment.  See Cuervo v. Sorenson, 112 F.4th 1307, 1312 (10th Cir. 2024)("When the district court considers documents outside the pleadings without a valid exception, it must convert the motion to summary judgment."); Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)("Tellabs").  First, the court can consider documents that the complaint incorporates by reference.  See Tellabs, 551 U.S. at 322 (citing 5 B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (3d ed. 2004 and Sup. 2007)).  See also Jacobsen v. Deseret Book Co., 287 F.3d 936, 941 (10th Cir. 2002)(the court can consider "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity.").  This category also includes written documents that are attached to the complaint as exhibits.  See Hall v. Bellmon, 935 F.2d 1106, 1112 (10th Cir. 1991)("A written document that is attached to the complaint as an exhibit is considered part of the complaint and may be considered in a Rule 12(b)(6) dismissal.").  Second, the court can consider "matters of which a court may take judicial notice." Tellabs, 551 U.S. at 322.  "[T]he court is permitted to take judicial notice of its own files and records, as well as facts which are a matter of public record."  Van Woudenberg v. Gibson, 211 F.3d 560, 568 (10th Cir. 2000), abrogated on other grounds by McGregor v. Gibson,

248 F.3d 946, 955 (10th Cir. 2001).

In contrast to these limited categories, it is improper for a court ruling on a motion to dismiss to rely on documents to which the parties cite in their motions.  For example, in <u>Gee v. Pacheco</u>, 627 F.3d 1178 (10th Cir. 2010), the defendants "supported their motion with numerous documents, and the district court cited portions of those motions in granting the [motion to dismiss]."  627 F.3d at 1186 (Court adds brackets).  The Tenth Circuit holds that "[s]uch reliance was improper" and that, even if "the district court did not err initially in reviewing the materials, the court improperly relied on them to refute Mr. Gee's factual assertions and effectively convert the motion to one for summary judgment."  <u>Gee v. Pacheco</u>, 627 F.3d at 1186-87 (Court adds brackets).

The Court previously has held that in ruling on a motion to dismiss where the issue was whether to toll a statute of limitations in a fraud action, the Court may not use in its ruling interviews and letters attached to the motion evincing that a plaintiff was aware of the defendant's alleged fraud before the statutory period expired.  <u>See</u> <u>Great Am. Co. v. Crabtree</u>, No. CIV 11-1129 JB/KBM, 2012 WL 3656500, at *3, *22-23 (D.N.M. Aug. 23, 2012)(Browning, J.).  The Court determines that the documents do not fall within any of the Tenth Circuit's exceptions to the general rule that a complaint must rest on the content's sufficiency alone, as the complaint does not incorporate the documents by reference or refer to the documents.  <u>See</u> <u>Great Am. Co. v. Crabtree</u>, 2012 WL 3656500, at *22-23.  <u>See also</u> <u>Mocek v. City of Albuquerque</u>, No. CIV 11-1009, 2013 WL 312881, at *50 (D.N.M. 2013)(Browning, J.)(refusing to consider statements that are not "central to [the plaintiff's] claims").

On the other hand, in a securities class action, the Court holds that a defendant's operating certification to which the plaintiffs refer in their complaint and is central to whether the plaintiffs'

adequately allege a loss falls within an exception to the general rule, and the Court may consider the operating certification when ruling on the defendant's motion to dismiss without converting the motion into one for summary judgment. See Genesee Cnty. Emps.' Retirement Sys. v. Thornburg Mortg. Secs. Tr. 2006-3, 825 F. Supp. 2d 1082, 1150-51 (D.N.M. 2011)(Browning, J.). See also Mata v. Anderson, 760 F. Supp. 2d 1068, 1101 (D.N.M. 2009)(Browning, J.)(relying on documents outside of the complaint because they were "documents that a court can appropriately view as either part of the public record, or as documents upon which the Complaint relies, and the authenticity of which is not in dispute"); Gallegos v. Bernalillo Cnty. Bd. of Cnty. Comm'rs, 278 F. Supp. 3d 1245, 1259-60 (D.N.M. 2017)(Browning, J.).

## LAW REGARDING THE FIRST AMENDMENT

The First Amendment states: "Congress shall make no law . . . abridging the freedom of speech, or of the press." U.S. Const. amend. I. The First Amendment secures the "freedom of expression upon public questions." New York Times Co. v. Sullivan, 376 U.S. 254, 269 (1964). According to Justice Louis Brandeis, Associate Justice of the Supreme Court, "[t]hose who won our independence believed that the final end of the state was to make men free to develop their faculties, and that in its government the deliberate forces should prevail over the arbitrary." Whitney v. California, 274 U.S. 357, 375 (1927). The Constitution's Framers "valued liberty both as an end and as a means," and "believed liberty to be the secret of happiness and courage to be the secret of liberty." Whitney v. California, 274 U.S. at 375. The Framers firmly believed that the "freedom to think as you will and to speak as you think are means indispensable to the discovery and spread of political truth," because, without them, "discussion would be futile." Whitney v. California, 274 U.S. at 375. Justice Brandeis noted that the values that the First Amendment protects are essential to the operation of the democracy that the Constitution creates.

See Whitney v. California, 274 U.S. at 375.  Robust public discussion is a "political duty" and is a "fundamental principle of the American government."  Whitney v. California, 274 U.S. at 375. Constitutional protections of freedom of expression and of the press, therefore, are "fashioned to assure unfettered interchange of ideas for the bringing out of political and social changes desired by the people."  Roth v. United States, 354 U.S. 476, 484 (1957).

The First Amendment, however, is not an absolute bar on government intervention.  "No law," does not actually mean "no law."  U.S. Const. amend. I.  See Dennis v. United States, 314 U.S. 494, 503 (1951)(noting that the First Amendment does not protect an "unlimited, unqualified right," because the "societal value of speech must, on occasion, be subordinated to other values and considerations"); Ashcroft v. ACLU, 535 U.S. 564, 573 (2002)(stating that, "'as a general matter, the First Amendment means that government has no power to restrict expression because of its messages, its ideas, its subject matter, or its content," but "this principle, like other First Amendment principles, is not absolute")(quoting Bolger v. Youngs Drug Prod. Corp., 463 U.S. 60, 65 (1983)).  Although the First Amendment speaks in absolutist terms, courts have long recognized that governments Constitutionally can restrict speech and the press under certain conditions.  See Holder v. Humanitarian L. Project, 561 U.S. 1, 26-29 (2010).  Justice Oliver Wendell Holmes, Associate Justice of the Supreme Court, notes in his famous example: "The most stringent protection of free speech would not protect a man in falsely shouting fire in a theater and causing a panic."  Schenck v. United States, 249 U.S. 47, 52 (1919).  Not all speech is protected speech.  See Chaplinsky v. New Hampshire, 315 U.S. 568, 571-72 (1942)("There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem."); Miller v. California, 413 U.S. 15, 23 (1973)("This much has been categorically settled by the Court, that obscene material is

unprotected by the First Amendment."). "[N]ot all speech is of equal First Amendment importance." Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 758 (1985). The extent to which the government may limit access to information or restrict speech "depends on the nature of the forum." Cornelius v. NAACP Legal Def. and Educ. Fund, Inc., 473 U.S. 788, 797 (1985). See Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989)(concluding that certain content-neutral time, place, and manner restrictions are Constitutional). Moreover, the First Amendment's speech and press protections limit both State and federal government action. See Gitlow v. New York, 268 U.S. 652, 666 (1925); Near v. Minnesota, 283 U.S. 697, 628 (1931). The First Amendment regulates "government regulation of private speech" and not government speech or purely private speech regulations. Pleasant Grove City, Utah v. Summum, 555 U.S. 460, 467 (2009). The First Amendment does not compel either the government or private persons to supply information. See Shero v. City of Grove, 510 F.3d 1196 (10th Cir. 2007). See In re Santa Fe Natural Tobacco Co. Mkting & Sales Practices and Prod. Liab. Litig., 388 F. Supp. 3d 1087, 1168-73 (D.N.M. Dec. 21, 2017)(Browning, J.).

## LAW REGARDING THE FIRST AMENDMENT RIGHTS OF PUBLIC EMPLOYEES

The First Amendment protects teachers; they do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." Kennedy v. Bremerton Sch. Dist., 597 U.S. 507 (2022)("Kennedy")(quoting Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 506 (1969)("Tinker."). Notwithstanding the Tinker principle, the speech rights of public-school employees are not "so boundless that they may deliver any message to anyone anytime they wish," because, "[i]n addition to being private citizens, teachers and coaches are also government employees paid in part to speak on the government's behalf and convey its intended messages." Kennedy, 597 U.S. at 508 (Court adds brackets). Because of teachers' dual status as public

employees and citizens entitled to Constitutional protections, the Supreme Court's First Amendment doctrine seeks to balance the "considerable value, moreover, in encouraging, rather than inhibiting, speech by public employees" against "the government's countervailing interest in controlling the operation of its workplaces." Lane v. Franks, 573 U.S. 228, 236 (2014).

When a public employee alleges that an employer's adverse employment action against them is impermissible retaliation under the First Amendment, the doctrinal contours of balancing derive from the Garcetti/Pickering test.  See Knopf v. Williams, 884 F.3d 939, 945 (10th Cir. 2018)(citing Garcetti v. Ceballos, 547 U.S. 410, 417 (2006)("Garcetti"); and Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, 391 U.S. 563, 568 (1968)("Pickering")).  The test applies "a five-prong analysis to determine whether action taken against an employee constitutes retaliation in violation of the employee's First Amendment rights."  Hook v. Regents of Univ. of Cal., 394 F. App'x 522, 534 (10th Cir. 2010)(unpublished).

> First, the court must determine whether the employee speaks pursuant to his official duties.  If the employee speaks pursuant to his official duties, then there is no constitutional protection because the restriction on speech simply reflects the exercise of employer control over what the employer itself has commissioned or created.  Second, if an employee does not speak pursuant to his official duties, but instead speaks as a citizen, the court must determine whether the subject of the speech is a matter of public concern.  If the speech is not a matter of public concern, then the speech is unprotected and the inquiry ends.  Third, if the employee speaks as a citizen on a matter of public concern, the court must determine whether the employee's interest in commenting on the issue outweighs the interest of the state as employer.  Fourth, assuming the employee's interest outweighs that of the employer, the employee must show that his speech was a substantial factor or a motivating factor in a detrimental employment decision.  Finally, if the employee establishes that his speech was such a factor, the employer may demonstrate that it would have taken the same action against the employee even in the absence of the protected speech.

Couch v. Bd. of Trs. of Mem'l Hosp., 587 F.3d 1223, 1235 (10th Cir. 2009)(quoting Brammer-Hoelter v. Twin Peaks Charter Acad., 492 F.3d 1192, 1202-3 (10th Cir. 2007))("Brammer-

Hoelter").

"Implicit within this five-prong analysis 'is a requirement that the public employer have

taken some adverse employment action against the employee.'" Hook v. Regents of Univ. of Cal.,

394 F. App'x at 534 (quoting Couch v. Bd. of Trs. of Mem'l Hosp., 587 F.3d at 1235-36). The

standard for determining whether an employer subjects an employee to an adverse employment

action is the same for retaliation claims under the First Amendment and Title VII. See Hook v.

Regents of Univ. of Cal., 394 F. App'x at 353.[79] The test is whether the action "'would deter a

---

[79]The Tenth Circuit recognizes that, "there was some confusion in our circuit as to what qualifies as an adverse employment action in the context of First Amendment retaliation." Hook v. Regents of Univ. of Cal., 394 F. App'x at 535 (citing Maestas v. Segura, 416 F.3d 1182, 1188 n.5 (10th Cir. 2005)). In Maestas v. Segura, the majority notes, in dicta, that "some forms of retaliation may be actionable under the First Amendment while insufficient to support a discrimination claim under Title VII." 416 F.3d at 1188 n.5. See Baca v. Sklar, 398 F.3d 1210, 1220-21 (10th Cir. 2005)("Although we have never delineated what actions constitute 'adverse employment actions' in the First Amendment context, we have repeatedly concluded that a public employer can violate an employee's First Amendment rights by subjecting an employee to repercussions that would not be actionable under Title VII." (citing Morfin v. Albuquerque Pub. Sch., 906 F.2d 1434, 1437 n.3 (10th Cir. 1990)(rejecting proposition that "only adverse employment decisions, such as termination, suspension, or transfer, in retaliation for constitutionally protected conduct are illegal. Actions short of an actual or constructive employment decision can in certain circumstances violate the First Amendment."); Schuler v. City of Boulder, 189 F.3d 1304, 1310 (10th Cir. 1999)(reprimanding employee, transferring her to another location, and removing job duties from her constitute adverse employment actions in First Amendment context)). In Couch v. Board of Trustees of Memorial Hospital, the Tenth Circuit, however, "clarified the parameters of First Amendment retaliation protection, explaining that [the Tenth Circuit] consider[s] an employment action to be adverse in the First Amendment retaliation setting if it 'would deter a reasonable person from exercising his First Amendment rights.'" Hook v. Regents of Univ. of Cal., 394 F. App'x at 353 (quoting Couch v. Bd. of Trs. of Mem'l Hosp., 587 F.3d at 1238). The Tenth Circuit explains in Hook v. Regents of University of California that "[t]his test is identical to the test which is applied in Title VII retaliation claims." Hook v. Regents of Univ. of Cal., 394 F. App'x at 353 (citing Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53 (2006)). In Baca v. Sklar, the Tenth Circuit reversed the Court's summary judgment for the defendant, in which the Court states: "Baca's allegations that Sklar undermined his supervisory authority, that Sklar was disrespectful by interrupting, changing subjects, and not participating in discussions, and that Sklar stopped attending staff meetings on a regular basis do not describe actionable adverse actions." Baca v. Sklar, No. CIV-02-1002 JB/ACT, 2004 U.S. Dist. LEXIS 28360, at *39 (D.N.M. Jan. 23, 2004)(Browning, J.)(citing Belcher v. City of McAlester, 324 F.3d

reasonable person from exercising his First Amendment rights.'" Hook v. Regents of Univ. of Cal., 394 F. App'x at 353 (quoting Couch v. Bd. of Trs. of Mem'l Hosp., 587 F.3d at 1238). See Proctor v. United Parcel Serv., 502 F.3d 1200, 1208 n.4 (10th Cir. 2007)(citing Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53 (2006)); Haynes v. Level 3 Commc'ns, 456 F.3d 1215, 1228 (10th Cir. 2006). See Gerald v. Locksley, 785 F. Supp. 2d 1074, 1117 (D.N.M. 2011)(Browning, J.)(applying the Title VII standard for adverse employment action to determine that neither "[t]he Defendants encouraging [the Plaintiff] to minimize or not pursue a grievance because it would not be good for his career without any action" nor the Defendants placing the Plaintiff on administrative leave amounted to adverse employment actions.).

### 1.    Speech Pursuant to Official Duties.

Pursuant to Garcetti, a plaintiff must show that the substance of the speech which forms the basis for the First Amendment claim involves something that is not part of the plaintiff's official duties and is a matter of public concern, and not merely a complaint involving the plaintiff's own employment. See Brammer-Hoelter, 492 F.3d at 1202. In Brammer-Hoelter, the Tenth Circuit applies the analysis from Garcetti to determine whether the employee's First-Amendment right is violated. See Brammer-Hoelter, 493 F.3d at 1202-08. First, the court must determine whether the employee speaks "pursuant to her official duties." Brammer-Hoelter, 493

---

1203, 1207 n.4 (10th Cir. 2004)("If the action taken by the employer in response to the employee's speech is inconsequential or has only speculative consequences, there can be no basis for a First Amendment claim.")). The Tenth Circuit determines that several actions by Sklar constitute adverse employment actions, including removing Baca's supervisory positions and encouraging employees to bypass Baca's supervision, contravening university protocol by reprimanding Baca, filing an Office of Equal Opportunity charge against Baca, and using the Office of Equal Opportunity charge to force Baca's resignation. See Baca v. Sklar, 398 F.3d at 1221. On remand, the jury found for the defendant. See Baca v. Sklar, CIV 02-1002 JB\ACT, Final Judgment at 1, filed August 26, 2005 (Doc. 184).

F.3d at 1202. "If the employee speaks pursuant to his official duties, then there is no constitutional protection because the restriction on speech 'simply reflects the exercise of employer control over what the employer itself has commissioned or created.'" Brammer-Hoelter, 492 F.3d at 1202 (quoting Garcetti, 547 U.S. at 422).

Speech relating to tasks within an employee's uncontested employment responsibilities may not be protected from regulation, even though the speech concerns an unusual aspect of an employee's job that is not part of his everyday functions. See Battle v. Bd. of Regents, 468 F.3d 755, 761 n.6 (11th Cir. 2006). In some circumstances, filing a complaint with "an agency outside [a plaintiff's] direct chain of command . . . [i]s not pursuant to official duties, but rather [i]s the speech of a private citizen." Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ., 595 F.3d 1126, 1137 (10th Cir. 2010)(Court adds brackets). The ultimate question is whether the employee speaks as a citizen or as a government employee -- an individual acting "in his or her professional capacity." Gerald v. Locksley, 785 F. Supp. 2d at 1104. See Jones v. Lincoln Cnty. Comm'rs, No. CIV 06-0591 JB/LCS, 2007 WL 5239190, at *11 (D.N.M. July 10, 2007)(Browning, J.)(concluding that an employee acted as a citizen, because "no particular political affiliation is required for Jones' position as Deputy Sheriff, and it is not plausible that Jones had an official duty to oppose his boss in a political election").

### 2.    Speech About Matters of Public Concern.

Second, if the employee does not speak pursuant to his or her official duties, but instead speaks as a citizen, the court must determine whether the subject of her speech is a matter of public concern. See Brammer-Hoelter, 492 F.3d at 1202-03. "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." Connick v. Myers, 461 U.S. 138, 147

(1983)("Connick")(finding that a terminated assistant district attorney's expressive activity does not involve a matter of public concern where she disseminates a questionnaire to her co-workers soliciting their views on office morale and dynamics, including whether they feel pressure to work in political campaigns).

> [W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.

Connick, 461 U.S. at 147. "Statements revealing official impropriety usually involve matters of public concern." Brammer-Hoelter, 492 F.3d at 1205 (citing Lighton v. Univ. of Utah, 209 F.3d 1213, 1224 (10th Cir. 2000)). Conversely, speech that merely airs "grievances of a purely personal nature" does not involve matters of a public concern. Brammer-Hoelter, 492 F.3d at 1205 ("In determining whether speech pertains to a matter of public concern, the court may consider 'the motive of the speaker and whether the speech is calculated to disclose misconduct or merely deals with personal disputes and grievances unrelated to the public's interest.'" (quoting Lighton v. Univ. of Utah, 209 F.3d at 1224)).

The Tenth Circuit in Brammer-Hoelter explains:

> [W]e have held that the following are not matters of public concern: speech regarding grievances about internal departmental affairs, Hom v. Squire, 81 F.3d 969, 974 (10th Cir. 1996), disputes over the term of employment, Lancaster v. Ind. Sch. Dist. No. 5, 149 F.3d 1228, 1233-34 (10th Cir. 1998), and workplace frustration, McEvoy v. Shoemaker, 882 F.2d 463, 466 (10th Cir. 1989).

Brammer-Hoelter, 492 F.3d at 1205 (Court adds brackets). In Sanchez v. Matta, No. CIV 03-2297 JB/LFG, 2004 WL 3426405 (D.N.M. Aug. 23, 2004)(Browning, J.), the Court explains that an employee spoke on a matter of public concern when: (i) the speech addresses

allegations of fraud, the inappropriate collection of state funds as reimbursement

for use of the executive director of the National Hispanic Cultural Center's personal vehicle at the IRS mileage rate when a state vehicle was available, the granting of a translation contract to executive director's sister, the attempted misuse of state travel funds, violations of the New Mexico Procurement Code, the misuse of government phones for personal reasons, discriminatory favoritism and preferential treatment toward certain employees, and harassment of other employees . . . ,

2004 WL 3426405, at *10-11, (ii) the employee speaks to "two high level officers within the organizational structure of the Center who had the ability to take action on Sanchez' concerns," 2004 WL 3426405, at *10-11, and (iii) no evidence suggests a "pre-existing dispute" between the employee and the executive director,  2004 WL 3426405, at *10-11.  See Jones v. Lincoln Cnty. Comm'rs, 2007 WL 5239190, at *11 (concluding that statements about political affiliation are a matter of public concern, because "'discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution'" (quoting Buckley v. Valeo, 424 U.S. 1, 14 (1976))); West v. N.M. Taxation & Revenue Dep't, 757 F. Supp. 2d 1065, 1128 (D.N.M. 2010)(Browning, J.)(determining that an Equal Employment Opportunity Commission ("EEOC") charge and complaints about employers' response to requests for accommodation are not matters of public concern, because they "focus on conditions of [the employee's] own employment").

   3.    **Balancing Interests.**

   Third, if the subject of the speech is a matter of public concern, the court must weigh "an employee's First Amendment speech against an employer's interest in an efficient and disciplined work environment." Brammer-Hoelter, 492 F.3d at 1207 (quoting Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1333 (10th Cir. 2007)).  "'[S]peech on public issues occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection." Connick, 461 U.S. at 145 (quoting NCAACP v. Claiborne Hardware Co., 458 U.S. 886, 913

(1982)(Court adds brackets).   "[T]he employer must also articulate its proffered interest in regulating the speech in question." Barker v. City of Del City, 215 F.3d at 1139 (Court adds brackets).  The Tenth Circuit explains:

> Nevertheless, the question is whether the employer "has an efficiency interest which would justify it in restricting the particular speech at issue." [Cragg v. City of Osawatomie, 143 F.3d 1343, 1347 (10th Cir. 1998)].   "In performing the balancing, the statement will not be considered in a vacuum; the manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose." Rankin v. McPherson, 483 U.S. 378, 388, (1987).

Brammer-Hoelter, 492 F.3d at 1207.

> A number of factors are considered in evaluating Defendants' interest under the Pickering balancing test.  Pertinent considerations include "the manner, time, and place of the employee's expression . . . the context in which the dispute arose . . . [and] whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise."

Patrick v. Miller, 953 F.2d 1240, 1248 (10th Cir. 1992)(quoting Rankin v. McPherson, 483 U.S. at 388).  Courts "defer to a public employer's reasonable predictions of disruption, but those predictions must be supported by the presentation of specific evidence.  The [employer] cannot satisfy its burden by making 'purely speculative allegations.'" Cragg v. City of Osawatomie, 143 F.3d 1343, 1347 (10th Cir. 1998)(quoting Moore v. City of Wynnewood, 57 F.3d 924, 934 (10th Cir. 1995)).  "Arguably, 'the only public employer interest that can outweigh a public employee's recognized speech rights is the interest in avoiding direct disruption, by the speech itself, of the public employer's internal operations and employment relationships.'" Brammer-Hoelter, 492 F.3d at 1207 (emphases in Flanagan v. Munger, 890 F.2d 1557, 1566 (10th Cir. 1989))(quoting Flanagan v. Munger, 890 F.2d at 1566).  See Sanchez v. Matta, 2004 WL 3426405, at *12-13 (determining that, where no "actual disruption" occurred, the employer's interests did not

outweigh the employee's).

###### 4.   Causation.

"Under the fourth prong of Garcetti, plaintiffs bear the burden of establishing both a detrimental employment decision (adverse employment action) and 'causation -- that is, that the constitutionally protected speech was a substantial motivating factor in the employer's decision to adversely alter the employee's conditions of employment.'" Couch v. Bd. of Trs. of Mem'l Hosp. of Carbon Cty., 587 F.3d at 1236 (quoting Maestas v. Segura, 416 F.3d 1182, 1188 & n.5 (10th Cir. 2005)). The second half of this prong requires a showing that the plaintiff's protected speech is a "'substantial factor or a motivating factor'" in the adverse action. Brammer-Hoelter, 492 F.3d 1192 at 1203 (quoting Lybrook v. Members of Farmington Mun. Sch. Bd. of Educ., 232 F.3d at 1338). Demonstrating the link between the protected speech and the adverse action is a fact-intensive inquiry and is thus ordinarily the jury's province. See Brammer-Hoelteremy, 492 F.3d at 1203. Nonetheless, "[t]o withstand summary judgment . . . , an employee must produce evidence linking the employer's action to the employee's speech." Maestas v. Segura, 416 F.3d at 1188 (Court adds brackets).

The Tenth Circuit summarizes some of the law regarding the causation requirement in Maestas v. Segura:

> Adverse action in close proximity to protected speech may warrant an inference of retaliatory motive. See Baca v. Sklar, 398 F.3d 1210, 1221 (10th Cir. 2005). But temporal proximity is insufficient, without more, to establish such speech as a substantial motivating factor in an adverse employment decision. Id[.]; see also Morfin v. City of East Chicago, 349 F.3d 989, 1005 (7th Cir. 2003)(explaining protected conduct cannot be a basis for retaliation where defendants did not know of such conduct). An employer's knowledge of the protected speech, together with close temporal proximity between the speech and challenged action, may be sufficiently probative of causation to withstand summary judgment. See Ramirez [v. Okla. Dep't of Mental Health], 41 F.3d [584] at 596 [(10th Cir. 1994)]. Other evidence of causation may include evidence the employer

expressed opposition to the employee's speech, see Alpha Energy Savers, Inc. v. Hansen, 381 F.3d 917, 929 (9th Cir. 2004), or evidence the speech implicated the employer in serious misconduct or wrongdoing.  See Baca, 398 F.3d at 1221.  On the other hand, evidence such as a long delay between the employee's speech and challenged conduct, see McGuire v. City of Springfield, 280 F.3d 794, 796 (7th Cir. 2002), or evidence of intervening events, see Gubitosi v. Kapica, 154 F.3d 30, 33 (2d Cir. 1998), tend to undermine any inference of retaliatory motive and weaken the causal link.

Maestas v. Segura, 416 F.3d at 1189.

Showing that an adverse action occurred in close proximity to protected speech is a common method of showing causation.  A plaintiff need not show proximity between the protected speech and an action sufficiently severe to be materially adverse, but can instead show temporal proximity between the speech and the beginning of a pattern of retaliatory activity, some instances of which are sufficient under the Garcetti/Pickering analysis.

Chavez-Rodriguez v. City of Santa Fe, No. CIV 07-0633 JB/DJS, 2008 WL 5992270, at *18

(D.N.M. Oct. 17, 2008)(Browning, J.), on reconsideration in part, 616 F. Supp. 2d 1153 (D.N.M.

2009)(Browning, J.), rev'd on other grounds, 596 F.3d 708 (10th Cir. 2010).  See Jones v. Lincoln

Cnty. Comm'rs, 2007 WL 5239190, at *12 (concluding that a genuine issue of material dispute

exists about whether an employees' political expression and association motivated the employers'

adverse employment action when "management personnel had ostracized" the employee and stated

that he did so, because "[a]ny constructive criticism would have been misconstrued as retaliation");

Sanchez v. Matta, 2004 WL 3426405, at *15 (granting summary judgment for the defendant on

the question of causation when the manager who issued a written reprimand and Notice of

Contemplated Action had only "general knowledge" about a grievance, avoided learning more

about the grievance and based the decision on material unrelated to the grievance, but denying

summary judgment for the defendant when the employer restricted the employee's representations

at meetings, "because it relieved" tension resulting from the employee's protected action).

5.    **Alternative Reason for the Employer's Action**.

To rebut a plaintiff's case, an employer may "'demonstrate that it would have taken the same action against the employee even in the absence of the protected speech.'" Brammer-Hoelter, 492 F.3d at 1203 (quoting Lybrook v. Members of Farmington Mun. Sch. Bd. of Educ., 232 F.3d at 1339).    "This step ensures a plaintiff cannot 'prevent his employer from assessing his performance record and reaching a decision not to rehire on the basis of that record, simply because the protected conduct makes the employer more certain of the correctness of its decision.'" Roberts v. Winder, 16 F.4th 1367, 1382 (10th Cir. 2021)(quoting Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 286 (1977)).    "This defense is principally an issue for the jury." See Brammer-Hoelter, 492 F.3d at 1203.

## LAW REGARDING FIRST AMENDMENT OVERBREADTH CHALLENGES

An overbreadth challenge is a facial challenge to a speech-restricting statute on First Amendment grounds, and, if successful, it results in the invalidation of the entire statute.    To succeed, the challenged statute must regulate substantially more expression than the First Amendment allows governments to regulate.    See Schad v. Borough of Mt. Ephraim, 452 U.S. 61 (1981).    The party challenging the statute need not have been engaged in Constitutionally protected expression to have standing to challenge the law; even if the law is Constitutional as applied to the challenging party, if the law is found to be overbroad, it is invalid in its entirety.    See Village of Schaumburg v. Citizens for a Better Env't, 444 U.S. 620, 634 (1980)("Given a case or controversy, a litigant whose own activities are unprotected may nevertheless challenge a statute by showing that it substantially abridges the First Amendment rights of other parties not before the court.").    There are, thus, two aspects of an overbreadth challenge that set it apart from other facial challenges: the substantive aspect and the standing aspect.

1.    __The Substantive Aspect: Inverting the Usual Rule for Facial Challenges__.

Outside of the First-Amendment context, for a party to succeed in facially challenging a statute, "the challenger must establish that no set of circumstances exists under which the Act would be valid."[80]    United States v. Salerno, 481 U.S. 739, 745 (1987).    Overbreadth is not quite

---

[80]The Tenth Circuit and leading commentators contend that the formulation in United States v. Salerno, 481 U.S. 739, 745 (1987), is neither normatively desirable nor -- more importantly for the Court's purposes -- descriptively accurate:

> [I]n City of Chicago v. Morales, [527 U.S. 41, 55 n.22 (1999),] a plurality of the Court asserted that "[t]o the extent that we have consistently articulated a clear standard for facial challenges, it is not the Salerno formulation, which has never been the decisive factor in any decision of this Court, including Salerno itself."
>
>      . . . .
>
> Salerno's language thus is accurately understood not as setting forth a test for facial challenges, but rather as describing the result of a facial challenge in which a statute fails to satisfy the appropriate constitutional standard.    In other words, where a statute fails the relevant constitutional test (such as strict scrutiny, the Ward test, or reasonableness review), it can no longer be constitutionally applied to anyone -- and thus there is "no set of circumstances" in which the statute would be valid.    The relevant constitutional test, however, remains the proper inquiry.

Doe v. City of Albuquerque, 667 F.3d 1111, 1125-26, 1127 (10th Cir. 2012)(emphasis in original)(Court adds brackets)(referring to Ward v. Rock Against Racism, 491 U.S. 781 (1989), which holds that, even in a public forum, the government may impose reasonable restrictions on the time, place, or manner of protected speech, as long as the restrictions are narrowly tailored to serve a significant governmental interest, the restrictions leave open ample alternative channels for communicating the information, and the restrictions are justified without reference to the content of the regulated speech).    See Richard H. Fallon, Jr., Fact and Fiction About Facial Challenges, 99 Cal. L. Rev. 915, 936-49 (2011)(examining empirical evidence and concluding that the Supreme Court regularly facially invalidates laws and ignores the purported standard when it does); Richard H. Fallon, Jr., As-Applied and Facial Challenges and Third-Party Standing, 113 Harv. L. Rev. 1321, 1322-23, 1342-43 (2000); Michael C. Dorf, Facial Challenges to State and Federal Statutes, 46 Stan. L. Rev 235, 239-42 (1994)("[T]he Salerno opinion cites no direct authority to support its truly draconian standard.").    If the standard in United States v. Salerno were taken seriously, virtually no statute would ever be invalidated.    A statute criminalizing male-male sexual relations would be Constitutional, because it could be applied validly to nonconsensual male-male sexual relations.    See Lawrence v. Texas, 539 U.S. 558 (2003)(striking down a male-male sodomy law without ever using the term "facial challenge" or reciting any recognizable

the 180-degree reverse of this standard -- which would be that a law is unconstitutional if it proscribes any Constitutionally protected speech -- but instead invalidates only those laws whose "overbreadth is substantial." Bd. of Airport Comm'rs of L.A. v. Jews for Jesus, Inc., 482 U.S. at 574. The usual burden of proof in attacking the Constitutionality of a statute is switched in the First Amendment context, so that the government "bears the burden of establishing its constitutionality," ACORN v. Municipality of Golden, 744 F.2d 739, 746 (10th Cir. 1984), and the usual presumption that a statute is constitutional is negated. See Doe v. City of Albuquerque, 667 F.3d 1111, 1120 (10th Cir. 2012)("'[A]s a general matter, we give all statutes a presumption of constitutionality and we must apply the same presumption to . . . ordinances.' However, this presumption does not apply when the challenged statute infringes upon First Amendment rights.") (omission in original)(quoting Gilmor v. Thomas, 490 F.3d 791, 798 (10th Cir. 2007))(citing ACORN v. Mun. of Golden, 744 F.2d 739, 746 (10th Cir. 1984)).

An example of a successful overbreadth challenge occurs in Schad v. Borough of Mount Ephraim. 452 U.S. 61 (1981). In that case, a nude-dancing club challenges a city ordinance that purports to ban all live entertainment in commercial zones.[81] See 452 U.S. at 63-64. Although

---

standard of the same). It is not clear how this standard even could be applied to Equal-Protection challenges, invidious-purpose challenges, procedural-rights challenges, or challenges that a law falls outside of the federal government's enumerated powers; how it can be squared with void-for-vagueness doctrine; or whether and how it affects severability analysis. See Citizens United v. Fed. Election Comm'n, 558 U.S. at 331("[T]he distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge.").

[81]The Borough of Mt. Ephraim argues that the zoning ordinance constituted a "reasonable time, place, and manner restriction." 452 U.S. at 74. The Supreme Court replies that, "[t]o be reasonable, time, place, and manner restrictions not only must serve significant state interests but also must leave open adequate alternative channels of communication. Here, the Borough totally excludes all live entertainment . . . ." 452 U.S. at 75-76 (citing Grayned v. City of Rockford, 408 U.S. at 116).

the Supreme Court has since determined that the First Amendment does not protect nude dancing, see Barnes v. Glen Theatre, Inc., 501 U.S. 560 (1991), the ordinance banned a substantial swath of activities -- such as "plays, concerts, musicals, dance," and athletic events -- that the First Amendment protects. Schad v. Borough of Mt. Ephraim, 452 U.S. at 66. The Supreme Court did not do as they might have done in non-First Amendment settings and narrowly interpret the ordinance to ban only Constitutionally unprotected speech, but rather struck the ordinance down entirely as overbroad. See 452 U.S. at 66.

"[T]he overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." Broadrick v. Oklahoma, 413 U.S. 601, 615-16 (1973). In Broadrick v. Oklahoma, the Supreme Court upholds a state law, patterned on the federal Hatch Act of 1939, 5 U.S.C. §§ 7321-7326, that bars government employees from engaging in partisan political activities. See 413 U.S. at 615-16. On its face, the statute can be construed to ban forms of expression, like wearing partisan buttons and displaying partisan bumper stickers on vehicles, that both parties agree the First Amendment protects.[82] See 413 U.S. at 615-16. The State Personnel Board, the body charged with enforcing the statute and disciplining noncompliant employees, internally interprets the statute to ban only unprotected speech, and the disciplined plaintiff-employees did not engage in protected speech, but merely seek to invalidate the law on

---

[82]Government employees, compared to private-sector employees, receive fewer First-Amendment protections from adverse employment actions. See Erwin Chemerinsky, Constitutional Law: Principles and Policies § 11.2.4.1, at 969; id. § 11.3.8.1, at 1112. Government employees are protected from adverse employment actions only on the basis of speech if: (i) the speech is "on a matter of public concern," Connick, 461 U.S. at 146; and (ii) the government's needs, "as an employer, in promoting the efficiency of the public services it performs through its employees," Pickering, 391 U.S. at 568, do not -- when balanced against the speech rights of the employee -- justify the speech restriction.

the basis of the theoretical unconstitutional applications.  See 413 U.S. at 615-16.  The Supreme

Court holds that the statute is "not substantially overbroad and that whatever overbreadth may

exist should be cured through case-by-case analysis of the fact situations to which its sanctions,

assertedly, may not be applied."  413 U.S. at 615-16.

As to the line between insubstantial overbreadth and substantial overbreadth, the Supreme

Court states:

> The concept of substantial overbreadth is not readily reduced to an exact
> definition.  It is clear, however, that the mere fact that one can conceive of some
> impermissible applications of a statute is not sufficient to render it susceptible to an
> overbreadth challenge.  On the contrary, the requirement of substantial overbreadth
> stems from the underlying justification for the overbreadth exception itself -- the
> interest in preventing an invalid statute from inhibiting the speech of third parties
> who are not before the Court.
> "The requirement of substantial overbreadth is directly derived from the
> purpose and nature of the doctrine.  While a sweeping statute, or one incapable of
> limitation, has the potential to repeatedly chill the exercise of expressive activity
> by many individuals, the extent of deterrence of protected speech can be expected
> to decrease with the declining reach of the regulation."  New York v. Ferber, 458
> U.S. 747, 772 (1982).
> In short, there must be a realistic danger that the statute itself will
> significantly compromise recognized First Amendment protections of parties not
> before the Court for it to be facially challenged on overbreadth grounds.

Members of the City Council of L.A. v. Taxpayers for Vincent, 466 U.S. 789, 800-01

(1984)(footnote omitted)(citing Erznoznik v. City of Jacksonville, 422 U.S. 205, 216 (1975)).

When assessing whether an overbroad statute is likely to chill third parties from engaging

in protected expression, courts should assess not only whether the number of unconstitutional

potential applications of the statute is significant relative to the overall number of applications, but

the level of interpretive discretion given to those in charge of its enforcement and the likelihood

of capricious enforcement.  In City of Houston v. Hill, 482 U.S. 451 (1987), the Supreme Court

strikes down as overbroad a city ordinance making it a crime "for any person to assault, strike or

in any manner oppose, molest, abuse or interrupt any policeman in the execution of his duty." 482

U.S. at 455 (quoting Code of Ordinances, City of Houston, Tex. § 34-11(a) (1984)). The Supreme

Court holds that the ordinance is "not narrowly tailored to prohibit only disorderly conduct or

fighting words," 482 U.S. at 465, and "criminalizes a substantial amount of constitutionally

protected speech, and accords the police unconstitutional discretion in enforcement," 482 U.S. at

466. The Supreme Court explains:

> As the Court observed over a century ago, "[i]t would certainly be dangerous if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large." United States v. Reese, 92 U.S. (2 Otto) 214, 221 (1876).
>
> . . . .
>
> The ordinance's plain language is admittedly violated scores of times daily, yet only some individuals -- those chosen by the police in their unguided discretion -- are arrested. Far from providing the "breathing space" that "First Amendment freedoms need . . . to survive," NAACP v. Button, 371 U.S. 415, 433 (1963), the ordinance is susceptible of regular application to protected expression.

City of Houston v. Hill, 482 U.S. at 465-67 (citations to the record omitted). The Court presumes

that, assuming the same level of overbreadth, the threat of criminal sanctions produces a stronger

chilling effect than that of civil monetary sanctions, directions to cease and desist, or exposure to

civil liability.

Some commentators have suggested that, when considering whether a statute's

overbreadth is substantial, courts should take into account the importance of the protected speech

being restricted or chilled. See Richard Fallon, Jr., Making Sense of Overbreadth, 100 Yale L.J.

853, 894 (1991). Under this view, a statute that chills a swath of political speech should be more

readily facially invalidated than one that chills sexual, frivolous, or even artistic speech -- the latter

statute being more amenable to as-applied challenges. Although the Supreme Court has not

endorsed this view explicitly, it has held that "the overbreadth doctrine does not apply to commercial speech." Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 497 (1982).

Nevertheless, the Supreme Court recently reaffirms that "[e]ven in the First Amendment context, facial challenges are disfavored," Moody v. NetChoice, LLC, 603 U.S. 707, 744 (2024)("NetChoice"), because "courts usually handle constitutional claims case by case, not en masse," 603 U.S. at 723 (citing Washington State Grange v. Washington State Republican Party, 552 U.S. 442, 450-51 (2008)("Washington").  "'Claims of facial invalidity often rest on speculation' about the law's coverage and its future enforcement.  And 'facial challenges threaten to short circuit the democratic process' by preventing duly enacted laws from being implemented in constitutional ways." NetChoice, 603 U.S. at 723 (quoting Washington, 522 U.S. at 451).  In light of these concerns, the Supreme Court states that facial challenges are "hard to win." NetChoice, 603 U.S. at 723.  Emphasizing these points, the Honorable Amy Coney Barrett, Associate Justice of the Supreme Court, notes the "dangers of bringing a facial challenge" and urges the NetChoice plaintiffs to bring as-applied challenges to the laws in question.  NetChoice, 603 U.S. at 745, 747 (Barrett, J., concurring).

### 2.    The Standing Aspect: The Near Abolition of Prudential Standing Factors.

A non-First Amendment, non-overbreadth facial challenge to a given statute is always more difficult to mount than an as-applied challenge to the same statute.  See United States v. Salerno, 481 U.S. at 745 (citing Schall v. Martin, 467 U.S. 253, 269 n.18 (1984))("[W]e have not recognized an 'overbreadth' doctrine outside of the limited context of the First Amendment.").  This is the case, because an as-applied challenge requires only that the law is unconstitutional as applied to the challenger's case.  See United States v. Raines, 362 U.S. 17, 21 (1960).  On the other

- 88 -

hand, outside of the First-Amendment context, a facial challenge requires this showing,[83] and also requires that there exists "no [other, theoretical] set of circumstances" in which the law could be applied Constitutionally.  United States v. Salerno, 481 U.S. at 745.  Thus, the default rule is that a successful as-applied challenge is a necessary, but not sufficient, ingredient to a successful facial challenge.  See United States v. Raines, 362 U.S. at 21.  The Supreme Court has attributed this rule to the Case or Controversy Clause, U.S. Const. art. III, § 2, cl. 1, specifically its standing requirement.[84]  See Broadrick v. Oklahoma, 413 U.S. at 610 (first citing Younger v. Harris, 401 U.S. 37, 52 (1971); and then citing Marbury v. Madison, 1 Cranch 137, 178 (1803))(explaining that "under our constitutional system, courts are not roving commissions assigned to pass judgment on the validity of the Nation's laws.").

The respective relative difficulty between mounting facial and as-applied challenges is almost, but not entirely, reversed in the context of a First Amendment overbreadth challenge.  See United States v. Hansen, 599 U.S. 762, 669 (2023)("Hansen").  In the First Amendment context, it is not necessary to have a viable as-applied challenge to succeed on a facial challenge.  Hansen, 599 U.S. at 669 ("[T]he overbreadth doctrine instructs a court to hold a statute facially unconstitutional even though it has lawful applications, and even at the behest of someone to whom

---

[83]A logical consequence of there being "no set of circumstances" wherein the law would be Constitutional is that the manner in which the government applies the law in the challenger's case also must be unconstitutional.  See United States v. Raines, 362 U.S. 17, 22 (1960)(discussing the rule that "one to whom application of a statute is constitutional will not be heard to attack the statute on the ground that impliedly it might also be taken as applying to other persons or other situations in which its application might be unconstitutional.").

[84]Standing is not the only reason that facial challenges are disfavored.  Other cases say that "[f]acial adjudication carries too much promise of 'premature interpretatio[n] of statutes' on the basis of factually barebones records."  Sabri v. United States, 541 U.S. 600, 609 (2004)(alterations in Sabri, 541 U.S. at 609)(quoting United States v. Raines, 362 U.S. at 22).

the statute can be lawfully applied.").  Put another way, "where the claim is that a statute is overly

broad in violation of the First Amendment, . . . [there is] no requirement that the person making

the attack demonstrate that his own conduct could not be regulated by a statute drawn with the

requisite narrow specificity."  Sec'y of State of Md. v. Joseph H. Munson Co., 467 U.S. 947, 957

(1984).  Even if the challenger engages in Constitutionally unprotected, validly penalized speech,

if he can establish that the statute penalizes a substantial swath of protected speech, then he will

prevail in getting the statute invalidated not only as it relates to the Constitutionally protected

speech of others, but also as it relates to his own unprotected speech.  See Hansen, 599 U.S. 669.

For example, if a statute criminalized "demeaning, threatening, or inflammatory words," a

challenger arrested for using "fighting words" in a bar -- unprotected speech which may be validly

criminalized under Chaplinsky v. New Hampshire, 315 U.S. 568 (1942) -- could challenge the law

on behalf of third parties who might risk arrest for constitutionally protected demeaning or

inflammatory words.  See Goading v. Wilson, 405 U.S. 518 (1972)(invalidating a Georgia law

making it a crime for "[a]ny person [to], without provocation, use . . . opprobrious words or

abusive language, tending to cause a breach of the peace").

      The relaxation of the usual standing rules in the overbreadth context, moreover, goes

further than simply allowing an individual to whom the law is Constitutionally applied to sue on

the basis of unconstitutional applications.  The challenged law need not have been applied against

the challenger at all; as long as the barebones requirements of Article III standing are met,[85] the

---

      [85]Establishing Article III standing requires three components: (i) an injury in fact, which is
"an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual
or imminent, not conjectural or hypothetical;" (ii) causation between the injury in fact and the
conduct complained of, such that the injury is fairly traceable to the challenged action; and (iii) "it
must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable
decision."  Lujan v. Defenders of Wildlife, 504 U.S. at 560-61 (Scalia, J.)(quoting Allen v. Wright,

elements of prudential standing are presumed satisfied in an overbreadth challenge.[86]  In Secretary of State of Maryland v. Joseph H. Munson Co., the Supreme Court allows a professional fundraising company to bring suit challenging a State statute that prohibits charities from soliciting funds unless at least seventy-five percent of their revenue is used for charitable purposes.  See 467 U.S. at 949.  The Supreme Court holds that the plaintiff has standing, even though the law has not been and -- as the company was not a charity -- could not be applied against it:

> [T]he Secretary's most serious argument against allowing Munson to challenge the statute is that there is no showing that a charity cannot bring its own lawsuit. Although such an argument might defeat a party's standing outside the First Amendment context, this Court has not found the argument dispositive in determining whether standing exists to challenge a statute that allegedly chills free speech.  To the contrary, where the claim is that a statute is overly broad in violation of the First Amendment, the Court has allowed a party to assert the rights of another without regard to the ability of the other to assert his own claims and "'with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity.'" Broadrick v. Oklahoma, 413 U.S. at 612 (quoting Dombrowski v. Pfister, 380 U.S. 479, 486 (1965)).  See also Schaumburg [v. Citizens for a Better Env't, 444 U.S. 620, 634 (1980)]("Given a case or controversy, a litigant whose own activities are unprotected may nevertheless challenge a statute by showing that it substantially abridges the First Amendment rights of other parties not before the court").

---

468 U.S. 737, 756 (1984); Whitmore v. Arkansas, 495 U.S. 149, 155 (1990); and Simon v. E. Kentucky Welfare Rts. Org., 426 U.S. 26, 38, 41-42 (1976)).

[86]A leading commentator offers a possible justification for the virtual abandonment of standing doctrine in the context of overbreadth challenges that also explains the concept of "taxpayer standing" for suits brought under the Establishment Clause: the grammar of the Constitution's text.  Nicholas Q. Rosenkranz, The Subjects of the Constitution, 62 Stan. L. Rev. 1209, 1250-57, 1257-63 (2010).  The argument's thrust is that, while all the other Bill of Rights provisions are written in passive voice, the First Amendment provides that "Congress shall make no law . . . ."  U.S. Const. amend. I.  See Rosenkranz, supra, at 1250.  Professor Rosenkranz suggests that, while the Constitution contemplates that, for example, Fourth Amendment harm occurs at the point when an unreasonable search occurs, First Amendment injury occurs when Congress passes the infringing law.  See Rosenkranz, supra, at 1255.

The fact that, because Munson is not a charity, there might not be a possibility that the challenged statute could restrict Munson's own First Amendment rights does not alter the analysis. Facial challenges to overly broad statutes are allowed not primarily for the benefit of the litigant, but for the benefit of society -- to prevent the statute from chilling the First Amendment rights of other parties not before the court. Munson's ability to serve that function has nothing to do with whether or not its own First Amendment rights are at stake. The crucial issues are whether Munson satisfies the requirement of "injury-in-fact," and whether it can be expected satisfactorily to frame the issues in the case. If so, there is no reason that Munson need also be a charity. If not, Munson could not bring this challenge even if it were a charity.

The Secretary concedes that the Art. III case-or-controversy requirement has been met and the Secretary has come forward with no reason why Munson is an inadequate advocate to assert the charities' rights. The activity sought to be protected is at the heart of the business relationship between Munson and its clients, and Munson's interests in challenging the statute are completely consistent with the First Amendment interests of the charities it represents. We see no prudential reason not to allow it to challenge the statute.

Sec'y of State of Md. v. Joseph H. Munson Co., 467 U.S. at 957-58 (Court adds brackets).

In Griffin v. Bryant, 30 F. Supp. 3d 1139 (D.N.M. 2014)(Browning, J.), the Court holds that a plaintiff has standing to challenge a municipality's rule prohibiting statements criticizing the municipality's employees or governing body. Griffin v. Bryant, 30 F. Supp. 3d at 1175-76. Even though the plaintiff has not been penalized for violating the municipality's rule, because the rule likely affects his speech, he has suffered a sufficient injury in fact to establish standing. See Griffin v. Bryant, 30 F. Supp. 3d at 1176.

## **LAW REGARDING A STATUTE BEING VOID FOR VAGUENESS**

"Facial invalidation 'is, manifestly, strong medicine' that 'has been employed by the Court sparingly and only as a last resort.'" Nat'l Endowment for the Arts v. Finley, 524 U.S. 569, 580 (1998)(quoting Broadrick v. Oklahoma, 413 U.S. at 613). "Vagueness doctrine is an outgrowth not of the First Amendment, but of the Due Process Clause of the Fifth Amendment." United States v. Williams, 553 U.S. 285, 304 (2008). "A statute can be impermissibly vague for either of

two independent reasons.  First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits.  Second, if it authorizes or even encourages arbitrary and discriminatory enforcement."  Hill v. Colorado, 530 U.S. 703, 732 (2000)(citing Chicago v. Morales, 527 U.S. 41, 56-57 (1999)("Morales").  See United States v. Williams, 553 U.S. at 304 (describing a vague statute as failing "to provide a person of ordinary intelligence fair notice of what is prohibited, or [as being] so standardless that it authorizes or encourages seriously discriminatory enforcement."); Mini Spas, Inc. v. South Salt Lake City Corp., 810 F.2d 939, 942 (10th Cir. 1987)("A statute violates due process if it is so vague that a person of common intelligence cannot discern what conduct is prohibited, required, or tolerated."). "What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is."  United States v. Williams, 553 U.S. at 306.  The Supreme Court notes that "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity."  Ward v. Rock Against Racism, 491 U.S. 781, 794 (1989).

"A federal court evaluating a vagueness challenge to a state law must read the statute as it is interpreted by the state's highest court."  United States v. Gaudreau, 860 F.2d 357, 361 (10th Cir. 1988).  In evaluating the Constitutional validity of state statutes, the Supreme Court states that "every presumption is to be indulged in favor of the validity of a statute."  Mugler v. Kansas, 123 U.S. 623, 661 (1887).  The Supreme Court of New Mexico, in discussing the presumption of Constitutional validity that attaches to acts of the New Mexico Legislature, states:

> A strong presumption of constitutionality underlies each legislative enactment, and we will not void a statute where a constitutional construction is reasonably supported by the statutory language.  See State v. Fleming, 2006-NMCA-149, 149 P.3d 113; Ortiz v. Taxation & Revenue Dep't, 1998-NMCA-027, 954 P.2d 109.  In construing a regulation or statute, "this Court has a duty to affirm

the legislation's validity and constitutionality if reasonably possible." Old Abe Co. v. N.M. Mining Comm'n, 1995-NMCA-134, 908 P.2d 776, 789-90. A statute is only unconstitutional "if it is so vague that persons of common intelligence must guess at its meaning and would differ in its application." City of Albuquerque v. Sanchez, 1992-NMCA-038, 832 P.2d 412, 418. However, "absolute or mathematical certainty is not required in the framing of a statute." State ex rel. Bliss v. Dority, 1950-NMSC-066, 225 P.2d 1007, 1017.

Bishop v. Evangelical Good Samaritan Soc'y, 2009-NMSC-036, ¶ 16, 146 N.M. 473, 479, 212 P.3d 361, 366-67. In some cases, however, the Supreme Court notes that it cannot remedy a Constitutionally imprecise state statute. See Hynes v. Mayor & Council of Oradell, 425 U.S. 610, 622 (1976)("Even assuming that a more explicit limiting interpretation of the ordinance could remedy the flaws we have pointed out -- a matter on which we intimate no view -- we are without power to remedy the defects by giving the ordinance constitutionally precise content.").

In determining whether a federal statute is unconstitutionally vague, the Supreme Court notes that a strong presumption of validity attaches to Congress' enactments and consistently construes a challenged statute narrowly rather than condemns it as unconstitutionally vague. See Skilling v. United States, 561 U.S. 358, 405 (2010)("Skilling")("It has long been our practice, however, before striking a federal statute as impermissibly vague, to consider whether the prescription is amenable to a limiting construction."); United States v. Nat'l Dairy Prods. Corp., 372 U.S. 29, 32 (1963)(stressing, in response to a vagueness challenge, "[t]he strong presumptive validity that attaches to an Act of Congress"). In Skilling, the Supreme Court looks to Congress' intent in passing the honest-services doctrine, and limits the construction of the honest-services doctrine to reach bribes and kickbacks, as Congress intends, stating:

> [T]here is no doubt that Congress intended § 1346 to reach at least bribes and kickbacks. Reading the statute to proscribe a wider range of offensive conduct, we acknowledge, would raise the due process concerns underlying the vagueness doctrine. To preserve the statute without transgressing constitutional limitations, we now hold that § 1346 criminalizes only the bribe-and-kickback core of the pre-

McNally [v. United States, 483 U.S. 350 (1987)] case law.

Skilling, 561 U.S. at 408.

In Grayned v. City of Rockford, the Supreme Court states that, when assessing whether a statute is vague, it looks to "'the words of the ordinance itself,' to the interpretations the court below has given to analogous statutes, and, perhaps to some degree, to the interpretation of the statute given by those charged with enforcing it." 408 U.S. at 110 (quoting Coates v. Cincinnati, 402 U.S. 518 (1972)). For example, in Minority Television Project Inc. v. F.C.C., No. C-06-02699, 2007 WL 4570293, at *1 (N.D. Cal. Dec. 21, 2007)(Laporte, J.), aff'd, 475 F. App'x 671 (9th Cir. 2012), on reh'g en banc, 736 F.3d 1192 (9th Cir. 2013), and aff'd, 736 F.3d 1192 (9th Cir. 2013), the Honorable Elizabeth D. Laporte, United States Magistrate Judge for the United States District Court for the Northern District of California, finds it premature to dismiss a facial challenge of void for vagueness until the plaintiffs introduced evidence of the Federal Communication Commission's ("FCC") enforcement decisions applying the statute in question -- a prohibition against certain paid promotional advertisements. 2007 WL 4570293, at *9. When the plaintiffs submit evidence of the FCC's enforcement, Judge Laporte finds the statute is not unconstitutionally vague, explaining:

> Assuming that the Court may "perhaps to some degree" consider the FCC's interpretation of the statute in evaluating whether the statute is vague, see Grayned v. City of Rockford, 408 U.S. 104, 110 (1972), as Plaintiff urges the Court to do, arguable inconsistencies in a statute's application in a handful of cases do not condemn a statute. If such limited inconsistencies rendered statutes unconstitutionally vague, the majority of statutes would probably not survive a vagueness challenge. Rather, "uncertainty at a statute's margins will not warrant facial invalidation if it is clear what the statute proscribes 'in the vast majority of its intended applications.'" California Teachers Ass'n, 271 F.3d at 1151(quoting Hill v. Colorado, 530 U.S. 703, 733 (2000)(rejecting vagueness challenge)(quotation marks omitted)). As in Grayned, the words of the statute here are marked by "flexibility and reasonable breadth, rather than meticulous specificity," and "it is clear what the ordinance as a whole prohibits." 408 U.S. at

110 (quoting Esteban v. Central Missouri State College, 415 F.2d 1077, 1088 (8th Cir. 1969)).

Minority TV Project Inc. v. FCC, 649 F.Supp.2d 1025, 1047 (N.D.Cal. 2009)(Laporte, M.J.).  The Supreme Court in Grayned v. City of Rockford notes: "Condemned to the use of words, we can never expect mathematical certainty from our language." 408 U.S. at 110.  The Supreme Court rejects a facial vagueness challenge to an ordinance that implicates First Amendment rights, and prohibits certain demonstrations "adjacent" to schools that "disturb[ ] or tend[ ] to disturb the peace or good order of such school session or class thereof," concluding that it is "clear what the ordinance as a whole prohibits," even though the statute does not specify the prohibited quantum of disturbance.   408 U.S. at 109-11 ("Although the prohibited quantum of disturbance is not specified in the ordinance, it is apparent from the statute's announced purpose that the measure is whether normal school activity has been or is about to be disrupted.").

Numerous statutes withstand facial vagueness challenges even though they contain arguably indeterminate language.  See, e.g., Hill v. Colorado, 530 U.S. at 732 (rejecting vagueness challenge to ordinance making it a crime to "approach" another person without that person's "consent" to engage in "oral protest, education, or counseling" within specified distance of health-care facility); Boos v. Barry, 485 U.S. 312, 332 (1988)(rejecting vagueness challenge to ordinance interpreted as regulating conduct near foreign embassies "when the police reasonably believe that a threat to the security or peace of the embassy is present"); Cameron v. Johnson, 390 U.S. 611, 616 (1968)(rejecting vagueness challenge to ordinance prohibiting protests that "unreasonably interfere" with access to public buildings); Kovacs v. Cooper, 336 U.S. 77, 79 (1949)(rejecting vagueness challenge to sound ordinance forbidding "loud and raucous" sound amplification).

## LAW REGARDING PROCEDURAL DUE PROCESS CLAIMS

The Fourteenth Amendment establishes: "No State shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV.  The Due Process Clause encompasses two distinct forms of protection: (i) procedural due process, which requires a State to employ fair procedures when depriving a person of a protected interest; and (ii) substantive due process, which guarantees that a State cannot deprive a person of a protected interest for certain reasons.  See Reid v. Pautler, 36 F. Supp. 3d 1067, 1136 (D.N.M. 2014)(Browning, J.)(citing Cnty. of Sacramento v. Lewis, 523 U.S. 833, 845-46 (1998)).  "Under either form of protection, however, a person must have a protected interest in either life, liberty, or property."  Chavez-Rodriguez v. City of Santa Fe, No. CIV 07-0633 JB/DJS, 2008 WL 5992271, at *6 (D.N.M. Oct. 9, 2008)(Browning, J.).  The Tenth Circuit prescribes a two-step inquiry for determining whether an individual's procedural due process rights are violated: (i) "[d]id the individual possess a protected property [or liberty] interest to which due process protection was applicable?"; and (ii) "[w]as the individual afforded an appropriate level of process?"  Camuglia v. City of Albuquerque, 448 F.3d 1214, 1219 (10th Cir. 2006)(quoting Clark v. City of Draper, 168 F.3d 1185, 1189 (10th Cir. 1999)).

"[T]o determine whether due process requirements apply in the first place, we must look not to the 'weight' but to the nature of the interest at stake."  Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 570-71 (1972).  "'Liberty' and 'property' are broad and majestic terms.  They are among the '(g)reat (constitutional) concepts . . . purposely left to gather meaning from experience."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 571 (quoting Nat'l Mutual Ins. Co. v. Tidewater Transfer Co., 337 U.S. 582, 646 (1949)(Frankfurter, J., dissenting)).  The Supreme Court has "made clear that the property interests protected by the procedural due process

clause extend well beyond actual ownership of real estate, chattels, or money. By the same token, the Court has required due process protection for deprivations of liberty beyond the sort of formal constraints imposed by the criminal process." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 571-72. "Yet, while the Court has eschewed rigid or formalistic limitations on the protection of procedural due process, it has at the same time observed certain boundaries," stating that "the words 'liberty' and 'property' in the Due Process Clause of the Fourteenth Amendment must be given some meaning." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 572.

> Concerning the Fourteenth Amendment's meaning of "liberty," the Supreme Court states:
>
> Without doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, to establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness of free men. In a Constitution for a free people, there can be no doubt that the meaning of 'liberty' must be broad indeed.

Bd. of Regents of State Colls. v. Roth, 408 U.S. at 572. "The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 576. These property interests include "real estate, chattels, or money," but they "may take many forms." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 571-76.

> Thus, the Court has held that a person receiving welfare benefits under statutory and administrative standards defining eligibility for them has an interest in continued receipt of those benefits that is safeguarded by procedural due process. Goldberg v. Kelly, 397 U.S. 254 [(1970)]. See Flemming v. Nestor, 363 U.S. 603, 611 [(1960)]. Similarly, in the area of employment, the Court has held that a public college professor dismissed from an office held under tenure provisions, Slochower v. Bd. of Education, 350 U.S. 551 [(1956)], and college professors and staff members dismissed during the terms of their contracts, Wieman v. Updegraff, 344 U.S. 183 [(1952)], have interests in continued employment that are safeguarded by due process.

Bd. of Regents of State Colls. v. Roth, 408 U.S. at 576-77.

Based upon these decisions, "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577. "Such an interest arises not from the Due Process Clause of the Constitution itself, but is created by independent sources such as a state or federal statute, a municipal charter or ordinance, or an implied or express contract." Teigen v. Renfrow, 511 F.3d 1072, 1079 (10th Cir. 2007). See Paul v. Davis, 424 U.S. 693, 710 (1976)("[Liberty and property] interests attain . . . constitutional status by virtue of the fact that they have been initially recognized and protected by state law."). "Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577. See Farthing v. City of Shawnee, 39 F.3d 1131, 1135 (10th Cir. 1994)("Rather, property interests, which are the subject of the present litigation, 'are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'")(quoting Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577)).

"[O]nce it is determined that the Due Process Clause applies, the question remains what process is due." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541 (1985)("Loudermill")(citing Morrissey v. Brewer, 408 U.S. 471, 481 (1972))(Court adds brackets). "An essential principle of due process is that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case." Loudermill, 470 U.S. at 542. "[D]ue process is flexible and calls for such procedural protections

as the particular situation demands." <u>Mathews v. Eldridge</u>, 424 U.S. 319, 334 (1976)("<u>Mathews</u>")(Court adds brackets). The Supreme Court explains that

> the root requirement of the Due Process Clause [is] that an individual be given an opportunity for a hearing before he is deprived of any significant property interest. This principle requires some kind of a hearing prior to the discharge of an employee who has a constitutionally protected property interest in his employment.
>
> . . . .
>
> [T]he pretermination hearing, though necessary, need not be elaborate. We have pointed out that [t]he formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings. In general, something less than a full evidentiary hearing is sufficient prior to adverse administrative action.

<u>Loudermill</u>, 470 U.S. at 542, 545 (footnote omitted). The Second Circuit states:

> The Supreme Court . . . explained that procedural due process is a flexible standard that can vary in different circumstances depending on "'the private interest that will be affected by the official action'" as compared to "the Government's asserted interest, 'including the function involved' and the burdens the Government would face in providing greater process." <u>Hamdi v. Rumsfeld</u>, 542 U.S. 507, [529] (2004)(quoting <u>Mathews v. Eldridge</u>, 424 U.S. at 335). A court must carefully balance these competing concerns, analyzing "'the risk of an erroneous deprivation' of the private interest if the process were reduced and the 'probable value, if any, of additional or substitute safeguards.'" <u>Id.</u> (quoting <u>Mathews v. Eldridge</u>, 424 U.S. at 335).

<u>United States v. Abuhamra</u>, 389 F.3d 309, 318 (2d Cir. 2004)(Court adds brackets). The hearing required depends on: (i) the nature of the private interest at stake; (ii) the risk of erroneous deprivation given the procedures already guaranteed, and whether additional procedural safeguards would prove valuable; and (iii) the government's interest and the burdens that additional procedures might impose. <u>See</u> <u>Mathews</u>, 424 U.S. at 335. For example, "[w]here . . . the state must act quickly, a meaningful postdeprivation hearing is adequate." <u>Clark v. City of Draper</u>, 168 F.3d at 1189. <u>See</u> <u>Spielman v. Hildebrand</u>, 873 F.2d 1377, 1385 (10th Cir. 1989)(concluding that removal of a child from parents' custody requires predeprivation hearing

"except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event").

The Court has considered procedural due process violations on multiple occasions.  See, e.g., A.M. through Youngers v. N.M. Dep't of Health, No. CIV 13-0692 JB/WPL, 2015 WL 13668431, at *37-43 (D.N.M. December 7, 2015)(Browning, J.)("Youngers").  For example, in Youngers, the Court concludes that the New Mexico Department of Health denies a woman with developmental disabilities due process when it deprives her of medical care, conditions of reasonable care, safety, and nonrestrictive confinement, because it affords her no process whatsoever for the deprivation.  See Youngers, 2015 WL 13668431, at *37-43.  The Court also concludes that a tenured city employee is not denied due process when the city fired him, because the city affords him a hearing after the firing, and the employee's due process claim is in reaction to the city's appeal of the hearing board's decision.  See Salazar v. City of Albuquerque, 776 F. Supp. 2d 1217, 1239 (D.N.M. 2011)(Browning, J.)("A citizen is entitled to process and is not necessarily guaranteed a win.").  See also Duprey v. Twelfth Judicial Dist. Court, 760 F. Supp. 2d 1189, 1215 (D.N.M. 2009)(Browning, J.)(denying due process claims where a state employee "got her opportunity to be heard at a complex grievance hearing, with an attorney and with an opportunity to question witnesses, and make opening and closing arguments to a panel of decision-makers"); Camuglia v. City of Albuquerque, 375 F. Supp. 2d 1299, 1308-09 (D.N.M. 2005)(Browning, J.), aff'd, 448 F.3d 1214, 1220-21 (10th Cir. 2006); Camuglia v. City of Albuquerque, 448 F.3d 1214, 1121 (10th Cir. 2006)("[I]t cannot be denied that the City, acting through its inspectors, may close a restaurant to protect the health of patrons and workers without first providing a hearing to the restaurant owner.").

More recently, in Lee v. University of New Mexico, 449 F.Supp 3d 1071 (D.N.M.

2020)(Browning, J.)("Lee I"), the Court, on a motion to dismiss, concludes that a student has alleges facts sufficient to state a procedural due process claim against the University of New Mexico ("UNM") based on the procedures that UNM used in its sexual misconduct investigation. See 449 F. Supp. 3d at 1124. The Court concludes that a student has a property interest in his or her continued enrollment at a university, but that the student does not have a liberty interest in his reputation, where the student does not allege that false statements are publicized. See Lee I, 449 F. Supp. 3d at 1122. The Court explains that, under Supreme Court and Tenth Circuit precedent, "'a student's legitimate entitlement to a public education as a property interest . . . is protected by the Due Process Clause,'" Lee I, 449 F. Supp. 3d at 1122 (quoting Gaspar v. Bruton, 513 F.2d 843, 850 (10th Cir. 1975)), but that

> damage to "reputation alone, apart from some more tangible interest such as employment," is insufficient to invoke the Due Process Clause's protections. Paul v. Davis, 424 U.S. 693, 701 (1976). Instead, a plaintiff "must show that as a result of the defamation, 'a right or status previously recognized by state law was distinctly altered or extinguished.'" Al-Turki v. Tomsic, 926 F.3d 610, 617 (10th Cir. 2019)(quoting Paul v. Davis, 424 U.S. at 711). This is the "stigma-plus" claim sufficient to implicate a constitutionally-protected liberty interest. See Gwinn v. Awmiller, 354 F.3d 1211, 1216, 1223-24 (10th Cir. 2004). The Tenth Circuit recognizes deprivation "of the right to attend school" as the sufficient "something more" to implicate the Due Process Clause.

Lee I, 449 F. Supp. 3d at 1122. Based on the student's property interest in his continued education at UNM and UNM's "limited interest in not providing many of the procedural safeguards" in a sexual assault investigation, the Court then concludes, under the Mathews, 424 U.S. at 335, balancing test, that the student's allegations that

> UNM's investigator made a determination against him without ever holding a formal hearing, and that he was not allowed to learn the witnesses' identities, attend any witness interviews, acquire the interview recordings, question witnesses regarding factual assertions, or get an opportunity to cross-examine . . . [were sufficient to] state[] a claim that UNM's hearing procedures do not comply with Due Process.

Lee I, 449 F. Supp. 3d at 1124.  Next, the Court addresses the issue of notice, and concludes that: (i) allegations that "UNM failed to inform [the student] that he faced expulsion" does not indicate a risk of erroneous deprivation where "UNM had already informed [the student] that he was banned from campus"; (ii) UNM fails to provide the student with adequate notice that UNM "would raise underage drinking claims at his sanctions hearing"; and (iii) UNM "heightened the risk of erroneous deprivation by informing [the student] that he could not bring in any new evidence at the sanctions hearing."  Lee I, 449 F. Supp. 3d at 1133-34 (citing Watson ex rel. Watson v. Beckel, 242 F.3d 1237, 1241 (10th Cir. 2001); and Mathews, 424 U.S. at 349)).

Subsequent to Lee I, in Lee v. University of New Mexico, 500 F. Supp. 3d 1181, 1240 (D.N.M. 2020)(Browning, J.)("Lee II"), the Court, on a motion for summary judgment, concludes that UNM does not violate the student's due process rights, on several grounds.  First, the Court concludes that UNM afforded the student "'some kind of hearing,'" Lee II, 500 F. Supp. 3d at 1216 (quoting Goss v. Lopez, 419 U.S. at 584), because (i) the Dean of Students "held an administrative hearing when it decided whether to expel" the student; (ii) "[a]t the administrative hearing, [the student] had 'the opportunity to present witnesses and evidence,' and have counsel present"; and (iii) at the hearing, a Student Conduct Officer with the Dean of Students "allowed [the student's] counsel to pass 'notes' and have 'whispered conversations' with [the student] during the hearing, although [the Student Conduct Officer] did not permit [the student's] counsel to 'make arguments on [the student's] behalf,'" Lee II, 500 F. Supp. 3d at 1240 (quoting the evidentiary record).  Second, the Court concludes that the "[s]tudents accused of violating university policy do not have an unfettered due process right to cross-examination in all disciplinary proceedings."  Lee II, 500 F. Supp. 3d at 1240 (citing Bd. of Curators of Univ. of

Missouri v. Horowitz, 435 U.S. 78, 86 n.3 (1978); Watson ex rel. Watson v. Beckel, 242 F.3d at

1242-43; Gorman v. Univ. of R.I., 837 F.2d 7, 14-15 (1st Cir. 1988); then citing Flor, 2020 WL

3410823, at * 6; and Pacheco v. St. Mary's Univ., 2017 WL 2670758, at *17 (W.D. Tex. June 20,

2017)(Lamberth, J.)).   The Court determines that, "despite [having a] substantial interest in his

education," denying the student the right to cross-examine witnesses "creates little risk of

erroneous deprivation," because the student admitted to engaging in the alleged misconduct to the

police after being Mirandized.[87]   Lee II, 500 F. Supp. 3d at 1240 (Court adds brackets)(citing Doe

v. Baum, 903 F.3d 575, 581 (6th Cir. 2018)("[C]ross-examination is unnecessary if a student

admits to engaging in misconduct," because "there is a little to be gained by subjecting witnesses

to adversarial questioning when the accused student has already confessed.")).   The Court explains

that, because the student admits to having non-consensual sexual contact with another student

while the alleged victim is incapacitated, the witness' "credibility was not at issue" and allowing

the student to cross-examine the witness "would be a 'fruitless exercise.'"   Lee II, 500 F. Supp. 3d

---

[87]Miranda v. Arizona, 384 U.S. 436 (1966), "requires that procedural safeguards be administered to a criminal suspect prior to 'custodial interrogation.'"   United States v. Perdue, 8 F.3d 1455, 1463 (10th Cir. 1993)(quoting Miranda v. Arizona, 384 U.S. at 444).   The Supreme Court provides the substance of the warning that must be given to a defendant to meet these procedural safeguard requirements:

> Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.   The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently.   If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning.   Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him.

Miranda v. Arizona, 384 U.S. at 444-45.

at 1242 (quoting <u>Winnick v. Manning</u>, 460 F.2d 545, 550 (2d Cir. 1972)).   The Court also concludes that (i) the student is not entitled to know a witness' identity, where the witness' statement "[does] not prejudice [the student] unfairly because that statement had virtually no impact on the [UNM's] decision" to expel him; (ii) the student is not entitled to access all the evidence, because UNM gives him "detailed summaries of . . . the relevant evidence" and provides him an opportunity to respond to the witness' statements; (iii) UNM's decision-making process does not violate the student's due process rights, because the "inquisitorial model"[88] is not inherently biased; (iv) UNM's application of the "preponderance-of-the-evidence standard" in student disciplinary proceedings does not violate the student's due process rights, because the Due Process Clause does not require universities to apply a higher evidentiary standard in student disciplinary proceedings; and (v) UNM does not violate the student's due process rights by considering alcohol as a sanctions factor, because the Court determines that it will not "impose a higher notice requirement on the sanctioning stage of a university than it imposes at the sentencing phase of a criminal trial."   <u>Lee II</u>, 500 F. Supp. 3d at 1242-55.

## <u>LAW REGARDING QUALIFIED IMMUNITY</u>

Government officials performing "discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."   <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982).   Qualified immunity "protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those

---

[88]The "inquisitorial system" is a "system of proof-taking used in civil law, whereby the judge conducts the trial, determines what questions to ask, and defines the scope and the extent of the inquiry."   Inquisitorial System, Black's Law Dictionary (11th ed. 2019).

defending a long drawn-out lawsuit.'" Roybal v. City of Albuquerque, No. CIV 08-0181 JB/LFG, 2009 WL 1329834, at *10 (D.N.M. Apr. 28, 2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)).

Section 1983 creates a cause of action for a plaintiff to seek money damages from State officials who have violated his or her constitutional or statutory rights.  See 42 U.S.C. § 1983. Additionally, pursuant to Bivens v. Six Unknown Agents of Federal Bureau of Narcotics, 403 U.S. 388, 397 (1971)("Bivens"), a plaintiff may seek money damages from federal officials who have violated his or her constitutional rights.[89]  The Supreme Court, however, deems it "untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials." Butz v. Economou, 438 U.S. 478, 504 (1978).  Officials may assert qualified immunity to ensure that fear of liability will not "unduly inhibit officials in the discharge of their duties." Anderson v. Creighton, 483 U.S. 635, 638, (1987).  See Green v. Padilla, 484 F. Supp. at 1129 (explaining that qualified immunity protects government officials who perform discretionary functions if there is no prior, well established case law which would have put them on fair notice of their potential liability).

---

[89]Bivens has been extended, however, to only a handful of constitutional rights.  See Davis v. Passman, 442 U.S. 228, 248 (1979)(finding an implied cause of action for violations of the equal protection principles enmeshed within the due process clause of the Fifth Amendment to the United States Constitution, U.S. Const. amend V); Carlson v. Green, 446 U.S. 14 (1980)(extending Bivens to allow for damages for violations of the cruel-and-unusual punishment clause of the Eighth Amendment to the United States Constitution).  The Supreme Court has expressed hesitation about federal courts extending Bivens into new contexts.  See Hernandez v. Mesa, 589 U.S. 93, 113 (2020)("When evaluating whether to extend Bivens, the most important question 'is "who should decide" whether to provide for a damages remedy, Congress or the courts?' The correct 'answer most often will be Congress.'" (first quoting Ziglar v. Abbasi, 582 U.S. 120, 134 (2017); and then quoting Bush v. Lucas, 462 U.S. 367, 380 (1983))).

If a government official has not violated a "clearly established" right, the official is shielded from personal liability.  Harlow v. Fitzgerald, 575 U.S. 800, 818 (1982).  Qualified immunity therefore "provides ample protection to all but the plainly incompetent or those who knowingly violate the law."  Malley v. Briggs, 475 U.S. 335, 341 (1986).  Qualified immunity protects officers who have "reasonable, but mistaken beliefs" and operate at the sometimes "hazy border" of the laws.  Saucier v. Katz, 533 U.S. 194, 205 (2001).  A court

> can often avoid ruling on the plaintiff's claim that a particular right exists.  If prior case law has not clearly settled the right, and so given officials fair notice of it, the court can simply dismiss the claim for money damages.  The court need never decide whether the plaintiff's claim, even though novel or otherwise unsettled, in fact has merit.

Camreta v. Greene, 563 U.S. 692, 705 (2011).  A series of policy considerations guide the Tenth Circuit's qualified-immunity analysis: "(1) protecting against 'unwarranted timidity on the part of public officials;' (2) ensuring 'that talented candidates are not deterred by the threat of damages suits from entering public service;' and (3) guarding against employees being distracted from their duties."  Estate of Jensen by Jensen v. Clyde, 989 F.3d 848, 856 (10th Cir. 2021)(citing Richardson v. McKnight, 521 U.S. 399, 408 (1997)).

Qualified immunity shields government officials from liability, therefore, when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Pearson v. Callahan, 555 U.S. 223, 231 (2009)(quoting Harlow v. Fitzgerald, 457 U.S. at 818).  When a defendant asserts qualified immunity, it "creates a presumption that they are immune from suit" and not a presumption that they are immune from liability.  Perea v. Baca, 817 F.3d 1198, 1202 (10th Cir. 2016).  When a defendant asserts qualified immunity, therefore, the plaintiff must demonstrate: (i) that the defendant's actions violated his or her federal Constitutional or statutory rights; and (ii) that the right was clearly established at the

time of the alleged misconduct, such that "every reasonable officer would have understood" as much.  Estate of Smart by Smart v. City of Wichita, 951 F.3d 1161, 1178 (10th Cir. 2020).  See Riggins, 572 F.3d at 1107.  See also Pueblo of Pojoaque v. New Mexico, 214 F. Supp. 3d 1028, 1079 (D.N.M. 2016)(Browning, J.)(requiring that the plaintiff must demonstrate both prongs of the qualified immunity analysis to overcome a defendant's qualified immunity defense).

**1.      The Procedural Approach to Qualified Immunity.**

The Supreme Court has clarified the proper procedure for lower courts to evaluate a qualified immunity defense.  Before the Supreme Court's decision in Pearson v. Callahan, 555 U.S. 223 (2009), the Supreme Court directed lower courts to decide, first, whether the facts alleged or shown by the plaintiff make out a Constitutional violation, and, if the plaintiff makes that showing, then decide whether the right at issue was clearly established at the time of the alleged violation.  See Saucier v. Katz, 533 U.S. 194, 200 (2001).  The Supreme Court's decision in Pearson v. Callahan, however, makes the so-called "Saucier two-step" advisory rather than mandatory, noting that Saucier v. Katz' "rigid order of battle" had faced criticism from lower courts on "practical, procedural, and substantive grounds."  Pearson v. Callahan, 555 U.S. at 234 (quoting Pierre N. Leval, Judging Under the Constitution: Dicta About Dicta, 81 N.Y.U. L. Rev. 1249, 1275, 1277 (2006)).  Although the Supreme Court recognizes that the Saucier rule is "beneficial" and "often appropriate," lower courts are now permitted to exercise their "sound discretion" when deciding "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  Pearson v. Callahan, 555 U.S. at 236-37.

In rejecting the prior mandatory approach, the Supreme Court recognizes that "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious

whether in fact there is such a right," and that such an approach burdens district courts and Courts

of Appeals with "what may seem to be an essentially academic exercise." Pearson v. Callahan,

555 U.S. at 237. The Supreme Court explains that the prior mandatory approach "departs from

the general rule of constitutional avoidance and runs counter to the 'older, wiser judicial counsel

'not to pass on questions of constitutionality unless such adjudication is unavoidable.'" Pearson

v. Callahan, 555 U.S. at 241 (quoting Scott v. Harris, 550 U.S. at 388; then quoting Spector Motor

Service, Inc. v. McLaughlin, 323 U.S. 101, 105 (1944)). See Reichle v. Howards, 566 U.S. 658,

664 (2012)(affirming Pearson v. Callahan's procedure and noting that deciding qualified immunity

issues on the basis of a right being not "clearly established" by prior caselaw "comports with our

usual reluctance to decide constitutional questions unnecessarily").

The Supreme Court recognizes seven circumstances where district courts "should address

only"[90] qualified immunity's clearly established prong: when (i) the first, Constitutional violation

question "is so fact bound that the decision provides little guidance for future cases"; (ii) "it

appears that the question will soon be decided by a higher court"; (iii) deciding the Constitutional

question requires "an uncertain interpretation of state law"; (iv) "qualified immunity is asserted at

---

[90]In Camreta v. Greene, the Supreme Court states that there are seven circumstances in which the district courts "should address only" the clearly established prong, but, in the same sentence, notes that deciding the violation prong is left "to the discretion of the lower courts." Camreta v. Greene, 563 U.S. at 707. In Kerns v. Bader, 663 F.3d 1173 (10th Cir. 2011), then-Judge Gorsuch, writing for the Tenth Circuit, interprets Camreta v. Greene to mean that district courts are restricted from considering the violation prong in seven particular circumstances. See Kerns v. Bader, 663 F.3d at 1180-81. The Supreme Court, however, has not stressed the seven circumstances as mandatory. Instead, it has recently reaffirmed only that lower courts "should think hard, and then think hard again before addressing both qualified immunity and the merits of an underlying constitutional claim." District of Columbia v. Wesby, 138 S. Ct. 577, 589 n.7 (2018). This language suggests that the inquiry is still discretionary, although the court should exercise its discretion carefully.

the pleading stage," and "the precise factual basis for the . . . claim . . . may be hard to identify";

(v) tackling the first element "may create a risk of bad decision making," because of inadequate

briefing; (vi) discussing both elements risks "bad decision making," because the court is firmly

convinced that the law is not clearly established and is thus inclined to give little thought to the

existence of the Constitutional right; or (vii) the doctrine of "constitutional avoidance" suggests

the wisdom of passing on the first Constitutional question when "it is plain that a constitutional

right is not clearly established but far from obvious whether in fact there is such a right." Kerns

v. Bader, 663 F.3d 1173, 1180-81 (10th Cir. 2011)(Gorsuch, J.)(quoting Pearson v. Callahan, 555

U.S. at 236-42).  Regarding the last of these seven circumstances, the Supreme Court has clarified

that courts may "avoid avoidance" and address the first prong before the second prong in cases

involving a recurring fact pattern, where guidance on the Constitutionality of the challenged

conduct is necessary, and the conduct is likely to face challenges only in the qualified immunity

context. Camreta v. Greene, 563 U.S. at 706-707.  See Kerns v. Bader, 663 F.3d at 1181.[91]

---

[91]In Kerns v. Bader, the Tenth Circuit reverses the Court's decision that an officer is not entitled to qualified immunity, noting that the Court "analyzed both aspects of the qualified immunity test before agreeing" with the plaintiff that the qualified immunity defense does not protect the officer.  663 F.3d at 1183.  In reversing, then-Judge Gorsuch states:

> Because we agree with Sheriff White on the latter (clearly established law) question, we reverse without addressing the former (constitutional violation) question.  And we pursue this course because doing so allows us to avoid rendering a decision on important and contentious questions of constitutional law with the attendant needless (entirely avoidable) risk of reaching an improvident decision on these vital questions.

663 F.3d at 1183-84.  The Tenth Circuit does not analyze whether the officer violates the plaintiff's constitutional rights and states that guidance on the particular Constitutional issue would be more appropriate in a case not involving qualified immunity:  "Neither do we doubt that the scope of the Constitution's protection for a patient's hospital records can be adequately decided in future cases where the qualified immunity overlay isn't in play (e.g., through motions to suppress wrongly seized records or claims for injunctive or declaratory relief)."  663 F.3d at 1187 n.5.  On

remand, the Court states:

> While the Court must faithfully follow the Tenth Circuit's decisions and opinions, the Court is troubled by this statement and the recent trend of the Supreme Court's hesitancy in § 1983 actions to address constitutional violations. A Reconstruction Congress, after the Civil War, passed § 1983 to provide a civil remedy for constitutional violations. See Mitchum v. Foster, 407 U.S. 225, 238-39 (1972). In Mitchum v. Foster, the Supreme Court explained:
>
>> Section 1983 was originally § 1 of the Civil Rights Act of 1871 . . . and was enacted for the express purpose of "enforc(ing) the Provisions of the Fourteenth Amendment." The predecessor of § 1983 was thus an important part of the basic alteration in our federal system wrought in the Reconstruction era through federal legislation and constitutional amendment.
>
> 407 U.S. at 238-39. Congress did not say it would remedy only violations of "clearly established" law, but that
>
>> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.
>
> 42 U.S.C. § 1983. The Supreme Court established the qualified immunity defense in Pierson v. Ray, 386 U.S. 547 (1967), and held that officials are not liable for Constitutional violations where they reasonably believe that their conduct is Constitutional. See E. Clarke, Safford Unified Sch. Dist. No. 1 v. Redding: Why Qualified Immunity is a Poor Fit in Fourth Amendment School Search Cases, 24 B.Y.U. J. Pub. L. 313, 329 (2010). The Supreme Court first introduced the "clearly established" prong in reference to an officer's good faith and held that a compensatory award would be appropriate only if an officer "acted with such an impermissible motivation or with such disregard of the [individual's] clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith." Wood v. Strickland, 420 U.S. 308, 322 (1975). In Harlow v. Fitzgerald, when the Supreme Court moved to an objective test, the clearly established prong became a part of the qualified immunity test. See 457 U.S. at

818 ("We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights."). It seems ironic that the federal courts would restrict a congressionally mandated remedy for constitutional violations -- presumably the rights of innocent people -- and discourage case law development on the civil side -- and restrict case law development to motions to suppress, which reward only the guilty and is a judicially created, rather than legislatively created, remedy. Commentators have noted that, "[o]ver the past three decades, the Supreme Court has drastically limited the availability of remedies for constitutional violations in" exclusionary rule litigation in a criminal case, habeas corpus challenges, and civil litigation under § 1983. J. Marceau, The Fourth Amendment at a Three-Way Stop, 62 Ala. L. Rev. 687, 687 (2011). Some commentators have also encouraged the courts to drop the suppression remedy and the legislature to provide more -- not less -- civil remedies for constitutional violations. See Christopher Slobogin, Why Liberals Should Chuck the Exclusionary Rule, 1999 U. Ill. L. Rev. 363, 390-91 (1999)("Behavioral theory suggests that the exclusionary rule is not very effective in scaring police into behaving. . . . These theories also suggest that a judicially administered damages regime . . . would fare significantly better at changing behavior at an officer level."); Hon. Malcolm R. Wilkey, Constitutional Alternatives to the Exclusionary Rule, 23 S. Tex. L.J. 531, 539 (1982)(criticizing the exclusionary rule and recommending alternatives). In Hudson v. Michigan, 547 U.S. 586 (2006), the Supreme Court noted that civil remedies were a viable alternative to a motion to suppress when it held that the exclusionary rule was inapplicable to cases in which police officers violate the Fourth Amendment when they fail to knock and announce their presence before entering. See 547 U.S. at 596-97. Rather than being a poor or discouraged means of developing constitutional law, § 1983 seems the better and preferable alternative to a motion to suppress. It is interesting that the current Supreme Court and Tenth Circuit appear more willing to suppress evidence and let criminal defendants go free, than have police pay damages for violations of innocent citizens' civil rights. It is odd that the Supreme Court has not adopted a clearly established prong for suppression claims; it seems strange to punish society for police violating unclear law in criminal cases, but protect municipalities from damages in § 1983 cases.

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d 1176, 1224 n.36 (D.N.M. 2012)(Browning, J.), abrogated on other grounds as recognized by Ysasi v. Brown, No. 13-0183, 2014 WL 936835, at *9 n.24 (D.N.M. Feb. 28, 2014)(Browning, J.). See Richard E. Myers, Fourth Amendment Small Claims Court, 10 Ohio St. J. Crim. L. 571, 590-97 (2013)(arguing that municipalities should establish small-claims courts to adjudicate police officers' Fourth Amendment violations and award monetary judgments). It is odd to suggest that the deficit of constitutional law should occur in the sphere of a factually shaky judge-made exclusionary rule and discourage Constitutional law at the cost of a Congressionally passed statute.

According to the Supreme Court, lower courts "should think carefully before expending 'scarce judicial resources' to resolve difficult and novel questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'" Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011)(quoting Pearson v. Callahan, 555 U.S. at 236-37).[92]  See Camreta v. Greene, 563

_____

[92]The appellate courts have little appreciation for how hard it is to do a clearly established prong review first without looking -- closely and thoroughly -- at whether there is a Constitutional right and whether there is a violation.  It is difficult to review the facts, rights, and alleged violations in the comparative cases without looking at the facts, rights, and alleged violations on the merits in the case before the Court.  Pearson v. Callahan sounds like a good idea in theory, but it does not work well in practice.  The clearly established prong is a comparison between the case before the Court and previous cases, and Pearson v. Callahan suggests that the Court can compare before the Court fully understands what it is comparing.  In practice, Saucier v. Katz works better.

The "Saucier two-step" encourages courts to articulate the Constitutional rights at issue. Before Pearson v. Callahan made the "Saucier two-step" discretionary, it faced criticism from numerous Supreme Court members.  Associate Justice Stephen Breyer writes, before Pearson v. Callahan, that he "would end the failed Saucier experiment now."  Morse v. Frederick, 551 U.S. 393, 432 (2007)(Breyer, J., concurring in the judgment and dissenting in part).  Joined by Associate Justices Ruth Bader Ginsburg and Stephen Breyer, Associate Justice John Paul Stevens criticizes Saucier v. Katz, because it is an "unwise judge-made rule under which courts must decide whether the plaintiff has alleged a constitutional violation before addressing the question whether the defendant state actor is entitled to qualified immunity."  Bunting v. Mellen, 541 U.S. 1019, 1019 (2004).  Joined by Chief Justice of the United States William Rehnquist, Associate Justice of the United States Supreme Court Antonin Scalia writes: "We should either make clear that constitutional determinations are not insulated from our review . . . or else drop any pretense at requiring the ordering in every case."  Bunting v. Mellen, 541 U.S. at 1025 (Scalia, J., dissenting from the denial of certiorari)(emphasis in original).

Judicial resources are valuable and scarce, but they should not be conserved at the expense of protecting Constitutional rights.  In addition to being easier in practice, Saucier v. Katz also increases the frequency and depth with which courts articulate Constitutional law.  See Nancy Leong, The Saucier Qualified Immunity Experiment, An Empirical Analysis, 36 Pepp. L. Rev. 667 (2009).  Chief Justice Rehnquist opines that "[d]eciding the constitutional question before addressing the qualified immunity question also promotes clarity in the legal standards for official conduct, to the benefit of both the officers and the general public."  Wilson v. Layne, 526 U.S. 603, 609 (1999).  The evidence to support Chief Justice Rehnquist's assertion, however, is mixed. See Paul W. Hughes, Not a Failed Experiment: Wilson-Saucier Sequencing and the Articulation of Constitutional Rights, 80 U. Colo. L. Rev. 401, 404 (2009)("[T]he proof of the pudding is in the eating; levels of constitutional articulation increased dramatically following the Court's development of the Wilson-Saucier sequencing doctrine.").  See also Leong, 36 Pepp. L. Rev. at 670 (finding that mandatory sequencing "leads to the articulation of more constitutional law, but not the expansion of constitutional rights"); Greg Sobolski & Matt Steinberg, Note, An Empirical

U.S. at 707 ("In general, courts should think hard, and then think hard again, before turning small cases into large ones.").  The Tenth Circuit will remand a case to the district court for further consideration when the district court has given only cursory treatment to qualified immunity's clearly established prong.  See Kerns v. Bader, 663 F.3d at 1182.  See also Pueblo of Pojoaque v. New Mexico, 214 F. Supp. 3d 1028, 1082-83 (D.N.M. 2016)(Browning, J.).

**2.      Clearly Established Rights.**

A right is "clearly established" when it is "sufficiently clear that every reasonable official employee would have understood that what he is doing violates that right." Mullenix v. Luna, 577 U.S. 7, 11 (2015)(quoting Reichle v. Howards, 566 U.S. at 664).  A clearly established right is "generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'"  Lobozzo v. Colorado Dep't of Corr., No. 10-1396, 429 F. App'x 707, 710 (10th Cir. 2011)(quoting Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983)).  "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186 (alteration in Holland ex rel. Overdorff v. Harrington, but not in Saucier v. Katz)(quoting Saucier v. Katz, 533 U.S. at 202).  A court should inquire "whether the law put officials on fair notice that the described conduct was unconstitutional" rather than engage in "a scavenger hunt for cases with precisely the same facts."  Pierce v. Gilchrist, 359 F.3d 1279,

---

Analysis of Section 1983 Qualified Immunity Actions and Implications of Pearson v. Callahan, 62 Stan. L. Rev. 523 (2010).  The bottom line is that a trial court often -- if not frequently -- needs to decide whether the Constitutional right is violated before deciding if it is clearly established.

1298 (10th Cir. 2004). In other words, existing precedent must have placed the constitutional or statutory question "beyond debate." Ashcroft v. al-Kidd, 563 U.S. at 741.

The Supreme Court requires that courts not define the constitutional right at issue "'at a high level of generality.'" White v. Pauly, 580 U.S. 73, 79 (2017)(quoting Ashcroft v. al-Kidd, 563 U.S. at 742). The Supreme Court refers to this principle as a "longstanding principle." White v. Pauly, 580 U.S. at 79. Nevertheless, the clearly established law must be "particularized" to the case's facts. Anderson v. Creighton, 483 U.S. at 640. If the clearly established law at issue is not sufficiently particularized, the "[p]laintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." Anderson v. Creighton, 483 U.S. at 639. "[G]eneral statements of the law" are not "inherently incapable" of clearly establishing a right, because they can sometimes give "fair and clear warning" to officers. United States v. Lanier, 520 U.S. 259, 271 (2017). See White v. Pauly, 580 U.S. at 79 (reiterating this principle). Importantly, the "unlawfulness must be apparent." Anderson v. Creighton, 483 U.S. at 640. See Brosseau v. Haugen, 543 U.S. 194, 199 (2004)("Of course, in an obvious case, these standards can 'clearly establish' the answer, even without a body of relevant case law.")(citing Hope v. Pelzer, 536 U.S. 730, 738 (2002)(noting that, in a case where the Eighth Amendment violation is "obvious," there need not be a materially similar case for the right to be clearly established)). A court therefore must "inquire whether clearly established law makes improper the actions that the officer took in the case's circumstances." City of Escondido v. Emmons, 586 U.S. 38, 42 (2019).

In the Tenth Circuit, until recently, this rule meant that a right is clearly established only when there is a factually similar "Supreme Court or Tenth Circuit decision on point, or if the clearly established weight of authority from other courts shows that the right must be as the

- 115 -

plaintiff maintains." Truman v. Orem City, 1 F. 4th 1227, 1235 (10th Cir. 2021)(quoting Thomas v. Kaven, 765 F.3d 1183, 1194 (10th Cir. 2014)).  Although a plaintiff asserting a violation of a clearly established right must in most circumstances point to a case that is sufficiently factually similar, the Supreme Court recently has stated that this closeness is not always required.  See Taylor v. Riojas, 592 U.S. 7, 9 (2020)("Taylor").  The Supreme Court, in a short per curiam opinion, suggests an objective, "no reasonable correctional officer" standard when it holds that "no reasonable correctional officer could have concluded that, under the extreme circumstances of this case, it was constitutionally permissible to house [the plaintiff] in such deplorably unsanitary conditions for such an extended period of time."  Taylor, 592 U.S. at 8.  In Taylor, corrections officers house an inmate in "shockingly unsanitary cells."  592 U.S. at 8.  One cell is covered "nearly floor to ceiling, in 'massive mounts' of feces: all over the floor, the ceiling, the window, the walls, and even 'packed inside the water faucet.'"  Taylor, 592 U.S. at 8 (quoting Taylor v. Stevens, 946 F.3d 211, 218 (5th Cir. 2019)).  Correctional officers confine the plaintiff in this cell for four days, but the plaintiff does not eat or drink, because he fears that his food and water are contaminated.  See 592 U.S. at 8.  Correctional officers then move the plaintiff to a second cell that is "frigidly cold" and is equipped with "only a clogged drain in the floor to dispose of bodily wastes."  592 U.S. at 8.  The plaintiff holds his bladder for more than twenty-four hours before finally involuntarily relieving himself, which causes the clogged drain to overflow and "raw sewage to spill across the floor."  592 U.S. at 8.  Because the plaintiff is not provided a bed and is confined without clothes, the plaintiff is "left to sleep naked in sewage."  Taylor, 592 U.S. at 8.

The United States Court of Appeals for the Fifth Circuit holds that these confinement conditions violated the Eighth Amendment's ban on cruel-and-unusual punishment, but it grants the corrections officers qualified immunity because the law was not clearly established.  See

Taylor, 592 U.S. at 8 (citing Taylor v. Stevens, 946 F.3d at 222).  The Fifth Circuit concludes that

the corrections officials did not have "fair warning" that confining the plaintiff in these conditions

would be unconstitutional.  Taylor v. Stevens, 946 F.3d at 222 (quoting Hope v. Pelzer, 536 U.S.

at 741).  The Supreme Court reverses, holding that the Fifth Circuit errs when it grants qualified

immunity on this basis.  See Taylor, 592 U.S. at 9.  Although the plaintiff could not identify a case

on point, the Supreme Court notes that -- even in the absence of a case clearly establishing the law

-- "no reasonable correctional officer could have concluded that, under the extreme circumstances

of this case, it was constitutionally permissible to house [the plaintiff] in such deplorably

unsanitary conditions for such an extended period of time."  Taylor, 592 U.S. at 8.  See Truman v.

Orem City, 1 F. 4th at 1240 (summarizing the Supreme Court's conclusion and stating that the

Supreme Court "made clear that [the plaintiff] did not have to" identify a case on point).

For decades, lower courts have tried diligently and faithfully to follow the unwritten signals

of superior courts.[93]  One such unwritten signal is, or at least was, that "a nigh identical case must

exist for the law to be clearly established."  Caldwell, 510 F.Supp. 3d at 1031 n.14.[94]  As numerous

---

[93]As former Tenth Circuit judge, and now Stanford law school professor, Michael
McConnell, notes, much of what lower courts do is read the implicit, unwritten signs that the
superior courts send them through their opinions.  See Michael W. McConnell, Address at the
Oliver Seth American Inn of Court: How Does the Supreme Court Communicate Its Intentions to
the Lower Courts: Holdings, Hints and Missed Signals (Dec. 17, 2014).

[94]The Court notes, as it has elsewhere, see, e.g., Caldwell, 510 F.Supp.3d at 1031 n.14, that
qualified immunity is a problematic doctrine.  This problem is particularly true of the Supreme
Court's approach before Taylor.  "Factually identical or highly similar factual cases are not . . . the
way the real world works."  Caldwell, 510 F.Supp.3d at 1031 n.14.
Many cases have so many facts that are unlikely to ever occur again in a significantly
similar way.  See York v. City of Las Cruces, 523 F.3d 1205, 1212 (10th Cir. 2008)("However,
[the clearly established prong] does not mean that there must be a published case involving
identical facts; otherwise we would be required to find qualified immunity wherever we have a
new fact pattern.").  The Supreme Court's obsession with the clearly established prong assumes
that officers are routinely reading Supreme Court and Tenth Circuit opinions in their spare time,

carefully comparing the facts in these qualified immunity cases with the circumstances they confront in their day-to-day police work.  It is hard enough for the federal judiciary to embark on such an exercise, let alone likely that police officers are endeavoring to parse opinions.  It is far more likely that, in their training and continuing education, police officers are taught general principles, and, in the intense atmosphere of an arrest, police officers rely on these general principles, rather than engaging in a detailed comparison of their situation with a previous Supreme Court or published Tenth Circuit case.  It strains credulity to believe that a reasonable officer, as he is approaching a suspect to arrest, is thinking to himself: "Are the facts here anything like the facts in York v. City of Las Cruces?"  Thus, when the Supreme Court grounds its clearly established jurisprudence in the language of what a reasonable officer or a "reasonable official" would know, Kisela v. Hughes, 584 U.S. 100, 105 (2018), yet still requires a highly factually analogous case, it either has lost sight of reasonable officer's experience or is using that language to mask an intent to create "an absolute shield for law enforcement officers," Kisela v. Hughes, 584 U.S. at 121 (Sotomayor, J. dissenting).  The Court concludes that the Supreme Court is doing the latter, crafting its recent qualified immunity jurisprudence to eliminate effectively § 1983 claims against State actors in their individual capacities by requiring an indistinguishable case and by encouraging courts to go straight to the clearly established prong.  See Saenz v. Lovington Mun. Sch. Dist., 105 F. Supp. 3d 1271, 1297 n.4 (D.N.M. 2015)(Browning, J.).

In most circumstances, a prior plaintiff must have been subjected to almost identical treatment, and a court must have found that law to have been clearly established for a subsequent plaintiff to get around the obstacle that qualified immunity creates.  See Stephen R. Reinhardt, The Demise of Habeas Corpus and the Rise of Qualified Immunity: The Court's Ever Increasing Limitations on the Development and Enforcement of Constitutional Rights and Some Particularly Unfortunate Consequences, 113 Mich. L. Rev. 1219, 1245 (2015)("[T]he Court has through qualified immunity created such powerful shields for law enforcement that people whose rights are violated, even in egregious ways, often lack any means of enforcing rights.").  See also White v. Pauly, 580 U.S. at 79 (criticizing the Tenth Circuit below, because it "failed to identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment).  In most of those situations, officials can escape liability for violating someone's statutory or constitutional rights, because a prior court has not addressed the issue.  As United States Circuit Judge for the Court of Appeals for the Fifth Circuit Don Willett notes, this situation creates a Catch-22.  See Zadeh v. Robinson, 902 F.3d 483, 499 (5th Cir. 2018)(Willett, J. concurring in part and dissenting in part)(opinion withdrawn on rehearing).  The plaintiffs "must produce precedent even as fewer courts are producing precedent.  Important constitutional questions go unanswered precisely because those questions are yet unanswered. Courts then rely on that judicial silence to conclude there's no equivalent case on the books." Zadeh v. Robinson, 902 F.3d at 499.  In short, "[n]o precedent = no clearly established law = no liability.  An Escherian Stairwell.  Heads defendants win, tails plaintiffs lose." Zadeh v. Robinson, 902 F.3d at 499.

The Court disagrees with the Supreme Court's approach.  The most conservative, principled decision is to minimize the expansion of the judicially created clearly established prong, so that it does not eclipse the Congressionally enacted § 1983 remedy.  As the Cato Institute notes in an amicus brief, "qualified immunity has increasingly diverged from the statutory and historical framework on which it is supposed to be based."  Pauly v. White, No. 17-1078 Brief of the Cato Institute as Amicus Curiae Supporting Petitioners at 2 (U.S. Supreme Court, filed March 2,

2018)("Cato Brief"). "The text of 42 U.S.C. § 1983 . . . makes no mention of immunity, and the common law of 1871 did not include any across-the-board defense for all public officials." Cato Brief at 2. "With limited exceptions, the baseline assumption at the founding and throughout the nineteenth century was that public officials were strictly liable for unconstitutional misconduct. Judges and scholars alike have thus increasingly arrived at the conclusion that the contemporary doctrine of qualified immunity is unmoored from any lawful justification." Cato Brief at 2. See generally William Baude, Is Qualified Immunity Unlawful?, 106 Cal. L. Rev. 45 (2018)(arguing that the Supreme Court's justifications for qualified immunity are incorrect). Further, as Justice Clarence Thomas has argued, because the Supreme Court's qualified immunity analysis "is no longer grounded in the common-law backdrop against which Congress enacted [§ 1983], we are no longer engaged in 'interpret[ing] the intent of Congress in enacting' the Act." Ziglar v. Abbasi, 582 U.S. 120, 158 (2017)(Thomas, J., concurring)(quoting Malley v. Briggs, 475 U.S. 335, 342 (1986)). "Our qualified immunity precedents instead represent precisely the sort of 'freewheeling policy choice[s]' that we have previously disclaimed the power to make." Ziglar v. Abbasi, 582 U.S. at 159-60 (Thomas, J., concurring)(quoting Rehberg v. Paulk, 566 U.S. 536, 363 (2012)). The judiciary should be true to § 1983 as Congress wrote it.

　　　　Moreover, in a day when police shootings and excessive force cases are in the news, there should be a remedy when there is a Constitutional violation, and jury trials are the most democratic expression of what police action is reasonable and what action is excessive. If the citizens of New Mexico decide that State actors use excessive force or deliberately are indifferent, the verdict should stand, and not be set aside because the parties could not find an indistinguishable Tenth Circuit or Supreme Court decision. Finally, always to decide the clearly established prong first and then always to say that the law is not clearly established could be stunting the development of Constitutional law. See Aaron L. Nielson & Christopher J. Walker, The New Qualified Immunity, 89 S. Cal. L. Rev. 1, 6 (2015). And while the Tenth Circuit -- with the exception of now-Justice Gorsuch, see Shannon M. Grammel, Justice Gorsuch on Qualified Immunity, Stan. L. Rev. Online (2017) -- seems to be in agreement with the Court, see, e.g., Casey, 509 F.3d at 1286, the Supreme Court's per curiam reversals appear to have the Tenth Circuit stepping lightly around qualified immunity's clearly established prong, see, e.g, Perry v. Durborow, 892 F.3d 1116, 1123-27 (10th Cir. 2018); Aldaba v. Pickens, 844 F.3d 870, 874 (10th Cir. 2016); Rife v. Jefferson, No. 17-7037, 742 F. App'x 377 (10th Cir. 2018); Malone v. Bd. of Cty. Comm'rs for Cty. of Dona Ana, No. 16-2222, 707 Fed.App'x. 552 (10th Cir. 2017); Brown v. City of Colo. Springs, No. 16-1206, 709 Fed.App'x. 906, 909 (10th Cir. 2017), and willing to reverse district court decisions should the district court conclude that the law is clearly established, but see Matthews v. Bergdorf, 889 F.3d 1136, 1149-50 (10th Cir. 2018)(Baldock, J.)(holding that a child caseworker was not entitled to qualified immunity, because a caseworker would know that "child abuse and neglect allegations might give rise to constitutional liability under the special relationship exception"); McCoy v. Meyers, 887 F.3d 1034, 1052-53 (10th Cir. 2018)(Matheson, J.)(concluding that there was clearly established law even though the three decisions invoked to satisfy that prong were not "factually identical to this case," because those cases "nevertheless made it clear that the use of force on effectively subdued individuals violates the Fourth Amendment").

Courts of Appeals have recently noted, however, Taylor clarifies that it is no longer the case that an almost-identical case must exist.  See Truman v. Orem City, 1 F. 4th at 1241 ("Just like any reasonable corrections officer should have understood the inmate in Taylor's conditions . . . offended the Constitution, so too should any reasonable prosecutor understand that providing a medical examiner fabricated evidence and then putting him on the stand to testify based on that false information offends the Constitution."); Moderwell v. Cuyahoga County, 997 F.3d 653, 660 (6th Cir. 2021)(explaining that the Supreme Court holds in Taylor that "there does not need to be a case directly on point" when no reasonable officer could conclude that the challenged action is constitutional); Taylor v. Ways, 999 F.3d 478, 492 (7th Cir. June 2, 2021)(noting that Taylor reaffirms that "the Supreme Court does not demand a case directly on point"); Roque v. Harvel, 993 F.3d 325, 335 (5th Cir. 2021)(citing Taylor for the proposition that, "'in an obvious case,' general standards 'can clearly establish the answer, even without a body of relevant case law" (quoting Brosseau v. Haugen, 543 U.S. 194, 199 (2004))).  See also Joanna C. Schwartz, Qualified Immunity and Federalism All the Way Down, 109 Geo. L.J. 305, 351 (2020)("The Court's decision in Taylor sends the signal to the lower courts that they can deny qualified immunity without a prior case on point."); Lawrence Rosenthal, Defending Qualified Immunity, 72 S.C.L. Rev. 547, 593 & n.193 (2020)("More recently, however, the Court has stressed that on egregious facts, qualified immunity should be denied regardless whether there are factually similar precedents.").

There are, therefore, two possible interpretations of Taylor.  First, Taylor could be clarifying that the holding in Hope v. Pelzer, 536 U.S. at 741 -- that identifying an earlier case with "'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established," but that it is "not necessary to such a finding" -- is still good law even

though it has fallen out of favor among lower courts.  This reading of <u>Taylor</u> would mean there is

a narrow exception to the standard requirement that a plaintiff identify an earlier case on point that

applies in cases only with "extreme circumstances" or "particularly egregious" facts.  Second,

<u>Taylor</u> could mean that a court now must ask whether the conduct is particularly egregious such

that no reasonable officer could have concluded that their actions are Constitutional, and, if the

conduct is egregious, then there does not need to be a case clearly establishing the law.

        Most Courts of Appeals have adopted the second interpretation.  Nonetheless, there is

confusion both between and within the Courts of Appeals about <u>Taylor</u>'s scope.[95]  Since <u>Taylor</u>,

---

[95]Cases from the United States Court of Appeals for the Ninth Circuit illustrate the confusion within the Courts of Appeals about <u>Taylor</u>'s scope.  Compare, for example, <u>O'Doan v. Sanford</u>, 991 F.3d 1027 (9th Cir. March 19, 2021), with <u>Rico v. Ducart</u>, 980 F.3d 1293 (9th Cir. 2020)(Silver, J., concurring in part and dissenting in part).  <u>O'Doan v. Sanford</u> noted that for law to be clearly established, "the right must be sufficiently clear that every reasonable official would [have understood] that what he is doing violates the right.  In other words, existing precedent must have placed the statutory or constitutional question beyond debate."  991 F.3d at 1036-37 (quoting <u>Reichle v. Howards</u>, 566 U.S. 658, 664 (2012)).  The Ninth Circuit points to the importance of factually analogous precedential cases, stating that: "the Supreme Court has reminded lower courts that "[u]se of excessive force is an area of the law 'in which the result depends very much on the facts of each case' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue."  <u>O'Doan v. Sanford</u>, 991 F.3d at (first citing <u>Kisela v. Hughes</u>, 584 U.S. at 104; then quoting <u>Mullenix v. Luna</u>, 577, U.S. 7, 13 (2015)(per curiam)).  The Ninth Circuit concludes that the plaintiff has not identified any precedent case law that has clearly established a right and emphasizes the importance of specificity over general or categorical statements of Constitutional violations in qualified immunity cases.  <u>See O'Doan v. Sanford</u>, 991 F.3d at 1044 (describing limits applying to the obviousness principle and distinguishing <u>O'Doan</u> from <u>Taylor</u> because of situational ambiguity.)  Finally, the Ninth Circuit reiterates that "the obviousness principle [is] an exception to the specific-case requirement [and] is especially problematic in the Fourth Amendment context."  <u>O'Doan v. Sanford</u>, 991 F.3d at 1044 (quoting <u>Sharp v. County of Orange</u>, 871 F.3d 901, 912 (9th Cir. 2017)).

        On the other hand, the Honorable Judge Leslie E. Silver's concurrence in <u>Rico v. Ducart</u>, 980 F.3d at 1305, restates that the second prong of qualified immunity asks whether a reasonable official would have known that his or her actions were unconstitutional.  <u>See Rico v. Ducart</u>, 980 F.3d at 1305.  Judge Silver then notes that requiring plaintiffs to show exceedingly specific and existing case law that addresses the alleged misconduct's lawfulness, narrows the second prong in a way that the Supreme Court rejects in <u>Ashcroft v. al-Kidd</u>, 563 U.S. 731, 741 (2011).  <u>See Rico v. Ducart</u>, 980 F.3d at 1306 (explaining that determining whether there is precedent addressing

courts have asked not just whether the law was clearly established through a factually similar case from that Court of Appeals or from the Supreme Court, but also whether the conduct at issue was "particularly egregious" such that "no reasonable correctional officer could have concluded that" their actions were constitutionally permissible.  See Taylor, 592 U.S. at 8.  See Truman v. Orem City, 1 F. 4th at 1240.  In other words, in addition to asking whether the officer is theoretically on notice that they are acting unlawfully,[96] the court also must ask whether the conduct at issue is

---

"the lawfulness of creating noise while conducting court-ordered suicide-prevention welfare checks in a maximum-security facility built of concrete, metal, and steel" is functionally equivalent to necessitating a case on point).  The concurrence's crux is that, while specificity is necessary when considering a case's context and the alleged violative conduct, courts should not require unreasonable specificity when obvious issues such as "basic and clearly necessary requirements" arise in the context of qualified immunity.  See Rico v. Ducart, 980 F.3d at 1306. (stating that "[b]asic and clearly necessary requirements, such as sleep" are established beyond debate both because a reasonable official would know that depriving an inmate of sleep obviously violates an inmate's rights and because "[t]he right to adequate sleep, a well-recognized human need, is also established by persuasive authority").

[96]The Court notes that one of the most basic premises of the law of qualified immunity -- that an officer is aware either actually or potentially that his or her conduct is unlawful because the officer knows the holdings of both watershed Constitutional decisions and the lower court decisions that apply them -- does not hold up to empirical scrutiny.  See Joanna C. Schwartz, Qualified Immunity's Boldest Lie, 88 U. Chi. L. Rev. 605, 610 (2021)(finding that, although police departments regularly inform officers about "watershed" decisions, officers are "not regularly informed about court decisions interpreting those decisions in different factual scenarios -- the very types of decisions that are necessary to clearly establish the law about the constitutionality of uses of force").  The Court previously has noted:

It is far more likely that, in their training and continuing education, police officers are taught general principles, and, in the intense atmosphere of an arrest, police officers rely on these general principles, rather than engaging in a detailed comparison of their situation with a previous Supreme Court or published Tenth Circuit case. It strains credulity to believe that a reasonable officer, as he is approaching a suspect to arrest, is thinking to himself: "Are the facts here anything like the facts in York v. City of Las Cruces?" Thus, when the Supreme Court grounds its clearly-established jurisprudence in the language of what a reasonable officer or a "reasonable official" would know, Kisela v. Hughes, 138 S. Ct. 1148, 1153 (2018), yet still requires a highly factually analogous case, it has either lost sight of reasonable officer's experience or it is using that language to mask an intent

"particularly egregious" -- an objective question.  McCoy v. Alamu, 141 S. Ct. 1364, 1364 (2021)(vacating and remanding in light of Taylor even though the conduct at issue was likely not "particularly egregious").[97]

The United States Court of Appeals for the Third Circuit, for example, notes that Taylor does not affect whether three State legislators who took a public stand against the sale of State-owned property and then tried to pass a law divesting the State's ability to sell it are entitled to qualified immunity, because the legislators' actions are "not so outrageous that 'no reasonable . . . officer could have concluded' they were permissible under the Constitution." HIRA Educ. Servs. N. Am. v. Augustine, 991 F.3d 180, 191 n.7 (3d Cir. 2021)(quoting Taylor, 592 U.S. at 8).  The United States Court of Appeals for the Seventh Circuit, too, concludes that Taylor means an officer is not entitled to qualified immunity if his or her conduct was "particularly egregious." Lopez v. Sheriff of Cook Cnty., 993 F.3d 981, 991 (7th Cir. 2021).  In Lopez v. Sheriff of Cook County,

_____

to create "an absolute shield for law enforcement officers," Kisela v. Hughes, 138 S. Ct. at 1162 (Sotomayor, J. dissenting).

Manzanares v. Roosevelt Cnty. Adult Detention Center, 331 F. Supp.3d 1260, 1294 n.10 (D.N.M. 2018)(Browning, J.).

[97]Professor Colin Miller of the University of South Carolina School of Law notes that there are only two likely interpretations of the Supreme Court's summary disposition of McCoy v. Alamu: (i) that the Supreme Court remands so that the Fifth Circuit could consider whether the case involves "extreme circumstances" or "particularly egregious facts" like those in Taylor; and (ii) that the Supreme Court remands so that the Fifth Circuit can reconsider without looking for analogous prior precedent and instead "determine whether any reasonable officer should have realized" that the conduct violated the plaintiff's constitutional rights.  Colin Miller, The End of Comparative Qualified Immunity, 99 Texas. L. Rev. Online 217, 224 (2021)("Miller, The End of Comparative Qualified Immunity").  Miller argues that this second interpretation is more likely to be correct, because it "would be difficult to characterize" the officer's conduct as "'particularly egregious' without making a similar finding about most other unconstitutional behavior by government officers who seek qualified immunity."  Miller, The End of Comparative Qualified Immunity, at 224 (no citation for quotation).

the Seventh Circuit holds that an off-duty correctional officer who shoots and then uses as a human

shield a man who fires his gun into the air near a crowd after a scuffle does not act "so egregious[ly]

that any reasonable officer would know they [are] violating the Constitution notwithstanding the

lack of an analogous decision."[98]  993 F.3d at 991.  The United States Court of Appeals for the

Ninth Circuit also distinguishes Taylor on the basis of the conduct's severity.  See Rico v. Ducart,

980 F.3d 1292, 1300 n.9 (9th Cir. 2020).    In Rico v. Ducart, the Ninth Circuit holds that

correctional officers who perform inmate-welfare checks that, because of the design of the prison,

creates loud noises every forty-five minutes are entitled to qualified immunity, because the facts

are not "as extreme as those present in" Taylor.  980 F.3d at 1300 n.9.  Similarly, the Ninth Circuit

---

[98]The Court does not agree with the Seventh Circuit's conclusion.  An off-duty officer using someone he has just shot multiple times as a human shield to "ward off" someone else with a gun -- the individual the officers uses as a human shield had moments earlier fired a gun into the air near a crowd -- is particularly egregious such that any reasonable officer should have realized that it violates someone's constitutional rights.  Lopez v. Sherriff of Cook Cnty., 993 F.3d 992.  Even if the officer is trying to protect himself and the public, firing a gun near a crowd does not justify being used as a flesh shield to protect an off-duty officer who shoots that shield moments earlier.  Numerous provisions of international law and the laws of war, see, e.g., Rome Statute of the International Criminal Court, art. 8(2)(b)(xxiii)(July 17, 1998)(including in the definition of "war crimes" "[u]tilizing the presence of a civilian or other protected person to render certain points, areas or military forces immune from military operations"), prohibit such conduct.  A police officer need not be familiar with international law to know that such conduct is improper, nor should someone else have been used as a human shield previously and a Court of Appeals concluded that conduct to have violated clearly established law for a subsequent human shield to overcome the burden of qualified immunity.  The Seventh Circuit holds that the situation is "too fast-moving, too unpredictable, and too volatile" for an officer to know that using as a human shield the person he has just shot multiple times is a violation that is "so egregious that any reasonable officer would know they are violating the Constitution notwithstanding the lack of an analogous decision."  993 F.3d at 992.  Instead, the Seventh Circuit appears to require the officer theoretically to be on notice that this conduct is a law violation because a prior officer must have done the same thing and an earlier court -- most likely the Seventh Circuit itself -- must have found that the use of human shields violates some clearly established law.  If human shields are banned in war, they should not be allowed on the Chicago's streets.  Any reasonable officer should know this conduct is not acceptable conduct under the Constitution.

also has decided that Taylor "only highlights the level of blatantly unconstitutional conduct necessary to satisfy the obviousness principles." O'Doan v. Sanford, 991 F.3d at 1044 (9th Cir. 2021).

The other Courts of Appeals, however, have characterized Taylor as only reaffirming an "extreme-circumstances" or "obvious-clarity" exception. The Fifth Circuit, for example, has distinguished Taylor, noting that it "involved a factually distinct claim involving unsanitary prison conditions," so it does not apply to a case about mental healthcare in prison. Landry v. Laborde-Lahoz, 852 Fed. App'x 123, at *129 (5th Cir. Apr. 19, 2021).[99] The Fifth Circuit, however, like other Courts of Appeals, has not adopted a consistent approach to Taylor. The Fifth Circuit also notes that "it would have been 'obvious' to a reasonable officer that" several officers using their body weight to apply pressure to an unarmed man who does not resist arrest while the man is in the "maximal-restraint" position for five-and-a-half minutes so that the man stops breathing and his lips turn blue -- while officers nearby "milled around"-- constitutes "such a severe tactic against this particular person would be constitutionally proscribed," and that the officer would "have no recourse to qualified immunity." Aguirre v. City of San Antonio, 995 F.3d 395, 403-04, 424 (5th Cir. 2020)(Jolly, J., concurring). The Fifth Circuit further cites Taylor to support its assertion that, "'in an obvious case,' general standards 'can clearly establish the answer, even without a body of relevant law.'" Roque v. Harvel, 993 F.3d 325, 335 (5th Cir. 2021)(quoting Brousseau v. Haugen,

---

[99]The Court does not agree with the Fifth Circuit's reasoning on this point, although it does not disagree with the case's result. The Fifth Circuit reasons that Taylor does not support the plaintiff's argument that County officials acted with deliberate indifference in violation of the Eighth Amendment, because it is "factually distinct." Landry v. Laborde-Lahoz, No. 20-20365, 852 Fed.App'x. at 129. That Taylor is factually distinct has no bearing on the merits of a deliberate-indifference claim, but impacts its applicability to the qualified immunity question.

542 U.S. 194, 199 (2004)).  In Roque v. Harvel, however, the Fifth Circuit does not say what those

"general standards" might be, from where they might come, or where a court might look for them,

and then proceeds to characterize qualified immunity law as requiring a case on point in almost all

circumstances.  993 F.3d at 335.[100]  More recently, however, the Fifth Circuit acknowledges that

Taylor excuses a plaintiff from "their obligation to identify an analogous case in 'extreme

circumstances' where the constitutional violation is 'obvious.'"  Cope v. Cogdill, 3 F.4th 198, 206

(5th Cir. 2021)(quoting Taylor, 592 U.S. at 8).  The Fifth Circuit stresses, however, that this hurdle

is a "high standard," because the facts must be "'particularly egregious.'"  Cope v. Cogdill, 3 F.4th

at 206 (quoting Taylor, 592 U.S. at 9).

Most relevant here, the Tenth Circuit also has not given Taylor consistent treatment.  For

example, the Tenth Circuit treats Taylor as an example of the rule of United States v. Lanier, 520

U.S. 259 (1997), that a "general constitutional rule already identified in the decisional law may

apply with obvious clarity to the specific conduct in question, even though the very action in

question has not previously been held unlawful," if it gives "fair and clear warning" that the

---

[100]The Fifth Circuit's treatment of Taylor and the clearly established analysis is not consistent.  In Tucker v. City of Shreveport, 998 F.3d 165 (5th Cir. 2021), the Fifth Circuit does not cite Taylor, but writes that "'[q]ualified immunity is justified unless no reasonable officer could have acted as [the defendant officers] did here, or every reasonable officer faced with the same facts would not have [acted as the defendant officers did].'" (quoting Mason v. Faul, 929 F.3d 752, 764 (5th Cir. 2019, cert. denied, 141 S. Ct. 116, 207 (2020)(citing District of Columbia v. Wesby, 583 U.S. 48, 63 (2018).  Tucker v. City of Shreveport, 998 F.3d at 176-77.  The Fifth Circuit's analysis in Tucker v. City of Shreveport confuses the reasonableness of the officers' behavior with the clarity of the precedent that clearly establishes the law.  See 998 F.3d 165.  As Taylor suggests, an officer can act particularly egregiously and not be entitled to qualified immunity even if no precedent clearly establishes the law.  See Ramirez v. Guadarrama, 2 F.4th 506, 523 (5th Cir. 2021)(mem.)(Willett, J., dissenting from the denial of rehearing en banc)("The Supreme Court's reliance on Taylor [in McCoy v. Alamu, 141 S. Ct. 1364 (2021)(mem.)] confirms that the Court does not consider that case an anomaly, but instead a course correction signaling lower courts to deny immunity for clear misconduct, even in cases with unique facts.").

conduct violates the plaintiff's constitutional rights.  United States v. Lanier, 520 U.S. at 271.  See Routt v. Howry, No. 19-6187, 835 F. App'x. 379, 382 (10th Cir. 2020).  This treatment of Taylor asks about the relationship between a "general constitutional rule already identified in the decisional law" and the "conduct in question," and asks whether that rule applies with "obvious clarity."  United States v. Lanier, 520 U.S. at 271 (emphasis added).  Elsewhere, the Tenth Circuit states: "It suffices that 'the alleged unlawfulness [is] apparent in light of preexisting law.' That is, 'a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question.'"  Huff v. Reeves, 996 F.3d 1082, 1088 (10th Cir. 2021)(quoting Riggins, 572 F.3d at 1101; and Taylor, 592 U.S. at 9).

In Frasier v. Evans, 992 F.3d 1003, 1015 (10th Cir. 2021), however, the Tenth Circuit writes that "under certain 'extreme circumstances' general constitutional principles established in the caselaw may give reasonable government officials fair warning that their conduct is constitutionally or statutorily unlawful."  Frasier v. Evans, 992 F.3d at 1015 (quoting Taylor, 592 U.S. at 9).  The Tenth Circuit continues by noting that the situation before it -- several police officers surround a man who asks one of the officers for a statement about the force the officer has just used on a "uncooperative suspect," and then one of the officers grabs the tablet and searches it for a video of the encounter -- is "not such a rare case" as Taylor or Hope v. Pelzer, 536 U.S. 730 (2002).  Frasier v. Evans, 992 F.3d at 1021-22.  In other words, rather than having to point to an existing case with sufficiently analogous facts, a plaintiff instead can defeat an assertion of qualified immunity by meeting Taylor's "extreme circumstances" or "particularly egregious" standard.  Frasier v. Evans, 992 F.3d at 1015.

More recently, the Tenth Circuit holds that, even without a prior precedent clearly establishing the law, it is "obvious" that a prosecutor providing materially false information to a

medical examiner that influences his expert opinion whether a homicide occurred -- and then putting that medical examiner on the stand to testify about that false information -- is "obviously egregious."  Truman v. Orem City, 1 F. 4th at 1240 (first quoting District of Columbia v. Wesby, 583 U.S. 48, 63 (2018); and then quoting Pierce v. Gilchrist, 359 F.3d 1279, 1298 (10th Cir. 2004)). The Tenth Circuit, in Truman v. Orem City, comparing the facts in that case directly to those in Taylor, continues: "Just like any reasonable correctional officer should understand the inmate in Taylor's conditions of confinement offended the Constitution, so too should any reasonable prosecutor understand that providing a medical examiner fabricated evidence and then putting him on the stand to testify based on that false information offends the Constitution."  1 F. 4th at 1240. In reaching its conclusion in Truman v. Orem City, the Tenth Circuit reiterates that its qualified immunity analysis is "'not a scavenger hunt for prior cases with precisely the same facts, and a prior case need not be exactly parallel to the conduct here for the officials to have been on notice of clearly established law.'"  Truman v. Orem City, 1 F. 4th at 1235 (quoting Reavis v. Frost, 967 F.3d 978, 992 (10th Cir. 2020)).  Because the Tenth Circuit concludes that "the right not to be deprived of liberty as a result of the fabrication of evidence by a government officer was clearly established at the time of the prosecutor's conduct," 1 F. 4th at 1236, it determines that the plaintiff had alleged plausibly a fabrication-of-evidence claim against the prosecutor, 1 F. 4th at 1237.  This treatment of Taylor does not ask only about the relationship between a "general constitutional rule already identified in the decisional law" and whether it applies with "obvious clarity" to the conduct, Routt v. Howry, 835 F. App'x at 382 (quoting United States v. Lanier, 520 U.S. at 271), but instead focuses on the objective "particularly egregious" standard, which applies even without any general Constitutional principles that courts have promulgated already, because "no reasonable [] officer" could have concluded the conduct to be lawful,  Taylor, 592 U.S. at 8.

The Court does its best to follow diligently and faithfully the unwritten signals of superior courts, but, here, the signals are not clear.[101]  The Court therefore will proceed with both lines of analysis.  An officer is entitled to qualified immunity unless a plaintiff can demonstrate: (i) that the defendant's actions violated his or her federal Constitutional or statutory rights; and (ii) that the right was clearly established either (a) by a factually similar Supreme Court or Tenth Circuit case on point, see Thomas v. Kaven, 765 F.3d 1183, at 1194, or, in rare cases, by "general constitutional principles," Routt v. Howry, 835 F. App'x. at 382 -- at the time of the alleged misconduct, or (b) because the conduct was "particularly egregious" such that "any reasonable officer should have realized" it was unlawful, Taylor, 141 S. Ct. at 54.  See Estate of Smart by Smart v. City of Wichita, 951 F.3d 1161, 1178 (10th Cir. 2020); Riggins, 572 F.3d at 1107 ("When a defendant asserts qualified immunity at summary judgment . . .  the plaintiff [must] . . . demonstrate on the facts alleged both that the defendant violated his constitutional or statutory

---

[101]The Court agrees with the Tenth Circuit's treatment of Taylor in Truman v. Orem City, 1 F.4th 1227, that Taylor marginally expands the standard in United States v. Lanier, and in Hope v. Pelzer, and stands for  the proposition that an officer is not entitled to qualified immunity when his or her conduct is "particularly egregious" such that "any reasonable [] officer should have realized" that his or her conduct offends the Constitution.  Taylor, 592 U.S. at 8.  See Moderwell v. Cuyahoga County, 997 F.3d 653, 660 (6th Cir. 2021)("'no reasonable correctional officer could have concluded' that the challenged action was constitutional, the Supreme Court has held that there does not need to be a case directly on point." (quoting Taylor, 592 U.S. at 8)).  The Court concludes this treatment to be correct, especially in light of the Supreme Court's summary disposition in McCoy v. Alamu, 141 S. Ct. 1364, 1364 (mem)(2021).  See Ramirez v. Guadarrama, 2 F.4th at 523-24 (Willett, J., dissenting from the denial of rehearing en banc)("The Supreme Court's reliance on Taylor [in McCoy v. Alamu] confirms that the Court does not consider that case an anomaly, but instead a course correction signaling lower courts to deny immunity for clear misconduct, even in cases with unique facts."); Miller, The End of Comparative Qualified Immunity, at 222-23.  On the other hand, given the Court's view on qualified immunity, the Court hopes that the lower courts make this new hole in the qualified immunity defense so wide that the nation can run a truck through it.

rights, and that the right was clearly established at the time of the alleged unlawful activity."); Pueblo of Pojoaque v. New Mexico, 214 F. Supp. 3d at 1079.

The Court has applied previously the "particularly egregious" standard to cases concerning sexual assault in prison.   See Ortiz v. New Mexico, 550 F.Supp.3d 1020, 1175 (D.N.M. 2021)(Browning, J.).   In Ortiz v. New Mexico, the Court concludes that any reasonable correctional officer should understand that sexually assaulting an inmate or "knowingly allowing [the sexual assault] to happen despite being aware that it was prohibited by State law and prison policy . . . 'offends the Constitution.'"   550 F. Supp. at 1175 (quoting Truman v. Orem City, 1 F.4th at 1240).   The behavior that the correctional officer exhibited is particularly egregious, because any reasonable officer would conclude that they are violating the Constitution.   See Ortiz v. New Mexico, 550 F. Supp. 3d at 1175 (citing Taylor, 592 U.S. at 8).   Under the "particularly egregious" standard, the Court concludes that the correctional officers are not entitled to qualified immunity.   See Ortiz v. New Mexico, 550 F. Supp. 3d at 1175.   The Court has applied the "particularly egregious" standard to several other cases as well.   See Howes v. New Mexico Dept. of Health, No. CIV 21-0256, 2023 WL. 1419832, at *78 (D.N.M. Jan. 31, 2023)(Browning, J.)(concluding that a doctor's allegations of violations of his liberty interest in his reputation were not "particularly egregious" such that a reasonable officer would have realized the conduct was unlawful); Copar Pumice Co., Inc. v. Morris, No. CIV 07-79, 2008 WL 2323488, at *28 (D.N.M. 2008)(Browning, J.)(concluding that an official's conduct is not objectively reasonable if he or she enforces an ordinance in a "particularly egregious manner or in a manner which a reasonable officer would recognize exceed the bounds of the ordinance" (quoting Mimics, Inc. v. Village of Angel Fire, 394 F.3d 836, 846-47 (2005)).

## LAW REGARDING RULE 56(D)

Rule 56(d) of the Federal Rules of Civil Procedure provides:

(d) When Facts Are Unavailable to the Nonmovant.

> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
>
>> (1) defer considering the motion or deny it;
>>
>> (2) allow time to obtain affidavits or declarations or to take discovery; or
>>
>> (3) issue any other appropriate order.

Fed. R. Civ. P. 56(d).[102]  "A party who seeks relief under subdivision (d) may seek an order deferring the time to respond to the summary-judgment motion."  Fed. R. Civ. P. 56(d) advisory committee's note to the 2010 amendments.  The rule permits a nonmovant to show by affidavit or declaration the need for additional discovery; a formal affidavit is thus not required.  See Fed. R. Civ. P. 56(d).  The rule permits a "written unsworn declaration, certificate, verification, or statement subscribed in proper form as true under penalty of perjury to substitute for an affidavit."  Fed. R. Civ. P. 56(c) advisory committee's note to the 2010 amendments.

When a party files an affidavit or declaration, and moves for additional discovery time under rule 56(d), the party invokes the court's discretion.  See Jensen v. Redev. Agency of Sandy City, 998 F.2d 1550, 1553-54 (10th Cir. 1993).  "'"Unless dilatory or lacking in merit,"'" a party's 56[(d)] application "'"should be liberally treated."'"  Jensen v. Redev. Agency of Sandy City, 998 F.2d at 1554 (quoting Comm. for the First Amendment v. Campbell, 962 F.2d 1517, 1522 (10th Cir. 1992)).  "The general principle of Rule 56(d) is that summary judgment should be refused

---

[102]Before 2010, this rule was rule 56(f); rule 56(d) "carries forward without substantial change the provisions of former subdivision (f)."  Fed. R. Civ. P. 56(d) advisory committee's note to the 2010 amendments.

where the nonmoving party has not had the opportunity to discover information that is essential to opposition." Price ex rel. Price v. W. Res., Inc., 232 F.3d 779, 783 (10th Cir. 2000). Rule 56(d) does not require, however, that summary judgment not be entered until discovery is complete. See Price ex rel. Price v. W. Res., Inc., 232 F.3d at 784.

"Rule 56[(d)] is not a license for a fishing expedition . . . ." Lewis v. Fort Collins, 903 F.2d at 758. To invoke rule 56(d), the party filing the affidavit or declaration must state with specificity how the desired time would allow it to meet its burden in opposing summary judgment. See Jensen v. Redev. Agency of Sandy City, 998 F.2d at 1554. Rule 56(d) may not be invoked based solely upon the assertion that discovery is incomplete or that specific facts necessary to oppose summary judgment are unavailable. See Jensen v. Redev. Agency of Sandy City, 998 F.2d at 1554. Moreover, while the summary judgment movant's exclusive control of information weighs heavily in favor of relief under 56(d), see Price ex rel. Price v. W. Res., Inc., 232 F.3d at 783, merely asserting such is insufficient to justify denial of summary judgment, see Jensen v. Redev. Agency of Sandy City, 998 F.2d at 1554. Furthermore, "if the party filing the Rule 56[(d)] affidavit has been dilatory, or the information sought is either irrelevant to the summary judgment motion or merely cumulative, no extension will be granted." Jensen v. Redev. Agency of Sandy City, 998 F.2d at 1554 (denying a 56(d) request and stating that "the record reflects that plaintiffs were dilatory in pursuing discovery prior to the filing of their 56[(d)] affidavit"). See Johnson v. Holmes, 377 F. Supp. 2d 1039, 1044-45 (D.N.M. 2004)(Browning, J.)(denying a 56(d) request where plaintiff did not explain why, during the discovery period that the court allowed, he did not obtain the discovery sought in his motion). The Tenth Circuit has summarized rule 56(d)'s requirements as follows:

> "A prerequisite to granting relief [pursuant to Rule 56[(d)]] . . is an affidavit furnished by the nonmovant.  Although the affidavit need not contain evidentiary facts, it must explain why facts precluding summary judgment cannot be presented.  This includes identifying the probable facts not available and what steps have been taken to obtain these facts.  In this circuit, the nonmovant also must explain how additional time will enable him to rebut movant's allegations of no genuine issue of fact."

Price ex rel. Price v. W. Res., Inc., 232 F.3d at 783 (quoting Comm. for the First Amendment v. Campbell, 962 F.2d at 1522)(outer brackets in Price ex rel. Price v. W. Res., Inc., but not in Comm. for the First Amendment v. Campbell)(inner brackets added).   A rule 56(d) affidavit or declaration must state, with specificity, exactly what additional discovery is believed necessary.  See Burke v. Utah Transit Auth. & Local 382, 462 F.3d 1253, 1264 (10th Cir. 2006).   If a party does not file an affidavit or declaration, a district court does not abuse its discretion in denying discovery.  See Tadlock v. Lahood, 2013 WL 6284428, at *5.

The Court has previously denied rule 56(d) motions where the information sought does not relate to a relevant legal question.  See Martinez v. Lucero, No. 11-10032012, WL 2175772, at *30 (D.N.M. May 31, 2012)(Browning, J.)("Because the information sought would not alter the Court's decision on either absolute or qualified immunity, the Court will deny the request for discovery pursuant to rule 56(d).").  Similarly, it has denied 56(d) requests where the party seeks duplicative information.  See Todd v. Montoya, 877 F. Supp. 2d 1048, 1099 (D.N.M. 2012)(Browning, J.)("There is little difference between the discovery he seeks and what he would seek if Montoya had not raised a qualified-immunity defense.").  Finally, the Court has dismissed rule 56(d) motions where the proponent does not submit a rule 56(d) affidavit.  See Chavez v. Cnty. of Bernalillo, 3 F. Supp. 3d 933, 991 (D.N.M. 2014)(Browning, J.)("He did not submit a rule 56(d) affidavit or declaration.").

## ANALYSIS

The Court denies Roemer's Motion for Partial Judgment on the Pleadings. In Section I of its analysis, the Court considers Roemer's arguments regarding his second cause of action, which challenges ARP 3.25's Constitutionality under the First Amendment on overbreadth grounds. See Motion, at 1. Here, the Court holds that Roemer's overbreadth challenge lacks a sound basis in the applicable law and relevant facts because ARP 3.25 does not prohibit "'a substantial amount of protected speech' relative to its 'plainly legitimate sweep.'" Hansen, 599 U.S. at 770 (quoting Williams, 553 U.S. at 292). Next, in Section II of its analysis, the Court considers Roemer's arguments regarding his third cause of action, which challenges ARP 3.80's Constitutionality under the First Amendment on overbreadth grounds and under the Due Process Clause of the Fourteenth Amendment on vagueness grounds. Motion at 1. In this section, the Court holds, pursuant to Hansen, that Roemer's overbreadth challenge lacks a sound basis in the applicable law and relevant facts. The Court also holds that Roemer's vagueness challenge lacks a sound basis in the applicable law and the relevant facts, as ARP 3.80's prohibitions are not unconstitutionally vague under the Due Process Clause.

In Section III of the analysis, the Court holds that Ms. Castille, DeLovato, and Arvizu are entitled to summary judgment and qualified immunity as to Roemer's due process claims. In Section IV of the analysis, the Court holds that Arvizu and the Regents Board are entitled to summary judgment, and, as to Arvizu, qualified immunity, on Roemer's overbreadth challenges to ARP 3.25 and ARP 3.80. In Section V of the analysis, the Court holds that the Defendants are entitled to summary judgment, and, as to the Defendants sued in their individual capacities, qualified immunity, as to Roemer's claim that the Defendants violate his First Amendment rights by firing him.

I.    **ROEMER IS NOT ENTITLED TO JUDGMENT ON THE PLEADINGS ON HIS FACIAL CHALLENGE TO ARP 3.25 PARTS 3(C) AND 3(D) BECAUSE THE POLICY DOES NOT PROHIBIT A SUBSTANTIAL AMOUNT OF PROTECTED SPEECH RELATIVE TO ITS PLAINLY LEGITIMATE SWEEP.**

The test for First Amendment overbreadth challenges is whether a "law's unconstitutional applications substantially outweigh its constitutional ones," NetChoice, 603 U.S. at 723. Accordingly, the proper first step is to "assess the state law['s] scope," NetChoice, 603 U.S. at 723, by determining "what it covers," Hansen, 599 U.S. at 770.   Importantly, "a law's unconstitutional applications must be realistic, not fanciful," to justify facial invalidation.  Hansen, 599 U.S. at 770.  In light of this guidance, the Court proceeds in three steps: (i) determine what speech falls within ARP 3.25 Part 3(D)'s purview; (ii) decide which, if any, of ARP 3.25 Part 3(D)'s applications violate the First Amendment; and (iii) weigh the unconstitutional applications against the Constitutional applications and reach a conclusion as to whether "law's unconstitutional applications substantially outweigh its constitutional ones." NetChoice, 603 U.S. at 723.

At step one, the Court starts with the Policy's plain language.  Part 3(C) reads: "No student or employee, either in the workplace or in the academic environment, should be subjected to unwelcome, non-consensual, non-verbal, verbal or physical conduct that is of a sexual nature. Even one incident may constitute a violation of NMSU policy, rule or procedure."  ARP 3.25 Part 3(C).  Part D reads:

> Conduct of a sexual nature, [sic] constitutes a violation of NMSU policy and/or law or policy when:
>
> 1.    Submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment or academic status;
> 2.    Submission to or rejection of the conduct is used as a basis for academic or employment decisions or evaluations, or permission to participate in an activity; or

3.     The conduct has the purpose or effect of substantially interfering with an individual's academic or work performance, or creating an intimidating, hostile and offensive environment in which to work or learn.

ARP 3.25 Part 3(D).

To begin, ARP 3.25 Part 3(C) is a policy statement that does not provide the prohibitionary rule -- the enforcement mechanism -- for the policy as a whole.  Not every section of NMSU's ARPs acts as a prohibitionary rule.  In NMSU's words, the ARPs are "the collection of NMSU system operational policies, which include rules and procedures."  Administrative Rules and Procedures, New Mexico State University, https://arp.nmsu.edu/ (last visited Feb. 26, 2025).  Part 3(C)'s language, at once aspirational and cautionary, has a preamble's flavor and does not announce a rule, in contrast to a prohibitionary Part like 3(D).  The phrase in the first sentence of Part 3(C), "no student . . . should be subjected to," employs the verb "should be" aspirationally.  Cf. Garcia v. United States, 709 F. Supp. 2d 1133, 1148 (D.N.M. 2010)(Browning, J.)(quoting The American Heritage Dictionary of the English Language 1670 (3d ed. 1992))(explaining that "should" is "used to express probability or expectation").  See also shall, Oxford Eng. Dictionary, https://www.oed.com/dictionary/shall_v?tab=meaning_and_use#23146335 (last visited Feb. 26, 2026)(definition of "should be" includes "ought according to expectation to be").  Instead of using rule-like verbs such as "shall," "will," or "must" -- all three of which appear elsewhere in ARP 3.25 -- Part 3(C) employs a passive construction, "should be subjected to," to convey its expectant character.  This construction signals that Part 3(C) does not operate as a rule that can be violated, but rather as a declaratory statement of institutional intent on the part of the university.

Similarly, the second sentence in Part 3(C) also does not operate as a rule.  The second sentence states that "[e]ven one incident may constitute a violation of NMSU policy, rule or

procedure."  ARP 3.25 Part 3(C) (emphasis added)(Court adds brackets).  "May" is a classically permissive verb that grants discretion, in this instance to the enforcer of NMSU policy.  Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 112 (2012)("The traditional, commonly repeated rule is that <u>shall</u> is mandatory and <u>may</u> is permissive.")(emphasis in original).  By virtue of this permissive language, NMSU gives administrators the flexibility to determine that a single incident violates its rules rather than imposing some kind of repeated-behavior requirement.

In short, Part 3(C) is a Constitutionally inoffensive statement of institutional intent.[103] Even the most vigorous critic of student speech codes admits that universities can aspire to eliminate certain kinds of disruptive sexual behavior.  Moreover, it requires little imagination to conceive of how someone might act or speak in a sexual way that is so disruptive as to warrant discipline on the basis of that single action, without more.  Because Part 3(C) announces a statement of intent rather than a prohibitionary rule, the Court concludes that it is not the proper subject of an overbreadth challenge and denies Roemer's Motion as to this Part.

Next, the Court turns to Part 3(D) and begins with the same textual inquiry: what speech does this Part prohibit?  As an initial matter, it is unclear if Roemer challenges the Constitutionality of all three paragraphs of Part 3(D) or only paragraph 3(D)(3).  Elsewhere in his Motion, Roemer concedes that he does not challenge NMSU's "authority to regulate harassment that meets the <u>Davis</u> standard," that is, behavior that is "so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victims' educational experience, that the victim-students are

---

[103]Roemer comes close to admitting this conclusion on page 7 of the Motion when he describes how Part 3(C) "states NMSU's intent to prohibit any 'unwelcome, non-consensual, non-verbal, verbal or physical conduct that is a sexual nature.'"  Motion at 7 (quoting ARP 3.25 Part 3(C)).

effectively denied equal access to an institution's resources and opportunities."  Motion at 7 (quoting Davis, 526 U.S. at 651).  Davis only gives the standard for one particular type of liability under Title IX, however -- a federal-funding-recipient's deliberate indifference to student-on-student sexual harassment that creates a hostile environment.  See Davis, 526 U.S. at 652.  Title IX also allows plaintiffs to proceed on a deliberate-indifference claim stemming from quid pro quo sexual harassment.  See Morse v. Regents of Univ. of Colo., 154 F.3d 1124, 1127 (10th Cir. 1998). Quid pro quo sexual harassment occurs when, on the basis of sex, "[a]n employee of the [federal funding] recipient condition[s] the provision of an aid, benefit, or service of the recipient on an individual's participation in unwelcome sexual conduct." 34 C.F.R. § 106.30(a) (2023).  See Wills v. Brown Univ., 184 F.3d 20, 25 (1st Cir. 1999)(quoting Lipsett v. Univ. of P.R., 864 F.2d 881, 898 (1st Cir. 1988))(defining quid pro quo harassment as occurring "when some benefit or adverse action, such as change in salary at work or a grade in school, is made to depend on providing sexual favors to someone in authority").  Parts 3(D)(1) and 3(D)(2) describe quid pro quo harassment.  It follows that because Roemer explicitly disclaims any Constitutional challenge to NMSU's prohibition of hostile-environment harassment that align with the Davis standard, he also must disclaim any constitutional challenge to NMSU's prohibition of quid pro quo sexual harassment in paragraphs (D)(1) and (D)(2), which tracks the definition in 34 C.F.R. § 106.30(a).  Accordingly, even though Roemer only explicitly disclaims a challenge to NMSU's ability to regulate hostile-environment sexual harassment that meets the Davis standard, the Court will infer from his Motion's focus that he also disclaims a challenge to NMSU's ability to regulate quid pro quo sexual harassment, at least in a way that does not extend beyond the definition in 34 C.F.R. § 106.30(a). Thus, the Court does not analyze the Constitutionality of ARP 3.25 Part 3(D)(1) and

(D)(2).[104]

Roemer focuses his facial challenge on Part 3(D)(3), and the Court turns now to this provision to determine its scope.  Recall that Part 3(D)(3) states: "Conduct of a sexual nature, [sic] constitutes a violation of NMSU policy and/or law or policy when . . . 3.  The conduct has the purpose or effect of substantially interfering with an individual's academic or work performance, or creating an intimidating, hostile and offensive environment in which to work or learn."  ARP 3.25 Part 3(D)(3).  Part 3 (D)(3) contains four parts performing different functions.  First, Part D's introductory phrase, "conduct of a sexual nature," cabins the provision's scope.  ARP 3.25 Part 3(D)(3).  Second, paragraph (D)(3)'s "purpose or effect" language sets up a two-track framework for violating the policy.  ARP 3.25 Part 3(D)(3).  The word "purpose" introduces the specific-intent track; the word "effect" introduces the effects-based track.  Pursuant to the specific-intent track, a speaker violates Part 3(D)(3) when he or she utters sexual speech with the purpose to either (i) substantially interfere with an individual's academic or work performance; or (ii) create an intimidating, hostile, and offensive environment in which to work or learn.  ARP 3.25 Part 3(D)(3).  Pursuant to the effects-based track, a speaker violates Part 3(D)(3) when they utter

---

[104]The Constitutionality of prohibitions on quid-pro-quo sexual harassment is not in serious question.  As then-Judge Alito wrties in Saxe, "a supervisor's statement 'sleep with me or you're fired' may be proscribed not on the ground of any expressive idea that the statement conveys, but rather because it facilitates the threat of discriminatory conduct."  Saxe, 240 F.3d 200 at 208.  According to one commentator, "[e]ven the most diehard free speech absolutist recognizes that the speech involved in quid pro quo harassment is tantamount to threats of extortion, expression that has long been punishable without raising substantial free speech concerns in any contexts."  Nadine Strossen, The Tensions Between Regulating Workplace Harassment and the First Amendment: No Trump, 71 Chi.-Kent L. Rev. 701, 726-27 (1995)(Court adds brackets).  Cf. NLRB v. Gissel Packing Co., 395 U.S. 575, 618 (1969)("If there is any implication that an employer may or may not take action  . .  for reasons unrelated to economic necessitates . . . , the statement is  . . a threat of retaliation based on misrepresentation and coercion, and as such without the protection of the First Amendment.").  To the extent Roemer's Motion seeks to challenge the Constitutionality of NMSU's prohibitions on quid pro quo harassment, his Motion, in that respect, is denied.

sexual speech that has the effect of either (i) substantially interfering with an individual's academic or work performance; or (ii) creating an intimidating, hostile, and offensive environment in which to work or learn.  See ARP 3.25 Part 3(D)(3).

Roemer advances two arguments as to Part 3(D)(3)'s unconstitutionality.  First, he contends that it prohibits speech on the basis of subjective listener reaction, which violates foundational First Amendment principles protecting the expression of unpopular ideas.  See Motion at 9.  Second, relying largely on out-of-Circuit authority, he contends that it prohibits speech based on motive alone, which violates the Tinker requirement that "'speech cannot be prohibited in the absence of a tenable threat of disruption.'"  Motion at 10 (quoting DeJohn, 537 F.3d 301, 317 (3rd Cir. 2008)).  Neither argument persuades the Court that Part 3(D)(3) is unconstitutionally overbroad.

### A.    ARP PART 3(D)(3) DOES NOT CONTAIN A SUBJECTIVE-LISTENER-REACTION CONDITION.

According to Roemer, because Part 3(D)(3) "contains no objective, 'reasonable person' standard, nor any requirement of severity of pervasiveness," it must, therefore, prohibit speech "that a listener subjectively believes creates a 'hostile' or 'offensive' environment." Motion at 8. If this is the case, then a great many applications of Part 3(D)(3) are unconstitutional, as the Supreme Court has held that "subjective listener reaction is not a valid basis for prohibiting speech." Motion at 8 (quoting ARP Part 3(D)(3)).  The dispute, therefore, is whether Part 3(D)(3) contains an unconstitutional subjective-listener-reaction condition.

A good starting point in determining whether Part 3(D)(3)'s language conveys a subjective-listener-reaction condition is to figure out what this type of condition looks like, textually. Examining other school speech codes demonstrates that subjective-listener-reaction conditions are

easily spotted and are altogether absent from Part 3(D)(3).  First, in <u>Saxe</u>, the United States Court of Appeals for the Third Circuit analyzes a high-school speech code that describes how harassment "'can include any unwelcome verbal, written, or physical conduct which offends, denigrates, or belittles an individual.'"  <u>Saxe</u>, 240 F.3d at 215 (quoting the speech code).  Writing for the panel, the Honorable Samuel Alito, then-Circuit Judge for the Third Circuit, concludes that "some of these purported definitions of harassment are facially overbroad," because the Supreme Court "has held time and again, both within and outside of the school context, that the mere fact that someone might take offense at the content of speech is not sufficient justification for prohibiting it."  <u>Saxe</u>, 240 F.3d 215 (citing <u>Tinker</u>, 393 U.S. at 509).  Second, the university speech code in <u>Bair</u> "directs students to communicate their beliefs 'in a manner that does not provoke, harass, intimidate, or harm another.'"  280 F. Supp. 2d at 370 (quoting the speech code).  According to <u>Bair</u>, "the terms 'provoke' and 'intimidate' focus upon listeners' reaction to speech"; "'the government,'" however, "' may not prohibit speech . . . based solely on the [e]motive impact that its offensive content may have on a listener.'"  <u>Bair</u>, 280 F. Supp. 2d at 371 (quoting <u>Saxe</u>, 240 F.3d at 209)(Court adds brackets).  Finally, the university speech code in <u>Speech First, Inc. v. Cartwright</u>, 32 F.4th 1110 (11th Cir. 2022)(Newsom, J.)("<u>Speech First</u>"), defines "'Hostile Environment Harassment'" as "'[d]iscriminatory harassment that is so severe or pervasive that it unreasonably interferes with, limits, deprives, or alters the terms or conditions of education; . . . employment; . . . or participation in a university program . . . , when viewed from both a subjective and objective perspective.'"  32 F.4th at 1114-15 (quoting the speech code)(Court adds brackets).

Each of these codes contains an easily identifiable subjective-listener-reaction condition; in contrast, no subjective-listener-reaction condition appears in Part 3(D)(3).  In <u>Saxe</u>, the code refers to "'unwelcome'" verbal conduct that "offends."  240 F.3d at 215 (quoting the speech code).

In <u>Bair</u>, the code prohibits communications that "'provoke.'"   280 F. Supp. 2d at 370 (quoting the speech code).   In <u>Speech First</u>, the code directs administrators to evaluate potential harassment from "'both a subjective and objective perspective.'"   32 F.4th at 1114-15 (quoting the speech code).   In contrast to these three speech codes, Part 3(D)(3) lacks identical or even similar language: it does not prohibit "unwelcome" or "provoking" speech, and it does not direct a "subjective" inquiry into the effect of "discriminatory harassment."   It does not incorporate explicitly a subjective-listener-reaction condition at all.   Because Part 3(D)(3) does not contain an explicit directive to evaluate violations subjectively, if Roemer's first argument is to succeed, a subjective-listener-reaction condition must inhere in the plain meaning either of "substantially interfering," or of "intimidating, hostile, and offensive."   ARP 3.25 Part 3(D)(3).

Turning first to "substantially interfering," the Court concludes that the phrase does not incorporate implicitly a Constitutionally impermissible subjective-listener-reaction standard. Merriam-Webster defines "substantial" as "considerable in quantity: significantly great." <u>Substantial</u>, https://www.merriam-webster.com/dictionary/substantial (last visited September 25, 2024).   Similarly, the New Oxford American Dictionary defines "substantially" as "to a great or significant extent." <u>Substantially</u>, The New Oxford American Dictionary 1736 (3d ed. 2010).   The meaning and connotation of "substantially," then, is no mystery: the word conveys a sense of tangible and measurable -- objective -- severity or change that dispels the contention that it is a disguised subjective-listener-reaction condition.   <u>See</u> <u>substantial</u>, The New Oxford American Dictionary 1736 (3d ed. 2010)(defining "substantial" as "real and tangible rather than imaginary.").

While substantially's plain meaning suffices to refute the contention that "substantially interfering" in Part 3(D)(3) harbors a subjective-listener-reaction condition, context confirms that

the phrase has an objective bent.  Cf. Mont v. United States, 587 U.S. 514, 524 (2019)(analyzing statutory context as part of a plain-text analysis).  In Part 3(D)(3), the full phrase reads: "substantially interfering with an individual's academic or work performance."  ARP 3.25 Part 3(D)(3) (emphasis added).  Academic and professional performance is comprised of objective benchmarks.  Students regularly turn in homework, take examinations, and participate in class, ordinarily for a grade.  If a student alleges that "conduct of a sexual nature" has caused them to fall behind on their assignments, to stop showing up for class, or to receive poor grades, an administrator can use these benchmarks to determine if the interference has been "substantial." ARP 3.25 Part 3(D)(3).  Similarly, if a professor alleges that a colleague violated Part 3(D)(3), NMSU could investigate any number of objective benchmarks to make a determination as to "substantial inference": whether the professor skipped class; missed departmental meetings; and failed to evaluate timely student work.  The bottom line is that Roemer's contention that ARP 3.25 lacks "any requirement of severity or pervasiveness" misses the mark.  Motion at 8.  Far from harboring a subjective-listener-reaction condition, Part 3(D)(3), by way of its reference to "academic or work performance," directs administrators to evaluate "substantial interference" by looking to objective benchmarks.  ARP 3.25 Part 3(D)(3).[105]

Roemer contends that there is another hiding place in Part 3(D)(3) for a subjective-listener-

---

[105]Saxe does not advance Roemer's arguments here.  In Saxe, then-Circuit Judge Alito concludes that the prong of the school-district speech code "which prohibits speech that would 'substantially interfere[e] with a student's educational performance,' may satisfy the Tinker standard."  Saxe, 240 F.3d at 216 (alterations in original).  Even though Roemer's subjective-listener-reaction argument is analytically distinct from his argument pursuant to Tinker, Judge Alito's conclusion that "the primary function of a public school is to educate its students; conduct that substantially interferes with the mission is, almost by definition, disruptive to the school environment," confirms that "substantially" conveys a level of objective severity.  Saxe, 240 F.3d at 216.

- 143 -

reaction condition: the "intimidating, hostile, and offensive environment" standard.  ARP 3.25 Part 3(D)(3); Motion at 8.  Roemer's brief misquotes the policy, however, because he replaces "and" with "or."  Motion at 8 (asserting that Part 3(D)(3) prohibits speech that "a listener subjectively believes creates a 'hostile' or 'offensive' environment")(emphasis added)(no citation for quoted material).  This replacement matters.  Roemer's Third Circuit cases, Saxe and DeJohn, both analyze speech codes that use "or" instead of "and," as in, "'an intimidating, hostile, or offensive environment.'"  DeJohn, 537 F.3d at 306 (quoting the Temple University speech code); Saxe, 240 F.3d at 215 (quoting the school-district speech code).   Under the disjunctive hostile-environment standards in Saxe and DeJohn, the speech codes "could conceivably be applied to cover any speech about some enumerated personal characteristics, the content of which offends someone."  Saxe, 240 F.3d at 217.  The disjunctive effectively neuters "intimidating" and "hostile"; as long as the speech is "offensive," that speech could violate the rule.  See Scalia & Garner, supra, at 116 ("With the conjunctive list, all three things are required -- while with the disjunctive list, at least one of the three is required, but any one (or more) of the three satisfies the requirement.")  The bottom line is that the disjunctive turns a hostile-environment standard into an offensive-environment standard -- and that standard is unconstitutional.  See Hustler Mag., Inc. v. Falwell, 485 U.S. 46, 55 (1988)(reaffirming the Supreme Court's "longstanding refusal to allow damages to be awarded because the speech in question may have an adverse emotional impact on the audience").

In contrast, ARP 3.25 Part 3(D)(3)'s standard employs a conjunctive construction; this distinction is important, because the conjunctive "and" combines the three adjectives' requirements into a "threshold showing of severity or pervasiveness."  Saxe, 240 F.3d at 217.  Under the NMSU code, "intimidating" and "hostile" retain their full force, because, "[w]ith the conjunctive list, all three things are required."  ARP 3.25 Part 3(D)(3); Scalia & Garner, supra, at

- 144 -

116 (Court adds brackets).  The environment must be (i) intimidating (in verb form, "[t]o render timid, inspire with fear; to overawe, cow; in modern use <u>esp.</u> to force or deter from some action by threats or violence"); (ii) hostile ("[u]nfriendly in feeling, action, nature, or character; contrary, adverse, antagonistic"); and (iii) offensive ("[c]ausing painful or unpleasant sensations [in reference to] the moral feelings: disgusting, nauseous, repulsive").  <u>Intimidate</u>, Oxford Eng. Dictionary 8 (2d ed. 1989)(Court adds brackets); <u>Hostile</u>, def. A.2.a, Oxford Eng. Dictionary 420 (2d ed. 1989)(Court adds brackets); <u>Offensive</u>, def. A.4, Oxford Eng. Dictionary 756 (2d ed. 1989)(Court adds brackets).  Employing the conjunctive construction discourages administrators from basing a policy violation on subjective offensiveness and encourages them to evaluate objectively disciplinary action.[106]

There is one final point to make regarding ARP 3.25 Part 3(D)(3)'s scope:  Roemer mischaracterizes <u>Davis</u> as imposing a limit on what types of sexual harassment schools may Constitutionally prohibit.  <u>See</u> Motion at 9-10 (asserting that NMSU designed ARP 3.25 to "evade" <u>Davis</u>' requirements).  Part 3(D)(3) does not include a disjunctive hostile-environment standard; however, it also does not merely duplicate the <u>Davis</u> standard, which, Roemer concedes, states a Constitutional regulation of speech.  Motion at 7.  The Court declines to read <u>Davis</u> -- and, for that matter, <u>Saxe</u> and <u>DeJohn</u> -- as imposing a magic-words requirement on university speech codes that address speech "of a sexual nature."  ARP 3.25 Part 3(D).  To illuminate Roemer's mischaracterization, the Court rewinds to 1979, when the Supreme Court decides <u>Cannon v.</u>

---

[106]As the Court discusses in more detail later, <u>see infra</u>, at 166, the Constitutional doubts canon guides the Court towards applying a limiting construction that renders the policy Constitutional.  This canon cautions against laying down a bright-line rule that, for example, a university speech code is facially overbroad unless it uses the word "objective" to create an explicit objective-listener-reaction condition.  Roemer has not pointed to any precedent that mandates this aggressive interpretive approach.

University of Chicago, 441 U.S. 677 (1979)("Cannon").  In Cannon, the plaintiff sues the University of Chicago pursuant to § 901 of Title IX -- which prohibits federal-funding recipients from engaging in discrimination on the basis of sex -- alleging that the University denied her admission to its medical school because she is a woman.  Cannon, 441 U.S. at 680.  Section 901, however, does not "expressly authorize a private right of action"; to the contrary, the remedial mechanism in the subsequent section, § 902, "establishes a procedure for the termination of federal financial support for institutions violating § 901."  Cannon, 441 U.S. at 683.  Despite the absence of a private right of action in the statute's text, the Supreme Court concludes nonetheless that Congress intends § 901 to contain an implied right of action; consequently, the Supreme Court holds that the plaintiff can proceed with her suit.  See Cannon, 441 U.S. at 717.

Twenty years later, the Supreme Court continues to face questions about the scope of the remedy it recognizes in Cannon: In Davis, the question presented is "whether a recipient of federal education funding may be liable for damages under Title IX under any circumstances for discrimination in the form of student-on-student sexual harassment."  Davis, 526 U.S. at 639.  Because Congress had not spoken on the issue, the Supreme Court is left to fashion its own standard in light of the notice requirement from its Spending Clause jurisprudence -- Congress enacted Title IX under the spending Clause, see Gebser v. Lago Vista Independent School District, 524 U.S. 274, 287 (1998) -- and from the remedial funding-withholding procedures in Title IX, see Davis, 526 U.S. at 639-40.  Putting it all together, Davis explains that a private plaintiff can hold a federal funding recipient liable for intentionally violating Title IX when the funding recipient is "deliberately indifferent" to student-on-student sexual harassment "that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school."  Davis, 526 U.S. at 650.

Even this brief history of <u>Cannon</u>, <u>Davis</u>, and Title IX's implied right of action belies Roemer's contention that the <u>Davis</u> standard marks an outer boundary circumscribing the sexual speech that a public university may Constitutionally prohibit.  <u>Davis</u> is not a First Amendment case, and it is a mistake for Roemer to treat it as a First Amendment case given the jurisprudential challenges associated with litigating the scope of the implied right of action and the corresponding remedy in Title IX.  The Supreme Court intended the <u>Davis</u> standard to <u>limit</u> a federal funding recipient's liability under Title IX.    <u>See</u> <u>Davis</u>, 526 U.S. at 652 (rejecting the dissent's characterization of the opinion as overly broad and emphasizing that courts should not impose "more sweeping liability than we read Title IX to require."); <u>Kollaritsch v. Mich. State Univ. Bd. of Trustees</u>, 944 F.3d 613, 619 (6th Cir. 2019)(Batchelder, J.)(quoting <u>Davis</u>, 526 U.S. at 643)(noting that the <u>Davis</u> standard is, "[b]y design and effect," a "'high standard' that applies only 'in certain limited circumstances.'").  <u>Davis</u> ensures that federal-funding recipients are liable only when they are "deliberately indifferent" to particularly severe student-on-student sexual harassment.  <u>Davis</u>, 526 U.S. at 643.  To reiterate, this high threshold for liability flows from the Spending Clause requirement that unless Congress identifies any condition on its Title IX funding "unambiguously," <u>Pennhurst State School & Hospital v. Halderman</u>, 451 U.S. 1, 17 (1981), "[S]tates may not be held liable for a violation" of Title IX's requirements, <u>Kollaritsch v. Michigan State University Board of Trustees</u>, 944 F.3d at 629 (Thapar, J., concurring)(Court adds brackets).  Thus, properly understood, <u>Davis</u> is a case that limits the scope of a school's liability for its own misconduct under federal law; in contrast, this case is about a school's ability under the First Amendment to discipline its employees and students for certain kinds of sexual speech.

The logical implication of Roemer's argument is that universities lack the authority to protect themselves from deliberate-indifference liability under <u>Davis</u> by proactively disciplining

students who harass other students.  Instead, in Roemer's world, universities must wait to intervene until the harassment is so severe as to become actionable under a federal statute.  Practically speaking, this notion makes little sense.  Schools may seek, of course, to protect themselves from civil liability, but the suggestion that the Constitution only permits them to discipline students for sexually harassing other students when the school's funding is at risk lacks legal and logical support.  Davis does not mandate such a puzzling result.

### B.    ARP 3.25 PART 3(D)(3) DOES NOT CONTAIN AN UNCONSTITUTIONAL MOTIVE-BASED PROHIBITION.

Next, the Court turns to Roemer's second argument regarding Part 3(D)(3)'s meaning and the allegedly unconstitutional applications that follow from that meaning.  Roemer contends that Part 3(D)(3)'s "purpose or effect" language introduces an unconstitutional motive-based prohibition.  See Motion at 10.  His argument rests almost exclusively on DeJohn, which he cites for the proposition that "'the focus on motive is contrary to Tinker's requirement that speech cannot be prohibited in the absence of a tenable threat of disruption.'"  See Motion at 10 (quoting DeJohn, 537 F.3d at 217.)

Neither Roemer nor the Third Circuit explains persuasively why Tinker renders a motive-based violation of Part 3(D)(3) is unconstitutional.  In ARP 3.25 Part 3(D)(3), "purpose" functions as a specific intent requirement.  ARP 3.25 Part 3(D)(3).  See United States v. Christy, 916 F.3d 814, 845 (10th Cir. 2019)(citing United States v. Bailey, 444 U.S. 394, 405 (1980))("'Purpose' corresponds loosely with the common-law concept of specific intent.").  While specific intent is a criminal-law concept, applying it to the speech-code context helps illustrate why Roemer cannot make a successful overbreadth showing.  Specific intent requires that the "defendant acts not only with knowledge of what he is doing, but does so with the objective of completing some unlawful

act." United States v. Blair, 54 F.3d 639, 642 (10th Cir. 1995).  For example, conspiracy is a specific intent crime, because one of the elements of the crime of conspiracy includes "'an agreement[,] the purpose of [which] must be to break the law.'"  United States v. Blair, 54 F.3d at 642 (quoting United States v. Nall, 949 F.2d 301, 305 (10th Cir. 1991))(alterations in United States v. Blair, but not in United States v. Nall).  Accordingly, student or faculty sexual speech violates Part 3(D)(3) if the speaker has the "purpose" -- the specific intent -- to either (i) substantially interfere with an individual's academic or work performance; or (ii) create an intimidating, hostile, and offensive environment in which to work or learn.  ARP 3.25 Part 3(D)(3).

The problem with Roemer's Tinker argument is that he does not provide examples of instances in which a speaker's sexual speech, uttered with the purpose either to interfere substantially with an individual's academic or work performance, or to create an intimidating, hostile, and offensive environment, is not, in fact, disruptive.  It is difficult to conceive of many situations where a speech uttered with the purpose to disrupt does not result in actual disruption. At large public universities, some students may arrive on campus with life experiences that more or less immunize them to attempted disruption; for example, a graduate-student veteran of the United States' Armed Forces may have been exposed to high-pressure environments in the military, such that, when they resume civilian life, they are extraordinarily even-keeled.  If this kind of student carries on, undisrupted and unperturbed, in the midst of sexual vitriol directed at him or her, the university could not Constitutionally discipline the speaker pursuant to Tinker, because the speech has not caused any material disruption.  See Tinker, 393 U.S. at 513.  This hypothetical is so rare that it does not make much difference to Roemer's overbreadth challenge, however.  See NetChoice, 603 U.S. at 723 (reiterating that First Amendment overbreadth challenges succeed only when "the law's unconstitutional applications substantially outweigh its

constitutional ones."). The more likely scenario is that, when a speaker utters sexual speech with the purpose of substantially interfering with an individual's academic or work performance or creating an intimidating, hostile, and offensive environment in which to work or learn, the speaker will achieve his or her goal, and successfully disrupt a student's education.[107] Universities have the power to discipline this speaker, because disruptive student speech at public universities lacks First Amendment protection pursuant to Tinker.[108] See Tinker, 393 U.S. at 513 (students' conduct that "materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech."). In sum, because speech uttered with the intent to disrupt is, in the vast majority of cases, actually disruptive, Roemer's attack on the purpose-based track in ARP 3.25 Part 3(D)(3) does not advance his overbreadth challenge.

### C. THE UNCONSTITUTIONAL APPLICATIONS OF ARP 3.25 DO NOT SUBSTANTIALLY OUTWEIGH THE CONSTITUTIONAL APPLICATIONS OF ARP 3.25.

The Court turns now to Roemer's examples of purportedly unconstitutional applications of ARP 3.25 Part 3(D)(3), keeping in mind that his overbreadth challenge will succeed only if the number of the provision's unconstitutional applications is "substantially disproportionate to the [provision's] lawful sweep." Hansen, 599 U.S. at 770 (citing New York State Club Assn., Inc. v.

---

[107]In this sense, Part 3(D)(3)'s specific-intent requirement is speech-protective. As the Supreme Court has recently reaffirmed in the criminal context, conditioning liability or discipline on a showing of a state-of-mind requirement is "an important tool" that provides "'breathing room'" for speech that cannot be proscribed, thereby "reduc[ing] the prospect of chilling fully protected expression." Counterman v. Colorado, 600 U.S. 66, 75 (2023)(Court adds brackets).

[108]The Court applies Tinker in the public-university setting, because both the Supreme Court and the Tenth Circuit apply Tinker in the university context. See Thompson v. Ragland, 23 F.4th 1252, 1256-58 (10th Cir. 2022)(Hartz, J.)( citing Healy v. James, 408 U.S. 169, 170-79 (1972); and Papish v. Bd. of Curators of Univ. of Mo., 410 U.S. 667, 667-68 (1973)(per curiam)).

City of N.Y., 487 U.S. 1, 14 (1988); and Members of City Council of L.A. v. Taxpayers for Vincent, 466 U.S. 789, 800-01 (1984))(Court adds brackets).  "In the absence of a lopsided ratio, courts must handle unconstitutional applications as they usually do -- case-by-case."  Hansen, 599 U.S. at 770.  In his Reply, Roemer offers three examples of protected speech that violates ARP Part 3(D)(3): (i) campus drag shows; (ii) protests in favor of transgender rights; and (iii) "the discussion of women in combat at issue in DeJohn."  Reply at 10.  None of these examples advance his overbreadth argument.

Roemer's first example, campus drag shows, requires more analysis than his second and third examples, which, as the Court will discuss shortly, do not fall within Part 3(D)(3)'s purview at all.  Roemer does not explain what he means by a "drag show," and while the Court will not attempt to give a comprehensive explanation of the term, suffice it to say that a "drag queen" is "a man who dresses in women's clothes and performs before an audience."  Colin Edward Carman, drag queen, Encyclopedia Britannica, https://www.britannica.com/topic/drag-queen (last visited Feb. 26, 2025).  "[D]ragging involves performance whereby the intent is an undoing of gender norms through doing (or dressing) the part of the opposite sex."  Carman, supra.  While some drag performances may feature sexual elements, it is not obvious how a sexual drag show might violate Part 3(D)(3), and Roemer's example is short on detail.  First, the specific-intent track does not come into play here; it is a stretch to imagine a student group organizing a drag show with the specific intent to interfere substantially with an individual's academic performance, or to create an intimidating, hostile, and offensive environment in which to learn.  See ARP 3.25 Part 3(D)(3).  That leaves the effects-based track, but Roemer's example fares no better here.  University students need not attend drag shows.  Students who choose not to attend drag shows, consequently, should not experience any "effects" from these shows.  Venturing beyond this conclusion is not the stuff

of overbreadth challenges, especially here, when Roemer does not offer more in-depth examples.

Roemer's second and third examples, "protests in favor of trans rights" and discussions of women in combat, Reply at 10, do not fall within Part 3(D)(3)'s purview, because they do not involve "conduct of a sexual nature." ARP 3.25 Part 3(D)(3). "Sexual" means "[r]elative to the physical intercourse between the sexes or the gratification of sexual appetites." Sexual, def. 3, Oxford Eng. Dictionary 113 (2d ed. 1989)(Court adds brackets). In the mine run of cases, students who demonstrate publicly to support transgender individuals engage in political advocacy, and not sexual conduct. Similarly, nothing in DeJohn indicates that the speech at issue in that case, "concerning women in combat and women in the military," has anything to do with sexual intercourse. DeJohn, 537 F.3d at 305.

The Court now has considered which of ARP 3.25 Part 3(D)(3)'s applications are unconstitutional: very few. The final two steps in the analysis are, first, to ascertain its Constitutional applications, and second, weigh them against the unconstitutional ones; again, Roemer only wins if the unconstitutional applications "substantially outweigh" the Constitutional applications. NetChoice, 603 U.S. at 723. The Court concludes that Roemer cannot make this showing, because the vast majority of Part 3(D)(3)'s applications are Constitutional pursuant to (i) the Garcetti/Pickering test governing the First Amendment protections of public employees' speech; and (ii) Tinker's material-disruption standard.[109]

─────────────────────

[109]The Court also concludes that Part 3(D)(3) is a permissible regulation of sexual speech pursuant to Bethel School District No. 403 v. Fraser, 478 U.S. 675 (1986)("Fraser"). Part 3(D) applies only to speech "of a sexual nature," which further distinguishes it from the speech codes in Saxe and DeJohn, and brings it within the scope of permissible regulation pursuant to Fraser. ARP 3.25 Part 3(D). First, "sexual" means "[r]elative to the physical intercourse between the sexes or the gratification of sexual appetites." Sexual, def. 3, Oxford Eng. Dictionary 113 (2d ed. 1989)(Court adds brackets). The narrow scope of "sexual" contrasts to the extraordinarily broad universe of policed speech in Saxe and DeJohn: In Saxe, the code covers "'verbal . . . or physical

conduct based on one's actual or perceived race, religion, color, national origin, gender, sexual orientation, disability, or other personal characteristics,'" Saxe, 240 F.3d at 215 (quoting the speech code), and in DeJohn, the code covers "'verbal . . . conduct of a sexual or gender-motivated nature,'" DeJohn, 537 F.3d 316 (quoting the speech code). "Sexual" has a more definite meaning than the catchall phrase "other personal characteristics" in Saxe and the descriptor "gender-motivated" in DeJohn. As a result, Part 3(D)'s use of "sexual" brings it within the permissible scope of regulations pursuant to Fraser.

Fraser gives public schools Constitutional leeway to discipline students for "offensively lewd and indecent" -- that is, sexual -- speech. Fraser, 478 U.S. at 685. In Fraser, a student, Matthew Fraser, delivers a short student-government campaign speech at a school assembly that centers around a none-too-subtle sexual metaphor. See, 478 U.S. at 675-76; id. at 687 (Brennan, J., concurring)(reproducing the speech in full, which opens with the line: "I know a man who is firm -- he's firm in his pants, he's firm in his shirt."). Fraser's high-school audience, predictably, is amused: "Some students hooted and yelled; some by gestures graphically simulated the sexual activities pointedly alluded to." Fraser, 478 U.S. at 678. His high school suspends him, and he sues under 42 U.S.C. § 1983, alleging that the school violates his First Amendment rights. See Fraser, 478 U.S. at 679. The district court and the court of appeals both hold for the student, but the Supreme Court reverses, remarking that "[t]he marked distinction between the political 'message' of the armbands in Tinker and the sexual content of respondent's speech in this case seem to have been given little weight by the Court of Appeals." Fraser, 478 U.S. at 680. According to the majority, "[n]othing in the Constitution prohibits the states from insisting that certain modes of expression are inappropriate and subject to sanctions," particularly when the "pervasive sexual innuendo" at issue "was plainly offensive to both teachers and students -- indeed to any mature person." Fraser, 478 U.S. at 683 (Court adds brackets). Justice Brennan, Associate Justice of the Supreme Court of the United States, puts a finer point on the rule in his concurrence, writing that, "in light of the discretion school officials have to teach high school students how to conduct civil and effective public discourse, and to prevent disruption of school education activities, it was not unconstitutional for school officials" to suspend Fraser. Fraser, 478 U.S. at 687-88 (Brennan, J., concurring).

The Supreme Court has not decided whether and to what extent its high-school-speech cases apply in the public-university setting. See Radwan v. Manuel, 55 F.4th 101, 117 (2nd Cir. 2022)(Bianco, J.)(quoting Bd. of Regents of Univ. of Wis. Sys. v. Southworth, 529 U.S. 217, 238 n.4 (2000)(Souter, J., concurring))("[T]he Court has suggested that [the holdings of Hazelwood, Fraser, and Tinker] may not apply with equal force in college and university settings.")(Court adds brackets). Moreover, separate and apart from the lack of Supreme Court guidance, there are pedagogical and social differences between the high-school and university settings that counsel caution in blindly relying on Fraser to resolve university speech cases. Fraser remains good law, however, see Mahoney Area School District v. B.L., 594 U.S. 180, 187 (2021), and it is relevant here because it recognizes that schools have particular Constitutional leeway in regulating sexual speech. As Professor Driver writes, "[r]ather than applying Tinker's disruption analysis, the Court's opinion in Fraser created a First Amendment exception for student speech of a sexual nature." Justin Driver, The Schoolhouse Gate: Public Education, the Supreme Court, and the Battle for the American Mind 94 (Court adds brackets). See Fraser, 675 U.S. at 683 ("Schools, as instruments of the state, may determine that the essential lessons of civil, mature conduct cannot

Roemer focuses his overbreadth challenge on student speech; while the Court, so far, has gone along with this framing, it is time to turn to the other group of individuals Part 3(D)(3) regulates: university employees. Nothing in Part 3(D)(3) limits its scope to students, and, as Roemer's own employment history illustrates, NMSU applies Part 3(D)(3) to its employees. Roemer does not address Part 3(D)(3)'s application to employees, and, understandably so, because government employers may regulate Constitutionally a great deal of their employees' speech, under certain circumstances. Public employees, including professors at a public university, are

---

be conveyed in a school that tolerates lewd, indecent, or offensive speech and conduct such as that indulged in by [the plaintiff.]"). In fact, some federal courts have taken an expansive view of Fraser. Not only do these courts apply it in the university setting, but they also apply it to speech that is not sexual, but merely rude. See Radwan v. Manuel, 55 F.4th at 122 (rejecting the notion that Fraser lacks any force in the university setting and holding that university officials are entitled to qualified immunity after terminating a student-athlete's scholarship for raising her middle finger at a broadcast camera after her soccer game); Pompeo v. Bd. of Regents of the Univ. of N.M., 852 F.3d 973, 988 (10th Cir. 2017)(Lucero, J.)(relying, in part, on Fraser to justify awarding qualified immunity to university officials who criticized a student's word choice in a paper); Sasser v. Bd. of Regents of the Univ. Sys. v. Georgia, No. 1:20-cv-4022-SDG, 2021 WL 4478743 (N.D. Ga. Sept. 30, 2021)(Grimberg, J.)(regarding a student's use of a racial slur, holding that "[t]he bounds of Sasser's First Amendment rights while on his University campus are defined by Tinker and Fraser.").

Regardless of Fraser's precise boundaries, it allows NMSU to promulgate Part 3(D)(3)'s prohibition of sexual speech, especially when the prohibition operates in tandem with its substantial-interference standard and its conjunctive-hostile-environment standard. Even reading Part 3(D)(3) broadly, one would have difficulty concluding that, if Fraser delivered his speech at NMSU, he would have violated the code. The silliness in the crowd during Fraser's speech -- the whooping, the gyrating, and so forth -- did not "substantially interfer[e]" with any student's academic performance, and while the speech may have offended some, it hardly created, under Part 3(D)(3), an "offensive, intimidating, and hostile environment." ARP 3.25 Part 3(D)(3)(Court adds brackets). See Driver, supra, at 94 ("While one teacher dedicated ten minutes of class to inviting discussion of Fraser's speech, that scant evidence hardly seemed to suggest that [the high school] teetered on the brink of bedlam.")(Court adds brackets). Cf. Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 271 n.4 (1988)("Hazelwood")(rejecting the notion that Fraser relies on the material disruption standard from Tinker). The bottom-line syllogism is this: Fraser's high school suspended him and did not violate the Constitution in doing so. Had Fraser given the same speech at NMSU, however, he would not have violated ARP 3.25 Part 3(D)(3). Therefore, Part 3(D)(3) is Constitutional pursuant to Fraser.

"paid in part to speak on the government's behalf and convey its intended messages." Kennedy, 597 U.S. at 508. While the Supreme Court acknowledges the "considerable value" in "encouraging" public employees' speech, the five-prong Garcetti/Pickering test weighs this value against "the government's countervailing interest in controlling the operation of its workplaces." Lane v. Franks, 573 U.S. at 236. Garcetti/Pickering's five prongs are:

> (1) whether the speech was made pursuant to an employee's official duties;
>
> (2) whether the speech was on a matter of public concern;
>
> (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests;
>
> (4) whether the protected speech was a motivating factor in the adverse employment action; and
>
> (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct.

Knopf v. Williams, 884 F.3d at 945 (quoting Trant v. Oklahoma, 754 F.3d 1158, 1165 (10th Cir. 2014))(paragraph breaks in Knopf v. Williams, but not in Trant v. Oklahoma).

The Court does not need to venture beyond the first prong of Garcetti/Pickering to demonstrate the many Constitutional applications of Part 3(D)(3), given that, if an employee "speaks pursuant to his official duties, then there is no constitutional protection." Brammer-Hoelter, 492 F.3d at 1202. See Garcetti, 547 U.S. at 422 (stating that the restriction on speech "simply reflects the exercise of employer control over what the employer itself has commissioned or created"). "'Speech is made pursuant to official duties if it is generally consistent with the "type of activities [the employee] was paid to do."'" McNellis v. Douglas Cnty. Sch. Dist., 116 F.4th 1122, 1133 (10th Cir. 2024)(quoting Brammer-Hoelter, 492 F.3d at 1203)(alteration in Brammer-Hoelter). A professor's official duties may include meeting with individual graduate students.

Consider an example in which each time a professor has a meeting with a particular student, he comments on how "sexy" she looks that day; as a result, the student stops scheduling meetings with the professor, and her progress on her dissertation falters accordingly. NMSU could discipline Constitutionally the professor pursuant to ARP 3.25 Part 3(D)(3) if it determines the remark interferes substantially with the student's academic performance. NMSU can apply Constitutionally Part 3(D)(3) in many variations of this scenario: the professor might comment, instead, about his or her own sexual prowess, a particular article of clothing the student wears, or a student's particular body part or other physical characteristic. A professor of music might repeatedly use a graphic sexual metaphor during a lesson in an attempt to convey the color of a particular musical phrase; as a result, her student begins to skip lessons and loses her first-chair position in the orchestra. A professor of art suggests to his student that she might benefit from drawing the professor himself in the nude, at his house, after a few glasses of wine; the student drops out of his class and falls behind on completing her degree. Only a lack of imagination limits the possible Constitutional applications.

Considered alone, these applications confirm that "the 'plainly legitimate sweep' of the provision is extensive" -- and this is all before the Court turns to Part 3(D)(3)'s potential Constitutional applications regarding student speech. Hansen, 599 U.S. at 782 (internal quotations have no citations). Some of this ground is familiar. Nonetheless, the following is a non-exhaustive list of student sexual speech that might constitute substantial interference with academic performance, or an intimidating, hostile, and offensive environment in which to learn: (i) a student calls attention to his laboratory partner's cleavage each day during class; (ii) during a rehearsal of Andrew Lloyd Weber's musical Cats, a student repeatedly makes comments about how much he loves "seeing all of those butts in costume"; and (iii) a male student paired with a female student

for a group coding project refuses to work on the project with her and, instead, persistently badgers her to go on a date with him.

These examples are vulgar, but that conclusion is the point: these are "heartland" applications of Part 3(D)(3), and they are Constitutional pursuant to Tinker. Hansen, 599 U.S. at 782. Part 3(D)(3) uses "substantial" to convey the material disruption of which Tinker speaks; then-Circuit Judge Alito would likely agree with this conclusion, in light of his observation that the "primary function of a public school is to educate its students; conduct that substantially interferes with the mission is, almost by definition, disruptive to the school environment." Saxe, 240 F.3d at 216. Similarly, sexual conduct that creates an "intimidating, hostile, and offensive environment in which to work or learn" also fits within the material disruption standard. Unlike other speech codes, Part 3(D)(3)'s hostile environment standard uses the conjunctive; if the Court takes all three words' definitions seriously, the environment that the provision describes is one in which material disruption is present, pursuant to Tinker.

The unconstitutional side of the ledger, in contrast, is "pretty much blank." Hansen, 599 U.S. at 782. The only one of Roemer's examples that is unconstitutional -- and even here, the Court does Roemer's work for him by filling in the hypothetical's details -- is when Part 3(D)(3) disciplines a student who speaks with the purpose to interfere substantially with another's academic performance, but the speech does not actually interfere: the individual the speech targets has the kinds of life experiences that render him or her practically immune to the effects of verbal abuse. Otherwise, because Part 3(D)(3) "does not have the scope [Romer] claims," it "does not produce the horribles he parades." Hansen, 599 U.S. at 782 (Court adds brackets). Roemer asks the Court to "throw out too much of the good based on a speculative shot at the bad. This is not the stuff of overbreadth -- as-applied challenges can take it from here." Hansen, 599 U.S. at 784-

85.

## II.    ARP 3.80 IS NEITHER UNCONSTITUTIONALLY OVERBROAD NOR UNCONSTITUTIONALLY VAGUE.

### A.    ROEMER HAS STANDING TO BRING HIS CHALLENGES TO ARP 3.80.

As a threshold issue, Roemer has standing to bring his overbreadth and vagueness claims regarding ARP 3.80.  To establish standing, Roemer must satisfy the injury-in-fact requirement -- injuries must be concrete, particularized, and actual or imminent -- the causation requirement, and the redressability requirement.  See TransUnion, 594 U.S. at 423.  The Defendants argue that Roemer cannot satisfy any of these requirements, because, they contend, NMSU terminates his employment because of ARP 3.25 violations, rather than because of ARP 3.80 violations.  See Response at 4.  Roemer has the burden to establish standing "'in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation.'"  Colo. Outfitters Ass'n v. Hickenlooper, 823 F.3d 537, 533 (10th Cir. 2016)(quoting Lujan v. Defenders of Wildlife, 504 U.S. at 561).  Roemer carries his burden here.  He alleges in his Complaint that the hearing officer's determination in each of his two cases finds that Roemer violated ARP 3.80 along with ARP 3.25; the Defendants admit this fact in their Answer.  See Complaint ¶ 98, at 23 (asserting these facts); Answer ¶ 98, at 11 (admitting these facts).  The Court does not agree with the notion that the hearing officer's reference to ARP 3.80 is an error or is otherwise untethered to the allegations in the two complaints; the more likely explanation is that the hearing officer references ARP 3.80 in each of her recommendations and final decisions because she concludes that Roemer violated ARP 3.80 in conjunction with ARP 3.25.  Because the NMSU Chancellor's Chief of Staff emailed Roemer, stating that "the Chancellor is in support of the recommended approved sanctions and to move

forward," the Court concludes that, pursuant to <u>Lujan</u>, Roemer suffers an injury-in-fact, his firing, that NMSU causes, and that the Court has the power to redress, by ordering that NMSU reinstate him.   Complaint ¶ 108, at 25 (alleging these facts); Answer ¶ 108, at 11 (admitting these facts). See <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. at 561.

### B.    ARP 3.80 IS NOT UNCONSTITUTIONALLY OVERBROAD.

Roemer has standing, so the Court proceeds to the merits of his overbreadth challenge to ARP 3.80.  The steps of the analysis remain the same.  The Court must: (i) address the provision's scope; (ii) decide which, if any, of ARP 3.80's applications violate the First Amendment; and (iii) weigh the unconstitutional applications against the Constitutional applications and reach a conclusion whether the "law's unconstitutional applications substantially outweigh its constitutional ones." <u>NetChoice</u>, 603 U.S. at 723.  Recall that ARP 3.80's title is "Prohibition of Bullying, Hazing and Hostile Misconduct (Non-Discriminatory)."  ARP 3.80.  ARP 3.80 Part 2(A) defines "bullying" as follows:

> A.    Bullying: An act or omission (not based on discriminatory motives prohibited by RPM and ARP 3.25) committed with the intention of intimidation or causing emotional distress or other harm, typically directed toward a person perceived to be vulnerable or less powerful.

ARP 3.80 Part 2(A).  ARP 3.80 Part 2(C) defines "Hostile Misconduct" as follows:

> B.     Hostile Misconduct: An unjustified act or omission or series of acts or omissions (not based on discriminatory motives prohibited by RPM. and ARP 3.25), which is sufficiently severe, pervasive or persistent so as to unreasonably interfere with or limit a person's ability to participate in academic opportunities or activities, or to work productively in the workplace. Bullying and Hazing are types of conduct which may constitute Hostile Misconduct under this rule.

ARP 3.80 Part 2(C).  Part 4(A) states:

> A.    Prohibition of Hostile Misconduct and Retaliation: Hostile Misconduct and Retaliation are prohibited.   Students and employees participating in such

misconduct are subject to disciplinary measures . . . The acquiescence or consent of the individual subjected to the misconduct constituting Hostile Misconduct is not a defense.  The following non-exhaustive list describes conduct that may contribute to a finding of a violation of this rule, if substantiated by the facts:

1.      Abusive or demeaning verbal acts or name calling; graphic and written statements in any media (e.g., texting, email, social media);

2.      Threats of harm or actual harm;

3.      Physical abuse, such as whipping, beating, branding, pushing, shoving, or tackling, use of physical restraints or objects;

4.      Forced physical activity, such as consumption of food, liquor or drugs, or sleep deprivation;

5.      Theft and/or destruction of property;

6.      Yelling, screaming, or calling members (prospective or actual) demeaning names, or restricting or substantially altering an individual's regular routines, including social interaction;

7.      Conduct that a reasonable, similarly situated individual would consider humiliating and or degrading to others;

8.      Forcing, requiring or endorsing another individual, including but not limited to prospective or new members of organization, to violate university policies, organization/association bylaws, team rules and/or any local, state, or federal law.

ARP 3.80 Part 4(A).  ARP 3.80 Part 6(C) states:

C.      Standard to Determine Violation: A violation of this rule occurs when the investigating office evaluates the evidence and finds, by a preponderance of the evidence, that the alleged Hostile Misconduct was sufficiently severe, pervasive or persistent such that a similarly situated reasonable person would be significantly and adversely impacted in their ability to benefit from the educational or work opportunities provided by the institution. A violation also occurs when the investigating offices finds that an adverse action was threatened or taken against an individual and was motivated by the individual's act of reporting Hostile Misconduct or participation in the resolution of a Hostile Misconduct allegation.

ARP 3.80 Part 6(C).

First, Part 4(A) determines ARP 3.80's scope.  Part 2 defines bullying, hazing, hostile misconduct, and retaliation.  See ARP 3.80 Part 2.  In contrast, Part 4's title is "Prohibited Misconduct"; this Part, not Part 2, states the actual prohibition, and it does so in no uncertain terms, declaring, in Part A, that "Hostile Misconduct and Retaliation are prohibited.  Students and employees participating in such misconduct are subject to disciplinary measures."  ARP 3.80 Part 4(A).  It goes on to provide a "non-exhaustive list" that "describes conduct that may contribute to a finding of a violation of this rule, if substantiated by the facts."  ARP 3.80 Part 4(A).  Importantly, Part 2's scope is not limited to speech; while the examples of potential violations include speech, they include also non-expressive, non-verbal acts, like "forced physical activity," "physical abuse, such as whipping," "theft," or "actual harm."  ARP 3.80 Part 2(C).

The next step, then, in determining ARP 3.80's scope, is to look at Hostile Misconduct's and Retaliation's definitions in Part 2 and determine what speech the definitions cover. According to Part 2(C), hostile misconduct entails certain "unjustified" acts or omissions that are "sufficiently severe, pervasive or persistent so as to unreasonably interfere with or limit a person's ability to participate in academic opportunities or activities, or to work productively in the workplace."  ARP 3.80 Part 2(C).  This definition focuses on the acts' results.  A violation hinges on whether the acts "unreasonably interfere with or limit" a person's participation in the academic or professional sphere.  ARP 3.80 Part 2(C).  Part 6(C), entitled "Standard to Determine Violation," confirms that "unreasonably" is an objective standard; it instructs administrators to evaluate a violation in light of whether a "similarly situated reasonable person would be significantly and adversely impacted in their ability to benefit from the educational or work opportunities" NMSU provides.  ARP 3.80 Part 6(C).

The phrase that precedes "so as to unreasonably interfere with" is "sufficiently severe,

pervasive or persistent." ARP 3.80 Part 2(C). This phrase adds context to Part 6(C)'s objective threshold for a violation; Part 2(C) describes how an "unjustified act or omission or series of acts or omissions" might arrive at the level of objective -- unreasonable -- interference to constitute a violation. ARP 3.80 Part 2(C). "Severe," "pervasive," and "persistent" have overlapping and reinforcing meanings. ARP 3.80 Part 2(C). Severe means "very great; intense." The New Oxford American Dictionary at 1599. Pervasive means "spreading widely throughout an area of a group of people." The New Oxford American Dictionary at 1309. Persistent means "continuing to exist or endure over a prolonged period." The New Oxford American Dictionary at 1307. Each of these words makes sense in context, because they correspond to different ways someone's actions might "unreasonably interfere with or limit a persons' ability to participate in academic opportunities or activity, or to work productively in the workplace." ARP 3.80 Part 2(C). A single action might be so severe -- intense -- that, standing alone, it causes unreasonable interference; or, multiple actions might be so pervasive -- widespread -- or persistent -- unrelenting -- that they cause unreasonable interference over a period of time.

Part 2(C)'s definition of Hostile Misconduct cross-references the Bullying and Hazing definitions, stating that "Bullying and Hazing are types of conduct which may constitute Hostile Misconduct under this rule." ARP 3.80 Part 2(C). As the Court notes earlier, "may" is a permissive word that conveys discretion; in this instance, it indicates that not every instance of Bullying and Hazing necessarily constitutes Hostile Misconduct. ARP 3.80 Part 2(C). Part 4(A) confirms this observation, as it prohibits only Hostile Misconduct and Retaliation, as opposed to Hostile Misconduct, Retaliation, Bullying, and Hazing. ARP 3.80 Part 4(A).[110] The result of Part

---

[110]ARP 3.80's title, "Prohibition of Bullying, Hazing and Hostile Misconduct (Non-Discriminatory)," might lead to the expectation that the Policy contains a flat prohibition on

4(A)'s structure is that the definition of Hostile Misconduct -- and the standards for determining a violation of the rule in Part 6(C) -- controls.  Roemer makes much of Part 2(A)'s definition of Bullying, contending that "NMSU can prohibit speech simply because it causes someone to subjectively experience 'emotional distress' or 'other harm.'"  Motion at 12 (quoting ARP 3.80 Part 2(A)).  Contrary to his assertion, however, ARP 3.80 filters an allegation of Bullying or Hazing through the Hostile Misconduct definition in Part 4(A) and the standards for violations in Part (6)(C) -- and, tellingly, Roemer's brief does not mention Part 6(C).  Given that the First Amendment does not protect physical acts "committed with the intention of intimidation or causing emotional distress or other harm," Roemer's challenge must focus necessarily on verbal bullying.  ARP 3.80 Part 2(A).  The only speech that Part 4(A) penalizes is speech uttered "with the intention of intimidation or causing emotional distress or other harm," ARP 3.80 Part 2(A), that is "sufficiently severe, pervasive or persistent so as to unreasonably interfere with or limit a person's ability to participate in academic opportunities or activities," ARP 3.80 Part 4(C), "such that a similarly situated reasonable person would be significantly and adversely impacted in their ability to benefit from the educational or work opportunities provided by the institution," ARP 3.80 Part 6(C).

Similarly, Part 4(A) necessarily filters its list of examples through the Hostile Misconduct definition in Part 2(C) and the Standard to Determine Violation section in Part 6(C).  The language hardly could be clearer that the list items are not per se violations of Part 4(A): the conduct in the

---

Bullying and Hazing -- not just Hostile Misconduct, of which Bullying and Hazing are a subset.  The title cannot overcome, however, the Policy's plain text, which prohibits Hostile Misconduct, and relies on its definition to link in Bullying and Hazing.  ARP 3.80 Part 4(A).  Moreover, as additional evidence that the title does not overcome the Policy's text, the title does not mention Retaliation, which Part 4(A) explicitly prohibits.  See ARP 3.80 Part 4(A).

list "may contribute to a finding of a violation of this rule, if substantiated by the facts." ARP 3.80 Part 4(A). This phrase leaves little room for interpretation. Not every instance of conduct in the list necessarily violates Part 4(A), because each situation is fact-dependent. So, when Roemer asserts that Part 4(A) prohibits "routine insults delivered over Twitter or group texting apps to the sharing of internet 'memes' that a recipient subjectively finds demeaning," he overstates his case, and overlooks Part 4(A)'s tempering language, which emphasizes fact-finding and notes that not every instance of conduct on the list constitutes a violation. Motion at 12-13.

Having analyzed what speech ARP 3.80 covers, the Court turns to the overbreadth analysis' next step and determines which of ARP 3.80's applications are unconstitutional versus Constitutional. Part 2(C) and 6(C), together, target speech and actions that interfere with students' and faculty's endeavors on campus. ARP Part 3.80 includes language that describes the interference's requisite magnitude -- "severe, pervasive or persistent" -- and incorporates explicitly a hypothetical reasonable person standard that administrators must use to assess whether a violation has occurred. ARP 3.80 Part 2(C); Part 6(C). This two-step drafting strategy flies a Tinker flag. Tinker permits schools to prohibit Constitutionally students' conduct that "materially disrupts class work or involves substantial disorder or invasion of the rights of others." Tinker, 393 U.S. at 513. "Materially disrupts" is an inherently indeterminate phrase, but Part 6(C) falls safely within this phrase's bounds. Part 6(C)'s language adds teeth to the Tinker standard and goes beyond what Tinker requires: pursuant to Part 6(C), discipline-worthy conduct must have a "significant[] and adverse[] impact[]" on a reasonable person's "ability to benefit from the educational or work opportunities" that NMSU provides. ARP 3.80 Part 6(C)(Court omits suffix). Because Part 2(C), 4(A), and 6(C) combine to prohibit conduct that materially disrupts students' educational activities, the Court concludes that ARP 3.80's plain language states a Constitutional

regulation of student speech pursuant to <u>Tinker</u>.

Because ARP 3.80's plain language targets particularly severe disruption, it follows that the vast majority of its applications are Constitutional, such that the Court is comfortable concluding at this step that Roemer's overbreadth challenge necessarily fails.  Nonetheless, the Court will address his examples of purportedly unconstitutional applications and determine whether those applications, if they exist, "substantially outweigh its constitutional ones." <u>NetChoice</u>, 603 U.S. at 723.  Roemer's first concern is that Part 2's definitions all include not only acts, but also "omissions."  Motion at 11 (quoting ARP 3.80 Part 2).  He contends that the word "omissions" allows NMSU to punish someone's "silent hostility towards another."  Motion at 11. It would violate the Constitution, were such punishment the case: "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein."   <u>West Virginia State Bd. of Educ. v. Barnette</u>, 319 U.S. 624, 642 (1943)(Jackson, J.).

Refusal to speak, however, cannot satisfy ARP 3.80's high threshold and objective standard for what constitutes interference.  Roemer's citation to <u>Meriwether v. Hartop</u>, 992 F.3d 492 (6th Cir. 2021)("<u>Meriwether</u>"), is inapposite in this regard.   In <u>Meriwether</u>, a public university disciplines a philosophy professor who refuses to use a student's preferred pronouns in class; the student, whom the professor believes is a male, asks the professor to refrain from using "Mr.," and to use instead "'feminine titles and pronouns.'"   992 F.3d at 499 (quoting the record).   The professor does not wish to comply with the student's request, on the basis of the professor's religious beliefs about gender identity, and suggests, as a compromise, that he refer to the student by the student's last name, without the honorific.  <u>See</u> 992 F.3d at 501.  The student receives a

high grade in the class and does not display "'anxiety, fear, or intimidation,'" but the university is not satisfied with the professor's compromise and issues a Title IX report addressing his conduct. 992 F.3d at 500-01 (quoting the record). The Title IX report states that the professor's refusal to comply with the student's request creates a hostile environment for the student, which the university defines as "'any situation in which there is harassing conduct that limits, interferes with or denies education benefits or opportunities, from both a subjective (the complainant's) and an objective (reasonable person's) viewpoint.'" 992 F.3d at 501 (quoting the record). The United States Court of Appeals for the Sixth Circuit holds that the university violates the professor's First Amendment rights by disciplining him pursuant to the university's non-discrimination policies. See 992 F.3d at 512.

Roemer's problem is that, if the Meriwether professor's conduct occurred at NMSU, the professor would not have violated ARP 3.80. Importantly, the student in Meriwether receives a good grade in the class, and the student's demeanor in class is entirely regular. See Meriwether, 992 F.3d at 500-01. These facts indicate that the professor's refusal to refer to the student as "Ms." does not interfere with the student's academics at all. At NMSU, if there is no significant and adverse impact to the student's schoolwork, then there is no violation, pursuant to ARP 3.80 Part 6(C). Accordingly, Meriwether's example does not add a tally to the unconstitutional side of the ARP 3.80 ledger.

Roemer's other examples fare no better. His Motion contends that each of the following examples constitutes a violation of ARP 3.80: (i) an art history professor shows a medieval painting of the Prophet Muhammad; (ii) a student appears in a photograph reading Mein Kampf; and (iii) a professor attends the "Unite the Right" rally in Charlottesville, Virginia. See Motion at 12. None of these examples violate Part 4(A), according to Part 6(C)'s standards, because, on these facts,

- 166 -

there is no interference in students' academic performance, at all, let alone "severe, pervasive or persistent," ARP 3.80 Part 2(C), interference that "significantly and adversely impact[s]," ARP 3.80 Part 6(C)(Court adds brackets), a student's education. The Court concludes, therefore, that Roemer's examples do not constitute unconstitutional applications of ARP 3.80.

It is worth noting two final points. First, like ARP 3.25, ARP 3.80 applies to NMSU employees, too, see ARP 3.80 Part 5, and public universities may regulate a great deal of employee speech without running afoul of the First Amendment. See Analysis Part I, supra. Rather than rehashing the Garcetti/Pickering test, the Court notes that many regulations of employee speech are Constitutional. Additionally, ARP 3.80 covers physical conduct in addition to speech, and non-expressive physical conduct lacks First Amendment protection. See Animal Legal Def. Fund v. Kelly, 9 F.4th 1219, 1227–28 (10th Cir. 2021)(citing United States v. O'Brien, 391 U.S. 367, 376 (1968))("Non-expressive conduct does not fall within the scope of the First Amendment."). In sum, ARP 3.80 has many Constitutional applications to disruptive student speech and employee speech. It also has many Constitutional applications to disruptive student and employee non-verbal and non-expressive conduct. In contrast, the ledger sheet looks thin on the unconstitutional side. The Court does not -- and need not -- determine that each and every application of ARP 3.80 is Constitutional. Roemer cannot show that ARP 3.80's "unconstitutional applications substantially outweigh its constitutional ones." NetChoice, 603 U.S. at 723. Consequently, the Court denies his overbreadth Motion as to ARP 3.80.

Second, the interpretation of a New Mexico public university's policies is a matter of state, not federal, law, see R.A.V. v. City of St. Paul, 505 U.S. 377, 381 (1992), and New Mexico courts apply a version of the Constitutional doubts canon,  see Adobe Whitewater Club of N.M. v. New Mexico State Game Comm'n, 2022-NMSC-020, ¶ 37, 519 P.3d 46, 57 (noting the "'well-

established principle of statutory construction that statutes should be construed, if possible, to avoid constitutional questions'")(quoting Lovelace Med. Ctr. v. Menendez, 1991-NMSC-002, ¶ 12, 111 N.M. 336, 806 P.2d 603).   While the provision at issue is not a Legislatively enacted statute, the Court has not located any New Mexico State cases suggesting that its courts would not apply the Constitutional doubts canon merely because a university enacts the rule at issue.  See West v. Derby Unified Sch. Dist. No. 260, 206 F.3d 1358,1368 (10th Cir. 2000)("In discerning the reach of the policy, we consider any limiting construction which the school district has given the policy.")(citing Osborne v. Ohio, 495 U.S. 103, 120 & n.14 (1990)).[111]  Roemer's own cases apply a limiting construction to university policies, too.  See Saxe, 240 F.3d at 215 (determining whether the policy at issue is susceptible to a limiting construction); DeJohn, 537 F.3d at 318 (same); Bair, 280 F.Supp. 2d at 369 (same).  In light of this well-settled principle, the Court is mindful that its job is not to go out of its way to construe the policies at issue here in an aggressive and broad way that pushes them closer to the Constitutional line.

### C.    ARP 3.80 IS NOT UNCONSTITUTIONALLY VAGUE.

ARP 3.80 is not unconstitutionally vague, pursuant to the loose requirements of the void-

---

[111]Notably, both Final Decisions' conclusions of law interpret ARP 3.25 to impose a reasonable person requirement:

> To determine if conduct qualifies as "sexual harassment" there are a number of factors that an institution may consider.  The elements of severity, pervasiveness, and objective offensiveness must be evaluated in light of the known circumstances and depend on the facts of each situation, but must be determined from the perspective of a ***reasonable person*** standing in the shoes of the complainant.

Buskirk Final Decision at 16 (bold and italics in original).  See Schweiger et al. Final Decision at 7 (restating this quote).  Ms. Archuleta-Staehlin's interpretation of ARP 3.25 is not dispositive, but it adds force to the notion that the policy is susceptible to a limiting construction.

for-vagueness doctrine in the civil context. Roemer's argument focuses in particular on the phrase "other harm" in ARP 3.80 Part A(2)'s definition of bullying. See Motion at 14. According to Roemer, ARP 3.80 gives NMSU "administrators unbridled discretion to punish whatever expression" they wish to punish. Motion at 13. Contrary to this argument, ARP 3.80 "clears the extremely low bar that the void-for-vagueness doctrine sets for non-penal statutes." Griffin v. Bryant, 30 F.Supp. 3d at 1175. "To find a civil statute void for vagueness, the statute must be 'so vague and indefinite as really to be no rule or standard at all.'" Seniors C.L. Ass'n, Inc. v. Kemp, 965 F.2d 1030, 1036 (11th Cir. 1992)(quoting Boutilier v. INS, 387 U.S. at 123). "Civil provisions need provide only 'intelligible benchmark[s]' to survive a void-for-vagueness challenge." Griffin v. Bryant, 30 F.Supp. 3d 1139, 1174 (D.N.M. 2014)(Browning, J.)(quoting K-S Pharmacies, Inc. v. AM. Home Prods. Corp., 962 F.2d 728, 732 (7th Cir. 1992)(Easterbrook, J.)).

ARP 3.80 penalizes only conduct and speech that significantly and adversely impacts student or faculty's academic and professional life. See ARP 3.80 Part 6(C). The "applicability or non-applicability," Griffin v. Bryant, 30 F.Supp. 3d at 1175, of ARP 3.80 is clear in many examples; to take just a few, forced alcohol consumption in a daily fraternity or sorority hazing ritual, committing an act of violence against another student, stealing another student's computer, or screaming obscenities in someone's face each time they pass you on campus all would violate ARP 3.80. A reasonable person would be able to predict that these actions would interfere significantly and adversely with a student's academic performance pursuant to ARP 3.80 Part 4(A) and Part 6(C). Accordingly, ARP 3.80 is not void for vagueness. See West v. Derby Unified Sch. Dist. No. 260, 206 F.3d at 1368(stating, as to a void for vagueness challenge, "'[g]iven the school's need to be able to impose disciplinary sanctions for a wide range of unanticipated conduct disruptive of the education process, . . . school disciplinary rules need not be as detailed as a

criminal code'")(quoting <u>Fraser</u>, 478 U.S. at 686)(brackets and ellipses in <u>West v. Derby Unified</u>

<u>Sch. Dist. No. 260</u>, but not in <u>Fraser</u>).

### III.    MS. CASTILLE, ARVIZU, THE REGENTS BOARD, AND DELOVATO ARE ENTITLED TO SUMMARY JUDGMENT ON COUNT I'S DUE PROCESS <u>CLAIM</u>.

The Court turns now to the Defendants' two summary judgment motions.  First, the Court

addresses the Defendants' Count I Motion, which asks the Court to grant summary judgment to Ms.

Castille, Arvizu, the Regents Board, and DeLovato as to Roemer's § 1983 due process claim, Count

I of his Complaint.  <u>See</u> Count I Motion at 1.  As a threshold matter, because Roemer sues Ms.

Castille, Arvizu, and DeLovato in their individual capacities, the Court analyzes whether these three

defendants are entitled to qualified immunity.  In contrast, Roemer sues the Regents Board in its

official capacity; the qualified immunity doctrine, therefore, is inapplicable as to the Regents Board.

Accordingly, the Court's analysis proceeds in four sections.  The first three sections evaluates

whether Ms. Castille, Arvizu, the Regents Board, and DeLovato violate Roemer's due process

rights.  This is the first prong of the qualified immunity defense that Ms. Castille, Arvizu, and

DeLovato assert.  The fourth section evaluates whether Roemer's due process rights were

established clearly at the time of the alleged Constitutional violation, the second prong of the

qualified immunity defense.  The Court concludes that the four defendants do not violate Roemer's

Constitutional rights, and, even if they violated his rights, those rights were not established clearly

at the time of the alleged misconduct.

### A.    MS. CASTILLE DOES NOT VIOLATE ROEMER'S DUE PROCESS <u>RIGHTS</u>.

As to Count I's allegation that Ms. Castille deprived Roemer of his Constitutional right to

due process, the Court concludes that Ms. Castille's actions do not violate Roemer's Constitutional

rights.  Roemer contends that seven of Ms. Castille's actions "deprived him of a fair and impartial hearing,"  Count I Response at 8: (i) Ms. Castille encouraged the student-complainants to take action against Roemer; (ii) Ms. Castille coached the student-complainants on how to respond to Roemer's counterarguments; (iii) Ms. Castille allowed the student-complainants to submit "untimely" evidence at the Hearing, but barred Roemer from submitting evidence about Ms. Castille's bias; (iv) Ms. Castille prevented Roemer from gathering exculpatory evidence by placing conditions on his administrative leave; (v) Ms. Castille denied Boecklen, Roemer's advisor at the hearing, access to training materials that Ms. Castille disseminated to the student-complainants' hearing advisors; (vi) Ms. Castille made sure her personal friend presided over the Hearing; and (vii) Ms. Castille refused to provide Roemer ARP 10.50's post-termination processes.  See Count I Response at 8 (citing Complaint ¶ 41, at 11-12; id. ¶ 60, at 16; id. ¶¶ 89-93, at 21-22; id. ¶¶ 75-77, at 19; id. ¶¶ 81-85, at 20-21; id. ¶¶ 94-96, at 22; and id. ¶¶ 109-112, at 25).  As an initial matter, the pleadings are not evidence, and Roemer cannot meet his burden of production at the summary judgment stage by citing to his Complaint.  See Kannady v. City of Kiowa, 590 F.3d 1161, 1169 (10th Cir. 2010)("If the movant carries this initial burden, the nonmovant may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."); Salehpoor v. Shahinpoor, 358 F.3d 782, 786 (10th Cir. 2004)("Reference to facial assertions in a complaint are not sufficient to overcome Rule 56 summary judgment when the record as a whole reveals that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.").  Accordingly, the Court considers only those of Roemer's assertions that the undisputed facts in the Factual Background Section support and does not consider his assertions that rely on allegations appearing only in the Complaint.  See Nilson v. Peerless Indem. Ins. Co., 484 F. Supp. 3d 1050,

1086 (D.N.M. 2020)(Browning, J.)("'Furthermore, it is not the Court's responsibility to scour the parties' evidence and filings to determine what facts are in dispute and what facts will defeat a motion for summary judgment.'")(quoting Coffey v. United States, 870 F. Supp. 2d 1202, 1209 (D.N.M. 2012)(Browning, J.)).  The three allegations that the undisputed facts support are: (i) Ms. Castille does not permit Roemer to gather exculpatory evidence; (ii) Ms. Castille helps ensure that her friend and former colleague presides over Roemer's hearing; and (iii) Ms. Castille does not offer Roemer the opportunity to proceed with an appeal pursuant to ARP 10.50.

Before turning to Roemer's first allegation as to Ms. Castille, the Court lays the groundwork for the due process analysis.  Roemer was a tenured professor.  See supra, at 4.  He possesses, therefore, a "property interest deserving of procedural due process protections." Tonkovich, 159 F.3d at 517 (citing Brenna v. S. Colo. State Coll., 589 F.2d 475, 476 (10th Cir.1978); and Bd. of Regents v. Roth, 408 U.S. 564, 576-77 (1972)).  The "fundamental requisites of due process consist of notice and an opportunity to be heard at a meaningful time and in a meaningful manner." Turney v. FDIC, 18 F.3d 865, 868 (10th Cir. 1994).  To determine whether Roemer is entitled to additional process, pursuant to the Mathews test, the Court

> must balance three factors: (1) the private interest that will be affected by the official action, (2) the probable value, if any, of additional or substitute procedural safeguards, and (3) the government's interest, including the fiscal and administrative burden, that the additional or substitute procedural requirements would entail.

Watson ex rel. Watson v. Beckel, 242 F.3d 1237, 1240 (10th Cir. 2001)(citing Mathews, 424 U.S. at 334-35).  See Caldwell, 510 F.Supp.3d at 1044 (analyzing a university student's due process claim using the Mathews test).  Mathews instructs, moreover, that due process "is flexible and calls for such procedural protections as the particular situation demands." Mathews, 424 U.S. at 334.

Roemer's first due process allegation that the undisputed facts support is that Ms. Castille

admonished Roemer when he contacted witnesses identified in a draft investigative report; her admonition, Roemer contends, prevented Roemer from gathering exculpatory evidence. See Final Report at 8.[112]  Roemer's contention that Ms. Castille's admonition violates his due process rights lacks a sound basis in the applicable law and the relevant facts.  The Tenth Circuit rejects a nearly identical argument in Tonkovich.  In Tonkovich, a law student notifies her law school that a tenured law professor "had engaged in a sexual act with her after discussing her grades."  159 F.3d at 510.  Subsequently, other law students submit additional complaints about the professor's alleged sexual misconduct.  See 159 F.3d at 512.  The university interviews these students and issues a formal complaint against the professor, but when the professor requests copies of the student-complainants' written statements, the university refuses to provide the statements to him. See id.  Instead, the university provides the professor with summaries of the student-complainants' statements.  See id.  It also withholds a tape-recorded interview between university officials and one of the law students from the professor.  See id.  After holding a hearing and giving the professor the opportunity to cross-examine witnesses, the university fires the professor.  See Tonkovich, 159 F.3d at 512-14.

In his subsequent lawsuit against the university, the professor asserts that the university violates his due process right to cross-examine witnesses by refusing to provide him with the tape-recording and the student-complainants' statements.    See 159 F.3d at 520.  The professor also

---

[112]The only document in the record that supports Roemer's assertion that Ms. Castille placed conditions on his administrative leave which prevented him from gathering exculpatory evidence is the Final Report, but the Final Report does not state that Ms. Castille, specifically, admonished Roemer for speaking with witnesses.  See Final Report at 8 ("On or about May 7, 2021, OIE received reports that Respondent had been contacting witnesses identified in the draft report.  Respondent was admonished and directed to cease having contact with them.").  To be generous to Roemer, the Court proceeds with the analysis as if Ms. Castille directed Roemer to stop contacting witnesses.

alleges "that all of the complainants . . . refused to allow" the professor's "attorney to interview them prior to the hearing." 159 F.3d at 512. The Tenth Circuit concludes that these assertions do not constitute a due process violation. See Tonkovich, 159 F.3d at 520-21. According to the Tenth Circuit, "[t]he fact that Professor Tonkovich was unable to discover every piece of evidence is of no consequence as a matter of procedural due process. The Due Process Clause does not guarantee that parties to an adversarial proceeding may discovery every piece of evidence they desire." Tonkovich, 159 F.3d at 520 (Court adds brackets). The professor's assertion that he could not interview the witnesses before the hearing fares no better. Because the professor has the opportunity to cross-examine witnesses, the Tenth Circuit concludes that his lack of "access to several of the witnesses' prior statements" does not constitute a due process violation. 159 F.3d at 520. Finally, the Tenth Circuit observes that the university provides the professor with summaries of the student-complainants' statements, and the professor does not cite "clearly established legal authority for the proposition that the Due Process Clause requires that he be allowed to interview adverse witnesses prior to a hearing." Tonkovich, 159 F.3d at 520-21.

Pursuant to Tonkovich, Ms. Castille does not violate Roemer's due process rights by barring him from contacting witnesses before his pre-termination hearing. Many, if not all, of the Tenth Circuit's justifications for its ruling in Tonkovich are present here. First, in Tonkovich, the university provides the professor with summaries of the witnesses' statements; here, NMSU provides Roemer with a nearly thirty-page report of the OIE's investigation that includes summaries of the investigator's conversations with various witnesses. See Final Report at 8 (beginning a section with the heading "Summary of the Relevant Evidence"). In addition to summarizing the evidence, the Final Report evaluates the witnesses' and Roemer's credibility by examining inconsistences in their statements and possible sources of bias. See Final Report at 20.

Second, in <u>Tonkovich</u>, the professor has the opportunity to cross-examine witnesses at the hearing; Roemer also has the opportunity to cross-examine witnesses at his pre-termination hearing. <u>See supra</u>, at 20. Even though the <u>Tonkovich</u> professor may not have been able to cross the witnesses exactly as he would have liked, an imperfect cross-examination does not violate due process. <u>Tonkovich</u>, 159 F.3d at 520. Likewise, here: Roemer may wish that he could have personally interviewed every witness before the hearing to aid his cross-examinations, but Ms. Castille does not violate his due process rights by forbidding him to do so. NMSU gives Roemer the Final Report, which provides Roemer with plenty of material from which to build his cross-examinations. Because the Tenth Circuit rejects nearly identical arguments in <u>Tonkovich</u>, the Court concludes that Ms. Castille does not violate Roemer's due process rights when she prevents him from speaking with witness before the hearing.

Roemer's second due process allegation as to Ms. Castille that the undisputed facts support is that Ms. Castille installed a personal friend and former of colleague of hers as the hearing officer at Roemer's hearing, which, according to Roemer, "significantly interfered with" the tribunal's impartiality. Count I Response at 8. In the due process context, courts presume "honesty and integrity in those serving as adjudicators." <u>Withrow v. Larkin</u>, 421 U.S. 35, 47 (1975). It is not easy for plaintiffs to overcome this presumption: "'[T]here must be some substantial countervailing reason to conclude that a decisionmaker is actually biased.'" <u>Riggins</u>, 572 F.3d at 1112 (quoting <u>Hicks v. City of Watonga</u>, 942 F.2d 737, 746-47 (10th Cir. 1991))(Court adds brackets). An administrator's actual bias may manifest as a "'personal or financial stake'" in a hearing's outcome, or as "'personal animosity'" towards the plaintiff. <u>Cypert v. Indep. Sch. Dist. No. I-050 of Osage Cnty.</u>, 661 F.3d 477, 481 (10th Cir. 2011)(<u>"Cypert"</u>)(quoting <u>Hortonville Joint Sch. Dist. No. 1 v. Hortonville Educ. Ass'n</u>, 426 U.S. 482, 491-92 (1976)). Roemer does not

contend that Ms. Archuleta-Staehlin has a financial interest in his hearing's outcome, so the appropriate line of inquiry focuses on whether she possessed personal animosity or bias towards him.

"Personal bias may be shown by prior statements going to the merits or animus that establish the decisionmaker cannot be fair." Riggins, 572 F.3d at 1113.  For example, in McClure v. Independent School District Number 16, 228 F.3d 1205 (10th Cir. 2000)("McClure"), the Tenth Circuit reverses the district court's grant of qualified immunity to the school-district defendant when two school-board adjudicators "publicly stated their intent to terminate Mrs. McClure's employment prior to the hearing at which the matter of her termination was to be decided."  228 F.3d at 1206.  Such statements, according to the Tenth Circuit, "are evidence of a biased tribunal." McClure, 228 F.3d at 1206.

Other courts hold that an adjudicator is impermissibly biased when the adjudicator's public statements reflect a more general personal animosity towards the plaintiff, and do not address the case's merits, specifically.   For example, in Hudson v. American Federation of Government Employees, 292 F.Supp. 3d 145 (D.C. Dist. 2017)(Boasberg, J.)("Hudson"), a union committee holds a misconduct hearing and removes a union official from office pursuant to the hearing's findings; after the hearing, however, one of the committee-members writes a tweet accusing the plaintiff "of being a 'Master Grifter that can blow $800k overbudget [sic] and accuse others of fiscal irresponsibility.'"  292 F. Supp. 3d at 155 (quoting the record)(brackets in Hudson).  The committee-member who sends this tweet, moreover, had filed previously an internal complaint against the plaintiff, which the union eventually dismissed as baseless.  See 292 F. Supp. 3d at 155.  The Hudson court deems this evidence "probative of bias" and orders the union to reinstate the plaintiff.  See 292 F. Supp. 3d at 155.

Roemer does not point to any record evidence that falls in either category of impermissible adjudicator bias.  First, Roemer does not point to any evidence tending to show that Ms. Archuleta-Staehlin made statements before the hearing that prejudge the merits of Roemer's case.  Cf. Staton v. Mayes, 552 F.2d 908, 914 (10th Cir. 1977)("The firm public statements before the hearing by defendant Mayes for the removal of Dr. Staton, and the discussions by defendants Moore and Wade as admitted, reveal a tribunal not meeting the demands of due process for a hearing with fairness and the appearance of fairness.")(citing Cinderella Career & Finishing Schs., Inc. v. FTC, 425 F.2d 583, 590-92 (D.C. Cir. 1970); and Texaco, Inc. v. FTC, 336 F.2d 754, 759-60 (D.C. Cir. 1964), cert. granted, judgment vacated sub nom. FTC v. Texaco, Inc., 381 U.S. 739 (1965)(per curiam)).  Second, Roemer does not point to any evidence tending to show that Ms. Archuleta-Staehlin disparaged, maligned, or otherwise spoke ill of him before or after the hearing.   Cf. Schonfeld v. Penza, 360 F. Supp. 1228, 1238 (S.D.N.Y. 1972)(Brieant, J.)(finding likelihood of success on the merits as to a bias claim when an adjudicator writes an article calling the plaintiff "false, dishonorable, and immoral"), aff'd, 477 F.2d 899, 904 n.8 (2d Cir. 1973)("In view of the intense politicalization of the Local, it would be almost impossible to find an impartial trial board from the membership.").

Roemer's core impartiality argument does not focus directly, however, on Ms. Archuleta-Staehlin; he focuses, instead, on Ms. Castille's alleged bias towards him and how that bias allegedly infects Ms. Archuleta-Staehlin.  According to Roemer, Ms. Castille's statements to the student-complainants during Ms. Castille's interviews with them demonstrate Ms. Castille's animosity towards Roemer.  In Schweiger's interview, Ms. Castille states that Roemer "thinks he's untouchable." Supra, at 15.  In Salas' interview, Ms. Castille states that "the question is, when can we stop letting Gary be Gary at New Mexico State University."   Supra, at 14.  In Buskirk's

interview, Ms. Castille states that it is "likely" that Roemer will face consequences from Buskirk's complaint. Supra, at 15. These statements support Roemer's contention that Ms. Castille dislikes him and hopes that the disciplinary proceedings will result in his departure from NMSU.

Pursuant to Tenth Circuit precedent, however, a non-adjudicator's alleged bias is "irrelevant" to an impartiality-of-the-tribunal claim. Cypert, 661 F.3d at 481 (stating that, because a particular defendant "was not a decisionmaker, his impartiality is irrelevant" to the plaintiff's hearing). As a result, although Roemer can show that Ms. Castille hopes the university fires him, this evidence does not permit his due process claim to survive summary judgment, because he does not allege that Ms. Castille ever performs an adjudicatory function in his case. Ms. Archuleta-Staehlin, not Ms. Castille, presides over the Hearing, and Ms. Archuleta-Staehlin, not Ms. Castille, recommends that NMSU fire Roemer. See supra, at 21; Schweiger et al. Final Decision at 8. As to Roemer's appeal, Arvizu, not Ms. Castille, denies Roemer's appeal. See supra, at 29. Roemer's theory of the case, moreover, is that Ms. Castille "acted as the equivalent of a (biased) prosecutor"; he describes Ms. Archuleta-Staehlin, in contrast, as "the decision maker." Count I Response at 10. Because the evidence does not tend to show that Ms. Castille acts as an adjudicator in Roemer's case, and Roemer does not contend that Ms. Castille acted as an adjudicator, Ms. Castille's dislike of Roemer is "irrelevant." Cypert, 661 F.3d at 481. See Mangels v. Pena, 789 F.2d 836, 838 (10th Cir. 1986)("[T]here must be some substantial countervailing reason to conclude that a decisionmaker is actually biased with respect to factual issues being adjudicated.")(citing Roberts v. Morton, 549 F.2d 158, 164 (10th Cir. 1976)).

Given that Ms. Castille's alleged bias as a non-adjudicator has no bearing on Roemer's impartiality claim, Roemer's remaining argument asks the Court to impute Ms. Castille's ill will towards him to Ms. Archuleta-Staehlin, by virtue of her personal and professional relationship

with Ms. Castille.  The undisputed facts show that: (i) at the time of the hearing, Ms. Archuleta-Staehlin is Ms. Castille's former colleague, see supra, at 21; (ii) Ms. Castille recommends to an NMSU colleague that NMSU should accept Ms. Archuleta-Staehlin's law firm's bid to serve as Hearing officers, see supra, at 12; (iii) Ms. Castille is friendly with Ms. Archuleta-Staehlin when Ms. Archuleta-Staehlin presides over Roemer's hearing, see supra, at 22; and (iv) Ms. Castille returns to work at the same law firm as Ms. Archuleta-Staehlin after leaving NMSU, see supra, at 22.  Again, "a person claiming bias on the part of an administrative tribunal must overcome a presumption of honesty and integrity in those serving as adjudicators."  Cypert, 661 F.3d at 481 (quoting Riggins, 572 F.3d at 1112).  To hold that the professional connections between the two women constitute a "substantial countervailing reason to conclude" that Ms. Archuleta-Staehlin was biased against Roemer,  Riggins, 572 F.3d. at 1112, would create a precedent without a limiting principle.  In a small State such as New Mexico, it is unremarkable that attorneys work with former colleagues in adversarial and non-adversarial professional settings.  If the professional friendship between Ms. Castille and Ms. Archuleta-Staehlin overcomes the presumption of integrity that courts afford to tribunals, any similar relationship could be subject to litigation.  The due process clause does not sweep this broadly.  Allowing Roemer's due process claim to proceed to a jury would set a conspiratorial precedent, pursuant to which professional collegiality masks a wink-and-nod scheme to rig the proceedings.  The Court declines to set such a precedent.

**B.    THE COURT DENIES ROEMER'S RULE 56(D) REQUEST, AND CONCLUDES THAT ARVIZU AND THE BOARD DO NOT VIOLATE ROEMER'S DUE PROCESS RIGHTS.**

At this juncture, the Court addresses Roemer's request for additional discovery pursuant to rule 56(d).  Roemer's counsel submits an affidavit requesting permission to depose Arvizu, Ms. Castille, DeLovato, and Ms. Archuleta-Staehlin regarding four topics: (i) "NMSU's post

termination process for Dr. Roemer and other faculty"; (ii) "the process by which Jacquelyn Archuleta-Staehlin was selected as the hearing officer for Dr. Roemer's case"; (iii) "the nature and extent of the personal and professional connection between" Ms. Castille and Ms. Archuleta-Staehlin; and (iv) "communications between" Ms. Castille and Ms. Archuleta-Staehlin "concerning" Roemer.  Declaration of Samantha K. Harris ¶ 22, at 4 (signed May 12, 2023), filed May 12, 2023 (Doc. 65-20)("Harris Decl.").  The Harris Decl. requests, moreover, "additional interrogatories and document requests concerning the handling of post-termination process in cases of faculty termination at NMSU."  Harris Decl. ¶ 23, at 4.  With regards to the relationship and communications between Ms. Castille and Ms. Archuleta-Staehlin, Roemer theory is that "it cannot be ruled out at this stage that there were significant ex parte communications between Defendant Castille and her friend Ms. Archuleta-Staehlin." Count I Response at 10.

The Court denies Roemer's rule 56(d) request.  Roemer has not "demonstrated with specificity the facts that additional discovery will yield and which are necessary to defend against" the Defendants' summary judgment motions. Stevenson v. City of Albuquerque, 446 F. Supp. 3d 806, 877 (D.N.M. 2020)(Browning, J.)("Stevenson").  To survive summary judgment, Roemer must prove that the Defendants violated his Constitutional rights and that his asserted rights are clearly established.  See Stevenson, 446 F. Supp. 3d at 877 (restating these requirements).  The discovery that Roemer seeks would not help him make these showings.  As to Roemer's request to discover information about Ms. Castille and Ms. Archuleta-Staehlin's relationship, the Harris Decl. stops short of saying what facts, precisely, Roemer anticipates discovering that would constitute a Constitutional violation, let alone one that is clearly established.  The Harris Decl. asserts that Ms. Castille "had a personal and professional relationship with the outside decision-maker . . . that significantly affected the fairness of the hearing."  Harris Decl. ¶ 18, at 3.  This

assertion is not specific enough to merit additional discovery.  In his many pages of briefing and pleadings, Roemer never avers what he believes transpired between Ms. Castille and Ms. Archuleta-Staehlin.  Roemer does not contend that Ms. Castille bribes Ms. Archuleta-Staehlin.  He does not contend that Ms. Castille goads Ms. Archuleta-Staehlin into making a statement regarding the case's merits before hearing the evidence.  The Court is left guessing.  About what the Court is certain, however, is that granting Roemer's request would set a precedent that, whenever a professional relationship and friendship between an investigator and a hearing officer exists, plaintiffs always would be entitled to conduct discovery to rule out the possibility of ex parte communications.  Contrary to Roemer's assertion that the rule 56(d) analysis "does not change merely because Defendants have raised a qualified immunity defense," Count I Response at 15, for better or worse, the qualified immunity doctrine exists, in part, to shield State officials from this kind of broad-reaching and intrusive discovery.  See Harlow v. Fitzgerald, 457 U.S. at 817 (discussing how broad-ranging discovery can be "peculiarly disruptive of effective government").

As to Roemer's second category of discovery requests pertaining to NMSU's post-termination process, the Court reaches the same conclusion.  In reaching this conclusion, the Court addresses the merits of Roemer's third contention as to Ms. Castille -- which is the same as his contention as to Arvizu -- regarding Roemer's post-termination process.  According to Roemer, even though ARP 10.50 entitles him to a post-termination hearing, Ms. Castille and Arvizu refuse to provide him with such a hearing.  See Count I Response at 11-12.   Roemer seeks to obtain, therefore, evidence whether the post-termination process he receives is "consistent with the post-termination process afforded to other tenured faculty" at NMSU.  Harris Decl. ¶ 14, at 3.

The problem is that Roemer does not explain how this evidence would allow him to survive summary judgment.  He does not cite to any legal authority holding that NMSU's allegedly uneven

application of its own rules constitutes a clearly established due process violation.  To the contrary, the Tenth Circuit has settled on the opposite approach: "[A] university's failure to follow its established guidelines in overseeing a grievance 'does not in and of itself implicate constitutional due process concerns.'"  Tonkovich, 159 F.3d at 522 (Court adds brackets)(quoting Purisch v. Tenn. Tech. Univ., 76 F.3d 1414, 1423 (6th Cir. 1996))(citing Jones v. City and Cnty. of Denver, 854 F.2d 1206, 1209 (10th Cir. 1988)).  The Tenth Circuit explains that arguments "whether statutes and regulations require a hearing" are "a red herring," because "the question raised in a procedural due process challenge is whether the level of process afforded to the [plaintiffs] passed constitutional muster, not whether [the defendants] followed statutes or regulations."  Ward v. Anderson, 494 F.3d 929, 935 (10th Cir. 2007)(Court adds brackets).  Accordingly, if Roemer's post-termination due process claim is to survive summary judgment, NMSU's alleged violation of its rules "'must result in a procedure which itself falls short of standards derived from the Due Process Clause.'"  Ward v. Anderson, 494 F.3d at 935 (quoting Hennigh v. City of Shawnee, 155 F.3d 1249, 1256 (10th Cir.1998))(citing Hulen v. Yates, 322 F.3d 1229, 1247 (10th Cir. 2003)("[O]nce the property right is established, it is purely a matter of federal constitutional law whether the procedure afforded was adequate.")).

Roemer's post-termination due process claim as to Arvizu and Ms. Castille lacks a sound basis in the applicable law: the Constitution does not require NMSU to provide Roemer additional post-termination process beyond his written appeal to Arvizu.  It follows that the evidence which Roemer seeks pursuant to rule 56(d) will not "better assist" him in defeating summary judgment and overcoming qualified immunity.  Stevens, 446 F. Supp. 3d at 878.  A "tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story."  Loudermill, 470 U.S. at

535.  Here, NMSU provided Roemer with written notice of the graduate students' complaints, see supra, at 17, an explanation of its evidence, in the form of the investigative summary, see supra, at 20, and an opportunity to present argument and cross-examine witnesses at the Hearing, see supra, at 20.  NMSU's pre-termination procedures satisfy Loudermill's requirements.  See Tonkovich, 159 F.3d at 526 ("A full-blown evidentiary hearing clearly meets the dictates of Loudermill.").  In light of the robust pre-termination process Roemer receives, the "importance of the procedures in the post-termination hearing is not as great": "simply giving the employee 'some opportunity' to present his side of the case 'will provide a meaningful hedge against erroneous action.'" Benavidez, 101 F.3d at 626 (quoting Loudermill, 470 U.S. at 543 n.8.).  See Flor, 469 F. Supp. 3d at 1156 ("'To evaluate the constitutionality of post-termination process,' the Court 'must view it in light of the pre-termination procedures it follows.'")(quoting Copelin-Brown v. N.M.  State Pers. Off., 399 F.3d at 1255).

Viewed in the light of Roemer's extensive pre-termination procedures, the post-termination procedures that NMSU affords him are Constitutionally adequate.  As to the first Mathews factor, Roemer has a "significant private interest in retaining employment." Benavidez, 101 F.3d at 626.  As to the second Mathews factor, the probable value of additional procedural safeguards, as the Court has discussed, Roemer receives "adequate, even extensive, pre-termination procedures." Benavidez, 101 F.3d at 626.  NMSU gives him notice of the charges, see supra, at 17, provides him with an extensive summary of the evidence, see supra, at 20, and gives him the opportunity to present evidence and cross-examine witnesses at the pre-termination hearing, see supra, at 20.  "Given these pre-termination procedures, the risk of an erroneous deprivation was minimized, tipping the balance in favor of a post-termination process in which [Roemer was] only entitled to 'some opportunity' to present [his] side of the case." Benavidez,

101 F.3d at 626 (no citation for quoted material)(Court adds brackets).

Here, Roemer receives this second opportunity to present his side of the case when NMSU permits him to submit a written appeal to Arvizu.  See supra, at 29.  The additional procedural safeguards that Roemer suggests, such as mandating that the post-termination decisionmaker, Arvizu, "personally hear from the parties or witnesses," Count I Response at 13, do not add much value to the decision-making process.  "The idea of conducting two identical hearings runs counter to traditional principles of adjudication."  Powell v. Mikulecky, 891 F.2d 1454, 1458 (10th Cir. 1989).  It would be odd to hold that due process requires a second round of fact-finding based on live testimony when the United States Courts of Appeals resolve cases after written submissions and oral argument -- or, in some cases, on the briefs alone.  See Oklahoma v. U.S. EPA, 93 F.4th 1262, 1262 n.* (10th Cir. 2024)("This case is therefore ordered submitted without oral argument"), cert. granted, 2024 U.S. LEXIS 4381 (2024).  Tenth Circuit precedent does not contain, moreover, a dual-hearing requirement.  To the contrary, the Tenth Circuit states: "To the extent the state provides more elaborate procedures prior to termination than are required under Loudermill, it need not duplicate them after termination."  Koessel v. Sublette Cnty. Sheriff's Dep't, 717 F.3d 736, 749 (10th Cir. 2013)(citing Benavidez, 101 F.3d at 626; Calhoun v. Gaines, 982 F.2d at 1476; and Powell v. Mikulecky, 891 F.2d at 1458).   This situation is present here.  NMSU's pre-termination procedures -- a robust evidentiary hearing -- surpass Loudermill's requirements.  The Constitution does not require NMSU to offer Roemer a second hearing involving live testimony.

In support of his contention that the written appeal is an inadequate post-termination process, Roemer points to Benavidez and Flor.  Neither case supports his contention.   In Benavidez, the Tenth Circuit rejects the former-employee-plaintiffs' argument that due process forbids their employer, the City of Albuquerque, from placing the burden of proof on them at their

post-termination hearing.  See 101 F.3d at 625.  The Tenth Circuit applies the Mathews test and concludes that, "[c]ombined with the City's elaborate pre-termination proceedings, the post-termination hearings," at which the employee-plaintiffs "could be represented by counsel, had the opportunity to present evidence, and were allowed to cross-examine witnesses," provides the employee-plaintiffs "with all the process they were due."  Benavidez, 101 F.3d at 627 (Court adds brackets).  Contrary to Roemer's contention, Benavidez does not hold that due process requires two robust evidentiary hearings pre- and post-termination.  Rather, Benavidez holds narrowly that when an employer provides "extensive" pre-termination process, the Constitution does not require allocating the burden of proof to the employer at the post-termination hearing.  See Benavidez, 101 F.3d at 627 ("Accordingly, Plaintiffs' procedural due process rights were not violated by the City requiring them to bear the burden of proof at their post-termination hearings.").  Roemer's contention that due process demands an in-person post-termination hearing with live testimony finds no support, therefore, in Benavidez.[113]

Flor also does not advance Roemer's contention.  In Flor, the University of New Mexico ("UNM") suspends the plaintiff-professor after giving the professor notice of the sexual-harassment charges against him -- by way of an interview with a university official -- and allowing

---

[113]Benavidez is a case where the employer's pre-termination procedures exceed what Loudermill requires: notice and some opportunity to be heard.  See Loudermill, 470 U.S. at 546 (describing the "essential requirements of due process" as "notice and an opportunity to be respond").  The employer in Benavidez does provide two hearings, a pre-deprivation hearing without cross-examination, where the plaintiffs could retain counsel, and a post-deprivation hearing, in which the plaintiffs could cross-examine witnesses and present evidence.  See Benavidez, 101 F.3d at 627.  By holding that the Constitution does not require the employer to provide additional procedural protections, the Tenth Circuit does not simultaneously raise the due process floor, such that future employers must match the procedures that the Benavidez employer provides.  Benavidez' holding that the employer's procedures are sufficient, but not necessary, does not advance Roemer's contention that dual evidentiary hearings are Constitutionally required.

him to respond in writing to a preliminary investigative report.  See Flor, 469 F.Supp. 3d at 1151.

After his suspension comes into effect, the professor attends a hearing before a peer-review board,

during which he is "'permitted to present evidence and witnesses, testify, and cross-examine

witnesses against him.'"  Flor, 469 F. Supp. 3d at 1156 (quoting the record).  The Honorable James

A. Parker, Senior United States District Judge for the District of New Mexico, rejects the

professor's contention that "he was entitled to greater post-deprivation protections because of the

limited pre-deprivation process he received."  469 F. Supp. 3d at 1155.  Senior Judge Parker writes:

"[T]he Court, having already found that Plaintiff likely received more pre-deprivation process than

is constitutionally required, believes that Plaintiff was entitled to something between a 'full-blown,

adversarial post-termination hearing,' and "'some opportunity'" to present his side of the case."

469 F. Supp. 3d at 1156 (quoting Calhoun v. Gaines, 982 F.2d at 1477; and Benavidez, 101 F.3d

at 626)(Court adds brackets).  The process that the professor receives, concludes Senior Judge

Parker, is Constitutionally adequate.  See 469 F. Supp. 3d at 1156.   Accordingly, Flor does not

state a requirement that a post-termination hearing requires live testimony and a second round of

factfinding.  Instead, Flor stands for the uncontroversial proposition that, when a plaintiff does not

receive a pre-termination evidentiary hearing, a post-termination evidentiary hearing satisfies due

process' requirements.

　　　　To sum up the second Mathews factor, Roemer does not articulate persuasively how, in

light of his pre-termination evidentiary hearing, additional post-termination procedures might

reduce the risk of error in the decision-making process.   The additional post-termination

procedures that Roemer proposes -- hearing live testimony from witnesses, see Count I Response

at 13 -- are duplicative of the procedures he has received already.  Tenth Circuit precedent suggests,

moreover, that due process does not require dual evidentiary hearings.  See Powell v. Mikulecky,

891 F.2d at 1458 ("The idea of conducting two identical hearings runs counter to traditional principles of adjudication."). The Court concludes, therefore, that the "probable value" of Roemer's suggested procedure -- in essence, another evidentiary hearing -- is low, because Roemer does not explain how additional factfinding would reduce the risk of an erroneous deprivation.

Finally, the Court turns to the third prong of the Mathews test, namely, the State's interest, and the "fiscal and administrative burdens" any additional procedures would impose. 424 U.S. at 335. Holding a second evidentiary hearing would impose a non-trivial administrative burden on NMSU. Requiring the university's chancellor to preside personally over a second evidentiary hearing necessitates a considerable investment in time. First, there is the time the chancellor spends presiding over the hearing. Second, there is the pre-hearing investment of time. If the chancellor is to preside over the hearing, he or she needs to have a plan about the hearing's structure, and how to handle any issues that arise, such as evidentiary objections. At the very least, the chancellor needs, in all likelihood, to sit down with an attorney to develop the contours of the adjudicator's role. It would make sense for the chancellor to review the pre-termination hearing's transcript, too. Reviewing the pre-termination hearing's transcript takes additional time, of course. All in all, requiring the chancellor to oversee personally a second evidentiary hearing each time a professor or student is terminated or expelled pursuant to the result of an earlier evidentiary hearing is a burden on NMSU.

Roemer makes much of the fact that NMSU's procedures provide, in some circumstances, for a post-termination appeal in front of a faculty appeals board. See NMSU ARP 10.50 - Faculty Alleged Misconduct Investigation, Discipline, and Appeals Process, Part 14, filed May 12, 2023 (Doc. 65-15)("ARP 10.50"). Indeed, Roemer emails Ms. Castille requesting an ARP 10.50 appeal. See supra, at 30. The fact remains, however, the robust pre-termination evidentiary hearing

Roemer receives necessarily relaxes NMSU's post-termination Constitutional obligations. ARP 10.50's post-termination procedures contemplate an evidentiary hearing with cross-examination. But this post-termination hearing is tailored to ARP 10.50's pre-termination procedures, which are less robust than the pre-termination hearing Roemer receives. ARP 10.50 Part 13(C) states that an "informal fact finding hearing shall be heard by either the dean or by the Dean's Advisory Committee." ARP 10.50 Part 13(C). ARP Part (C)(4), entitled "Conduct of the pre-Determination Hearing," states:

> At the pre-determination hearing, the faculty member will be given the opportunity to respond to the charges and to the evidence, including the submission of documentary and other evidence, such as any witness statements collected. In the event the faculty members informs the dean in advance of the hearing that an NMSU employee is a necessary witness and will not cooperate in providing a statement, NMSU will make arrangements for the witness to be available either in person or through other telephonic or technological means.

ARP 10.50 Part 13(C)(4). These procedures do not contemplate a pre-termination hearing featuring live testimony and cross-examination, like the one that Roemer receives. Instead, Part 13(C)(4) provides for a hearing conducted on the papers, specifically, "documentary and other evidence, such as any witness statements collected." ARP 10.50 Part 13(C)(4). Only if a witness refuses to provide a statement will NMSU arrange "for the witness to be available in person." ARP 10.50 Part 13(C)(4). It makes sense, therefore, that the subsequent appeal pursuant to ARP 10.50 Part 14(D)(9) provides for live witness testimony. See ARP 10.50 Part 14 (D)(9). ("Witnesses shall be excluded from the hearing except to provide their testimony.").

Due process does not entitle Roemer to mix and match ARP 10.50's post-termination procedures, which are tailored to a less protective pre-termination hearing, with his robust pre-termination procedures. NMSU allowed Roemer to cross-examine the witnesses against him before NMSU fired him, which is more than what Loudermill and ARP 10.50 Part 13(C)(4)

require.  Under these circumstances, NMSU's refusal to give Roemer a second evidentiary hearing

pursuant to ARP 10.50 does not violate the Constitution.  Accordingly, Arvizu and Ms. Castille

are entitled to summary judgment as to Roemer's procedural due process claim.[114]

## C.    DELOVATO DOES NOT VIOLATE ROEMER'S DUE PROCESS RIGHTS.

The final due process defendant is DeLovato, the OIE investigator who interviews

witnesses in the course of drafting the Final Report.  Roemer's claim against DeLovato also does

not survive summary judgment.  Roemer alleges that DeLovato "deprived Plaintiff of his clearly

established right to a fair and impartial process," because she denied him and his advisor "access

---

[114]In addition to Ms. Castille, DeLovato, and Arvizu, Roemer also names the Regents Board as a due process defendant.  See Complaint at 26.  Roemer sues the Regents Board in its official capacity as "a governmental entity."  Complaint ¶ 12, at 3.  In his Complaint, Roemer, requests injunctive relief in the form of reinstatement to his former position.  See Complaint ¶ vi, at 41.  Section 1983 permits Roemer to bring a cause of action for prospective injunctive relief against State officials, like the Regents Board, in their official capacities.  See Will v. Mich. Dept. of State Police, 491 U.S. 58, 71 n.10 (1989)("Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because "official-capacity actions for prospective relief are not treated as actions against the State.");  Meiners v. Univ. of Kan., 359 F.3d 1222, 1232 (10th Cir. 2004)("Reinstatement of employment is a form of prospective equitable relief that is within the doctrine of Ex parte Young.")(citing Doe v. Lawrence Livermore Nat. Lab., 131 F.3d 836, 839-41 (9th Cir.1997); and Elliott v. Hinds, 786 F.2d 298, 302 (7th Cir.1986)).

"It has long been settled," however, that "'[n]either states nor state officers sued in their official capacity are "persons" subject to suit under section 1983' for monetary damages."  Tufaro v. Okla. ex rel. Bd. of Regents of the Univ. of Okla., 107 F.4th 1121, 1135 (10th Cir. 2024)(Federico, J. ))("Tufaro")(quoting Duncan v. Gunter, 15 F.3d 989, 991 (10th Cir. 1994.))(brackets in Tufaro, but not in Duncan v. Gunter).  Section 1983 does not permit Roemer, therefore, to seek money damages against the Regents Board.  See Tufaro, 107 F.4th at 1135 ("[The University of Oklahoma] is a state university created by state law, and '[o]ur cases have consistently found state universities are arms of the state.'")(quoting Watson v. Univ. of Utah Med. Ctr., 75 F.3d 569, 575 (10th Cir. 1996))(Court adds first brackets, second brackets in Tufaro, but not in Watson v. Univ. of Utah Med. Ctr.).  As to Roemer's reinstatement claim, the due process analysis is the same as the due process analysis regarding Ms. Castille and Arvizu.  Accordingly, the Regents Board is entitled to judgment as a matter of law on Roemer's § 1983 claim for injunctive relief based on due process violations.

to the evidence for two full weeks during which time the complainants and their advisors had access to such evidence." Count I Response at 13. First, Roemer does not explain how this delay prejudiced him. The hearing took place on August 17, 2021, months after DeLovato's delay. <u>See</u> <u>supra</u>, at 21. The Final Report is not so voluminous that a two-week delay implicates Roemer's Constitutional rights. Additionally, Roemer does not cite to any legal authority supporting his contention that a two-week delay in access to evidence violates the Constitution. The Tenth Circuit has concluded that there is no due process violation when a university refuses to provide a professor access to several witnesses' prior statements in preparation for a disciplinary hearing. <u>See</u> <u>Tonkovich</u>, 159 F.3d at 520. If denying a plaintiff access to evidence altogether does not violate due process, neither does DeLovato's delay in providing Roemer access to evidence. DeLovato is entitled, therefore, to summary judgment on Roemer's due process claim, because she does not violate his constitutional rights.

> **D.    EVEN IF MS. CASTILLE, ARVIZU, AND DELOVATO VIOLATE ROEMER'S DUE PROCESS RIGHTS, THOSE RIGHTS WERE NOT <u>CLEARLY ESTABLISHED</u>.**

Even if Ms. Castille, Arvizu, and DeLovato violate Roemer's Due Process rights, those rights were not established clearly at the time of the events. "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" <u>Holland ex rel.</u> <u>Overdorff v. Harrington</u>, 268 F.3d at 1186 (quoting <u>Saucier v. Katz</u>, 533 U.S. at 202)(alteration in <u>Holland ex rel. Overdorff v. Harrington</u>, but not in <u>Saucier v. Katz</u>). A reasonable official is on notice that his or her actions violate a clearly established right if precedent places the legal question "'beyond debate.'" <u>Reichle v. Howards</u>, 566 U.S. at 664 (quoting <u>Ashcroft v. al-Kidd</u>, 563 U.S.

at 741).  Accordingly, the relevant inquiry is whether there is a Supreme Court or Tenth Circuit case with facts similar enough to this case's facts[115] such that Ms. Castille, DeLovato, and Arvizu would be on notice that Roemer's post-termination appeal is Constitutionally insufficient process. See Green v. Padilla, 697 F.Supp 3d. 1115, 1197 (D.N.M. 2023)(Browning, J.)("It is not enough, however, to pull a right from case law and apply it to the facts at hand; the Supreme Court requires that courts connect the clearly-established-law analysis to the case's 'particularized' facts.")(quoting Anderson v. Creighton, 483 U.S. at 640).

Roemer does not point to a factually analogous Tenth Circuit or Supreme Court case that he contends establishes clearly that a post-termination evidentiary hearing must follow a full-blown evidentiary hearing.  See Green v. Padilla, 697 F. Supp 3d. at 1196 ("To overcome qualified immunity, the plaintiff must direct the Court to a specific Supreme Court or Tenth Circuit decision that clearly establishes the right at the time of the alleged misconduct.")(citing Mullenix v. Luna, 577 U.S. at 11; and Harlow v. Fitzgerald, 457 U.S. at 818).  He cites to Benavidez in support of his position.  See Count I Response at 12.  Benavidez is not sufficiently factually similar to this case's facts, however, to establish clearly Roemer's right to a more fulsome post-termination hearing.  In Benavidez, the fired employees receive a pre-termination hearing that includes the chance to respond to the allegations orally or in writing through counsel.  See 101 F.3d at 627.  As

---

[115]With regards to the Supreme Court's per curiam opinion in Taylor that introduces a lower bar for fact-to-fact similarity in the qualified-immunity context when government conduct is particularly egregious, the Defendants' conduct in this case does not approach the level of depravity the Taylor defendants display in locking an inmate in a freezing, feces-covered cell.  See Taylor, 592 U.S. at 8.  Accordingly, there is no need to apply the Taylor standard to any of the qualified-immunity analyses here.  See Frasier v. Evans, 992 F.3d at 1015 (noting that "under certain 'extreme circumstances' general constitutional principles established in the caselaw may give reasonable government officials fair warning that their conduct is constitutionally or statutorily unlawful")(quoting Taylor, 592 U.S. at 9).

to the post-termination process, the fired employees also receive a post-termination hearing, at which, through counsel, they are allowed to present evidence and cross-examine witnesses.  See 101 F.3d at 627.  After weighing the Mathews factors, the Tenth Circuit concludes that the employer does not violate the fired employees' due process rights by placing the burden of proof on them at the post-termination hearing, stating: "Combined with the City's elaborate pre-termination proceedings, the post-termination hearings provided Mr. Smith and Mr. Benavidez with all the process they were due."  101 F.3d at 627.

Benavidez does not establish clearly that NMSU owes Roemer additional post-termination process.  The holding is that the combination of the two hearings' procedures satisfies due process requirements.  Roemer receives more process in his pre-termination hearing than the Benavidez plaintiffs receive, however.  NMSU allows Roemer to cross-examine witnesses at his pre-termination hearing, which is perhaps the most important procedural protection an employer can provide.  See Salazar v. City of Albuquerque, No. CIV 10-0645 JB/ACT, 2014 WL 6065603, at *45 (D.N.M. Oct. 27, 2014)(Browning, J.)("The Tenth Circuit has held that 'procedural due process often requires confrontation and cross-examination of those whose word deprives a person of his or her livelihood,' but that it is 'not necessary in every case.'")(quoting Nard v. City of Okla. City, 153 F. App'x 529 (10th Cir.2005)).  Given this significant difference between the pre-termination hearing in Benavidez and Roemer's pre-termination hearing, Benavidez' facts are not sufficiently similar to this case's facts to establish clearly that due process requires Roemer to receive a post-termination evidentiary hearing.

As to Supreme Court precedent, Roemer also does not contend that there is a Supreme Court case that is factually similar to this case and establishes clearly his right to a post-deprivation evidentiary hearing.  The most factually similar Supreme Court case is Loudermill, but even this

case is materially factually different.  In <u>Loudermill</u>, two fired public employees receive no opportunities to respond to the charges against them before termination.  <u>See</u> 470 U.S. at 535.  In holding that the Constitution requires public employers to provide an employee with for-cause protection with "some opportunity for the employee to present his side of the case," the Supreme Court notes that its decision rests, in part, on the availability of a post-termination hearing pursuant to State law.  470 U.S. at 543.  <u>See id.</u> at 546.  In contrast, NMSU gives Roemer opportunities that the <u>Loudermill</u> defendants unconstitutionally withhold: Roemer receives a pre-termination evidentiary hearing, and a written post-termination appeal.  Accordingly, <u>Loudermill</u> is too factually dissimilar to establish clearly the contours of Roemer's post-termination process after his initial pre-termination evidentiary hearing.

## IV.    THE REGENTS BOARD AND ARVIZU ARE ENTITLED TO SUMMARY JUDGMENT ON COUNTS II AND III, BECAUSE ARP 3.25 AND 3.80 FACIALLY ARE CONSTITUTIONAL.

In Counts II and III of his Complaint, Roemer asks the Court to issue declaratory and injunctive relief against Arvizu and the Regents Board on the grounds that they promulgate and administer two unconstitutional policies:  ARP 3.25 and ARP 3.80.  <u>See</u> Complaint ¶¶ 124-145, at 27-31.  The allegation as to Arvizu receives a qualified immunity analysis, because Roemer sues him in his official and individual capacities.  The allegation as to the Regents Board does not receive a qualified immunity analysis, because Roemer sues the Regents Board in its official capacity.

### A.    ARVIZU IS ENTITLED TO SUMMARY JUDGMENT AS TO COUNTS II AND III, BECAUSE ARP 3.25 AND ARP 3.80 DO NOT VIOLATE ROEMER'S CONSTITUTIONAL RIGHTS.

The Court discusses Roemer's arguments as to ARP 3.25 and ARP 3.80 in Parts I and II of the analysis.  In these Parts, the Court holds that ARP 3.25 and ARP 3.80 facially are

Constitutional. Accordingly, Arvizu does not violate Roemer's Constitutional rights, because the policy he enforces is Constitutional.

**B.    ARVIZU IS ENTITLED TO QUALIFIED IMMUNITY AS TO COUNTS II AND III, BECAUSE, EVEN IF ARP 3.25 AND ARP 3.80 ARE UNCONSTITUTIONAL, THEIR UNCONSTITUTIONALITY WAS NOT ESTABLISHED CLEARLY WHEN ARVIZU TERMINATED ROEMER.**

Even if ARP 3.25 and ARP 3.80 are facially unconstitutional, Arvizu is entitled to qualified immunity. "To overcome qualified immunity, the plaintiff must direct the Court to a specific Supreme Court or Tenth Circuit decision that clearly establishes the right at the time of the alleged misconduct." See Green v. Padilla, 697 F.Supp 3d. at 1196)(citing Mullenix v. Luna, 577 U.S. at 11; and Harlow v. Fitzgerald, 457 U.S. at 818). Roemer does not point to a Tenth Circuit case or a Supreme Court case that he contends is factually similar to this case's facts to establish clearly ARP 3.25's and ARP 3.80's unconstitutionality. The Court has also been unable to locate a Tenth Circuit case that addresses the Constitutionality of a university speech code. See Hunt v. Bd. of Regents of Univ. of N.M., 792 Fed. App'x. 595, 603-04 (10th Cir. 2019)(Holmes, J.)(unpublished)("Like the Supreme Court, our student speech cases mainly concern on-campus speech by K-12 students.").

As to the Supreme Court, while not factually similar to this case's facts, the most relevant precedents are Tinker and Fraser. Neither Tinker nor Fraser analyzes a facial challenge to a university speech code, however. Accordingly, Tinker and Fraser are too factually dissimilar to establish clearly ARP 3.25's and ARP 3.80's unconstitutionality. First, Tinker sets forth vague standards regarding permissible regulation of student speech. See Tinker, 393 U.S. at 513 (stating that schools have a particular interest in regulating speech that "materially disrupts classwork or involves substantial disorder or invasion of the rights of others"). These standards do not place

- 194 -

the unconstitutionality of any particular university speech code "'beyond debate.'"  <u>Thompson v.</u> <u>Ragland</u>, 23 F.4th 1252, 1255 (10th Cir. 2022)(quoting <u>District of Columbia v. Wesby</u>, 583 U.S. 48, 63 (2018)).

Second, <u>Fraser</u>'s facts are too dissimilar to this case's facts so as to establish clearly that NMSU's speech code regulating sexual conduct is unconstitutional.  <u>Fraser</u> permits public schools to discipline students for "offensively lewd and indecent" speech.  478 U.S. at 685.  The Supreme Court has not applied <u>Fraser</u> in the public university setting, but neither has it held definitively that <u>Fraser</u> is limited to public K-12 schools.  ARP 3.25 pertains to sexual conduct and implicates <u>Fraser</u>.  In the qualified immunity context, <u>Fraser</u> may well convince a reasonable university official that regulating sexual speech on campus is Constitutionally permissible.  <u>Fraser</u> does not establish clearly, therefore, that ARP 3.25 is unconstitutionally overbroad.

Finally, Roemer does not point to a factually similar case in the Tenth Circuit or the Supreme Court, moreover, that he contends establishes clearly ARP 3.80's unconstitutionality. <u>See</u> <u>Green v. Padilla</u>, 697 F.Supp 3d. at 1196 ("To overcome qualified immunity, the plaintiff must direct the Court to a specific Supreme Court or Tenth Circuit decision that clearly establishes the right at the time of the alleged misconduct.")(citing <u>Mullenix v. Luna</u>, 577 U.S. at 11; and <u>Harlow</u> <u>v. Fitzgerald</u>, 457 U.S. at 818).  <u>Chicago v. Morales</u>, 527 U.S. 41, while not factually similar to this case's facts, is a relevant precedent regarding the void-for-vagueness doctrine.  <u>Morales</u> addresses a statute that "prohibits 'criminal street gang members' from 'loitering' with one another or with other persons in any public place."  527 U.S. at 45-46 (no citation for quoted material). The Supreme Court declares the law void for vagueness, reasoning that "the vagueness that dooms this ordinance is not the product of uncertainty about the normal meaning of 'loitering,' but rather about what loitering is covered by the ordinance and what is not."  527 U.S. at 57.  The law, notes

the Supreme Court, fails "to distinguish between innocent conduct and conduct threatening harm." 527 U.S. at 57.

The ordinance's language in Morales is not sufficiently similar to ARP 3.80's language so as to establish clearly that a university speech code is unconstitutionally vague when it prohibits acts that are "sufficiently severe, pervasive or persistent so as to unreasonably interfere with or limit a person's ability to participate in academic opportunities or activities." ARP 3.80 Part 2(C). ARP 3.80 articulates "'an imprecise but comprehensible normative standard'" and clarifies this standard by providing a non-exclusive list of conduct that violates the rule. Morales, 527 U.S. at 60 (quoting Coates v. Cincinnati, 402 U.S. 611, 614 (1971)("Coates"). The examples demonstrate that ARP 3.80 targets "conduct threatening harm," such as physical abuse -- beating, whipping, branding or pushing -- forced consumption of liquor, and theft. ARP 3.80 Part 4(A). Unlike the ordinacne in Morales, which does not specify a standard of conduct, see 527 U.S. at 60 (quoting Coates, 402 U.S. at 614), ARP 3.80 gives students "adequate notice" that NMSU will not tolerate specific egregiously disruptive conduct, 527 U.S. at 60.

Finally, as to Tenth Circuit precedent, not only does Roemer not cite to a single factually analogous case where the Tenth Circuit has declared a statute void for vagueness, the Court could not locate, in its own research, a factually similar Tenth Circuit case. See Green v. Padilla, 697 F. Supp 3d. at 1196 ("To overcome qualified immunity, the plaintiff must direct the Court to a specific Supreme Court or Tenth Circuit decision that clearly establishes the right at the time of the alleged misconduct.")(citing Mullenix v. Luna, 577 U.S. at 11; and Harlow v. Fitzgerald, 457 U.S. at 818). The most factually similar Tenth Circuit case the Court could locate is Doctor John's, Inc., v. City of Roy, 465 F.3d 1150, 1158 (10th Cir. 2006), in which the Tenth Circuit addresses a vagueness challenge to an adult-novelty-store licensing ordinance. See 465 F.3d at 1158. The

ordinance applies to a commercial establishment that has a "significant or substantial portion of its stock-in-trade" in various media "characterized by their emphasis upon the exhibition or description of specified sexual activities or specified anatomical areas." 465 F.3d at 1158. A novelty store challenged the ordinance's Constitutionality, alleging that the language specifying the quantity of stock which triggers the licensing regime and the language specifying the stock which triggers the licensing regime renders the ordinance unconstitutionally vague. See 465 F.3d at 1158. The Tenth Circuit rejects both arguments. See 465 F.3d at 1158, 1160. First, the Tenth Circuit reasons that "there are myriad instances in which" a business would be certain that its stock triggers the ordinance's quantity provision. See 465 F.3d at 1158. Even though the "significant or substantial" standard "gives officials some discretion over which businesses" must comply with the licensing regime, "it does not vest the sort of 'virtually complete discretion' that has formed the basis for facial vagueness attacks." 465 F.3d at 1158 (quoting Kolender v. Lawson, 461 U.S. 352, 358 (1983)). Second, the Tenth Circuit makes quick work of the challenge to the "characterized by an emphasis" language, concluding that, "in most of the ordinance's applications, a business will have clear notice as to what the material in its store emphasizes." 465 F.3d at 1160.

Doctor John's, Inc., v. City of Roy's facts are not sufficiently similar to this case's facts to put a reasonable official on notice that ARP 3.80 is unconstitutional. In most of ARP 3.80's applications, a student or faculty member will know what actions are so "severe, pervasive or persistent," ARP 3.80 Part 2(C), to "significantly and adversely" impact a person's education at MSU, ARP 3.80 Part 6(C). This second phrase in Part 6(C) forecloses the notion that NMSU administrators have nearly unlimited enforcement discretion, because ARP 3.80 violations must tie into a particularly severe educational impact. Anyone affiliated with NMSU would know,

moreover, that engaging in name calling, threats, physical abuse, theft, and coerced violations of state or federal laws, see ARP 3.80 Part 4(A), violates university rules.  Roemer does not point to any Tenth Circuit cases that cut against this conclusion.  Accordingly, Arvizu is entitled to qualified immunity as to Roemer's vagueness challenge to ARP 3.80: Not only is there no Constitutional violation, even if there was, ARP 3.80's unconstitutionality was not clearly established at the time that Arvizu acted.

### C.    THE REGENTS BOARD IS ENTITLED TO SUMMARY JUDGMENT AS TO COUNTS II AND III, BECAUSE ARP 3.25 AND ARP 3.80 DO NOT VIOLATE ROEMER'S CONSTITUTIONAL RIGHTS.

As discussed in Parts I and II of the analysis, ARP 3.25 and ARP 3.80 facially are Constitutional.  Therefore, there is no Constitutional violation.  Accordingly, the Regents Board are entitled to summary judgment as to Counts II and III.

### V.    THE DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT -- AND, AS TO THOSE DEFENDANTS SUED IN THEIR INDIVIDUAL CAPACITIES, QUALIFIED IMMUNITY -- ON COUNT IV.

The Defendants are entitled to summary judgment -- and, as to each Defendant sued in their individual capacity, qualified immunity -- on Count IV's allegation that the Defendants violate Roemer's First Amendment rights by terminating him for engaging in purportedly protected speech.  Roemer's Complaint contends that his Blake Email is protected speech, but he does not specify other instances of his speech that he asserts are similarly protected.  See Complaint ¶ 148, at 31-32.  In the interest of thoroughness, this Part analyzes Roemer's speech that the two Final Decisions identify in their "Findings of Fact" and "List of Allegations" sections. Accordingly, there are four buckets of speech: (i) the Schweiger et al. Final Decision's Findings of Fact; (ii) the Buskirk Final Decision's Findings of Fact; (iii) the Schweiger et al. Final Decision's List of Allegations; and (iv) the Buskirk Final Decision's List of Allegations.  In each

of the four sections, the Court first concludes that there is no Constitutional violation, and, second, concludes that, even if there is a Constitutional violation, the scope of Roemer's First Amendment protections as a university professor was not established clearly at the time of the alleged misconduct.   Before turning to the analysis of the four buckets of speech, the Court addresses the governing legal framework in the following section.

### A.    THE **GARCETTI/PICKERING** FRAMEWORK APPLIES TO THE **SPEECH AT ISSUE.**

As an initial matter, the parties do not identify the correct legal standard governing Roemer's claim.   Roemer contends that he "engaged in constitutionally protected speech and has been subjected to numerous adverse employment actions -- including, ultimately, termination of his employment -- as a result."   Complaint ¶ 147, at 31.   This cause of action is a First Amendment retaliation claim, even though Roemer does not label his claim as a First Amendment retaliation claim.   The test governing the scope of public employees' First Amendment protections is the Garcetti/Pickering test.   See Tufaro, 107 F.4th at 1137 (applying "the Garcetti/Pickering test that 'governs First Amendment retaliation claims'")(quoting Nixon v. City & Cnty. of Denver, 784 F.3d 1364, 1367 (10th Cir. 2015)).   Roemer does not mention or engage with this framework,[116] but the Tenth Circuit consistently uses the Garcetti/Pickering framework to analyze cases in which public-university employees bring § 1983 claims against their employers for taking adverse employment actions against them that allegedly violate their First Amendment rights.   See Tufaro, 107 F.4th at 1137 (applying Garcetti/Pickering when a professor of medicine at the University of Oklahoma brings a § 1983 claim alleging that the university violates his First Amendment rights

---

[116]For their part, the Defendants refer briefly to the public-employee speech doctrine, see Counts II-IV QI Motion at 14, but argue primarily that ARP 3.25 and ARP 3.80 satisfy intermediate scrutiny, see Counts II-IV QI Motion at 9-10.

by refusing to renew his contract after he complains about misconduct at the university hospital); Joritz v. Gray-Little, 822 F. App'x 731 (10th Cir. 2020)(unpublished)(applying Garcetti/Pickering when a tenure-track professor at the University of Kansas brings a § 1983 claim alleging that the university violates her First Amendment rights by firing her after she complains about procedural irregularities in her tenure review); Singh v. Cordle, 936 F.3d 1022, 1033 (10th Cir. 2019)(applying Garcetti/Pickering when an assistant professor at Emporia State University brings a § 1983 claim alleging that the university violates his First Amendment rights by firing him after he alleges that his department is "a discriminatory workplace"); Peterson v. Williams, No. 20-4059, 2022 WL 1421959, at *3 (10th Cir. May 5, 2022)(unpublished)(applying Garcetti/Pickering when a tenured professor at Dixie State University brings a § 1983 claim alleging that the university violates his First Amendment rights by firing him after he criticizes a departmental leader).    Notwithstanding the parties' briefs, the Court analyzes Roemer's First Amendment § 1983 claim pursuant to the Garcetti/Pickering framework.

"As a public employee," Roemer "'enjoyed First Amendment rights, but not to the same extent as a private citizen.'"    Tufaro, 107 F.4th at 1137 (quoting Seifert v. Unified Gov't of Wyandotte Cnty., 779 F.3d 1141, 1151 (10th Cir. 2015)).    A public employee's First Amendment protections depend on "'a careful balance "between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."'"    Tufaro, 107 F.4th at 1137 (quoting Lane v. Franks, 573 U.S. at 231)(alterations in Tufaro, but not in Lane v. Franks).    The Garcetti/Pickering test provides this balancing's doctrinal contours as to First Amendment retaliation claims.    See Tufaro, 107 F.4th at 1137.    The test's five factors are:

1. whether the speech was made pursuant to an employee's official duties;

- 200 -

2. whether the speech was on a matter of public concern;

3. whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests;

4. whether the protected speech was a motivating factor in the adverse employment action; and

5. whether the defendant would have reached the same employment decision in the absence of the protected conduct.

Tufaro, 107 F.4th at 1138 (spacing and numbering in original). While the first three factors are usually legal questions, and the final two factors are usually fact questions, Roemer must establish all five factors to prevail on his claim. See Tufaro, 107 F.4th at 1138 ("And although we call these factors, they are also essential elements: '[t]o prevail, a plaintiff must establish all five elements.'")(quoting Knopf v. Williams, 884 F.3d 939, 945 (10th Cir. 2018)).

### B.    DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY ON ROEMER'S CLAIMS BASED ON ROEMER'S SPEECH IN THE SCHWEIGER ET AL. FINAL DECISION'S FINDINGS OF FACT.

The Schweiger et al. Final Decision includes nine findings of fact:

1.    Dr. Roemer is a professor at New Mexico State University in Las Cruces, New Mexico in the department of Fish, Wildlife and Conservation Ecology, hereinafter "FWCE".

2.    At all times relevant each of the Complainants were enrolled in the department of Fish, Wildlife and Conservation Ecology post graduate programs.

3.    As a professor in the Department of FWCE Respondent Roemer held a position of authority over each of the Complainants, either directly or indirectly.

4.    Dr. Roemer exercised that authority directly over the complainants who either served as teaching assistants or were specifically in his section of the department FWCE as graduate students.

5.    The general consensus of the Department was that Dr. Roemer was difficult

to work with and for, according to the Department Chair Dr. W. Gompper.

6.      Dr. Roemer admits he did comment on the appearance, smell and body parts, dating and relationship status of female students on more than one occasion.

7.      The comments from Dr. Roemer were unsolicited and unwelcome.

8.      Dr. Roemer's comment during the brown bag presentation of Ms. Schweiger was not directed towards the content of her presentation, but was unsolicited and unwelcome and is sexual harassment.

9.      Dr. Roemer's response to the allegations was he was not used to functioning in a time where comments made regarding women would be considered inappropriate.

Schweiger et al. Final Decision at 3-4.

### 1.      <u>Terminating Roemer Based On His Speech Identified In The Schweiger Et Al. Final Decision's Findings Of Fact Does Not Violate Roemer's Constitutional Rights, Because That Speech Was Made Pursuant To His Official Duties</u>.

Only two of these nine findings refer to Roemer's alleged statements.  Finding of fact six states that Roemer "admits he did comment on the appearance, smell, and body parts, dating and relationship status of female students on more than one occasion."  Schweiger et al. Final Decision at 4.  Finding of fact eight states that Roemer's "comment during the brown bag presentation of Ms. Schweiger was not directed towards the content of her presentation, but was unsolicited and unwelcome and is sexual harassment."  Schweiger et al. Final Decision at 4.  Both of these findings implicate speech that Roemer makes pursuant to his official duties.  The Tenth Circuit states that "'speech is made pursuant to official duties if it is generally consistent with the "type of activities [the employee] was paid to do."'"  <u>McNellis v. Douglas Cnty. Sch. Dist.</u>, 116 F.4th at 1133 (quoting <u>Brammer-Hoelter</u>, 492 F.3d at 1203)(alteration in <u>Brammer-Hoelter</u>).  "If an employee speaks pursuant to his official duties, then there is no Constitutional protection, because the

restriction on speech 'simply reflects the exercise of employer control over what the employer itself has commissioned or created.'" Brammer-Hoelter, 492 F.3d at 1202 (quoting Garcetti, 547 U.S. at 422).

Roemer is a professor by trade, and a professor's job is to interact with students, both inside and outside of the classroom. First, as to the statement in finding of fact six, when Roemer remarks out loud that he can tell that a student is in her office because he smells her lotion from down the hall, see Counts II-IV Response at 19, Roemer makes this remark pursuant to his professorial job responsibilities: interacting with students on campus. Similarly, when Roemer walks into McKibben's office and states, "[w]ell, you have really strong athletic legs," Pre-termination Tr. (Doc. 66-13) at 162:14-19 (Court adds brackets), he makes this remark as a professor speaking with a graduate student in her office on campus. Second, as to the statement in finding of fact eight, the result is no different. Attending a lunchtime presentation series is consistent with Roemer's role as a teacher-supervisor, in that he can monitor his students' academic progress reflected in their presentations, and with his role as professor-academic, in that he can provide substantive feedback on presenters' work. Accordingly, when Roemer tells a male graduate student to "ask her out already," Pre-termination Tr. (Doc. 66-13) at 160:3 -- referring to a female presenter -- Roemer's remark falls within his role as a student mentor and scholar. Because Roemer's statements that the Schweiger, et al. Final Decision's Findings of Fact references are made pursuant to his official duties, they lack Constitutional protection. See Brammer-Hoelter, 492 F.3d at 1202.[117]

_____

[117]Garcetti's "official duties" test does not apply to university faculty speech "related to scholarship or teaching." Garcetti, 547 U.S. at 425. See Porter v. Bd. of Trustees of N.C. State Univ., 72 F.4th 573, 582 (4th Cir. 2023)("Porter"). Here, while Roemer's speech "was in his capacity as an employee," Roemer was not "teaching a class nor discussing topics he may teach

- 203 -

C. **DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY ON ROEMER'S CLAIMS BASED ON ROEMER'S SPEECH IN THE <u>BUSKIRK FINAL DECISION'S FINDINGS OF FACT</u>.**

The Buskirk Final Decision's Findings of Fact state:

1.  Dr. Roemer is a professor at New Mexico State University in Las Cruces, New Mexico in the department of Fish, Wildlife and Conservation Ecology, hereinafter "FWCE".

2.  At all times relevant the Complainant was enrolled in the department of Fish, Wildlife and Conservation Ecology post graduate programs.

3.  As a professor in the Department of FWCE Respondent Roemer held a direct position of authority over the Complainant.

4.  Dr. Roemer exercised that authority directly over the complainant who served as a teaching assistant and was a graduate student in his section of the department FWCE.

5.  The general consensus of the Department was that Dr. Roemer was difficult to work with and for, according to the Department Chair Dr. W. Gompper.

6.  Dr. Roemer admits he did comment on the appearance, and relationship status of female students on more than one occasion.

7.  The comments from Dr. Roemer were unsolicited and unwelcome.

8.  Dr. Roemer's comments were unsolicited and unwelcome and constitute sexual harassment.

9.  Dr. Roemer's response to the allegations was he was not used to functioning in a time where comments made regarding women would be considered inappropriate.

10. Dr. Roemer did interfere with the Complainant Buskirk's ability to

---

or write about as part of his employment" when he made the remarks to which he admitted at the Hearing. <u>Porter</u>, 72 F.4th at 583. As the Honorable Amul Thapar, United States Circuit Judge for the United States Court of Appeals for the Sixth Circuit, frames it, "the academic-freedom exception to <u>Garcetti</u> covers all classroom speech related to matters of public concern, whether that speech is germane to the contents of the lecture or not." <u>Meriwether</u>, 992 F.3d at 507. Even though the setting of Roemer's "ask her out already" remark is an academic setting, the remark does not address the presentation's topic or any other matter of public concern. Accordingly, Roemer's speech in this setting does not fall within <u>Garcetti</u>'s scholarship-or-teaching exception.

complete the work on her graduate degree by insisting he remain a part of her research reporting. This could have been avoided with a third party intervenor to guarantee the fidelity of the results and the security of the data.

Buskirk Final Decision at 12-13.

1.     **Terminating Roemer Based On His Speech Identified In The Buskirk Final Decision's Findings Of Fact Does Not Violate Roemer's Constitutional Rights, Because That Speech Was Made Pursuant To His Official Duties.**

Two of these ten findings of fact describe Roemer's statements. First, finding of fact six states: "Roemer admits he did comment on the appearance, and relationship status of female students on more than one occasion." Buskirk Final Decision at 13. This finding corresponds to Roemer's admission that he commented on McKibben's legs in her office, which the Court addresses in the preceding section. Second, finding of fact ten states that "Roemer did interfere with the Complainant Buskirk's ability to complete the work on her graduate degree by insisting he remain a part of her research reporting. This could have been avoided with a third party intervenor to guarantee the fidelity of the results and the security of the data." Buskirk Final Decision at 13. This finding of fact implicates Roemer's email to Buskirk on September 26, 2020, in which Roemer expresses his unwillingness to allow Buskirk to publish a thesis using his data without his continued involvement in supervising her work. See supra, at 15.

As to finding of fact ten, Roemer's refusal to allow Buskirk to use his data is not expressive conduct that the First Amendment protects. Rumsfeld v. F. for Acad. & Institutional Rts., Inc., 547 U.S. 47, 66 (2006)("[W]e have extended First Amendment protection only to conduct that is inherently expressive."). Conduct is expressive when the speaker intends to convey a particularized message, and there is a high likelihood that the speaker's audience will understand that message. See Texas v. Johnson, 491 U.S. at 404 ("In deciding whether particular conduct

- 205 -

possesses sufficient communicative elements to bring the First Amendment into play, we have

asked whether '[a]n intent to convey a particularized message was present, and [whether] the

likelihood was great that the message would be understood by those who viewed it.'")(quoting

Spence v. Washington, 418 U.S. 405, 410-11 (1974))(brackets in Texas v. Johnson, but not in

Spence v. Washington).  The flip side of this coin is that "it has never been deemed an abridgment

of freedom of speech or press to make a course of conduct illegal merely because the conduct was

in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed."

Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 502 (1949).  When Roemer refuses to allow

Buskirk access to his data without his supervision, NMSU does not seek to discipline him based

on the words he uses to convey this decision.  Rather, the discipline's basis is the decision itself.

Roemer could have made this decision and implemented it in a way that does not involve the

written or spoken word.  For example, he could have added password protections to his data files

that would prevent Buskirk from accessing them.  Keeping Buskirk away from the data is an act

that does not convey a particularized message.  See Meyers v. E. Okla. Cnty. Tech. Ctr., 776 F.3d

1201, 1206-07 (10th Cir. 2015)(stating, as to a public employee's argument that retaliating against

her subordinate is protected speech, even when her boss tells her not to retaliate against the

subordinate: "[t]hat act of disobedience was not constitutionally protected, for it involved conduct

rather than speech").[118]

---

[118]In the alternative, even if Roemer's decision to deny Buskirk data access is expressive
conduct, the Defendants are still entitled to summary judgment.  If Roemer's decision and his
email conveying that decision is expressive conduct, it is expressive conduct that pertains to
Roemer's research methods and scholarship.  Accordingly, because Garcetti does not apply to a
public university professor's "core academic functions," the Court proceeds, out of an abundance
of caution, pursuant to the more speech-protective Pickering/Connick framework.  See
Meriwether, 992 F.3d at 505 ("Simply put, professors at public universities retain First
Amendment protections at least when engaged in core academic functions, such as teaching and

**D.    DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY ON ROEMER'S CLAIMS BASED ON ROEMER'S SPEECH IN THE SCHWEIGER ET AL. FINAL DECISION'S LIST OF ALLEGATIONS.**

Regarding the next two sections of analysis: In the interest of thoroughness, the Court applies the Garcetti/Pickering test to each of Roemer's statements in the two Final Decisions' lists of allegations.  The Schweiger et al. Final Decision's list of issues are: (i) that Roemer made "comments about the female body, attractiveness, appearance, boyfriends, and dating"; (ii) that Roemer made comments "interpreted as 'belittling,' 'demeaning,' including that female co-workers were 'charmed' by a male individual; [] referring to graduate and undergraduate students as 'Ladies' or 'cute,' and by stating that it was not part of his 'generation' to use preferred pronouns"; (iii) that Roemer's "graphic description of a sexual assault incident as contained in his email dated August 29, 2020, purposefully targeted and subjected female graduate students to

---

scholarship."). See id. at 507 ("Although Garcetti does not bar Meriwether's free-speech claim, that is not the end of the matter. We must now apply the longstanding Pickering-Connick framework to determine whether Meriwether has plausibly alleged that his in-class speech was protected by the First Amendment.")(citing Hardy v. Jeferson Cmty. Coll., 260 F.3d 671, 678 (6th Cir. 2001); Adams v. Trs. of the Univ. of N.C.-Wilmington, 640 F.3d 550, 563 (4th Cir. 2011); Demers v. Austin, 746 F.3d 402, 411 (9th Cir. 2014); and Buchanan v. Alexander, 919 F.3d 847, 852-53 (5th Cir. 2019)). Roemer fares no better, however, under Pickering/Connick. Pickering/Connick first asks whether the speech at issue relates to a matter of public concern; second, it queries whether the speaker's interest in articulating a viewpoint on the matter of public concern is greater than the State's interest in the efficiency of the public services it performs through the speaker. See Meriwether, 992 F.3d at 508 (quoting Connick v. Myers, 461 U.S. at 146; and Pickering v. Bd. of Educ., 391 U.S. at 568)(stating these two steps). "Speech addresses a public matter when it is 'fairly considered as relating to any matter of political, social, or other concern to the community.'" Sinfuego v. Curry Cnty. Bd. of Cnty. Comm'rs, 360 F. Supp. 3d 1177, 1246 (D.N.M. 2018)(Browning, J.)(quoting Connick v. Myers, 461 U.S. at 146). Roemer's statement that a graduate student may use his data only if he supervises his or her work amounts to a personal preference about the proper structuring of professor-student relationships. This preference is not a matter of public concern, because it is "'internal in scope and personal in nature.'" Brammer-Hoelter, 492 F.3d at 1206 (quoting Bunger v. Univ. of Okla., 95 F.3d 987, 992 (10th Cir.1996)). Accordingly, even if Roemer's decision to deny Buskirk data access is expressive conduct, it lacks First Amendment protection in this context.

discriminatory conduct based on sex/gender"; (iv) that Roemer's "emails dated August 28 & 29, 2020, purposefully targeted and subjected graduate students to discriminatory conduct based on race"; (v) that Roemer's remarks during a graduate student's lunch presentation were "inappropriate and sexually harassing." Schweiger et al. Final Decision at 2-3 (no citation for quoted material). The Court now applies Garcetti/Pickering to Roemer's statements in these allegations.

       1.      **Terminating Roemer Based On His Speech Identified In The Schweiger Et Al. Final Decision's List of Allegations Does Not Violate Roemer's Constitutional Rights, Because That Speech Was Made Pursuant To His Official Duties.**

The first allegation in the Schweiger et al. Final Decision is that Roemer made remarks about women's bodies, appearance, boyfriends, and relationship status. See Schweiger et al. Final Decision at 2. This allegation corresponds to the finding of fact about Roemer's conversation with McKibben concerning her legs, which the preceding sections analyze. The second allegation is that Roemer makes comments "interpreted as 'belittling,' 'demeaning,' including that female co-workers were 'charmed' by a male individual; by referring to graduate and undergraduate students as 'Ladies' or 'cute,' and by stating that it was not part of his 'generation' to use preferred pronouns." Schweiger et al. Final Decision at 2 (no citations for quoted material). Roemer does not contend that these alleged remarks occur during his classes or appear in his written scholarship; accordingly, Garcetti/Pickering applies. Interacting with co-workers and students is part and parcel of a professor's job. Roemer makes each of these remarks, therefore, in the course of his official duties. When Roemer interacts with co-workers and students in the university's halls outside of the classroom, the Constitution does not preclude NMSU from "freely regulat[ing]" his remarks that NMSU deems incompatible with its objectives as Roemer's employer. Brammer-

Hoelter, 492 F.3d at 1204 (Court adds brackets)("Consequently, statements regarding all of these and similar matters were made pursuant to Plaintiffs' official duties and could be freely regulated by the Academy.").

Only one aspect of this second allegation merits further discussion beyond the Court's analysis in the preceding sections, namely, Roemer's alleged statement that his generation is not accustomed to using personal pronouns.  At the hearing, Roemer's testimony about to whom he makes this statement is vague.  Roemer states that the first time that he encountered the notion of personal pronouns "was at a talk"; while Roemer "didn't really think that much about it after the conference," he "started seeing it on people's emails" and "asked people about it."  Pre-Termination Tr. (Doc. 66-13)  at 166:1-17.  When "people started explaining it" to Roemer, he "would say something, 'Well, my generation, we didn't even have preferred pronouns.'"  Pre-Termination Tr. (Doc. 66-13)  at 166:16-19.  Later in the hearing, Roemer returns to this topic and provides additional context, clarifying that these discussions occur between him and his students:

> And I would expect students to call me "Dr. Roemer" until they get to know me.  They don't even know me and they're on a first-name basis.  So they're talking about preferred pronouns, and I'm, like, "Well, why don't you refer to me as "Dr. Roemer" because, guess what?  You don't have a PhD, and you haven't been a professor for 20 years, and you haven't been a wildlife biologist for 35 years.

Pre-Termination Tr. (Doc. 66-13) at 210:21-211:4.  Record evidence shows that Roemer makes his statement about his generation's familiarity with pronouns while he is at a brewery with other professors and graduate students.  See Final Report at 24 (documenting Schweiger and McKibben's assertion that the pronoun conversation occurs at Bosque Brewery with Roemer); Pre-Termination Tr. (Doc. 66-13)  at 169:4-14 (describing Roemer's recollection of a conversation with Schweiger, McKibben, and other NMSU professors and graduate students at Bosque Brewery).

The pronoun conversation's location does not change the result of the official-duties analysis.  See McNellis v. Douglas Cnty. Sch. Dist., 116 F.4th at 1133 ("Our precedents 'have taken a broad view of the meaning of speech that is "pursuant" to an employee's "official duties."'")(quoting Thomas v. City of Blanchard, 548 F.3d 1317, 1324 (10th Cir. 2008))(no citation for internal quotation marks).  When Roemer goes out to drinks with his graduate students, the event's predicate is the professor/student relationship.  See Piggee v. Carl Sandburg Coll., 464 F.3d 667, 671 (7th Cir. 2006)("[T]he instructor/student relationship does not end the moment the instructional period is over.")(citing Doe v. Oberweis Dairy, 456 F.3d 704, 715-16 (7th Cir.2006))(Court adds brackets).  NMSU may not have "expressly required" Roemer to attend social events with his students, but when he does attend social events with his students, he attends these events as a NMSU employee, and not as a private citizen.  Brammer-Hoelter, 492 F.3d at 1203 ("An employee's official job description is not dispositive, however, because speech may be made pursuant to an employee's official duties even if it deals with activities that the employee is not expressly required to perform.").  To conclude otherwise would be to take a crabbed view of what it means to be a professor, and Tenth Circuit precedent advises otherwise: if "speech reasonably contributes to or facilitates the employee's performance of the official duty, the speech is made pursuant to the employee's official duties."  Brammer-Hoelter, 492 F.3d at 1203.  A professor is a scholar, an instructor, and a mentor.  When a professor interacts with his or her current graduate students, drawing lines based on geography -- off-campus socializing versus on-campus socializing -- misses the point.  The bottom line is that NMSU pays professors to speak with students.

This conclusion does not suggest that every time and anywhere Roemer interacts with an NMSU student or colleague he speaks pursuant to his official duties.  To the contrary, other fact

patterns may dictate a different result. For example, if Roemer hires a student to water his houseplants or runs into a student at the grocery store, the ensuing conversation would not be one in which Roemer speaks pursuant to his official duties. Here, when an event revolves around the professor-student relationship, however, and the individuals participating in the conversation are all affiliated with NMSU, Roemer speaks as an NMSU employee. Cf. Brammer-Hoelter, 492 F.3d at 1203 (reasoning that certain instances of the teacher-plaintiffs' speech is not pursuant to their official duties, because "the discussions included ordinary citizens and parents who were not employed by the Academy").

The next two allegations in the Schweiger et al. Final Decision contend that Roemer's "graphic description of a sexual assault incident as contained in his email dated August 29, 2020, purposefully targeted and subjected female graduate students to discriminatory conduct based on sex/gender" and race. Schweiger et al. Final Decision at 2-3. Roemer sends the Blake Email pursuant to his official duties, and it lacks First Amendment protection as a result. His email is similar to the public-school employee's email in McNellis, where the Tenth Circuit concludes that the employee is speaking pursuant to his official duties. See 116 F.4th at 1134. In McNellis, the employee is an assistant principal at a high school and also a parent at the school; he serves on an administrative team at the school, moreover, which meets "'once a week to discuss any issues that may arise with respect to extracurricular activities.'" 116 F.4th at 1127-28 (quoting the record). When the school theater director emails the employee and the other staff at the high school about her selection of a school play regarding the murder of Matthew Shepard in Laramie, Wyoming, the employee responds over email. See 116 F.4th at 1128. He asks: "'As a Dad of a student here and also as an employee in the school, what is my recourse if I disagree with the production?'", and, in a different email, states: "'As a [C]hristian I would love to collaborate with your project. Please let

me know if the love that Jesus can provide will help your play.'" 116 F.4th at 1128-29 (quoting the

record)(brackets in original). The school fires the employee, and the employee sues, but the Tenth

Circuit holds that the employee sends these emails in his professional capacity. See 116 F.4th at

1134. First, the Tenth Circuit notes that his emails fall within his duties as a member of the

administrative team that discusses issues regarding extracurricular activities. See 116 F.4th at 1133.

Second, the Tenth Circuit observes that the employee states in his email that he brings his queries

"'as an employee in the school.'" 116 F.4th at 1134 (quoting the record). Third, the Tenth Circuit

highlights the fact that the employee sends his emails to an "'internal email thread that only included

[the high-school's] staff'"; while the email's audience is not dispositive, states the Tenth Circuit,

"the staff-only nature of the email further suggests Mr. McNellis was speaking pursuant to his

official duties." 116 F.4th at 1134 (quoting the record)(Court adds brackets). Finally, the Tenth

Circuit rejects the employee's contention that his duties as part of the administrative team

addressing issues regarding extracurricular activities did not include determining school-play's

content: according to the Tenth Circuit, "'[a]n employee's official job description is not

dispositive,'" and the employee's emails "aligned" with his administrative-team duties. 116 F.4th

at 1136 (quoting Brammer-Hoelter, 492 F.3d at 1203).

    McNellis' reasoning weighs in favor of concluding Roemer's Faculty-Talk email is sent

pursuant to his official duties. First, as to the email's context, just as the McNellis employee sends

his email in response to a staff-wide email, Roemer sends the Blake Email in response to

Chancellor Arvizu's campus-wide email. See supra, at 9. In the Blake Email, Roemer quotes

Chancellor Arvizu's email at length before concluding: "I think it is incumbent upon academic

professionals to conduct research and seek the truth." Blake Email at 2. Roemer's critique

suggests that the Chancellor's email is the genesis of his discontent, just like the internal

announcement about the school play in <u>McNellis</u> leads to the employee's query: "[W]hat is my recourse if I disagree with the production." <u>McNellis</u>, 116 F.4th at 1128-29 (Court adds brackets). Second, as to the email's content, similar to the <u>McNellis</u> employee's statement in the email that he brings his concerns as an employee in the school, Roemer testifies at the Hearing that he sends the email "as a citizen of the campus." Pre-Termination Tr. (Doc. 66-13) at 159:1-6. Finally, as to the email's audience, just as the <u>McNellis</u> employee sends his emails to the high schools' staff, Roemer sends his email to an NMSU faculty email list and NMSU graduate students. <u>See</u> <u>supra</u>, at 9; <u>Tufaro</u>, 107 F.4th at 1139 (observing that, in an official-duties analysis, while "not every complaint was raised by email, all of Tufaro's email criticisms were sent from his official OU email account to other OU email accounts"). In both cases, public employees send internal emails responding to earlier public-employee emails. <u>See</u> <u>supra</u>, at 9; <u>McNellis</u>, 116 F.4th at 1128-29. These similarities lead to the conclusion that Roemer's email is sent pursuant to his official duties and lacks Constitutional protection.

The final allegation in the Schwieger et al. Final Decision that implicates Roemer's speech is that Roemer's remarks during a graduate student's lunch presentation were "inappropriate and sexually harassing." Schweiger et al. Final Decision at 3. This allegation refers to Roemer's remark to a male graduate student -- who, in Roemer's estimation, praises Schweiger's talk too effusively -- "ask her out already." Pre-Termination Tr. (Doc. 55-5) at 160:1-5. As the Court discusses earlier, NMSU pays Roemer to attend graduate-student presentations. Attending these presentations is part of what professors do. Roemer's speech to a graduate student at this presentation, unrelated to the talk's substance, is made pursuant to his official duties, and lacks Constitutional protection.

2.    <u>**Even If There is a Constitutional Violation, the Legal Scope of Roemer's Official Duties as a Public University Professor Was Not Established Clearly at the Time of the Alleged Misconduct**</u>.

Even if the Court's conclusion that Roemer's off-campus speech with graduate students is made pursuant to his official duties is incorrect, the Defendants sued in their individual capacities are entitled to qualified immunity, because Supreme Court and Tenth Circuit precedent does not establish clearly the contours of when a professor speaks pursuant to his or her official duties. "To overcome qualified immunity, the plaintiff must direct the Court to a specific Supreme Court or Tenth Circuit decision that clearly establishes the right at the time of the alleged misconduct." <u>Green v. Padilla</u>, 697 F.Supp 3d. at 1196 ("(citing <u>Mullenix v. Luna</u>, 577 U.S. at 11; and <u>Harlow v. Fitzgerald</u>, 457 U.S. at 818). Roemer does not point to a Supreme Court or Tenth Circuit case that he contends is factually similar to this case such it is established clearly that NMSU violates his Constitutional rights by disciplining him for the speech described above. The Court has determined, through its own research, that <u>Brammer-Hoelter</u> is a Tenth Circuit case that analyzes public-school teachers' First Amendment rights pursuant to <u>Garcetti</u>, but <u>Brammer-Hoelter</u>'s facts are not sufficiently similar to this case's facts to overcome qualified immunity. In <u>Brammer-Hoelter</u>, teachers at a public charter school "developed a number of concerns or grievances about the operation, management, and mission" of the school. <u>Brammer-Hoelter</u>, 492 F.3d at 1199. "They began to meet off-campus and after hours at restaurants, in each others' homes, and at least once at a church to discuss these concerns." <u>Brammer-Hoelter</u>, 492 F.3d at 1199. The school's principal orders the teachers to refrain from discussing school matters outside of work, but the teachers continue to meet off-campus to discuss their concerns. <u>See Brammer-Hoelter</u>, 492 F.3d at 1199. After hostilities between the teachers and the principal increase, the teachers resign, attempt to rescind their resignations, and ultimately file a lawsuit when the school refuses to rehire

them.  See Brammer-Hoelter, 492 F.3d at 1199.

Analyzing the teachers' First Amendment retaliation claim pursuant to Garcetti, the Tenth Circuit first concludes that the teachers' complaints about the school's "expectations regarding student behavior," "curriculum and pedagogy," and spending on classroom materials "were made pursuant to" the teachers' "official duties and could be freely regulated by" the school.  Brammer-Hoelter, 492 F.3d at 1204.  The Tenth Circuit also concludes, however, that some of the teachers' statements are not made pursuant to their official duties.  See Brammer-Hoelter, 492 F.3d at 1204-05.  Statements that fall into this category include "criticisms of the school board," the teachers' relationship with the principal and the principal's restrictions on their speech and association, "whether the Academy charter would be renewed," and upcoming school board elections.  Brammer-Hoelter, 492 F.3d at 1204-05.  In holding that these statements are not made pursuant to the teachers' official duties, the Tenth Circuit offers three justifications: (i) the teachers have "no supervisory responsibility and no duty to report with regard to any of the problems being discussed"; (ii) "discussions of these matters" occur "after hours and outside of the Academy"; and (iii) "the discussions included ordinary citizens and parents" whom the school does not employ.  Brammer-Hoelter, 492 F.3d at 1205.

Brammer-Hoelter's facts are not sufficiently similar to this case's facts to establish clearly that a public university professor does not speak pursuant to his official duties when he speaks with graduate students off-campus or on-campus.  First, Brammer-Hoelter is about teachers talking with other teachers, parents, and community members.  By contrast, this case is about a professor speaking with students.  If NMSU sought to discipline Roemer based on his remarks to another professor when they were out to dinner, this case would be different.  A professor's multi-faceted role on a university campus, especially with regards to a professor's relationship with graduate

students whom the professor supervises, merits necessarily a different official-duties analysis than the analysis in Brammer-Hoelter. See Brammer-Hoelter, 492 F.3d at 1204 ("Instead, we must take a practical view of all the facts and circumstances surrounding the speech and the employment relationship.")(citing Garcetti, 547 U.S. at 423). Second, the discussions in Brammer-Hoelter are akin to town halls or small gatherings involving individuals whom the school does not employ. Conversely, there is no outside element here; Roemer makes his alleged remarks in this case to NMSU students in his professorial capacity. See Chavez-Rodriguez v. City of Santa Fe, 596 F.3d 708, 714 (10th Cir. 2010)("While the personal relationship between the employee and her audience is a factor this court considers, the court must also be cognizant of the full context in which the speech occurs."). Because the official-duties analysis goes case-by-case and avoids bright-line rules, the differences between the speech at issue in Brammer-Hoelter and the speech at issue in this case mean that Roemer's First Amendment rights as a professor speaking outside of the classroom about topics unrelated to his scholarship are not clearly established in the Tenth Circuit. Accordingly, the Defendants sued in their individual capacities are entitled to qualified immunity.

Similarly, even if the Defendants fired Roemer because of the Blake Email, and even if firing him -- and sending him a disciplinary letter based on the email -- violates his Constitutional rights, the Defendants sued in their individual capacities are entitled to qualified immunity. Roemer does not point to a Tenth Circuit or Supreme Court case that he contends is factually similar to this case so as to establish clearly that his email to other NMSU employees and students is not sent pursuant to his official duties. See Green v. Padilla, 697 F.Supp 3d. at 1196 ("To overcome qualified immunity, the plaintiff must direct the Court to a specific Supreme Court or Tenth Circuit decision that clearly establishes the right at the time of the alleged misconduct.")(citing Mullenix v. Luna, 577 U.S. at 11; and Harlow v. Fitzgerald, 457 U.S. at 818).

At the time the discipline and firing occur, it was not established clearly in the Tenth Circuit that a university professor emailing a faculty and graduate students from his official email does so as a private citizen.  By the Court's count, there are thirty-eight published Tenth Circuit cases that cite Garcetti and pre-date September 8, 2021, which is when Ms. Castille informs Roemer that the hearing officer recommends terminating him.  None of these cases are sufficiently factually similar to this case so as to place the scope of Roemer's official duties "beyond debate," such that any reasonable NMSU official would know that disciplining him or firing him because of his email violates his clearly established rights.  Reichle v. Howards, 566 U.S. at 664 (quoting Ashcroft v. al-Kidd, 563 U.S. at 741).

Of the thirty-eight Tenth Circuit cases, the case with facts most similar to this case's facts is Bailey v. Independent School District No. 69 of Canadian County, Oklahoma, 896 F.3d 1176 (10th Cir. 2018)("Bailey").  Like this case, Bailey addresses whether a public-school employee's written communications are made pursuant to his official duties, but its facts are not sufficiently similar to this case's facts so as to illuminate the official-duties question in a way that would have put the Defendants on notice that disciplining Roemer because of the Blake Email violates his First Amendment rights.  In Bailey, an athletic director at a public school writes a letter to a judge in support of his nephew, who has been convicted of sex crimes and is awaiting sentencing.  See 896 F.3d at 1179.  The athletic director sends the letter on school letterhead that includes the school logo and his title.  See 896 F.3d at 1179.  In the letter, the athletic director describes his position at the school and relies on his professional experience to justify his observations about young people and their aptitude for rehabilitation.  See 896 F.3d at 1179.  After the athletic director writes a second letter to the court in support of his nephew on the same letterhead, the school district's superintendent decides to terminate the director "based on his use of school letterhead to request

- 217 -

leniency for a child pornographer." 896 F.3d at 1179.  The athletic director sues the superintendent and the school district, alleging "wrongful termination in retaliation for speech protected by the First Amendment."  896 F.3d at 1179.  Applying <u>Garcetti</u>'s first prong, the Tenth Circuit holds that the athletic director does not send the letter pursuant to his official duties.  <u>See</u> 896 F.3d at 1183.  Even though the letter includes the school district's name and logo, along with the athletic director's job title, the Tenth Circuit concludes that writing letters of support for personal purposes "was not a requirement of" the athletic director's job.  896 F.3d at 1183.

There are two factual differences between the athletic director's letter in <u>Bailey</u> and the Blake Email that prevent <u>Bailey</u>'s holding from applying with "obvious clarity" to "the specific conduct in question" here.  <u>United States v. Lanier</u>, 520 U.S. at 271.  First, the athletic director sends his letter to a judge and not to one of his colleagues at the school.  <u>See Bailey</u>, 896 F.3d at 1179.  By comparison, Roemer sends his email to NMSU faculty and graduate students, as opposed to sending it to a local newspaper or writing a social media post.  <u>See supra</u>, at 9.  Second, the <u>Bailey</u> letter has nothing to do with school affairs.  It conveys the athletic director's support of his incarcerated family member.  On the other hand, Roemer's email is all about university affairs. <u>See supra</u>, at 9.  Its purpose is to critique Arvizu's earlier email about the same subject -- not just to spontaneously share Roemer's own opinions.  In sum, the <u>Bailey</u> employee sends his letter to an external audience about a personal topic.  <u>See Bailey</u>, 896 F.3d at 1179.  <u>Bailey</u>'s facts are not sufficiently similar to this case's facts to put a reasonable official on notice that the First Amendment protects a university professor's email to other professors and students criticizing a university official's earlier email.

As to Supreme Court precedent, <u>Garcetti</u>'s facts are not sufficiently similar to this case's facts to establish clearly that Roemer does not send his email pursuant to his official duties.  In

Garcetti, a district attorney alleges his employer retaliates against him after he writes a memorandum criticizing an affidavit that a sheriff submitted to obtain a search warrant. See 547 U.S. at 413-14. The Supreme Court concludes that because the district attorney "did not act as a citizen when he went about conducting his daily professional activities, such as supervising attorneys, investigating charges, and preparing filings," his memorandum lacks First Amendment protection. See 547 U.S. at 422. The district attorney's job duties in Garcetti are not sufficiently similar to a university professor's job duties so as to establish clearly that Roemer's email is not sent pursuant to his official duties. To the contrary, the district attorney's internal memo responding to a word-related document -- a probable cause affidavit -- is analogous to Roemer's internal email responding to the Chancellor's earlier email. Accordingly, Garcetti does not put a reasonable university official on notice that Roemer sends the Blake Email as a private citizen and not "as a citizen of the campus." Pre-Termination Tr. (Doc. 55-5) at 159:3-4.

### E. DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY ON ROEMER'S CLAIMS BASED ON ROEMER'S SPEECH IN THE BUSKIRK FINAL DECISION'S LIST OF ALLEGATIONS.

The Buskirk Final Decision's list of issues are: (i) that Roemer touched, hugged, placed his arm around, and kissed Buskirk while telling her that he loved her; (ii) that Roemer asked Buskirk if she had a boyfriend and told her that she was "'hired to work, so she better not get a boyfriend and get distracted from her job'"; (iii) that Roemer made comments relating to Buskirk's appearance and gender "and in his manner of communications with Buskirk"; (iv) that Roemer made remarks "interpreted as 'belittling,' 'demeaning,' including that female co-workers were 'charmed' by a male individual; [] referring to graduate and undergraduate students as 'Ladies' or 'cute,' and by stating that it was not part of his 'generation' to use preferred pronouns"; and (v) that Roemer retaliated against Buskirk once he learned she filed an OIE complaint against him.

Buskirk Final Decision at 11-12 (no citation for quoted material).

      1.      **Terminating Roemer Based On His Speech Identified In The Buskirk Final Decision's List of Allegations Does Not Violate Roemer's Constitutional Rights, Because That Speech Was Made Pursuant To His Official Duties.**

Roemer's speech that Buskirk Final Decision's allegations describe is also made pursuant to his official duties. First, the Buskirk Final Decision alleges that Roemer tells Buskirk that he loves her. See Buskirk Final Decision at 11. Second, the Buskirk Final Decision alleges that Roemer tells Buskirk that he hires her to work, so she should not get a boyfriend that might distract her from her job. See id. The third allegation similarly accuses Roemer of making comments about Buskirk's appearance and gender. See id. These three remarks get the same analysis. As the Court has stated, a professor's remark that is unrelated to a substantive academic topic made to a student outside the classroom is made pursuant to the professor's official duties. See supra, at 210. The fourth allegation is the same as the Schweiger et al. Final Decision's second allegation, which the Court has already analyzed. See supra, at 207-08. The fifth allegation corresponds to the Buskirk Final Decision's tenth finding of fact, which the Court already has analyzed. See supra, at 205. Accordingly, the Defendants are entitled to summary judgment as to Roemer's claim that they violate his First Amendment rights by firing because of his speech, as detailed in the two Final Decisions' allegations.

      2.      **Even If There is a Constitutional Violation, the Legal Scope of Roemer's Official Duties as a Public University Professor Was Not Established Clearly at the Time of the Alleged Misconduct.**

Even if there is a Constitutional violation, the legal scope of Roemer's official duties as a public university professor was not established clearly at the time of the alleged misconduct. The Court addresses this prong of the qualified immunity defense in the preceding sections. See supra,

at 213.  Accordingly, Arvizu, Ms. Castille, Conner, DeLovato, Flores, and Gompper are entitled to qualified immunity as to Count IV's allegation, pursuant to § 1983, that these Defendants violated Roemer's First Amendment rights.

**IT IS ORDERED** that: the Plaintiff's Motion for Partial Judgment on the Pleadings, filed February 14, 2023 (Doc. 42), is denied; (ii) the Defendants' Motion for Judgment on the Pleadings or for Summary Judgment Based on Qualified Immunity on Count I of Plaintiff's Complaint and Memorandum in Support, filed April 21, 2023 (Doc. 55), is granted; (iii) the Defendants' Motion for Summary Judgment Based on Qualified Immunity on Courts II-IV of Plaintiff's Complaint and Memorandum in Support, filed April 21, 2023 (Doc. 56), is granted; (iv) the Regents Board, Arvizu, Ms. Castille, and DeLovato are entitled to summary judgment -- and, as to Arvizu, Ms. Castille, and DeLovato, qualified immunity -- as to Count I's allegations that Regents Board, Arvizu, Ms. Castille, and DeLovato deprive Roemer of his Constitutional right to Due Process; (v) Arvizu and the Regents Board are entitled to summary judgment -- and Arvizu is entitled to qualified immunity -- as to Count II's allegation that they administered a NMSU policy -- ARP 3.25 -- that is facially overbroad in violation of the First Amendment; (vi) the Regents Board and Arvizu are entitled to summary judgment – and Arvizu is entitled to qualified immunity -- as to Count III's allegations that they administered another NMSU policy -- ARP 3.80 -- that is facially overbroad and facially vague in violation of the First Amendment; and (vii) the Regents Board, Arvizu, Ms. Castille, Conner, DeLovato, Flores, and Gompper are entitled to summary judgment -- and, as to the each Defendant besides the Regents Board, qualified immunity -- as to Count IV's allegation that the Defendants violate Roemer's First Amendment rights by disciplining and terminating him pursuant to ARP 3.25 and 3.80; and (viii) the Plaintiff's request for additional discovery pursuant to rule 56(d) of the Federal Rules of Civil Procedure is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Samantha Harris
Allen Harris PLLC
Narbeth, Pennsylvania

-- and --

Michael Thad Allen
Allen Harris PLLC
Quaker Hill, Connecticut

-- and --

Nicholas Thomas Hart
Harrison & Hart, LLC
Albuquerque, New Mexico

     *Attorneys for the Plaintiff*

Cody R. Rogers
Serpe Andrews, PLLC
Las Cruces, New Mexico

     *Attorneys for Defendant Board of Regents of New Mexico State University, Dan Arvizu,*
       *Donald Conner, Annamarie DeLovato, Rolando Flores, and Matthew Gompper*

Michelle Lalley Blake
Allen Law Firm, LLC
Albuquerque, New Mexico

     *Attorneys for Defendant Laura Castille*